PAE AO 241
(Rev. 05/2018)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

| United States District Court | District: Eastern District of Pennsylvania |
|---|---|
| **Name (under which you were convicted):** James Kelly | **Docket or Case No.:** CP-51-CR-1011621-1995 |
| **Place of Confinement:** SCI Somerset | **Prisoner No.:** DB-5777 |
| **Petitioner** (Include the name under which you were convicted): James Kelly | **Respondent** (Name of Warden, Superintendent, Jailor, or authorized person having custody of petitioner): Eric Tice, SCI Somerset Superintendent |

**v.**

and

The District Attorney of the County of: Philadelphia

and

The Attorney General of the State of: Pennsylvania

### PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:
   Court of Common Pleas, Philadelphia County, Pennsylvania

   (b) Criminal docket or case number (if you know): CP-51-CR-1011621-1995

2. (a) Date of judgment of conviction (if you know): August 20, 1996

   (b) Date of sentencing: August 21, 1996

3. Length of sentence: Life in Prison without the Possibility of Parole

4. In this case, were you convicted on more than one count or of more than one crime?  ☑ Yes   ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case:
   First Degree Murder (18 Pa.C.S. § 2502) and Criminal Conspiracy (18 Pa. C.S. § 903).

PAE AO 241
(Rev. 05/2018)

Page 5

6.     (a)  What was your plea?  (Check one)

☑ (1)    Not Guilty          ☐ (3)    Nolo contendere (no contest)

☐ (2)    Guilty              ☐ (4)    Insanity plea

(b)  If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? __N/A__

(c)  If you went to trial, what kind of trial did you have? (Check one)

☑ Jury          ☐ Judge only

7.     Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☑ Yes          ☐ No

8.     Did you appeal from the judgment of conviction?

☑ Yes          ☐ No

9.     If you did appeal, answer the following:

(a)  Name of court: Superior Court of Pennsylvania

(b)  Docket or case number (if you know): No. 01799 PHL 98

(c)  Result: Affirmed in part. Remanded for an evidentiary hearing on IAC claims.

(d)  Date of result (if you know): July 9, 1999 and August 24, 2000

(e)  Citation to the case (if you know): Com. v. Kelly, 742 A.2d 1146 (Pa. Super. Ct. 1999); Com. v. Kelly, 764 A.2d 1124 (Pa.Super.Ct. 2000).

(f)  Grounds raised:
     1). Inconsistent verdict;
     2). Sufficiency of the evidence;
     3). Verdict against the weight of the evidence;
     4). IAC - Failure to call several alibi witnesses, failure to object to court's jury instruction
     re: inconsistent statements, and failure to present an opening statement.

(g)  Did you seek further review by a higher state court?

☑ Yes          ☐ No

PAE AO 241
(Rev. 05/2018)

If yes, answer the following:

(1) Name of court: Supreme Court of Pennsylvania

(2) Docket or case number (if you know): No. 579 E.D.ALLOC. (2000)

(3) Result: Allocatur denied

(4) Date of result (if you know): February 9, 2001

(5) Citation to the case (if you know): Com. v. Kelly, 781 A.2d 141 (2001).

(6) Grounds raised: 1) Did the Superior Court err in approving Trial counsel's failure to secure

and present a witness where the Trial court never determined the truthfulness of trial counsel

2) Does this court require the Superior Court to review claims raised by new counsel

3) If Trial counsel fails to find and interview witnesses is a defendant bound by his answer to a colloquy with trial court

(h) Did you file a petition for certiorari in the United States Supreme Court?

&#9744; Yes    &#9745; No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

(i) Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

&#9745; Yes    &#9744; No

10. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: Court of Common Pleas, Philadelphia, PA

(2) Docket or case number (if you know): CP-51-CR-1011621-1995

(3) Date of filing (if you know): 07/1997

(4) Nature of the proceeding: PCRA

(5) Grounds raised: Requested that his right to appeal be reinstated.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☑ Yes    ☐ No

(7) Result: An evidentiary hearing was granted.

(8) Date of result (if you know): January 8, 1998

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: Court of Common Pleas, Philadelphia, PA

(2) Docket or case number (if you know): CP-51-CR-1011621-1995

(3) Date of filing (if you know): 09/26/2001

(4) Nature of the proceeding: PCRA

(5) Grounds raised: _____

1) Ineffective assistance of counsel

2) the Commonwealth suppressed exculpatory evidence related to the

possible participation of a suspect he identified as "Boochie."

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes    ☑ No

(7) Result: PCRA denied without and evidentiary hearing

(8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: Superior Court of Pennsylvania

(2) Docket or case number (if you know): 755 EDA 2003

(3) Date of filing (if you know): February 25, 2004

(4) Nature of the proceeding: Appeal from dismissal of PCRA Petition

(5) Grounds raised: _____

1. IAC claims

1. Brady claim related to potential alternative suspect known as "Boochie".

_____

_____

PAE AO 241
(Rev. 05/2018

Page 8

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes    ☑ No

(7) Result: Affirmed- Judge Ford Elliot dissenting

(8) Date of result (if you know): December 18, 2006

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion:

(1) First petition:     ☑ Yes         ☐ No

(2) Second petition:    ☑ Yes         ☐ No

(3) Third petition:     ☑ Yes         ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

11.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**CAUTION:** To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:**
The Commonwealth Suppressed Material and Exculpatory Evidence in Violation of James Kelly's Due Process Rights.

_____

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

At the time of James Kelly's 1996 trial, the Commonwealth had in its possession

documents and information undermining the credibility of both key Commonwealth

identification witnesses, as well as critical information linking a viable alternative suspect to the crime.

This information was not disclosed to Mr. Kelly before trial.

_____

_____

PAE AO 241
(Rev. 05/2018)

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

A state petition for post-conviction relief raising substantially similar claims is currently

pending at docket # CP-51-CR-1011621-1995. Mr. Kelly requests that the instant

petition be held in abeyance pending the exhaustion of his state court claims.

**(c) Direct Appeal of Ground One:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        [ ] Yes    [ ] No

    (2) If you did not raise this issue in your direct appeal, explain why? _____

_____

_____

**(d) Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a
state trial court?

        [✓] Yes    [ ] No

    (2) If your answer to Question (d)(1) is "Yes," state:

        Type of motion or petition: Post-Conviction Relief Act Petition

        Name and location of the court where the motion or petition was filed: _____

        Philadelphia County Court of Common Pleas

        Docket or case number (if you know): CP-51-CR-1011621-1995

        Date of the court's decision: Pending

        Result (attach a copy of the court's opinion or order, if available): _____

        _____

    (3) Did you receive a hearing on your motion or petition?    [ ] Yes    [ ] No

    (4) Did you appeal from the denial of your motion or petition?    [ ] Yes    [ ] No

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

        [ ] Yes    [ ] No

    (6) If your answer to Question (d)(4) is "Yes," state:

        Name and location of the court where the appeal was filed: _____

        _____

        Docket or case number (if you know): _____

        Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this
issue: _____

_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,
etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

**GROUND TWO:** Mr. Kelly is Entitled to Relief Because the Cumulative Effect of the Constitutional Violations
Rendered His Trial Fundamentally Unfair In Violation of His Due Process Rights

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
At the time of Mr. Kelly's 1996 trial, the Commonwealth was in possession of material

and exculpatory information undermining the credibility of its key witnesses and

inculpating a viable alternative perpetrator. The Suppression of this information denied

Mr. Kelly the opportunity to conduct an informed pre-trial investigation and properly

confront his accusers.

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____
A state court post-conviction relief act petition is currently pending at docket #

CP-51-CR-1011621-1995.

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

☐ Yes  ☑ No

(2) If you did not raise this issue in your direct appeal, explain why? _____

The information supporting this claim was disclosed to Mr. Kelly for the first time

on August 30, 2021 and March 15, 2022, respectively.

**(d) Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes          ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Post-Conviction Relief Act Petition _____

Name and location of the court where the motion or petition was filed: Court of Common _____

Pleas, Philadelphia County, Pennysīvania _____

Docket or case number (if you know): CP-51-CR-1011621-1995 _____

Date of the court's decision: Pending _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?          ☐ Yes          ☐ No

(4) Did you appeal from the denial of your motion or petition?          ☐ Yes          ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☐ Yes          ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

_____

_____

_____

PAE AO 241
(Rev. 07/10)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____

_____

_____

_____

**GROUND THREE:** Mr. Kelly is Actually Innocent of the Offense. His Conviction and

Sentence Represent a Fundamental Miscarriage of Justice.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Mr. Kelly has been incarcerated for the last 27 years. He had always maintained his

innocence. The information forming the basis of this petition was suppressed by the

Commonwealth. The newly discovered facts disclosed by the Commonwealth on August

30, 2021 and March 15, 2022 undermine the only evidence connecting Mr. Kelly

to the offense and provide critical information inculpating a viable alternative perpetrator.

_____

_____

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

A state court post-conviction petition is currently pending at docket #

CP-51-CR-1011621-1995.

_____

_____

**(c) Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

    ☐ Yes    ☑ No

(2) If you did not raise this issue in your direct appeal, explain why? _____

_____

_____

**(d) Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

    ☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: Post- Conviction Relief Act Petition _____

Page 13

Name and location of the court where the motion or petition was filed: _____

Court of Common Pleas, Philadelphia County, Pennsylvania

Docket or case number (if you know): CP-51-CR-1011621-1995

Date of the court's decision: Pending

Result (attach a copy of the court's opinion or order, if available): _____

(3) Did you receive a hearing on your motion or petition?                     ☐ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?                ☐ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
    ☐ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____

**GROUND FOUR:** _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

_____

**(c) Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        [ ] Yes    [ ] No

    (2) If you did not raise this issue in your direct appeal, explain why? _____

        _____

        _____

**(d) Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        [ ] Yes    [ ] No

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    (3) Did you receive a hearing on your motion or petition?    [ ] Yes    [ ] No

    (4) Did you appeal from the denial of your motion or petition?    [ ] Yes    [ ] No

PAE AO 241
(Rev. 07/10)

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____
_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: _____

_____
_____
_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

_____
_____
_____
_____
_____

12.    Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?

☐ Yes    ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

presenting them: _____

_____
_____
_____

PAE AO 241
(Rev. 07/10)

Page 16

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so,

which ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

13. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?

    ☑ Yes        ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. On April 21, 2008 to the United States District Court

for the Eastern District of Pennsylvania James Kelly filed a Pro se petition for a Writ of Habeas Corpus, case no. 2:08-CV-01073.

Mr. Kelly raised numerous claims of ineffective assistance of counsel, insufficiency of the evidence, violations of Brady v.

Maryland, and judicial misconduct. Additionally, on April 5, 2016 Mr. Kelly filed a Motion with the Third Circuit Court of Appeals

seeking permission to file a successive habeas petition. His motion was denied on April 19, 2016.

(See attached explanation of complete procedural history)

14. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?

    ☑ Yes        ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised: _____

A state post-conviction relief act petition, substantially mirroring the above claims, is currently pending at docket #

CP-51-CR-1011621-1995. Mr. Kelly requests that the instant petition be held in abeyance pending the exhaustion of his state court

claims.

15. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Andrew Gay 1731 Spring Garden St. Philadelphia, PA 19130

_____

(b) At arraignment and plea: N/A _____

_____

(c) At trial: Geoffrey Seay 834 Chestnut St. Suite 206 Philadelphia, PA 19107

(d) At sentencing: Geoffrey Seay 834 Chestnut St. Suite 206 Philadelphia, PA 19107

(e) On appeal: Randolph Goldman 1420 Walnut St. Suite 1400 Philadelphia, PA 19102

(f) In any post-conviction proceeding: Jules Epstein 718 Arch Street Suite 501
Philadelphia, PA 19106

(g) On appeal from any ruling against you in a post-conviction proceeding: _____
Lawrence Wood 26 West Miner St. West Chester, PA 19382

16. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?

☐ Yes   ☑ No

(a) If so, give the name and location of the court that imposed the other sentence you will serve in the future: _____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?

☐ Yes   ☑ No

17. **TIMELINESS OF PETITION:** If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition*
Mr. Kelly satisfies the standard required by 28 U.S.C. (s) 2244(2)(B)(i) as the facts upon which his petition is predicated
could not have been discovered previously through the exercise of due diligence.

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court. The limitation period shall run from the latest of -

    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

    (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: _____

1. hold these proceedings in abeyance pending the resolution of state court proceedings; 2. Upon

reactivation of these proceedings, that the Court require the Commonwealth to respond to the petitioner;

3. Permit evidentiary development and discovery; and 4. Grant Habeas Corpus relief.

or any other relief to which petitioner may be entitled.

_____
*Signature of Attorney (if any)*

PAE AO 241
(Rev. 07/10)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____.

*(month, date, year)*

Executed (signed) on_____(date).

_____

*Signature of Petitioner*

If the person signing is not the petitioner, state the relationship to petitioner and explain why petitioner is not signing this petition. _____ See attorney signature_____

_____

_____

_____

_____

## James Kelly Procedural History

1.     Petition: July 1997- Post Conviction Relief Act Petition
Ground: Requesting that appellate rights be reinstated due to trial counsel's failure to file Post-Sentence Motions or a Notice of Appeal.
Evidentiary Hearing: January 8, 1998
Disposition: Appellate Rights Reinstated

2.     Petition: June 5, 1998 – Direct Appeal to the Superior Court of Pennsylvania
Grounds Raised: Sufficiency of the Evidence, Ineffective Assistance of Counsel
Case Citation: *Commonwealth v. Kelly*, 742 A.2d 1146 (Pa. Super. 1999) (unpublished memorandum).
Disposition: July 9, 1999 - Affirmed conviction but remanded for an evidentiary hearing on IAC claims.
Evidentiary Hearing: December 8, 1999
Disposition: December 8, 1999- IAC claims dismissed.
Case Citation: *Commonwealth v. Kelly*, 764 A.2d 1124 (Pa. Super. 2000) (unpublished memorandum)
Disposition: Superior Court affirmed- August 24, 2000
Petition: Petition for Allowance of Appeal  - Pennsylvania Supreme Court – September 21, 2000
Disposition: Allocatur Denied- February 9, 2001
Case Citation: *Commonwealth v. Kelly*, 781 A.2d 141 (Pa. 2001) (unpublished memorandum).

3.     Petition: September 26, 2001- Post Conviction Relief Act Petition
Case Citation: *Commonwealth v. Kelly*, 918 A.2d 787 (Pa. Super. 2006) (unpublished memorandum)
Grounds Raised: Ineffective Assistance of Counsel and Brady Claims
Disposition: PCRA Denied without an evidentiary hearing

4.     Petition: February 25, 2004 Appeal from the dismissal of PCRA Petition
Disposition: Affirmed- December 18, 2006 – Judge Elliot Ford dissenting

5.     Petition: April 20, 2007- Petition for Allowance of Appeal to Pennsylvania Supreme Court
Disposition: Allocatur denied on October 26, 2007

6.     Petition: April 21, 2008 Petition for Writ of Habeas Corpus with Eastern District Court of Pennsylvania
Case Citation: *Kelly v. Rozum*, No. 2:08-CV-01073, 2009 WL 3245565, at *8 (E.D. Pa. Oct. 6, 2009)

Grounds Raised: IAC claims, insufficiency of the evidence, Brady Claims, and judicial misconduct.

Disposition: February 18, 2009 – Magistrate Judge Rice Issued Report and Recommendation that the petition be dismissed.

- October 6, 2009- R&R adopted by District Court Judge Pratter
- Certificate of Appealability- Denied February 17, 2010 (*See Kelly v. Rozum*, No. 09-4290 (3d Cir. Feb. 17, 2010).

7.   Petition: November 15, 2012 Petition for Post Conviction Relief
     Grounds Raised: After discovered evidence and IAC claims
     Case Citation: *Commonwealth v. Kelly*, 108 A.3d 110 (Pa. Super. 2014).
     Disposition: February 21, 2014 – Petition dismissed without an evidentiary hearing
     - Superior Court of Pennsylvania- Affirmed October 10, 2014
     - Allocatur denied – April 24, 2015
     - Case Citation: *Commonwealth v. Kelly*, 565 EAL 2014 (Pa. 2014) (unpublished memorandum).

8.   Petition: April 5, 2016- Motion for Permission to File a Successive Habeas Petition
     Disposition: Motion denied April 19, 2016
     Case Citation: *In re: James Kelly*, No. 16-1791 (3d Cir.).

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

JAMES KELLY,

               Petitioner,

        v.

Eric Tice, Superintendent, State
Correctional Institution at Somerset; Josh
Shapiro, Attorney General, Office of
Attorney General; Lawrence Krasner,
District Attorney, Philadelphia County,
Pennsylvania

               Respondents.

Docket No. _____

Honorable _____
United States District Judge

## SECOND PETITION FOR RELIEF PURSUANT TO 28 U.S.C. § 2254 AND CONSOLIDATED INITIAL MEMORANDUM OF LAW

Nilam A. Sanghvi, Esq.
Attorney I.D. No. 209989
Ryan Becker, Esq.
Attorney I.D. No. 331376
PENNSYLVANIA INNOCENCE PROJECT
Temple University Beasley School of Law
1515 Market Street, Suite 300
Philadelphia, PA 19102
215-204-4255

Elizabeth A. DeLosa, Esq.
Attorney I.D. No. 309521
PENNSYLVANIA INNOCENCE PROJECT
Duquesne University School of Law
Tribone Building
914 Fifth Avenue
Pittsburgh, PA 15219
412-482-2069

*Counsel for James Kelly*

Petitioner, JAMES KELLY, through undersigned counsel, petitions for habeas corpus relief pursuant to 28 U.S.C. § 2241 *et seq.* and the Constitution of the United States.

This petition is being submitted in connection with a motion filed in the United States Court of Appeals for the Third Circuit seeking authorization to file a successor habeas corpus petition, pursuant to 28 U.S.C. § 2244. Accordingly, this petition assumes that such permission has been granted.

## INTRODUCTION

James Kelly has been incarcerated for the last 27 years for a homicide he did not commit. Kelly, a thirty-six-year-old former Marine who worked for the City of Philadelphia at the time of the crime, adamantly maintains that he had nothing to do with the January 1, 1993 murder of Travis "Bud" Hughston.

At trial, the Commonwealth argued that Hughston was killed because of a drug territory dispute. Unable to link Kelly to any previous history of drug dealing or any connection to an active drug territory dispute in the area, the Commonwealth's case rested entirely upon the identification testimony of two witnesses, Ernestine Williams and Colie Baxter, both of whom had significant credibility issues and one of whom (Baxter) identified Kelly as involved in the crime for the first time at trial, three years after the incident.

On August 30, 2021 and March 15, 2022, respectively, the Philadelphia County District Attorney's Office ("DAO") gave counsel access to the Philadelphia Police Department's homicide investigation files (the "H Files") for the Travis Hughston[1] and Stacy Williams murders. Both files contained critical exculpatory information previously undisclosed to Kelly or any of his attorneys during the last 27 years.

After a careful review of both H Files, a theme emerged—Thomas Lockwood, a 19-year-old young man at the time of the crime, who had a reputation in the community as a mid-level drug dealer with a strong propensity for violence, was an obvious alternative suspect deserving of police attention. Unfortunately, Lockwood went completely uninvestigated for his potential role in the Hughston homicide. Instead, based solely on Ernestine Williams' ever-changing story, the

---

[1] The DAO located only a small portion of the Hughston H File but provided the full Williams H File.

2

Commonwealth proceeded to trial against Kelly.

Today, however, with the recent disclosure of the Williams and Hughston H Files, it is clear that at the time of Kelly's 1995 arrest and subsequent 1996 trial, the Commonwealth was aware and in possession of documentation supporting four critical and previously suppressed facts:

> a. Key witness, Colie Baxter made a pre-trial identification of Thomas Lockwood, not James Kelly, as the driver of the getaway vehicle he saw fleeing the Hughston homicide scene;
>
> b. Thomas Lockwood was known to own and drive at least four white or light-colored vehicles matching the description of the getaway car given by several witnesses on the night of Hughston's murder;
>
> c. At the time of the Hughston and Williams homicides, Ernestine Williams lived in a home owned by Thomas Lockwood; and
>
> d. In 1995, Thomas Lockwood was charged and convicted of the Williams homicide (which occurred in September 1993), a crime that shared several factual similarities with the Hughston homicide and that occurred just four blocks away from the scene of Hughston's homicide.

Had any of the above facts been disclosed to Kelly or his defense counsel before trial, as required by *Brady v. Maryland* and its progeny, they would likely have changed defense counsel's pre-trial investigation, cross examination strategy, and ultimately the outcome of Kelly's trial. Moreover, had this critical evidence been disclosed, defense counsel would have had the opportunity to locate and interview witnesses to the Stacy Williams homicide. These interviews may have yielded new information further linking Thomas Lockwood to the offense.

Specifically, had this critical evidence been disclosed, defense counsel would have been alerted to the existence of Steven Anderson, a close friend of Stacy Williams who was well acquainted with Thomas Lockwood, his associates, and the violent drug territory disputes that were occurring in the neighborhood at that time. Anderson recalls Lockwood being connected with light-colored vehicles and working with two drug dealers in the neighborhood who may have been involved in Hughston's homicide. Kelly did not have the opportunity to seek this information from

3

Anderson before his trial because his existence was not disclosed.

The Commonwealth's failure to disclose this critical evidence robbed Kelly of his ability to properly conduct a comprehensive pre-trial investigation as well as to fully confront his accusers. Moreover, the Commonwealth's suppression of this information prevented the jury from performing its critical task of making a full and fair credibility assessment of the witnesses presented before it. Simply put, the suppression of this critical evidence resulted in a trial in which no reliable adjudication of guilt or innocence could have taken place.

As explained in this petition, the suppression of this information rendered Kelly's trial fundamentally unfair, in violation of his due process rights. If a jury had learned about the connection of Thomas Lockwood not only to the illicit sale of drugs in this very community but also to both of the Commonwealth's key witnesses, it would more likely than not have reached a different result—*i.e.*, have a reasonable doubt as to Kelly's guilt.

Lastly, Kelly is also entitled to relief on the independent ground that the new evidence he presents establishes his actual innocence.

## RELATED PENDING LITIGATION

In addition to moving in the United States Court of Appeals for the Third Circuit for leave to file this successor *habeas corpus* petition, Kelly filed a petition under the Pennsylvania Post Conviction Relief Act ("PCRA") on August 29, 2022 in the Philadelphia County Court of Common Pleas. That matter is docketed at *Commonwealth v. James Kelly*, CP-51-CR-1011621- 1995, and the PCRA petition is attached here as Exhibit 1. The allegations contained in the PCRA petition largely mirror those contained herein. In the interest of comity and judicial economy, Kelly therefore requests that the Court hold this habeas petition in abeyance pending the resolution of the state court litigation.

4

## ELIGIBILITY AND BASES FOR RELIEF

Kelly sets forth in this petition claims based on due process violations under the fourteenth amendment to the United States Constitution and on his actual innocence.

## RELEVANT PROCEDURAL HISTORY

### A.    Pre-Trial

1.    Andrew Gay represented Kelly at his preliminary hearing. During the pre-trial and trial phases, Geoffrey Seay represented Kelly.

2.    Kelly's jury trial in the Court of Common Pleas of Philadelphia County before the Honorable James A. Lineberger commenced on August 9, 1996.[2]

3.    After nearly two days of deliberations, on August 20, 1996, Kelly was convicted of first-degree murder and conspiracy. On August 21, 1996, he was sentenced to life imprisonment without the possibility of parole.

### B.    Post-Trial Motions and Appeals

4.    After Kelly's conviction, trial counsel failed to file post-sentence motions or a notice of appeal. In July 1997, through new counsel Randolph Goldman, Kelly filed a PCRA petition requesting that his right to appeal be reinstated, which was granted after a January 8, 1998 evidentiary hearing. Kelly filed post-sentence motions that were denied by the operation of law.

5.    On June 5, 1998, Kelly filed a direct appeal, raising several challenges to the sufficiency of the evidence and alleging that trial counsel was ineffective for failing to call numerous alibi witnesses who were available to testify. *Commonwealth v. Kelly*, 742 A.2d 1146 (Pa. Super. 1999) (unpublished memorandum). On July 9, 1999, the Superior Court affirmed

---

[2] The Commonwealth tried Kelly jointly with his co-defendant, Larry Mullins.

Kelly's conviction but remanded for an evidentiary hearing on his claim that counsel was ineffective for failing to "call witnesses who could have exonerated him and in failing to make an opening statement." *Id.*

6.      During the evidentiary hearing, Joan Arrington, Kelly's common-law wife, testified that Kelly was with her at the time of the shooting. She explained that they had a tradition of family prayer every year on New Year's Day and that her mother, children, and Reverend James Becoat were also present. *See* N.T. 12/6/1999, 87-88. Reverend Becoat also testified that he attended the gathering and that Kelly was present for the entire evening. *Id.* at 75-76.

7.      Lex Traylor testified that he saw two men leaving the scene of the shooting and neither looked like Kelly. *Id.* at 41-44.

8.      Denise Holsey Miller testified that she grew up with Kelly. *Id.* at 59. On the night of the offense, Holsey saw Ernestine Williams asking three men for help with her car. *Id.* at 59-60. Holsey said the men were unfamiliar to her and that Kelly was not with the group. *Id.*

9.      On December 8, 1999, the trial court denied Kelly's ineffective assistance of counsel claims. *Commonwealth v. Kelly*, 764 A.2d 1124 (Pa. Super. 2000) (unpublished memorandum). Kelly appealed, and the Superior Court affirmed on August 24, 2000. *Id.*

10.     On September 21, 2000, Kelly, through newly retained counsel Jules Epstein, filed a petition for allowance of appeal to the Pennsylvania Supreme Court, which the Court denied on February 9, 2001. *Commonwealth v. Kelly*, 781 A.2d 141 (Pa. 2001) (unpublished memorandum).

**C.      PCRA Petitions**

11.     On September 26, 2001, Kelly filed a *pro se* petition for post-conviction relief, which Mr. Epstein amended on October 17, 2001. *Commonwealth v. Kelly*, 918 A.2d 787 (Pa. Super. 2006) (unpublished memorandum). Kelly raised several claims of ineffective assistance of counsel and a claim that the Commonwealth suppressed exculpatory evidence related to the

6

possible participation of a suspect he identified as "Boochie." *Id.* The PCRA court denied his petition without a hearing. *Id.*

12.     Kelly appealed on February 25, 2004, and the Superior Court affirmed on December 18, 2006, concluding in part that all of Kelly's claims were waived. *Id.* Judge Ford Elliott dissented and explained that Kelly properly preserved his argument that counsel was ineffective. Id. Judge Ford Elliott went on to conclude that Kelly "was so deprived of his Sixth Amendment right to effective trial counsel for failing to challenge the admissibility of witness-pressuring testimony and for failing to call character witnesses that appellant is entitled to a new trial." *Id.* On April 20, 2007, Kelly filed a petition for allowance of appeal to the Pennsylvania Supreme Court, which denied the petition on October 26, 2007. *Commonwealth v. Kelly*, 934 A.2d 1277 (Pa. 2007) (unpublished memorandum).

13.     On November 15, 2012, Kelly filed a third petition for post-conviction relief. Kelly raised several claims of after discovered evidence and ineffective assistance of counsel. *Commonwealth v. Kelly*, 108 A.3d 110 (Pa. Super. 2014). Kelly supported his claims with a recently obtained statement by Tameka Ledbetter, the victim's girlfriend, who claimed to have identified Sharif Curry as the shooter during the police investigation. *Id.* The evidence of Curry as an alternative suspect was not disclosed to defense counsel at the time of trial. *Id.* On February 21, 2014, the PCRA court denied Kelly's petition without a hearing. Id. Kelly appealed, and the Superior Court affirmed on October 10, 2014. *Id.* On November 10, 2014, Kelly filed a petition for allowance of appeal to the Pennsylvania Supreme Court, which was denied on April 24, 2015. *Commonwealth v. Kelly*, 565 EAL 2014 (Pa. 2014) (unpublished memorandum).

## D.     Federal Habeas Corpus Petitions

14.     On April 21, 2008, Kelly filed a timely *pro se* petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania. *Kelly v. Rozum*, No.

7

2:08-CV-01073, 2009 WL 3245565, at *8 (E.D. Pa. Oct. 6, 2009). Kelly sought a new trial, raising numerous claims of ineffective assistance of counsel, insufficiency of the evidence, violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and judicial misconduct. *Id.* On February 18, 2009, Magistrate Judge Rice recommended that the petition be dismissed. *Id.* at *5. On October 6, 2009, Judge Pratter adopted the Report and Recommendation, denied Kelly's petition, and determined there was no probable cause to issue a certificate of appealability. *Id.* at *1. On February 17, 2010, the Third Circuit Court of Appeals denied Kelly's request for a certificate of appealability. *Kelly v. Rozum*, No. 09-4290 (3d Cir. Feb. 17, 2010).

15. On April 5, 2016, Kelly filed a motion, through new counsel Lawrence Wood, requesting permission from the Third Circuit Court of Appeals to file a successive federal habeas petition, which the Third Circuit denied on April 19, 2016. *In re: James Kelly*, No. 16-1791 (3d Cir.).

### STATEMENT OF THE FACTS RELEVANT TO PETITIONER'S CLAIM

#### A. Travis Hughston's Death and the Police Investigation

16. At approximately 8:08 p.m. on January 1, 1993, Travis Benjamin Hughston, known as Bud, was shot to death while standing outside his girlfriend Tameka Ledbetter's home at 2000 N. Bambrey Street.

17. Emergency calls were immediately received, and police were dispatched to the area. *See* Emergency Dispatch Records (PCRA Pet'n Exh. 1).[3]

---

[3] All references to "PCRA Pet'n Exh." followed by a number refer to the PCRA exhibits attached to the pending state petition.

18.     Upon being dispatched to the scene, Officers Stephen McCuster and Thomas Demalto encountered a black male who was later identified as Colie Baxter[4] in his vehicle on 25th and Diamond Streets. Baxter directed officers to the location of the gunfire. *See* 1/1/1993 Officer Mark Alston Statement (PCRA Pet'n Exh. 2).

19.     Officers found Hughston lying face down just outside 2027 N. Bambrey Street. He was transported to a hospital and then pronounced dead at 8:26 p.m. N.T. 8/14/1996, 65-66; N.T. 8/15/1996, 6, 130.

20.     As mentioned above, Colie Baxter was one of the first witnesses to encounter police on the night of Hughston's homicide. *See* 1/1/1993 Colie Baxter Police Interview (PCRA Pet'n Exh. 3); *see also* 1/1/1993 Alston Statement. Baxter was interviewed twice during the investigation—first on the night of the homicide and again approximately ten months later on October 13, 1993 during a pre-trial identification procedure. *See* 10/13/1993 Colie Baxter Police Interview (PCRA Pet'n Exh.4).

21.     According to Baxter's initial statements, he was stopped at a red light on 25th and Diamond Streets when he heard several gunshots. *See* 1/1/1993 Baxter Police Interview at 1. He immediately pulled his car to the side of the street and observed two black males run from the direction of the scene and enter a small two door white car with sun guards in the back window. *Id.* at 2.

22.     Baxter described the driver of the getaway vehicle as "brown skin, in his 20's, about 5'8", 180lbs . . . carrying something in his right hand by the way he was holding his arm to his side, he was wearing a dark hat, like a Kofu or maybe knit, [and] a long black trench coat." *Id.*

---

[4] Various police reports indicate that on the night of Hughston's homicide, Baxter gave law enforcement the name Corey Braxton. *See* 1/1/1993 Alston Statement. In this petition, we refer to him as Colie Baxter, the name he gave at trial. *See* N.T. 8/15/1996, 7.

Baxter described the passenger as "a black male, in his 20's too . . . shorter about 5'5", thin, dark brown complexion . . . [and] wearing a light to medium blue sweat suit with some red in it." *Id.*

23.     According to Baxter, the vehicle slowed while it passed him, allowing him to make eye contact with both occupants. *Id.* at 1-2.

24.     Officers Tyrone Redding and Mark Alston arrived on scene shortly thereafter and immediately began to secure the scene and interview witnesses. *See* 1/1/1993 Alston Statement; 1/1/1993 Officer Tyrone Redding Statement (PCRA Pet'n Exh. 5). Based on these interviews, a flash description was sent to on-scene and nearby law enforcement to be on the lookout for two black males between the ages of 18-20 years old, standing approximately 6'0" feet tall, wearing a 3/4 length black trench coat and red pants, and driving a white compact car with sun visors in the rear window. *See* 1/1/1993 Telephone and Radio Tap Transmittal (PCRA Pet'n Exh. 6).

25.     George Patterson, owner and resident of 2000 N. Bambrey Street, told police that he had been watching football with his niece Tameka Ledbetter and her boyfriend Travis Hughston. *See* 1/1/1993 George Patterson Police Interview (PCRA Pet'n Exh. 7). Patterson observed Ledbetter and Hughston saying goodbye. *Id.* at 1. Shortly after Hughston left the home, Patterson heard several gunshots. *Id.* at 1-2. Consistent with other witness descriptions, Patterson reported that when he looked outside, he saw a man in a long black trench coat running toward Diamond Street. *Id.* at 2. He pulled his niece back inside the house and instructed her to call the police. *Id.*

26.     Tameka Ledbetter told police that Hughston had been at her home with her that night. *See* 1/1/1993 Tameka Ledbetter Police Interview (PCRA Pet'n Exh. 8). She reported that Hughston had just left when she heard three gunshots. *Id.* at 2. She went outside where she saw Hughston laying on the ground approximately two houses away. *Id.*

10

27.    Ledbetter further reported seeing a black male standing on the corner of N. Bambrey and Page Streets putting a gun in his waistband; he wore a black skull cap and black ¾ length trench coat. *Id.* at 3-4. She watched the male enter a white vehicle, drive toward Diamond Street, and turn onto Glenwood Avenue. *Id.*

28.    As background, Ledbetter reported that Hughston was involved in the illegal sale of drugs in the area. *Id.* at 4. She did not believe that Hughston sold the drugs himself but instead had others working for him. *Id.* She stated that in the months before Hughston's homicide several people had been shot in the neighborhood. *Id.* at 5. Rumors circulated that Hughston may have had something to do with the shootings, but she did not believe this because she and Hughston were out of town at the time of each of the shootings. *Id.*

29.    Police also interviewed Ernestine Williams on the night of Hughston's homicide— the first of multiple interviews with police and a defense investigator that would result in eight different statements over the course of the next two years.

30.    Williams initially told police that she was in her second story bedroom with her boyfriend Kevin Mathis when they both heard gunshots. *See* 1/1/1993 Ernestine Williams Police Interview (PCRA Pet'n Exh. 9). Mathis immediately looked out the window and told her that someone was lying on the ground. *Id.* Only then did Williams look out the window to see a man lying on the ground and a woman standing next to him crying and screaming. *Id.* Williams denied seeing the shooting, anyone with a gun, or anyone running away from the scene. *Id.* at 2-3.

31.    On March 21, 1993, Williams provided a second statement. *See* 3/21/1993 Ernestine Williams Police Interview (PCRA Pet'n Exh. 10). During this interview, Williams told detectives that she had in fact witnessed the shooting and had even spoken with Hughston's assailants before his death. *Id.* Williams described one of the two perpetrators as standing 5'7",

11

weighing approximately 180lbs, and wearing a long black leather coat, black shoes, and a black turtleneck. *Id.* She described the other man as standing approximately 5'11-6'1", with big lips and a medium build, and wearing a beige full-length coat and dress shoes. *Id.* at 2.

32.     Williams provided her third and fourth statements on September 14 and 15, 1993. *See* 9/14/1993 and 9/15/1993 Ernestine Williams Police Interviews (PCRA Pet'n Exhs. 11 and 12).

33.     On September 14, Williams stated that she could now name Hughston's shooter as she had been buying drugs from him over the last several months. *See* 9/14/1993 Williams Police Interview.

34.     On September 15, after being shown two photo arrays, one containing the picture of Larry Mullins and the other containing a fifteen-year-old picture of James Kelly, Williams for the first time identified Larry Mullins as Hughston's shooter and James Kelly as Mullins' accomplice. *See* 9/15/1993 Williams Police Interview.

35.     On July 2, 1995, nearly 22 months after her September 1993 identification, police again interviewed Williams and she claimed for the first time that she saw Kelly pass Mullins a gun before the shooting. *See* 7/2/1995 Affidavit of Probable Cause (PCRA Pet'n Exh. 13).

36.     On July 6, 1995, Kelly was arrested and charged with homicide, possession of an instrument of crime; violation of the Uniform Firearms Act, and criminal conspiracy.

37.     A few weeks after Kelly's arrest, on July 20, 1995, Williams spoke to Jerry Benoff, a private investigator for the defense. *See* 7/20/1995 Ernestine Williams Interview with Jerry Benoff (PCRA Pet'n Exh. 14). To Benoff, Williams claimed that in the aftermath of Hughston's

12

homicide she was being "harassed" by the police. *See id.* at 5-6.[5] Williams claimed that police brought her to the homicide division for questioning "about six times" before she made her March 21, 1993 statement. *See id.* at 6.

38. Williams also claimed that during her initial interviews, police detectives did not believe her and speculated that she was "taking money from these other guys, drug dealers, to put the blame on somebody else." *Id.* at 10.

39. Williams reported that, during one of the interviews, police showed her a single 8x10 picture of James Kelly and told her his name. *Id.* at 16. They did this even though other detectives, whose names she could not recall, told her they believed "Tommy," a man who lived on Page Street, was involved in the homicide. *Id.* at 15.

40. On October 31, 1995, just before the preliminary hearing, Williams gave her seventh statement, changing some details given in her prior accounts. *See* 10/31/1995 Ernestine Williams Police Interview (PCRA Pet'n Exh.15).

41. Minutes after providing that statement, Williams testified for the Commonwealth at Kelly's and Mullins' preliminary hearing, providing her eighth recorded statement. When asked to identify Kelly, Williams stated "he don't look like the picture I saw." N.T. 10/31/1995, 28-29. It was not until the court declared Williams a hostile witness that she acquiesced and identified

---

[5] Detective Leon "Luby" Lubiejewski was one of the detectives assigned to this investigation. *See* 10/31/1995 Williams Statement at 1. During Detective Lubiejewski's career with the Philadelphia Police Department, he was alleged to have committed various acts of misconduct, including concealing exculpatory evidence pointing to an alternative perpetrator and threatening and incentivizing vulnerable witnesses into making false identifications and providing false testimony. *See* The Homicide Files, *The Philadelphia Inquirer*, *available at* https://www.inquirer.com/crime/inq2/philadelphia-murder-homicide-cases-database-20210507.html#/ (last accessed Aug. 29, 2022).

13

Kelly as the man she saw the evening of Hughston's murder who passed Mullins the gun. *Id.* at 34.

42. All charges were held over for court.

**B. James Kelly's Trial and Sentencing**

43. Kelly's jury trial took place from August 14-20, 1996, with the Honorable James A. Lineberger presiding. Geoffrey Seay represented Kelly, and Richard Sax prosecuted the case for the Commonwealth. Kelly and Mullins[6] were tried together.

44. As mentioned above, in both its opening and closing arguments, the Commonwealth speculated that Hughston's murder was related to an ongoing drug territory dispute and that Hughston was in the area in part to receive a "package," a "brown paper bag's poison contents." N.T. 8/14/1996, 35-37; N.T. 8/19/1996, 33.

45. Kelly had no prior connection to drug sales, and the Commonwealth did not offer any evidence that he was involved in a drug dispute. *See* N.T. 8/19/1996, 69. Indeed, defense counsel objected to the Commonwealth's closing argument that the murder was drug related where there was "never, ever any testimony to even infer there was any type of drugs or any type of cocaine or crack or anything" in the package Hughston received. *Id.*

46. Instead, the Commonwealth linked Kelly to Hughston's homicide based solely on the identification testimony of Ernestine Williams and the surprise in-court identification by Colie Baxter.

47. **Ernestine Williams** testified that on the night of January 1, 1993, she left her home at 2023 N. Bambrey Street, where she had lived for the last seven years, with a plan to visit her mother. N.T. 8/14/1996, 81. Upon pulling out of her parking space, Williams' car broke down. *Id.*

---

[6] Court-appointed attorney Charles Mirarchi represented Mullins.

14

She asked several neighbors and passersby for assistance to no avail. *Id.* Eventually, she encountered two males standing outside a neighborhood speakeasy located just one block down on Page Street. *Id.* at 84. Neither was able to assist her. *Id.* Williams eventually went back into her home. *Id.* at 86. A few minutes later she looked out of her second story bedroom window and observed the same two men approach and shoot Travis Hughston. *Id.* at 89-90. Williams admitted to drinking alcohol and smoking crack cocaine throughout the day on January 1, 1993. *Id.* at 128-29. Williams made an in-court identification of James Kelly and Larry Mullins as the two men she saw shoot Hughston. *Id.* at 110-12.

48.     **Detective Walter Hoffner** testified that during the summer of 1993 he was assigned to the Special Investigations Unit, which investigated unsolved homicides. N.T. 8/16/1996, 5. Detective Hoffner testified that during Williams' third statement to law enforcement, taken nine months after the homicide on September 14, 1993, she for the first time provided law enforcement with the names James and Larry. *Id.* at 27. The next day, Williams was again brought into the homicide division and shown two photo arrays in which she identified Larry Mullins and James Kelly as Hughston's assailants. *Id.* at 28.

49.     Notably, on cross examination, Detective Hoffner acknowledged that the photo of Kelly used in the photo array was taken fifteen years earlier in 1978; the photo depicted Kelly as a 22-year-old man and better matched the description of the assailants provided by several witnesses. *Id.* at 34-35. Detective Hoffner testified that he did this to match the other men depicted and create a more "fair photo display". *Id.*

50.     Detective Hoffner additionally testified that "Boochie", Kendall Harris, and Daniel Lockwood were known drug dealers in the area whose names had come up during the investigation

15

but for unknown reasons were not suspected to be the shooters and thus, were not investigated. *Id.*
at 53-54.[7]

51.    Finally, without alluding to the property's actual owner, Detective Hoffner testified
that at the time of Hughston's homicide, he was aware that Ernestine Williams did not own the
residence in which she lived, namely 2023 N. Bambrey Street. *See* N.T. 8/16/1996, 37.

52.    Consistent with his initial statement to police, **Colie Baxter** testified that on January
1, 1993, he was stopped at a light at 25th and Diamond Streets when he heard gunfire. *See* N.T.
8/15/1996, 8. Baxter pulled over to the side of the road. *Id.* He observed two men run from the
area of the gun shots. *Id.* Baxter described the first man as wearing a long black trench coat and
holding something down by his side. *Id.* The second man was wearing a sweatsuit and entered the
passenger side of the vehicle. *Id.* Baxter testified that as the car drove away it slowed, and he was
able to get a better look at the occupants. *Id.*

53.    While describing Baxter to the Court during an *in camera* hearing before opening
statements, the Commonwealth mentioned Baxter only as a witness against Kelly's co-defendant:
"Colie Baxter, as Miracrhi knows, is another eyewitness of the defendant Larry Mullins running
from the scene." N.T. 8/14/1996, 8. Additionally, in the Commonwealth's opening statement, the
prosecutor similarly did not indicate to the jury that Baxter would say anything to link Kelly to the
crime: "He saw a man, Larry Mullins, and another man running from Bambry [sic] Street after he
heard the shots, gets to their car with another man and flee." *Id.* at 49.

---

[7] During Ernestine Williams' March 21, 1993 interview, she told police that she had heard that
Anna Mae Lighty was dating the man in the ¾ leather coat. *See* 3/21/1993 Williams Police
Interview at 4. According to Lighty's March 28, 1993 interview (PCRA Pet'n Exh.16), neighbors
at the time believed Lighty was involved in a romantic relationship with **Daniel Lockwood**, but
she claimed they were just friends.

16

54.    However, in a move that surprised all parties, during his direct examination, Baxter identified Kelly, for the first time, as the driver of the vehicle he observed that evening. *Id.* at 12. On cross examination, Baxter conceded that while he had been shown "a lot of photographs" by police during his October 1993 statement, he had been unable to identify Kelly. *Id.* at 42. Baxter also conceded that Kelly looked older than the men he saw on the night of the shooting. *Id.* at 52.

55.    The Commonwealth called a number of other fact witnesses, none of whom implicated Kelly or Mullins. Specifically:

- **Delphine Howard**, owner of a speakeasy located at 2552 Page Street that was allegedly visited by the perpetrators just minutes before Hughston's death, testified that she could not remember whether anyone bought beer or alcohol from her home that evening. *Id.* at 96;

- **Catricia Hughston**, Travis Hughston's mother, provided life in being testimony. *See* N.T. 8/15/1996, 6;

- **George Patterson**, lived at 2031 N. Bambrey Street and, along with his niece (and Hughston's girlfriend) Tameka Ledbetter, visited with Hughston in their home just before his death. *Id.* at 116. Patterson testified to seeing a young black male in a 3/4 length trench coat running from the scene. *Id.*; and

- **Andre Bracey**, who testified that he was walking along N. Bambrey Street just before 8:00 p.m. on January 1, 1993 when he saw a young black male wearing a ¾ length black coat. *Id.* at 87. Bracey had a bad feeling, decided to return home, and heard gunfire a few minutes later. *Id.*

56.    The Commonwealth also called a number of law enforcement and expert witnesses who testified to responding to and securing the scene as well as conducting initial witness

17

interviews (Officers Stephen McCuster and Tyrone Redding, N.T. 8/15/1996, 127-43 and 143-52); the autopsy (Dr. Ian Hood, N.T. 8/14/1996, 57-76); and the firearms examination that showed that the bullets and casings recovered from the scene and Hughston's body most likely came from the same gun (Officer James O'Hara, N.T. 8/15/1996, 153-79).

57.    Kelly's attorney called only one witness for the defense, Travis Hughston's brother Kenyatta. **Kenyatta Hughston** testified that in the days immediately after his brother's murder, he had two conversations with Ernestine Williams in which she told him that she had witnessed the murder and that "Tommy, Kendall, and Boochie" were responsible. N.T. 8/16/1996, 64-66. Kenyatta testified also that while he knew "Boochie" and Kendall, he did not recognize, know, or have any affiliation with Kelly. *Id.* at 67.

58.    Though they were present in court and ready to testify, defense counsel failed to call two witnesses, Joan Arrington and Reverend James Beacoat, both of whom would have testified that Kelly was at home with family all night on January 1, 1993. *See* 9/19/1997 Joan Arrington Affidavit (PCRA Pet'n Exh.17); 10/3/1997 Reverend James Beacoat Affidavit (PCRA Pet'n Exh.18).

59.    The jury deliberated for nearly two full days before finding Kelly and Mullins guilty of first-degree murder and criminal conspiracy. Kelly was found not guilty of possessing an instrument of crime. The Court did not allow the Commonwealth to go to the penalty phase for either defendant because it found the aggravating circumstances to be insufficient. N.T. 8/20/1996, 13-18.

60.    On August 21, 1996, both Kelly and Mullins were sentenced to life in prison without the possibility of parole.

18

**C.  Evidence On Which This Petition Is Based**

61.    As mentioned above, on August 30, 2021 and March 15, 2022, respectively, the District Attorney's Office produced the H Files for the Travis Hughston and Stacy Williams homicides. The files contained critical and previously undisclosed information linking alternative perpetrator Thomas Lockwood to drug sales and violent drug territory disputes in the neighborhood, as well as to both key Commonwealth witnesses, Ernestine Williams and Colie Baxter.

62.    Specifically, the Hughston H File contained an undated police report indicating that before his surprise in-court identification of Kelly, Baxter identified Thomas Lockwood as the man he saw enter the driver's side of the of the getaway vehicle on the night of Hughston's homicide. *See* Undated Police Report (PCRA Pet'n Exh. 19).

63.    The Williams H File revealed three additional previously undisclosed facts as well as critical additional witness information.

64.    *First*, in the later part of 1993, the Philadelphia Police Fugitive Task Force searched for Thomas Lockwood in relation to the Stacy Williams homicide. Records from this search showed that Lockwood owned and was known to drive several light-colored vehicles,[8] all of which matched the description provided by witnesses of the getaway vehicle seen fleeing the Hughston homicide scene. *See* 1/1/1993 Baxter Police Interview; 1/1/1993 Ledbetter Police Interview; 1/26/1998 Lex Traylor Affidavit (PCRA Pet'n Exh. 23).

---

[8] *See* Handwritten notes, referencing Beige Cadillac Pennsylvania license plate AGJ9212 (registered to Elise Clark, Lockwood's girlfriend at the time) (PCRA Pet'n Exh.20); 12/13/1993 Police Activity Sheet, referencing White Buick, Pennsylvania license plate AAZ4599 (also registered to Clark) (PCRA Pet'n Exh.21); 6/6/1994 Police Activity Sheet, referencing White Acura Legend, no license plate information available, and metallic beige Nissan Maxima, partial license plate information listed as ZKH722 (PCRA Pet'n Exh.22).

65.     *Second*, Philadelphia County real estate records also obtained as part of the fugitive search for Lockwood indicated that at the time of both the Hughston and Williams murders, Thomas Lockwood owned the home where Ernestine Williams lived. *See* 6/14/1994 Philadelphia Police Fugitive Task Force Activity Sheet re: 2023 N. Bambrey Street (PCRA Pet'n Exh. 24). At trial, Williams testified she was inside this home when she witnessed Hughston's shooting and continued to live there until the Commonwealth relocated her to a more affluent neighborhood in south Philadelphia in exchange for her testimony against Kelly in 1996. *See* N.T. 8/16/1996, 35-37.

66.     *Third*, on March 18, 1996, five months before Kelly's trial began, Thomas Lockwood was convicted of third-degree murder for the September 21, 1993 shooting death of Stacy Williams—a homicide that shares a number of critical similarities to the Travis Hughston murder. Specifically, Hughston and Williams were both 19-year-old young men at the time of their deaths, and both were known to engage in the illegal sale of drugs in the same area of North Philadelphia. *See* 1/1/1993 Ledbetter Police Interview.[9]

67.     According to witnesses, in the days before his death, Williams and his friends Jonathan Fuller and Steven Anderson were seen arguing with Lockwood and his cousin Anthony over a disputed drug corner located at Croskey and W. Norris Streets—just four blocks away from where Hughston was killed earlier that year. *See* 9/21/1993 Steven Anderson Police Interview (PCRA Pet'n Exh. 28).

---

[9] *See also* 9/23/1993 Jonathan Fuller Police Interview (PCRA Pet'n Exh. 25); 9/22/1993 Frances Jones Police Interview (PCRA Pet'n Exh. 26); 9/21/1993 Reshie Davis Police Interview (PCRA Pet'n Exh. 27); 9/21/1993 Steven Anderson Police Interview; 9/21/1993 Antonio Williams Police Interview (Pet'n Exh. 29); 9/21/1993 Anthony Johnston Police Interview (PCRA Pet'n Exh.30); 9/21/1993 Felicia Williams Police Interview (PCRA Pet'n Exh. 31); Philadelphia Police Homicide Case Summary for Stacy Williams (PCRA Pet'n Exh. 32).

68.     On September 21, 1993, Thomas and Anthony Lockwood approached Williams and while they were standing in front of 2200 West Norris Street. *See* 9/21/1993 Fuller Police Interview. In broad daylight, the Lockwoods opened fire. *Id.*

69.     Fuller survived. *Id.*

70.     Williams suffered a fatal gunshot wound to the head. *See* Philadelphia Police Homicide Case Summary for Stacy Williams.

71.     Thomas and Anthony Lockwood fled the scene on foot and, similar to witness descriptions in the Hughston homicide, both were seen entering a light-colored getaway vehicle. *See* 9/21/1993 Karen Schoolfield Police Interview (PCRA Pet'n Exh. 33).

72.     Williams' close friend Steven Anderson spoke to police on the day of Williams' murder. *See* 9/21/1993 Anderson Interview. During this interview, Anderson described a violent altercation that occurred between himself, his friends (Jonathan Fuller and Stacy Williams), and Thomas Lockwood just the day before. *See* 9/21/1993 Steven Anderson Police Interview at 4-5.

73.     According to Anderson, on September 20, 1993, Anderson, Fuller, and Williams were walking together towards W. Norris and Croskey Streets when Anderson was overheard insulting Lockwood's cousin Derrick. *Id.* at 3. Shortly thereafter, Thomas Lockwood and three unknown males assaulted Anderson. *Id.*

74.     Later that day another altercation took place which resulted in Williams' younger brother, Antonio Williams, being shot in the arm by Anthony Lockwood. *Id.* at 3-4.[10]

---

[10] *See* 9/21/1993 Antonio Williams Police Interview (discussing earlier Lockwood shooting); 9/21/1993 Felicia Williams Police Interview (same).

21

75.     Anderson told police that the altercations between the two groups were "really over drugs" and that "Tommy want[e]d Stacy off the corner [of W. Norris and Croskey Streets] because he wouldn't make no money while Stacy was out there." *Id.* at 7.

76.     Stacy Williams was shot to death the very next day.

77.     On March 18, 1996, Lockwood was convicted of third-degree murder for the Williams homicide. *See* Docket, *Commonwealth v. Lockwood*, No. CP-51-CR-0209951-1995 (PCRA Pet'n Exh. 34).

78.     At no time before Kelly's trial or during the last 27 years was any of this critical information disclosed to Kelly or any of his attorneys.

79.     After the Commonwealth disclosed the Williams H File, counsel located and interviewed Anderson, who they first learned about from the Williams H File. Anderson confirmed that he grew up in the neighborhood where Hughston and Williams were killed. *See* Elizabeth DeLosa Certification ("DeLosa Cert.") ¶ 4 (PCRA Pet'n Exh. 35). Anderson also confirmed that Lockwood killed his friend, Stacy Williams. *Id.* at ¶ 5.

80.     Anderson explained that Lockwood was "a known drug dealer in [his] community," who worked for "high ranking . . . drug dealers" Abdul "Boochie" King and Kendall Harris. *Id.* at ¶ 8. Anderson reported that Lockwood violently enforced his control over drug corners in the neighborhood and had also been involved in a shooting of Williams' brother, Antonio. *Id.* at ¶ 7.

81.     Anderson further remembered that Lockwood drove around the neighborhood in a vehicle matching the description of the car that was involved in the Hughston homicide. *Compare id.* at ¶ 9 (Lockwood drove a "white Buick with sun visors in the rear windshield") *with* 1/1/1993 Baxter Police Interview (assailants' vehicle was a "small white car . . . with those sun guards in the back window").

22

## E.    Kelly's Efforts to Prove His Innocence and Obtain Relief

82.    As a prerequisite to a successive habeas petition, Kelly must show that he has exercised due diligence. Although the District Court may engage in a "factually intensive" review of the issue, this Court is only required to decide whether Kelly has made a *prima facie* showing of diligence.[11] Moreover, the "reasonable diligence" standard does not require extreme or exceptional diligence.[12]

83.    In the context of suppressed evidence, this Court has made clear that the "United States Supreme Court has never recognized an affirmative due diligence duty of defense counsel as part of *Brady*, let alone an exception to the mandate of Brady as this would clearly be." *Dennis v. Sec'y, Pa. Dep't of Corrections*, 834 F.3d 263, 290 (3d Cir. 2016) (*en banc*). "Crucially, the defendant's 'reasonabl[e] expect[ation]' that the government will comply with *Brady* . . . does not evaporate upon conviction or after trial." *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 293 (3d Cir. 2021) (citing *Wilson v. Beard*, 426 F. 3d 653 (3d Cir. 2008)). Because of these principles, "a habeas petitioner's *Brady* claim is timely under § 2244(d)(1)(D) so long as it is filed within one year of the date on which the petitioner has reason to believe that the prosecution may have violated its duty of disclosure." *Id.*

84.    Nevertheless, even though diligence should not be required in this situation, Kelly has made the required reasonable efforts to protect his interests. In particular, he has sought relief through the court system.[13] He has also diligently attempted on his own to ascertain facts to prove

---

[11] *Holland v. Florida*, 130 S. Ct. 2549, 2565 (2010).

[12] *Lacava v. Kyler*, 398 F.3d 271, 277 (3d Cir. 2005) (reasonable diligence does not require "maximum feasible diligence"); *Wilson v. Beard*, 426 F.3d 653, 660 (3d Cir. 2005) (requiring "reasonable diligence under the circumstances").

[13] *See* PCRA Pet'n ¶¶ 77-85 (detailing procedural history).

his innocence, including working with his fellow inmates to find effective legal counsel and to raise funds to hire a private investigator.

85.    For example, in early 2008 after retiring from the bench, former Chester County Court of Common Pleas President Judge Lawrence Wood began accepting court-appointed post-conviction cases. Soon thereafter, Judge Wood was asked to review the post-conviction claims of a man named George Bussinger.[14] Bussinger told Judge Wood about his then cellmate, Kelly. According to Bussinger, "I have been in jail for a while, and I pretty much know when a person is guilty and when they are not. I read my roommate's paperwork, the entire discovery, and he is innocent. . . ."[15]

86.    Instead of accepting Judge Wood's legal assistance for himself, Bussinger asked the Judge to review the facts underlying Kelly's case. Moved by what he read, Judge Wood agreed to represent Kelly in Kelly's then-pending first federal habeas petition, which Kelly had been litigating *pro se*. That petition was unsuccessful.

87.    Judge Wood also informed Kelly that he believed it was necessary to retain a private investigator. Kelly and his family are of limited financial means. But, believing in Kelly's innocence, his fellow inmates pooled their money together to raise $1,000 to hire an investigator.[16] In 2012, Kelly filed a second PCRA petition that was supported, in part, by the efforts of the investigator hired with the donated money. That petition was also unsuccessful.

---

[14] *See Commonwealth v. George Bussinger*, CP-51-CR-0204951-2002 (Phila. Cnty. Ct. Com. Pl.).
[15] *See* The Prisoner Whose Story Led Fellow Inmates To Raise Funds For His Defense, *The Philadelphia Inquirer* (Sept. 12, 2016), *available at* https://www.inquirer.com/news/prisoner-whose-story-led-fellow-inmates-raise-funds-his-defense-20160912.html (last accessed Aug. 29, 2022).
[16] *Id.*

24

88.     Undeterred, Kelly also sought help from others, including the Pennsylvania Innocence Project, which agreed to investigate the case and then represent Kelly after a lengthy multi-stage review process.[17] Despite all of these efforts, however, it was not until the Commonwealth voluntarily disclosed the Hughston and Williams H Files—files that Kelly and his attorneys had no other way of accessing—that Kelly learned of the facts supporting his proposed successive petition.

## CLAIMS FOR RELIEF

### CLAIM I

### THE COMMONWEALTH OF PENNSYLVNIA SUPPRESSED MATERIAL AND EXCULPATORY EVIDENCE IN VIOLATION OF KELLY'S DUE PROCESS RIGHTS.

89.     The Fourteenth Amendment to the United States Constitution guarantees due process of law to criminal defendants. U.S. Const. Amends. XIV.

90.     The United States Supreme Court has long held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the prosecution to disclose evidence favorable to the accused. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

91.     The prosecution's duty to disclose under *Brady* extends to exculpatory evidence known to the police even if it is unknown to the prosecutor. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

92.     There are three elements to a *Brady* claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the government must have suppressed the evidence, whether intentionally or inadvertently; and (3) the suppressed

---

[17]   *See* Pa. Innocence Project: Frequently Asked Questions, *available at* https://painnocence.org/faqs (last accessed Aug. 29, 2022) (detailing review process).

evidence was material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see also Burke*, 781 A.2d at 1141.

93. To establish materiality, a petitioner "need not show that he 'more likely than not' would have been acquitted if the new evidence is admitted." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) *(per curiam)*. Rather, evidence is material "when there is any *reasonable* likelihood it could have affected the judgment of the jury." *Id.* (emphasis added) (citations and internal quotation marks omitted); *see also, e.g.*, *Dennis*, 834 F.3d at 285 (the "touchstone of materiality is a reasonable probability"). "The adjective is important." *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*; *see also Weiss*, 986 A.2d at 815. It follows that a petitioner can still prevail even if "the undisclosed information may not have affected the jury's verdict." *Wearry*, 577 U.S. at 392 n.6.

94. The *Brady* materiality standard is co-extensive with *Strickland v. Washington*, 466 U.S. 668 (1984), prejudice. *See Marshall v. Hendricks*, 307 F.3d 36, 53 (3d Cir. 2002). *Strickland* prejudice is established, like *Brady* materiality, by a showing of less than a preponderance of the evidence. Because a reasonable probability is one "sufficient to undermine confidence in the outcome," *Strickland*, 466 U.S. at 694, the *Strickland* prejudice standard is not "stringent;" it is, in fact, "less demanding than the preponderance standard," *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (*Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered").

26

95.    In assessing materiality, the Court does not examine the impact of each piece of suppressed evidence. Rather, the impact of the suppressed exculpatory evidence is viewed cumulatively. *Kyles*, 514 U.S. at 419 ("stressing" that materiality is considered "**collectively, not item by item**" (emphasis added)); *Dennis*, 834 F.3d at 360 (same).

96.    None of the evidence on which this petition is based has previously been disclosed to Kelly, his trial counsel, or the various attorneys who have represented Kelly throughout the last 27 years.

97.    The Commonwealth's suppression of multiple items of material exculpatory evidence revealing the substantial connections between key Commonwealth witness Ernestine Williams and alternative perpetrator Thomas Lockwood as well as the critical impeachment evidence regarding Colie Baxter's pre-trial identification of Thomas Lockwood as the driver of the identified getaway vehicle, violated Kelly's federal and state due process rights in violation of *Brady* and its progeny.

**I.    The Commonwealth Suppressed Evidence That Before Trial Key Witness Colie Baxter Identified Thomas Lockwood, Not James Kelly, As The Driver Of The Getaway Vehicle.**

98.    The Commonwealth's suppression of evidence that before trial key witness Colie Baxter identified Thomas Lockwood as the driver of the getaway vehicle violated Kelly's state and federal due process rights.

99.    *First*, this undisclosed identification is exculpatory as it points to someone else as the driver, the role Kelly was alleged to have played, and it also would have been critical impeachment evidence in response to Baxter's surprise in-court identification.

100.    *Second*, the information was suppressed. The document supporting this claim is an undated police report that indicates Baxter was interviewed and picked Tommy Lockwood's photograph out of a lineup. *See* Undated Police Report. This document is not listed in the letters

27

itemizing the discovery provided to Kelly and his counsel before trial and trial counsel has confirmed he did not receive them. *See* ¶ 62, *supra*; s*ee also* 11/9/1995 Discovery Letter (PCRA Pet'n Exh. 36); Geoffrey Seay Certification ("Seay Cert.") ¶¶ 6, 7 (PCRA Pet'n Exh. 37).

101.    Although the prosecution produced Baxter's January and October 1993 statements to police to Kelly's trial counsel, neither of these statements indicated that Baxter had ever identified anyone as the driver of the getaway vehicle before trial.

102.    *Third*, this prior identification evidence is material. As Justice William Brennan noted, "There is *almost nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Dennis*, 834 F.3d at 313 (McKee J., concurring) (citing *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J. dissenting) (emphasis in original) (quoting Elizabeth F. Loftus, Eyewitness Testimony (1979)).

103.    Here, the Commonwealth's case against Kelly rested entirely on the credibility and perceived reliability of its two key witnesses, Colie Baxter and Ernestine Williams. In fact, during closing arguments, the Commonwealth argued that the fact that both Williams and Baxter, two people who did not know one another, identified the same two men (Mullins and Kelly) was corroborating evidence of their accuracy. *See* N.T.8/19/1996, 41-42.

104.    As trial counsel has confirmed, *see* Seay Cert. ¶ 7, had he been armed with Baxter's pre-trial identification of Lockwood, he could have impeached Baxter's surprise in-court identification of Kelly and pointed out that Lockwood, who was 19 years old and 6'0" at the time of the offense, more closely fit Baxter's original description of the assailants. *See Youngblood v. W. Virginia*, 547 U.S. 867 (2006) (holding Brady duty extends to impeachment evidence as well as exculpatory evidence); *see also Kyles*, 514 U.S. at 444-45 (holding that nondisclosure of

28

evidence undermining eyewitness identifications of the defendant by what the state identified as its "two best witnesses" was material under Brady).

105.    Moreover, had this pre-trial identification information been disclosed, it would have "significantly changed [his] pre-trial investigation strategy," allowing him to investigate Lockwood's potential connection to the offense. *Id.*; *see also Commonwealth v. Boyle*, 368 A.2d 661, 669 (Pa. 1977) ("It is well established that proof of facts showing the commission of the crime by someone else is admissible."); *Dennis*, 834 F.3d at 305 (granting habeas relief based on suppression of alternate perpetrator evidence).

106.    The suppression of this critical information hindered the jury's ability to properly assess Baxter's credibility. Accordingly, there is no question that this evidence was exculpatory and material to Kelly's defense. *See, e.g.*, *Dennis*, 834 F.3d at 311 ("Alterations in defense preparation and cross-examination at trial are precisely the types of qualities that make evidence material under *Brady*.").

107.    Had the jury been presented with this information directly calling into question the reliability and accuracy of one of the Commonwealth's key witness' identification, there is a reasonable probability that the outcome in this case would have been different.

**II.    The Commonwealth Suppressed Evidence That Alternative Perpetrator Thomas Lockwood Was Known To Own And Drive At Least Four White Or Light-Colored Vehicles Matching The Description Of The Getaway Vehicle Given By Several Witnesses On The Night Of Hughston's Murder.**

108.    The Commonwealth's suppression of information that Thomas Lockwood was known to own and drive several white or light-colored vehicles that matched the description of the vehicle used to flee the scene of the Hughston homicide, *see* ¶ 64, *supra*; *see also* n.8, *supra*, violated Kelly's state and federal due process rights.

29

109.    *First*, this information is exculpatory because it links an alternate suspect to the type of car involved in Hughston's murder.

110.    *Second*, this information was suppressed. The material supporting this claim comes from fugitive task force police activity sheets detailing the attempts to locate and arrest Lockwood for the Williams's homicide. *See* 6/4/1994 Fugitive Task Force Police Activity Sheet; 12/13/1993 Police Activity Sheet; Handwritten notes; 6/6/1994 Police Activity Sheet. According to these documents, Lockwood owned or was associated with at least four white or light-colored vehicles, all potentially matching the witness descriptions of the car used to flee the Hughston homicide scene. *Id.* Although the fugitive task force compiled this information during its search for Lockwood in late 1993 through early 1995, these documents were not listed in the letters documenting the discovery produced before Kelly's trial and trial counsel has confirmed he did not receive them. *See* 11/9/1995 Discovery Letter; Seay Cert. ¶ 8.

111.    *Third*, this information is material. While information existed linking Thomas Lockwood to vehicles similar in description to the getaway vehicle associated with the Hughston homicide, no evidence ever connected Kelly to a matching vehicle. This evidence thus, would have supported Kelly's alternate perpetrator defense, especially in conjunction with Colie Baxter's identification of Lockwood as the driver of the alleged vehicle. According to trial counsel, this information "especially in conjunction with Mr. Baxter's identification of Lockwood as the driver of the getaway vehicle, . . . would have informed [his] pre-trial investigation strategy and enabled [him] to further call into question Mr. Baxter's surprise in-court identification of [his] client, Mr. Kelly, as the driver." Seay Cert. ¶ 8.

112.    There is a reasonable probability that the outcome at trial would have been different if the jury had this information.

30

**III.    The Commonwealth Suppressed Evidence That At The Time Of Travis Hughston's Homicide, Key Witness Ernestine Williams Lived In A Home Owned by Alternative Perpetrator Thomas Lockwood.**

113.    The Commonwealth's suppression of information that at the time of Travis Hughston's homicide, key witness Ernestine Williams lived in a home owned by alternative perpetrator Thomas Lockwood, *see ¶* 65, *supra*, violated Kelly's state and federal due process rights.

114.    *First*, this information is favorable because it is impeachment material that would have exposed Williams' potential fear of Lockwood or bias to protect Lockwood and thus to implicate someone else, namely Kelly.

115.    *Second*, the information regarding Ernestine Williams' connection to Thomas Lockwood was suppressed. The evidence supporting this claim comes from a record of the Philadelphia Police Department's attempts to locate and arrest Lockwood for the Williams's homicide. *See* 6/14/1994 Philadelphia Police Fugitive Task Force Activity Sheet re: 2023 N. Bambrey Street. According to police activity sheets, Philadelphia real estate records indicated that Thomas Lockwood owned 2023 N. Bambrey Street. This information spurred police to visit 2023 N. Bambrey and interview Ernestine Williams and her then boyfriend Kevin Mathis, in an attempt to locate Lockwood. *See* 6/15/1994 Ernestine Williams Interview (PCRA Pet'n Exh. 38). Neither the real estate records nor the police activity sheets are listed in the letters documenting the discovery produced before Kelly's trial, and trial counsel has confirmed he did not receive them. *See* 11/9/1995 Discovery Letter; Seay Cert. ¶ 9.

116.    In fact, it appears that the only information regarding Williams's residence during Kelly's trial came from Detective Hoffner's testimony. He testified that he was "aware" that Williams did not own 2023 N. Bambrey, but he did not say who did. *See* N.T. 8/16/1996, 37. This

31

testimony was incomplete and insufficient to alert counsel to the relationship between Williams and Lockwood.

117. *Third*, as discussed above, the information that a central Commonwealth witness was directly connected to an alternative suspect is material to Kelly's defense. Although defense counsel cross-examined Williams and police investigators on her inconsistencies and the basis for her identification, counsel lacked an obvious explanation for why Williams might have come to falsely accuse Kelly. *See* Seay Cert. ¶ 9. In fact, during closing arguments, the Commonwealth balked at defense counsel's assertion that Williams' may have been approached by the actual shooters and told to keep quiet. "Defense counsel in their opening said to you, the reason why she's saying its these two men is that there were two other men involved and that they paid her a visit and she's afraid of them. What does that—if she's afraid of them, them right out there, them, what good does that do her to come in here and identify these two defendants?" N.T. 8/19/1996, 52

118. The suppressed real estate records, however, demonstrated that Williams had a direct relationship to Lockwood—one that may have motivated her to both conceal what she knew about his involvement and to identify Kelly after consistent police "harras[ment]." *See* 7/20/1995 Ernestine Williams Interview with Jerry Benoff.

119. As confirmed by trial counsel, had the Commonwealth disclosed these records, it would have "significantly changed [his] pre-trial investigation strategy", would have enabled him to "fully cross examine [] Williams" regarding her connection to Lockwood, and would have allowed him to provide the jury with an alternative and more concrete explanation of her fear and why she may have been biased or motivated to change her statements throughout the investigation and to testify against Kelly. *See* Seay Cert. ¶ 9; *see also Kyles*, 514 U.S. at 434

32

(Evidence that tends to impeach prosecution witnesses may be material under this standard);

*Youngblood*, 547 U.S. at 868.

120.    Had this information, in conjunction with Baxter's identification, been disclosed, there is a reasonable probability that the outcome in this case would have been different.

## IV.    The Commonwealth Suppressed That Thomas Lockwood Was Convicted Of A Similar Homicide Occurring Just Four Blocks Away And Within Mere Months Of The Hughston Murder.

121.    The Commonwealth's suppression of information that in February 1995 Thomas Lockwood was arrested for and subsequently convicted of the Stacy Williams homicide, a murder that shared a number of factual similarities with the Hughston offense and occurred at a nearly identical location during the same time period in 1993, *see* ¶¶ 66-77, *supra*, violated Kelly's state and federal due process rights.

122.    *First*, this information is favorable to Kelly because it would have allowed him to point to Thomas Lockwood as an alternative suspect, who, unlike Kelly, had ties to the drug trade in the neighborhood where Hughston's murder took place.

123.    *Second*, this information was suppressed. The evidence supporting this claim comes from the evidence that the Commonwealth relied on to convict Lockwood of Williams's homicide, including records of police activity, witness statements, and arrest information. *See* n.6, *supra*; *see also* Thomas Lockwood Arrest Photo (PCRA Pet'n Exh. 39). Lockwood's trial for the Williams homicide occurred in March 1996, five months before Kelly's August 1996 trial. *See* Docket, *Commonwealth v. Lockwood*, No. CP-51-CR-0209951-1995.

124.    As confirmed by trial counsel, none of this material was included in the discovery provided before trial. *See* Seay Cert. ¶ 10; *see also* 11/9/1995 Discovery Letter. Defense counsel

33

had no way to access the information from the Williams H File and had no reason to know or suspect the connection between the two murders.

125.   *Third*, this information is material. During Kelly's trial, the Commonwealth theorized that Hughston was killed following a dispute over drug territory. *See* N.T. 8/14/1996, 36-37. However, the Commonwealth was not able to provide the jury with any evidence that connected Kelly, a full-time city employee without any prior connection to the sale or distribution of narcotics and who did not fit the physical description of either of the alleged perpetrators,[18] to the illegal sale of drugs.

126.   By contrast, the information contained in the Williams' H File illustrates that Thomas Lockwood had an extensive connection to the immediate vicinity of both the Hughston and Williams homicides.[19] For example, growing up, Thomas Lockwood lived with his mother, father, and siblings just a half block away from the Hughston murder scene at 2554 Page Street and, as noted above, owned the property where Ernestine Williams lived, located just two doors down from where Hughston was shot. *See* Thomas Lockwood Arrest Photo (providing Lockwood's address); 6/14/1994 Philadelphia Police Fugitive Task Force Activity Sheet.

---

[18] In both the Hughston and William homicides, witnesses consistently described seeing either two or three young black males, ranging in age from late teens to early twenties, with slim builds, standing approximately 5'7" to 6'0." Witnesses described similar behavior following each homicide, with the men fleeing the scene on foot before leaving the area in a light-colored getaway and also described one of the assailants wearing similar clothing in each of the homicides, namely a 3/4 length black trench coat. As discussed above, *see* ¶¶ 22, 24, n.9, *supra*, Lockwood was a much closer fit to these descriptions than Kelly in age, height, build, and access to a vehicle matching the description of the car used to flee both scenes. *See* Lockwood Arrest Photo.

[19] *See* n.9, *supra*.

34

127.    Additionally, numerous witnesses, including Steven Anderson, told police that Thomas Lockwood was engaged in frequent incidents of violence in an effort to control particular disputed drug corners in the area..[20]

128.    Kelly's defense at trial was severely prejudiced where the Commonwealth suppressed evidence of an alternate suspect who had direct connections to the violent drug trade in the area and had been convicted of a homicide based on the very type of drug territory dispute the Commonwealth accused Kelly of participating in.

129.    Specifically, if Kelly had the information regarding Lockwood's conviction for the Williams homicide, he could have broadened his pre-trial investigation strategy to include witnesses to that murder, like Steven Anderson and others who were acquainted with and could provide a physical description of Thomas Lockwood as well as describe the various on-going drug territory disputes Lockwood was involved in. *See* Seay Cert. ¶ 10; *see also* DeLosa Certification.

130.    It is well established under federal law that the protection of Brady extends to the defendant's ability to investigate alternate defense theories and to formulate trial strategy. *See Bagley*, 473 U.S. at 683 (a court must consider "any adverse effect that the prosecutor's failure ... [to disclose the evidence] might have had on the preparation or presentation of the defendant's case"); *see also Dennis*, 834 F.3d at 308 (evidence of another lead was material because it "would have impacted the course of the trial, which includes investigative activities").

131.    The availability of this material would also have allowed trial counsel to cross-examine witnesses on Lockwood's similarity to the described suspects, Lockwood's connection to the neighborhood, and whether Lockwood may have had a motive to kill Hughston.

---

[20] *See* n.9, *supra*; *see also* ¶¶ 66-77, *supra*.

132.   As confirmed by trial counsel, this information in conjunction with all of the suppressed information detailed above, would have enabled him to present the jury with a far more robust alternative perpetrator theory. *See* Seay Cert. ¶ 10; *see also Natividad v. Beard*, No. 08-449, 2021 WL 3737201, at \*10-12 (E.D. Pa. Aug. 24, 2021) ("[T]here is a reasonable probability that had the jury heard an 'other person' defense, the result of the proceeding would have been different.").

133.   Additionally, Kelly could have cross-examined law enforcement witnesses on the thoroughness of their investigation and their efforts to investigate Lockwood and rule him out as a suspect. *See* N.T. 8/16/1996, 53-55. *See, e.g.*, *Kyles*, 514 U.S. at 446-51 ("[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation . . . and we may consider such use in assessing a possible *Brady* violation"); *Dennis*, 834 F.3d at 311 (holding alternate perpetrator lead was material because defense counsel "could have used the information contained in the . . . documents to challenge detectives at trial regarding their paltry investigation of the lead").

134.   For example, Detective Hoffner testified that, although investigators had been given the names of many potential suspects, including the name of Thomas Lockwood's family member, Daniel, none of these alternative perpetrators were investigated as law enforcement was focused only on Kelly and Mullins by the middle of 1993.

135.   Had this information been disclosed, especially in conjunction with Williams' connection to and Baxter's previous identification of Lockwood, there is a reasonable probability that the outcome in this case would have been different.

36

## **CLAIM II**

### **KELLY IS ENTITLED TO RELIEF BECAUSE THE CUMULATIVE EFFECT OF THE CONSTITUTIONAL VIOLATIONS AT HIS TRIAL RENDERED IT FUNDAMENTALLY UNFAIR, VIOLATING HIS DUE PROCESS RIGHTS.**

136.    In the alternative, should the Court decide that Kelly is not entitled to relief based on any individual constitutional claim he has raised for failure to show prejudice, it should nevertheless grant him relief because the cumulative effect of the constitutional errors he raises rendered his trial fundamentally unfair, violating his right to due process. *See Albrecht v. Horn*, 485 F.3d 103, 138-39 (3d Cir. 2007) ("We recognize that errors that individually do not warrant habeas relief may do so when combined."). In particular, *Brady* material must "be considered collectively, not item by item." *Kyles*, 514 U.S. at 436-37; *see also Wearry*, 577 U.S. at 394 (holding that "state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively").

137.    The suppression of the four Thomas Lockwood related facts outlined above robbed Kelly of his ability to adequately prepare for and defend himself at trial.

138.    *First,* Kelly and his defense team were unable to conduct a focused pre-trial investigation and thus were unprepared to present the jury with a concrete alternative perpetrator theory. *See Dennis*, 834 F.3d at 308.

139.    Had the required information been disclosed, Kelly's defense team could have explored whether Thomas Lockwood matched the physical description of Hughston's shooters, investigated Lockwood's connection to the neighborhood, determined what types of vehicles he drove or was associated with, and investigated whether he had any prior connection to the sale of drugs in the community.

140.    As it stood, however, Kelly's defense team was left to merely speculate regarding some unknown uninvestigated alternative perpetrator.

37

141. *Second*, as detailed above, at trial the Commonwealth effectively rested the entirety of its case on the testimony of Baxter and Williams as the only witnesses who linked Kelly to the murder. The failure to disclose the suppressed material robbed Kelly of his ability to fully confront his accusers and prevented the jury from performing its critical task of making a full and fair credibility assessment of the witnesses presented before it. The suppressed information undermined both witnesses, demonstrating a direct relationship between Williams and Lockwood and critically undermining Baxter's in-court identification testimony. If defense counsel had the suppressed material "the value of [] those witnesses would have been substantially reduced or destroyed." *Kyles*, 514 U.S. at 441.

142. Moreover, defense counsel called only one witness on Kelly's behalf—the victim's brother, Kenyatta Hughston. Kenyatta critically testified that in the days immediately after his brother's shooting, Williams told him that "**Tommy**, Kendall, and Boochie" were responsible for his brother's death. N.T. 8/16/1996, 65 (emphasis added). During closing arguments, however, the Commonwealth questioned the accuracy of Kenyatta's memory as well as his motivations for coming forward—"You have to think about what his motivations were then and now. . . . This is someone who supposedly gave him all kinds of critical information. Was it Ernestine Williams? Oh yeah, that's it. Five minutes later he can't even remember her name." N.T. 8/19/1996, 59-60.

143. Had the jury known about Williams' underlying connection to Lockwood and Lockwood's substantial ties to the community, Kenyatta's testimony regarding this conversation may well have been given more weight by the jury.

144. Taken together, the suppression of this critical evidence resulted in a trial in which no reliable adjudication of guilt or innocence could have taken place.

## CLAIM III

## KELLY IS ACTUALLY INNOCENT OF THE OFFENSE. HIS CONVICTION AND SENTENCE REPRESENT A FUNDAMENTAL MISCARRIAGE OF JUSTICE.

145.   In addition to his due process claims, Kelly's actual innocence is an independent substantive ground upon which to relieve him of his unconstitutional incarceration. *See, e.g.*, *House v. Bell*, 547 U.S. 518 (2006) (remanding capital case for evidentiary development on whether petitioner was actually innocent; the petitioner subsequently was exonerated); *Kuhlman v. Wilson*, 477 U.S. 436, 452 (1986) ("a prisoner retains a powerful and legitimate interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated"); *In re Winship*, 397 U.S. 358, 264 (1970) ("It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned.").

146.   In *Herrera v. Collins*, 506 U.S. 390, 417 (1993), the Supreme Court stated: "We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." The Third Circuit has also considered whether a freestanding actual innocence claim exists even in the non-capital context, but it too has not yet decided the issue. *See, e.g.*, *Lee I*, 667 F.3d at 400 (declining to decide the issue because the case was resolved on other grounds).

147.   The Supreme Court has, however, treated actual innocence as a gateway for consideration of procedurally defaulted claims. *See McQuiggin v. Perkins,* 569 U.S. 383 (2013); *Schlup v. Delo,* 513 U.S. 298 (1995). The standard for establishing actual innocence in that circumstance is showing that "it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence." *Schlup*, 513 U.S. at 327-29. This Court

39

should extend that standard and recognize actual innocence as a freestanding claim because the continued incarceration of one who is actually innocent shocks the conscience and violates substantive due process.

148.    This is the appropriate case for recognizing such a claim, and Kelly has met the *Schlup* standard.

149.    Before the disclosure of the previously suppressed material, the Commonwealth's case against Kelly was weak and based entirely on the identification testimony of two witnesses with significant credibility issues. After the exculpatory evidence was produced, no reliable evidence remains. The newly disclosed evidence that Baxter identified an entirely different person before trial critically undermines his surprise in-court identification. Similarly, the newly disclosed evidence that Williams had a direct relationship to another potential suspect suggests she had a motivation to lie about Kelly in order to protect herself. This motivation is particularly damaging to the Commonwealth's case because Williams initially denied seeing anything and gave dramatically different accounts of the crime over repeated interviews. No other evidence at trial implicated Kelly. Moreover, other suppressed evidence demonstrates that the man Baxter identified, Thomas Lockwood, is a viable alternative suspect in the Hughston homicide.

150.    Should this Court find that, given all of the above, Kelly is "actually innocent" of the charges for which he was convicted, this is an appropriate case in which to recognize a freestanding actual innocence claim and grant immediate relief.

## ALLEGATIONS PURSUANT TO 28 U.S.C. § 2244

151.    The Court may consider a second or successive habeas corpus petition where:

> (2) A claim presented in a second or successive habeas corpus
> application under section 2254 that was not presented in a prior
> application shall be dismissed unless– . . .

> (B)(i) the factual predicate for the claim could not have been
> discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of
> the evidence as a whole, would be sufficient to establish by clear
> and convincing evidence that, but for constitutional error, no
> reasonable fact finder would have found the applicant guilty of the
> underlying offense.

28 .S.C. § 2244.

152.    As articulated throughout this petition, Kelly satisfies paragraph 2(B)(i) in that the facts presented herein could not have been previously discovered through the exercise of diligence. The information that supports this petition was suppressed by the Commonwealth and only disclosed to Kelly for the first time on August 30, 2021 and March 15, 2022, respectively. Kelly files the instant petition within one year of those disclosures.

153.    Additionally, as outlined above, in the context of suppressed evidence this Court has made clear that the "United States Supreme Court has never recognized an affirmative due diligence duty of defense counsel as part of *Brady*, let alone an exception to the mandate of Brady as this would clearly be." *Dennis*, 834 F.3d at 290. "Crucially, the defendant's 'reasonabl[e] expect[ation]' that the government will comply with *Brady* . . . does not evaporate upon conviction or after trial." *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 293 (3d Cir. 2021) (citing *Wilson v. Beard*, 426 F. 3d 653 (3d Cir. 2008)). Because of these principles, "a habeas petitioner's *Brady* claim is timely under § 2244(d)(1)(D) so long as it is filed within one year of the date on which the petitioner has reason to believe that the prosecution may have violated its duty of disclosure." *Id.*

154.    Nevertheless, even though diligence should not be required in this situation, Kelly has made the required reasonable efforts to protect his interests by seeking relief through the court system, *see* PCRA Pet'n ¶¶ 77-85 (detailing procedural history), and attempting on his own to

41

ascertain facts to prove his innocence, *see* ¶¶ 82-88, *supra*; *see also Munchinski v. Wilson*, 694

F.3d 308, 330 (3d Cir. 2012) (stating that due diligence requires only that the petitioner have acted

with "reasonable diligence in the circumstances. . . If a petitioner 'did what he reasonably thought

was necessary to preserve his rights . . . based on information he received . . . , then he can hardly

be faulted for not acting more 'diligently' than he did.'") (citing *Holmes v. Spencer*, 685 F.3d 51,

65 (1st Cir. 2012)). When that analysis is conducted, the Court's jurisdiction over this petition is

clear.

 155.   Despite Kelly's best efforts, the Commonwealth's suppression prevented him from

discovering the material and exculpatory evidence that forms the basis of this petition.

Additionally, the Commonwealth's suppression denied Kelly due process as protected by the

Fourteenth Amendment. Mr. Kelly is actually innocent of the crime for which he was convicted.

 156.   Habeas relief is warranted.

<center>**REQUEST TO HOLD THESE PROCEEDINGS IN ABEYANCE**</center>

 157.   The claims raised in this habeas petition are virtually identical to the claims raised

by Kelly within this past year in a Pennsylvania (successor) state post-conviction petition. Kelly's

pending PCRA proceeding will either result in the award of relief to Kelly, or the exhaustion of

his claims and underlying facts.

 158.   As Kelly's state post-conviction proceedings are unresolved, he has not exhausted

his state court remedies, and federal habeas review would be premature. *See, e.g.*, *O'Sullivan v.

Boerckel*, 526 U.S. 838, 842 (1999) ("state prisoner must give the state courts an opportunity to

act on his claims before he presents those claims to a federal court in a habeas petition").

 159.   Kelly is compelled to seek the protection of the federal courts before exhausting

state court remedies, however, because his failure to do so could forever bar him from obtaining

federal habeas review of the claims he is currently litigating in state court. AEDPA has a one-year

<center>42</center>

limitations period. *See* 28 U.S.C. § 2244(d)(1). Recognizing the exhaustion requirement, AEDPA allows tolling this one-year limitations period for the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2).

160. Kelly has pending in state court an "application for State post- conviction or other collateral review with respect to the pertinent judgment or claim." 28 U.S.C. § 2244(d)(2). Thus, if Kelly could be certain that his currently pending state court application would be deemed "properly filed" within the meaning of § 2244(d)(2), the AEDPA statute of limitations would be tolled by the pending state proceedings. Were that the case, Kelly would have no reason to seek this Court's protection, and he would wait until after exhaustion of state remedies before seeking federal review.

161. Kelly and his counsel believe his state court proceedings are "properly filed." Given previous United States Supreme Court construction of the term "properly filed," however, that may not be determined until after the state courts rule. If the Commonwealth argues and the state courts agree that Kelly's PCRA petition is untimely, then, under *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), Kelly's state court application could be deemed not properly filed and the pending state court application would not toll AEDPA's limitations period. Kelly therefore must now seek federal review or risk the forfeiture of his federal claims altogether.

162. Although there exists a strong argument that Kelly would be entitled to "equitable tolling" of the AEDPA limitations period, if the courts rule that equitable tolling is not available in this case, Kelly's failure to seek federal review now could result in forfeiture of his rights under federal law.

43

163.    The claims Kelly raises are worthy of federal review and demonstrate that Kelly should have his right to federal review preserved if relief does not come through the state petition. In the meantime, under the "suspense" or "abeyance" doctrines, the federal litigation would be stayed pending exhaustion in the state court. *See Rhines v. Weber,* 544 U.S. 269, 277 (2005).

164.    This petition, therefore, is filed within the year allowed by AEDPA, although federal review is technically premature. Since state court remedies have not been exhausted, and because even a dismissal without prejudice in federal court could endanger Kelly's right to seek federal review after exhaustion, federal habeas proceedings should be held in suspense or abeyance pending the outcome of the state court proceedings.

## CONCLUSION AND REQUEST FOR RELIEF

Based on the information presented above, Kelly presents credible evidence that his trial was fundamentally unfair because of significant violations of his due process rights. The Commonwealth denied him powerful exculpatory evidence that undermined his ability to investigate, prepare a defense, and challenge the only witnesses connecting him to the offense with significant evidence of bias and inconsistencies. This denial of his basic right to defend himself was even more prejudicial where the suppressed evidence pointed to a credible alternative perpetrator who had direct connections to the Commonwealth's speculative theory of the crime. Had the jury been provided with this exculpatory information a different verdict in this case would likely have been achieved.

For all of the above reasons and the attached exhibits, Petitioner requests that the Court:

A.    Hold these proceedings in abeyance pending resolution of the state court proceedings;

44

B.      Upon reactivation of these proceedings, that the Court require the
        Commonwealth to respond to this *Petition*;

C.      Permit evidentiary development and discovery as needed for the resolution of
        Petitioner's claims; and

D.      Grant habeas corpus relief.

Respectfully submitted,

Nilam A. Sanghvi, Esq.
Attorney I.D. No. 209989
Ryan Becker, Esq.
Attorney I.D. No. 331376
PENNSYLVANIA INNOCENCE PROJECT
Temple University Beasley School of Law
1515 Market Street, Suite 300
Philadelphia, PA 19102
215-204-4255

Elizabeth A. DeLosa, Esq.
Attorney I.D. No. 309521
PENNSYLVANIA INNOCENCE PROJECT
Duquesne University School of Law
Tribone Building
914 Fifth Avenue
Pittsburgh, PA 15219
412-396-5877

*Counsel for James Kelly*

# EXHIBIT 1

FILED
08/29/2022 06:46:10 PM
Post Trial Unit
By: K. JOH

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## CRIMINAL TRIAL DIVISION

| COMMONWEALTH OF PENNSYLVANIA, | : | |
|---|---|---|
| Respondent | : | |
| | : | |
| | : | |
| v. | : | CP-51-CR-1011621-1995 |
| | : | |
| JAMES KELLY, | : | |
| Petitioner | : | |

On this _____ day of _____, 20____, upon consideration of Petitioner

James Kelly's petition pursuant to the Post Conviction Relief Act, and after considering the

Commonwealth's position, it is hereby ORDERED AND DECREED that Petitioner's request for

an evidentiary hearing is GRANTED.

The hearing shall be scheduled before this Court on the _____ day of _____,

20____, at _____ o'clock _____.m.

By the Court:

_____

J.

Nilam A. Sanghvi
Attorney No. 209989
Ryan Becker
Attorney No. 331376
THE PENNSYLVANIA INNOCENCE PROJECT
1515 Market Street, Suite 300
Philadelphia, PA 19102

Elizabeth DeLosa
Attorney No. 309521
THE PENNSYLVANIA INNOCENCE PROJECT
Tribone Center
914 Fifth Avenue
Pittsburgh, PA 15219

*Attorneys for Petitioner James Kelly*

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | PHILADELPHIA COUNTY COURT OF |
| Respondent | : | COMMON PLEAS |
| | : | CRIMINAL TRIAL DIVISION |
| | : | |
| v. | : | CP-51-CR-1011621-1995 |
| | : | |
| JAMES KELLY, | : | |
| Petitioner | : | |

## PETITION FOR POST-CONVICTION RELIEF

To the Honorable Judges of the Philadelphia County Court of Common Pleas:

Petitioner James Kelly, by and through undersigned *pro bono* counsel, hereby files this

Petition for Post-Conviction Relief Pursuant to 42 Pa. C.S. § 9541 *et seq*. For the reasons set

forth here, this Court should hold an evidentiary hearing, vacate Kelly's conviction, and grant

him a new trial.

## INTRODUCTION

1. James Kelly has been incarcerated for the last 27 years for a homicide he did not

commit. Kelly, a thirty-six-year-old former Marine who worked for the City of Philadelphia at

the time of the crime, adamantly maintains that he had nothing to do with the January 1, 1993 murder of Travis "Bud" Hughston.

2.      At trial, the Commonwealth argued that Hughston was killed because of a drug territory dispute. Unable to link Kelly to any previous history of drug dealing or any connection to an active drug territory dispute, the Commonwealth's case rested entirely upon the identification testimony of two witnesses, Ernestine Williams and Colie Baxter, both of whom had significant credibility issues and one of whom (Baxter) identified Kelly as involved in the crime for the first time at trial, three years after the incident.

3.      On August 30, 2021 and March 15, 2022, respectively, the Philadelphia County District Attorney's Office ("DAO") gave counsel access to the Philadelphia Police Department's homicide investigation files (the "H Files") for the Travis Hughston[1] and Stacy Williams murders. Both files contained critical exculpatory information previously undisclosed to Kelly or any of his attorneys during the last 27 years.

4.      After a careful review of both H Files, a theme emerged—Thomas Lockwood, a 19-year-old young man at the time of the crime, who had a reputation in the community as a mid-level drug dealer with a strong propensity for violence, was an obvious alternative suspect deserving of police attention. Unfortunately, Lockwood went completely uninvestigated for his potential role in the Hughston homicide. Instead, based solely on Ernestine Williams' ever-changing story, the Commonwealth proceeded to trial against Kelly.

5.      Today, however, with the recent disclosure of the Williams and Hughston H Files, it is clear that at the time of Kelly's 1995 arrest and subsequent 1996 trial, the Commonwealth

---

[1] The DAO located only a small portion of the Hughston H File but provided the full Williams H File.

2

was aware and in possession of documentation supporting four critical and previously suppressed facts:

    a.    Key witness, Colie Baxter made a pre-trial identification of Thomas Lockwood, **not James Kelly**, as the driver of the getaway vehicle he saw fleeing the Hughston homicide scene;

    b.    Thomas Lockwood was known to own and drive at least four white or light-colored vehicles matching the description of the getaway car given by several witnesses on the night of Hughston's murder;

    c.    At the time of the Hughston and Williams homicides, Ernestine Williams lived in a home owned by Thomas Lockwood; and

    d.    In 1995, Thomas Lockwood was charged with and convicted of the Williams homicide (which occurred in September 1993), a crime that shared several factual similarities with the Hughston homicide and that occurred just four blocks away from the scene of Hughston's homicide.

6.    Had any of the above facts been disclosed to Kelly or his defense counsel before trial, as required by *Brady v. Maryland* and its progeny, they would likely have changed defense counsel's pre-trial investigation, cross examination strategy, and ultimately the outcome of Kelly's trial.

7.    Moreover, had this critical evidence been disclosed, defense counsel would have had the opportunity to locate and interview witnesses to the Stacy Williams homicide. These interviews may have yielded new information further linking Thomas Lockwood to the offense. Specifically, had this critical evidence been disclosed, defense counsel would have been alerted to the existence of Steven Anderson, a close friend of Stacy Williams who was well acquainted

3

with Thomas Lockwood, his associates, and the violent drug territory disputes that were occurring in the neighborhood at that time. Anderson recalls Lockwood being connected with light-colored vehicles and working with two drug dealers in the neighborhood who may have been involved in Hughston's homicide. Had Anderson been interviewed 27 years ago, before Kelly's trial, the outcome of this case may well have been different.

8.    The Commonwealth's failure to disclose this critical evidence robbed Kelly of his ability to properly conduct a comprehensive pre-trial investigation as well as to fully confront his accusers. Moreover, the Commonwealth's suppression of this information prevented the jury from performing its critical task of making a full and fair credibility assessment of the witnesses presented to it. Simply put, the suppression of this critical evidence resulted in a trial in which no reliable adjudication of guilt or innocence could have taken place.

9.    Kelly now files this petition to raise the above referenced *Brady* and new evidence claims.

10.    Under these circumstances and consistent with the requirements of the Post Conviction Relief Act, this Court should, at minimum, grant Kelly an evidentiary hearing. Based on the significant evidence of constitutional violations and the newly-discovered Anderson evidence, Kelly is entitled to a new trial.

### Factual Background

#### *Travis Hughston's Death And The Police Investigation*

11.    At approximately 8:08 p.m. on January 1, 1993, Travis Benjamin Hughston, known as Bud, was shot to death while standing outside his girlfriend Tameka Ledbetter's home at 2000 N. Bambrey Street.

12.    Emergency calls were immediately received, and police were dispatched to the

4

area. *See* Emergency Dispatch Records (attached as Exhibit 1).

13.    Upon being dispatched to the scene, Officers Stephen McCuster and Thomas Demalto encountered a black male who was later identified as Colie Baxter[2] in his vehicle on 25th and Diamond Streets. Baxter directed officers to the location of the gunfire. *See* 1/1/1993 Officer Mark Alston Statement (attached as Exhibit 2).

14.    Officers found Hughston lying face down just outside 2027 N. Bambrey Street. He was transported to a hospital and then pronounced dead at 8:26 p.m. N.T. 8/14/1996, 65-66; N.T. 8/15/1996, 6, 130.

15.    As mentioned above, Colie Baxter was one of the first witnesses to encounter police on the night of Hughston's homicide. *See* 1/1/1993 Colie Baxter Police Interview (attached as Exhibit 3); *see also* 1/1/1993 Alston Statement. Baxter was interviewed twice during the investigation—first on the night of the homicide and again approximately ten months later on October 13, 1993 during a pre-trial identification procedure. *See* 10/13/1993 Colie Baxter Police Interview (attached as Exhibit 4).

16.    According to Baxter's initial statements, he was stopped at a red light on 25th and Diamond Streets when he heard several gunshots. *See* 1/1/1993 Baxter Police Interview at 1. He immediately pulled his car to the side of the street and observed two black males run from the direction of the scene and enter a small two door white car with sun guards in the back window. *Id.* at 2.

17.    Baxter described the driver of the getaway vehicle as "brown skin, in his 20's, about 5'8", 180lbs . . . carrying something in his right hand by the way he was holding his arm to

---

[2] Various police reports indicate that on the night of Hughston's homicide, Baxter gave law enforcement the name Corey Braxton. *See* 1/1/1993 Alston Statement. In this petition, we refer to him as Colie Baxter, the name he gave at trial. *See* N.T. 8/15/1996, 7.

5

his side, he was wearing a dark hat, like a Kofu or maybe knit, [and] a long black trench coat." *Id.* Baxter described the passenger as "a black male, in his 20's too . . . shorter about 5'5", thin, dark brown complexion . . . [and] wearing a light to medium blue sweat suit with some red in it." *Id.*

18.     According to Baxter, the vehicle slowed while it passed him, allowing him to make eye contact with both occupants. *Id.* at 1-2.

19.     Officers Tyrone Redding and Mark Alston arrived on scene shortly thereafter and immediately began to secure the scene and interview witnesses. *See* 1/1/1993 Alston Statement; 1/1/1993 Officer Tyrone Redding Statement (attached as Exhibit 5). Based on these interviews, a flash description was sent to on-scene and nearby law enforcement to be on the lookout for two black males between the ages of 18-20 years old, standing approximately 6'0" feet tall, wearing a 3/4 length black trench coat and red pants, and driving a white compact car with sun visors in the rear window. *See* 1/1/1993 Telephone and Radio Tap Transmittal (attached as Exhibit 6).

20.     George Patterson, owner and resident of 2000 N. Bambrey Street, told police that he had been watching football with his niece Tameka Ledbetter and her boyfriend Travis Hughston. *See* 1/1/1993 George Patterson Police Interview (attached as Exhibit 7). Patterson observed Ledbetter and Hughston saying goodbye. *Id.* at 1. Shortly after Hughston left the home, Patterson heard several gunshots. *Id.* at 1-2. Consistent with other witness descriptions, Patterson reported that when he looked outside, he saw a man in a long black trench coat running toward Diamond Street. *Id.* at 2. He pulled his niece back inside the house and instructed her to call the police. *Id.*

21.     Tameka Ledbetter told police that Hughston had been at her home with her that night. *See* 1/1/1993 Tameka Ledbetter Police Interview (attached as Exhibit 8). She reported that

6

Hughston had just left when she heard three gunshots. *Id.* at 2. She went outside where she saw Hughston laying on the ground approximately two houses away. *Id.*

22.    Ledbetter further reported seeing a black male standing on the corner of N. Bambrey and Page Streets putting a gun in his waistband; he wore a black skull cap and black ¾ length trench coat. *Id.* at 3-4. She watched the male enter a white vehicle, drive toward Diamond Street, and turn onto Glenwood Avenue. *Id.*

23.    As background, Ledbetter reported that Hughston was involved in the illegal sale of drugs in the area. *Id.* at 4. She did not believe that Hughston sold the drugs himself but instead had others working for him. *Id.* She stated that in the months before Hughston's homicide several people had been shot in the neighborhood. *Id.* at 5. Rumors circulated that Hughston may have had something to do with the shootings, but she did not believe this because she and Hughston were out of town at the time of each of the shootings. *Id.*

24.    Police also interviewed Ernestine Williams on the night of Hughston's homicide—the first of multiple interviews with police and a defense investigator that would result in eight different statements over the course of the next two years.

25.    Williams initially told police that she was in her second story bedroom with her boyfriend Kevin Mathis when they both heard gunshots. *See* 1/1/1993 Ernestine Williams Police Interview (attached as Exhibit 9). Mathis immediately looked out the window and told her that someone was lying on the ground. *Id.* Only then did Williams look out the window to see a man lying on the ground and a woman standing next to him crying and screaming. *Id.* Williams denied seeing the shooting, anyone with a gun, or anyone running away from the scene. *Id.* at 2-3.

26.    On March 21, 1993, Williams provided a second statement. *See* 3/21/1993

7

Ernestine Williams Police Interview (attached as Exhibit 10). During this interview, Williams

told detectives that she had in fact witnessed the shooting and had even spoken with Hughston's

assailants before his death. *Id.* Williams described one of the two perpetrators as standing 5'7",

weighing approximately 180lbs, and wearing a long black leather coat, black shoes, and a black

turtleneck. *Id.* She described the other man as standing approximately 5'11-6'1", with big lips

and a medium build, and wearing a beige full-length coat and dress shoes. *Id.* at 2.

27.     Williams provided her third and fourth statements on September 14 and 15, 1993.

*See* 9/14/1993 and 9/15/1993 Ernestine Williams Police Interviews (attached as Exhibits 11 and

12).

28.     On September 14, Williams stated that she could now name Hughston's shooter

as she had been buying drugs from him over the last several months. *See* 9/14/1993 Williams

Police Interview.

29.     On September 15, after being shown two photo arrays, one containing the picture

of Larry Mullins and the other containing a fifteen-year-old picture of James Kelly, Williams for

the first time identified Larry Mullins as Hughston's shooter and James Kelly as Mullins'

accomplice. *See* 9/15/1993 Williams Police Interview.

30.     On July 2, 1995, nearly 22 months after her September 1993 identification, police

again interviewed Williams and she claimed for the first time that she saw Kelly pass Mullins a

gun before the shooting. *See* 7/2/1995 Affidavit of Probable Cause (attached as Exhibit 13).

31.     On July 6, 1995, Kelly was arrested and charged with homicide, possession of an

instrument of crime; violation of the Uniform Firearms Act, and criminal conspiracy.

32.     A few weeks after Kelly's arrest, on July 20, 1995, Williams spoke to Jerry

Benoff, a private investigator for the defense. *See* 7/20/1995 Ernestine Williams Interview with

8

Jerry Benoff (attached as Exhibit 14). To Benoff, Williams claimed that in the aftermath of Hughston's homicide she was being "harassed" by the police. *See id.* at 5-6.[3] Williams claimed that police brought her to the homicide division for questioning "about six times" before she made her March 21, 1993 statement. *See id.* at 6.

33.     Williams also claimed that during her initial interviews, police detectives did not believe her and speculated that she was "taking money from these other guys, drug dealers, to put the blame on somebody else." *Id.* at 10.

34.     Williams reported that, during one of the interviews, police showed her a single 8x10 picture of James Kelly and told her his name. *Id.* at 16. They did this even though other detectives, whose names she could not recall, told her they believed "Tommy," a man who lived on Page Street, was involved in the homicide. *Id.* at 15.

35.     On October 31, 1995, just before the preliminary hearing, Williams gave her seventh statement, changing some details given in her prior accounts. *See* 10/31/1995 Ernestine Williams Police Interview (attached as Exhibit 15).

36.     Minutes after providing that statement, Williams testified for the Commonwealth at Kelly's and Mullins' preliminary hearing, providing her eighth recorded statement. When asked to identify Kelly, Williams stated "he don't look like the picture I saw." N.T. 10/31/1995, 28-29. It was not until the court declared Williams a hostile witness that she acquiesced and identified Kelly as the man she saw the evening of Hughston's murder who passed Mullins the

---

[3] Detective Leon "Luby" Lubiejewski was one of the detectives assigned to this investigation. *See* 10/31/1995 Williams Statement at 1. During Detective Lubiejewski's career with the Philadelphia Police Department, he was alleged to have committed various acts of misconduct, including concealing exculpatory evidence pointing to an alternative perpetrator and threatening and incentivizing vulnerable witnesses into making false identifications and providing false testimony. *See* The Homicide Files, *The Philadelphia Inquirer* (available at https://www.inquirer.com/crime/inq2/philadelphia-murder-homicide-cases-database-20210507.html#/) (last accessed Aug. 29, 2022).

gun. *Id.* at 34.

37.    All charges were held over for court.

### *James Kelly's Trial And Sentencing*

38.    Kelly's jury trial took place from August 14-20, 1996, with the Honorable James A. Lineberger presiding. Geoffrey Seay represented Kelly, and Richard Sax prosecuted the case for the Commonwealth. Kelly and Mullins[4] were tried together.

39.    As mentioned above, in both its opening and closing arguments, the Commonwealth speculated that Hughston's murder was related to an ongoing drug territory dispute and that Hughston was in the area in part to receive a "package," a "brown paper bag's poison contents." N.T. 8/14/1996, 35-37; N.T. 8/19/1996, 33.

40.    Kelly had no prior connection to drug sales, and the Commonwealth did not offer any evidence that he was involved in a drug dispute. *See* N.T. 8/19/1996, 69. Indeed, defense counsel objected to the Commonwealth's closing argument that the murder was drug related where there was "never, ever any testimony to even infer there was any type of drugs or any type of cocaine or crack or anything" in the package Hughston received. *Id.*

41.    Instead, the Commonwealth linked Kelly to Hughston's homicide based solely on the identification testimony of Ernestine Williams and the surprise in-court identification by Colie Baxter.

42.    **Ernestine Williams** testified that on the night of January 1, 1993, she left her home at 2023 N. Bambrey Street, where she had lived for the last seven years, with a plan to visit her mother. N.T. 8/14/1996, 81. Upon pulling out of her parking space, Williams' car broke down. *Id.* She asked several neighbors and passersby for assistance to no avail. *Id.* Eventually,

---

[4] Court-appointed attorney Charles Mirarchi represented Mullins.

she encountered two males standing outside a neighborhood speakeasy located just one block

down on Page Street. *Id*. at 84. Neither was able to assist her. *Id*. Williams eventually went back

into her home. *Id*. at 86. A few minutes later she looked out of her second story bedroom

window and observed the same two men approach and shoot Travis Hughston. *Id*. at 89-90.

Williams admitted to drinking alcohol and smoking crack cocaine throughout the day on January

1, 1993. *Id*. at 128-29. Williams made an in-court identification of James Kelly and Larry

Mullins as the two men she saw shoot Hughston. *Id*. at 110-12.

43.     **Detective Walter Hoffner** testified that during the summer of 1993 he was

assigned to the Special Investigations Unit, which investigated unsolved homicides. N.T.

8/16/1996, 5. Detective Hoffner testified that during Williams' third statement to law

enforcement, taken nine months after the homicide on September 14, 1993, she for the first time

provided law enforcement with the names James and Larry. *Id*. at 27. The next day, Williams

was again brought into the homicide division and shown two photo arrays in which she identified

Larry Mullins and James Kelly as Hughston's assailants. *Id*. at 28.

44.     Notably, on cross examination, Detective Hoffner acknowledged that the photo of

Kelly used in the photo array was taken fifteen years earlier in 1978; the photo depicted Kelly as

a 22-year-old man and better matched the description of the assailants provided by several

witnesses. *Id*. at 34-35. Detective Hoffner testified that he did this to match the other men

depicted and create a more "fair photo display". *Id*.

45.     Detective Hoffner additionally testified that "Boochie", Kendall Harris, and

Daniel Lockwood were known drug dealers in the area whose names had come up during the

investigation but for unknown reasons were not suspected to be the shooters and thus, were not

11

investigated. *Id.* at 53-54.[5]

46.     Finally, without alluding to the property's actual owner, Detective Hoffner testified that at the time of Hughston's homicide, he was aware that Ernestine Williams did not own the residence in which she lived, namely 2023 N. Bambrey Street. *See* N.T. 8/16/1996, 37.

47.     Consistent with his initial statement to police, **Colie Baxter** testified that on January 1, 1993, he was stopped at a light at 25th and Diamond Streets when he heard gunfire. *See* N.T. 8/15/1996, 8. Baxter pulled over to the side of the road. *Id.* He observed two men run from the area of the gun shots. *Id.* Baxter described the first man as wearing a long black trench coat and holding something down by his side. *Id.* The second man was wearing a sweatsuit and entered the passenger side of the vehicle. *Id.* Baxter testified that as the car drove away it slowed, and he was able to get a better look at the occupants. *Id.*

48.     While describing Baxter to the Court during an *in camera* hearing before opening statements, the Commonwealth mentioned Baxter only as a witness against Kelly's co-defendant: "Colie Baxter, as Miracrhi knows, is another eyewitness of the defendant Larry Mullins running from the scene." N.T. 8/14/1996, 8. Additionally, in the Commonwealth's opening statement, the prosecutor similarly did not indicate to the jury that Baxter would say anything to link Kelly to the crime: "He saw a man, Larry Mullins, and another man running from Bambry [sic] Street after he heard the shots, gets to their car with another man and flee." *Id.* at 49.

---

[5] During Ernestine Williams' March 21, 1993 interview, she told police that she had heard that Anna Mae Lighty was dating the man in the ¾ leather coat. *See* 3/21/1993 Williams Police Interview at 4. According to Lighty's March 28, 1993 interview (attached as Exhibit 16), neighbors at the time believed Lighty was involved in a romantic relationship with **Daniel Lockwood**, but she claimed they were just friends.

12

49.     However, in a move that surprised all parties, during his direct examination, Baxter identified Kelly, for the first time, as the driver of the vehicle he observed that evening. *Id.* at 12. On cross examination, Baxter conceded that while he had been shown "a lot of photographs" by police during his October 1993 statement, he had been unable to identify Kelly. *Id.* at 42. Baxter also conceded that Kelly looked older than the men he saw on the night of the shooting. *Id.* at 52.

50.     The Commonwealth called a number of other fact witnesses, none of whom implicated Kelly or Mullins. Specifically:

- **Delphine Howard**, owner of a speakeasy located at 2552 Page Street that was allegedly visited by the perpetrators just minutes before Hughston's death, testified that she could not remember whether anyone bought beer or alcohol from her home that evening. *Id.* at 96;

- **Catricia Hughston**, Travis Hughston's mother, provided life in being testimony. *See* N.T. 8/15/1996, 6;

- **George Patterson**, lived at 2031 N. Bambrey Street and, along with his niece (and Hughston's girlfriend) Tameka Ledbetter, visited with Hughston in their home just before his death. *Id.* at 116. Patterson testified to seeing a young black male in a 3/4 length trench coat running from the scene. *Id.*; and

- **Andre Bracey**, who testified that he was walking along N. Bambrey Street just before 8:00 p.m. on January 1, 1993 when he saw a young black male wearing a ¾ length black coat. *Id.* at 87. Bracey had a bad feeling, decided to return home, and heard gunfire a few minutes later. *Id.*

51.     The Commonwealth also called a number of law enforcement and expert

13

witnesses who testified to responding to and securing the scene as well as conducting initial witness interviews (Officers Stephen McCuster and Tyrone Redding, N.T. 8/15/1996, 127-43 and 143-52); the autopsy (Dr. Ian Hood, N.T. 8/14/1996, 57-76); and the firearms examination that showed that the bullets and casings recovered from the scene and Hughston's body most likely came from the same gun (Officer James O'Hara, N.T. 8/15/1996, 153-79).

52.    Kelly's attorney called only one witness for the defense, Travis Hughston's brother Kenyatta. **Kenyatta Hughston** testified that in the days immediately after his brother's murder, he had two conversations with Ernestine Williams in which she told him that she had witnessed the murder and that "Tommy, Kendall, and Boochie" were responsible. N.T. 8/16/1996, 64-66. Kenyatta testified also that while he knew "Boochie" and Kendall, he did not recognize, know, or have any affiliation with Kelly. *Id.* at 67.

53.    Though they were present in court and ready to testify, defense counsel failed to call two witnesses, Joan Arrington and Reverend James Beacoat, both of whom would have testified that Kelly was at home with family all night on January 1, 1993. *See* 9/19/1997 Joan Arrington Affidavit (attached as Exhibit 17); 10/3/1997 Reverend James Beacoat Affidavit (attached as Exhibit 18).

54.    The jury deliberated for nearly two full days before finding Kelly and Mullins guilty of first-degree murder and criminal conspiracy. Kelly was found not guilty of possessing an instrument of crime. The Court did not allow the Commonwealth to go to the penalty phase for either defendant because it found the aggravating circumstances to be insufficient. N.T. 8/20/1996, 13-18.

55.    On August 21, 1996, both Kelly and Mullins were sentenced to life in prison without the possibility of parole.

14

***Evidence On Which This Petition Is Based***

56.     As mentioned above, on August 30, 2021 and March 15, 2022, respectively, the

District Attorney's Office produced the H Files for the Travis Hughston and Stacy Williams

homicides. The files contained critical and previously undisclosed information linking alternative

perpetrator Thomas Lockwood to drug sales and violent drug territory disputes in the

neighborhood, as well as to both key Commonwealth witnesses, Ernestine Williams and Colie

Baxter.

57.     Specifically, the Hughston H File contained an undated police report indicating

that before his surprise in-court identification of Kelly, Baxter identified Thomas Lockwood as

the man he saw enter the driver's side of the of the getaway vehicle on the night of Hughston's

homicide. *See* Undated Police Report (attached as Exhibit 19).

58.     The Williams H File revealed three additional previously undisclosed facts as

well as critical additional witness information.

59.     *First*, in the later part of 1993, the Philadelphia Police Fugitive Task Force

searched for Thomas Lockwood in relation to the Stacy Williams homicide. Records from this

search showed that Lockwood owned and was known to drive several light-colored vehicles,[6] all

of which matched the description provided by witnesses of the getaway vehicle seen fleeing the

Hughston homicide scene. *See* 1/1/1993 Baxter Police Interview; 1/1/1993 Ledbetter Police

Interview; 1/26/1998 Lex Traylor Affidavit (attached as Exhibit 23).

---

[6] *See* Handwritten notes, referencing Beige Cadillac Pennsylvania license plate AGJ9212
(registered to Elise Clark, Lockwood's girlfriend at the time) (attached as Exhibit 20);
12/13/1993 Police Activity Sheet, referencing White Buick, Pennsylvania license plate
AAZ4599 (also registered to Clark) (attached as Exhibit 21); 6/6/1994 Police Activity Sheet,
referencing White Acura Legend, no license plate information available, and metallic beige
Nissan Maxima, partial license plate information listed as ZKH722 (attached as Exhibit 22).

60.    *Second*, Philadelphia County real estate records also obtained as part of the

fugitive search for Lockwood indicated that at the time of both the Hughston and Williams

murders, Thomas Lockwood owned the home where Ernestine Williams lived. *See* 6/14/1994

Philadelphia Police Fugitive Task Force Activity Sheet re: 2023 N. Bambrey Street (attached as

Exhibit 24). At trial, Williams testified she was inside this home when she witnessed Hughston's

shooting and continued to live there until the Commonwealth relocated her to a more affluent

neighborhood in south Philadelphia in exchange for her testimony against Kelly in 1996. *See*

N.T. 8/16/1996, 35-37.

61.    *Third*, on March 18, 1996, five months before Kelly's trial began, Thomas

Lockwood was convicted of third-degree murder for the September 21, 1993 shooting death of

Stacy Williams—a homicide that shares a number of critical similarities to the Travis Hughston

murder. Specifically, Hughston and Williams were both 19-year-old young men at the time of

their deaths, and both were known to engage in the illegal sale of drugs in the same area of North

Philadelphia. *See* 1/1/1993 Ledbetter Police Interview.[7]

62.    According to witnesses, in the days before his death, Williams and his friends

Jonathan Fuller and Steven Anderson were seen arguing with Lockwood and his cousin Anthony

over a disputed drug corner located at Croskey and W. Norris Streets—just four blocks away

from where Hughston was killed earlier that year. *See* 9/21/1993 Steven Anderson Police

Interview (attached as Exhibit 28).

---

[7] *See also* 9/23/1993 Jonathan Fuller Police Interview (attached as Exhibit 25); 9/22/1993
Frances Jones Police Interview (attached as Exhibit 26); 9/21/1993 Reshie Davis Police
Interview (attached as Exhibit 27); 9/21/1993 Steven Anderson Police Interview; 9/21/1993
Antonio Williams Police Interview (attached as Exhibit 29); 9/21/1993 Anthony Johnston Police
Interview (attached as Exhibit 30); 9/21/1993 Felicia Williams Police Interview (attached as
Exhibit 31); Philadelphia Police Homicide Case Summary for Stacy Williams (attached as
Exhibit 32).

16

63.     On September 21, 1993, Thomas and Anthony Lockwood approached Williams and while they were standing in front of 2200 West Norris Street. *See* 9/21/1993 Fuller Police Interview. In broad daylight, the Lockwoods opened fire. *Id.*

64.     Fuller survived. *Id.*

65.     Williams suffered a fatal gunshot wound to the head. *See* Philadelphia Police Homicide Case Summary for Stacy Williams.

66.     Thomas and Anthony Lockwood fled the scene on foot and, similar to witness descriptions in the Hughston homicide, both were seen entering a light-colored getaway vehicle. *See* 9/21/1993 Karen Schoolfield Police Interview (attached as Exhibit 33).

67.     Williams' close friend Steven Anderson spoke to police on the day of Williams' murder. *See* 9/21/1993 Anderson Interview. During this interview, Anderson described a violent altercation that occurred between himself, his friends (Jonathan Fuller and Stacy Williams), and Thomas Lockwood just the day before. *See* 9/21/1993 Steven Anderson Police Interview at 4-5.

68.     According to Anderson, on September 20, 1993, Anderson, Fuller, and Williams were walking together towards W. Norris and Croskey Streets when Anderson was overheard insulting Lockwood's cousin Derrick. *Id.* at 3. Shortly thereafter, Thomas Lockwood and three unknown males assaulted Anderson. *Id.*

69.     Later that day another altercation took place which resulted in Williams' younger brother, Antonio Williams, being shot in the arm by Anthony Lockwood. *Id.* at 3-4.[8]

70.     Anderson told police that the altercations between the two groups were "really over drugs" and that "Tommy want[e]d Stacy off the corner [of W. Norris and Croskey Streets] because he wouldn't make no money while Stacy was out there." *Id.* at 7.

---

[8] *See* 9/21/1993 Antonio Williams Police Interview (discussing earlier Lockwood shooting); 9/21/1993 Felicia Williams Police Interview (same).

71.    Stacy Williams was shot to death the very next day.

72.    On March 18, 1996, Lockwood was convicted of third-degree murder for the Williams homicide. *See* Docket, *Commonwealth v. Lockwood*, No. CP-51-CR-0209951-1995 (attached as Exhibit 34).

73.    At no time before Kelly's trial or during the last 27 years was any of this critical information disclosed to Kelly or any of his attorneys.

74.    After the Commonwealth disclosed the Williams H File, counsel located and interviewed Anderson, who they first learned about from the Williams H File. Anderson confirmed that he grew up in the neighborhood where Hughston and Williams were killed. *See* Elizabeth DeLosa Certification ("DeLosa Cert.") ¶ 4 (attached as Exhibit 35). Anderson also confirmed that Lockwood killed his friend, Stacy Williams. *Id*. at ¶ 5.

75.    Anderson explained that Lockwood was "a known drug dealer in [his] community," who worked for "high ranking . . . drug dealers" Abdul "Boochie" King and Kendall Harris. *Id*. at ¶ 8. Anderson reported that Lockwood violently enforced his control over drug corners in the neighborhood and had also been involved in a shooting of Williams' brother, Antonio. *Id*. at ¶ 7.

76.    Anderson further remembered that Lockwood drove around the neighborhood in a vehicle matching the description of the car that was involved in the Hughston homicide. *Compare id*. at ¶ 9 (Lockwood drove a "white Buick with sun visors in the rear windshield") *with* 1/1/1993 Baxter Police Interview (assailants' vehicle was a "small white car . . . with those sun guards in the back window").

18

## PROCEDURAL HISTORY

### *Post Sentence Motions And Direct Appeal*

77.     After Kelly's conviction, trial counsel failed to file post-sentence motions or a notice of appeal. In July 1997, Kelly filed a PCRA petition requesting that his right to appeal be reinstated, which was granted after a January 8, 1998 evidentiary hearing. Kelly filed post-sentence motions that were denied by the operation of law. On June 5, 1998, Kelly filed a direct appeal, raising several challenges to the sufficiency of the evidence and alleging that trial counsel was ineffective for failing to call numerous alibi witnesses who were available to testify. *Commonwealth v. Kelly*, 742 A.2d 1146 (Pa. Super. 1999) (unpublished memorandum). On July 9, 1999, the Superior Court affirmed Kelly's conviction but remanded for an evidentiary hearing on his claim that counsel was ineffective for failing to "call witnesses who could have exonerated him and in failing to make an opening statement." *Id.*

78.     During the evidentiary hearing, Joan Arrington, Kelly's common-law wife, testified that Kelly was with her at the time of the shooting. She explained that they had a tradition of family prayer every year on New Year's Day and that her mother, children, and Reverend James Becoat were also present. *Id.* at 87-88. Reverend Becoat also testified that he attended the gathering and that Kelly was present for the entire evening. *Id.* at 75-76.

79.     Lex Traylor testified that he saw two men leaving the scene of the shooting and neither looked like Kelly. *See* N.T. 12/6/1999, 41-44.

80.     Denise Holsey Miller testified that she grew up with Kelly. *Id.* at 59. On the night of the offense, Holsey saw Ernestine Williams asking three men for help with her car. *Id.* at 59-60. Holsey said the men were unfamiliar to her and that Kelly was not with the group.[9] *Id.*

---

[9] This was consistent with Williams' trial testimony that she had asked the assailants for help with her car and identified Kelly as one of the men she approached. N.T. 8/14/1996, 81.

19

81.     On December 8, 1999, the trial court denied Kelly's ineffective assistance of

counsel claims. *Commonwealth v. Kelly*, 764 A.2d 1124 (Pa. Super. 2000) (unpublished

memorandum). Kelly appealed, and the Superior Court affirmed on August 24, 2000. *Id.* On

September 21, 2000, Kelly filed a petition for allowance of appeal to the Pennsylvania Supreme

Court, which the Court denied on February 9, 2001. *Commonwealth v. Kelly*, 781 A.2d 141 (Pa.

2001) (unpublished memorandum).

### *PCRA Petitions*

82.     On September 26, 2001, Kelly filed a *pro se* petition for post-conviction relief.

*Commonwealth v. Kelly*, 918 A.2d 787 (Pa. Super. 2006) (unpublished memorandum). Kelly

raised several claims of ineffective assistance of counsel and a claim that the Commonwealth

suppressed exculpatory evidence related to the possible participation of a suspect he identified as

"Boochie." *Id.* The PCRA court denied his petition without a hearing. *Id.* Kelly appealed on

February 25, 2004, and the Superior Court affirmed on December 18, 2006, concluding in part

that all of Kelly's claims were waived. *Id.* Judge Ford Elliott dissented and explained that Kelly

properly preserved his argument that counsel was ineffective. *Id.* Judge Ford Elliott went on to

conclude that Kelly "was so deprived of his Sixth Amendment right to effective trial counsel for

failing to challenge the admissibility of witness-pressuring testimony and for failing to call

character witnesses that appellant is entitled to a new trial." *Id.* On April 20, 2007, Kelly filed a

petition for allowance of appeal to the Pennsylvania Supreme Court, which denied it on October

26, 2007. *Commonwealth v. Kelly*, 934 A.2d 1277 (Pa. 2007) (unpublished memorandum).

83.     On November 15, 2012, Kelly filed a third petition for post-conviction relief.

Kelly raised several claims of after discovered evidence and ineffective assistance of counsel.

*Commonwealth v. Kelly*, 108 A.3d 110 (Pa. Super. 2014). Kelly supported his claims with a

recently obtained statement from Tameka Ledbetter, the victim's girlfriend, who claimed to have identified Sharif Curry as the shooter during the police investigation. *Id*. The evidence of Curry as an alternative suspect was not disclosed to defense counsel at the time of trial. *Id*. On February 21, 2014, the PCRA court denied Kelly's petition without a hearing. *Id*. Kelly appealed, and the Superior Court affirmed on October 10, 2014. *Id*. On November 10, 2014, Kelly filed a petition for allowance of appeal to the Pennsylvania Supreme Court, which was denied on April 24, 2015. *Commonwealth v. Kelly*, 565 EAL 2014 (Pa. 2014) (unpublished memorandum).

### *Federal Habeas Corpus Petitions*

84.    On April 21, 2008, Kelly filed a timely *pro se* petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania. *Kelly v. Rozum*, No. 2:08-CV-01073, 2009 WL 3245565, at *8 (E.D. Pa. Oct. 6, 2009). Kelly sought a new trial, raising numerous claims of ineffective assistance of counsel, insufficiency of the evidence, violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and judicial misconduct. *Id*. On February 18, 2009, Magistrate Judge Rice recommended that the petition be dismissed. *Id*. at *5. On October 6, 2009, Judge Pratter adopted the Report and Recommendation, denied Kelly's petition, and determined there was no probable cause to issue a certificate of appealability. *Id*. at *1. On February 17, 2010, the Third Circuit Court of Appeals denied Kelly's request for a certificate of appealability. *Kelly v. Rozum*, No. 09-4290 (3d Cir. Feb. 17, 2010).

85.    On April 5, 2016, Kelly filed a motion, through counsel, requesting permission from the Third Circuit Court of Appeals to file a successive federal habeas petition, which the Third Circuit denied on April 19, 2016. *In re: James Kelly*, No. 16-1791 (3d Cir.).

21

## JURISDICTION & ELIGIBILITY FOR RELIEF

86.     This Court has jurisdiction over this petition, and Kelly is eligible for relief under the PCRA.

### *Jurisdiction*

87.     A PCRA petition shall be filed within one year of the date the judgment becomes final. *See* 42 Pa. C.S. § 9545(b).

88.     Though Kelly's conviction became final many years ago, the claims raised in this PCRA petition are timely under the governmental interference and new facts exceptions to the one-year limitation.

89.     Kelly's failure to raise the *Brady* claims in this petition earlier "was the result of interference by government officials with the presentation of this claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States." 42 Pa. C.S. § 9545(b)(1)(i). Specifically, the Commonwealth suppressed the evidence in the Hughston and Williams H Files on which Kelly's claims are based in violation of the Pennsylvania and United States Constitutions.

90.     Likewise, due to the Commonwealth's suppression of all information regarding Thomas Lockwood and his role in the homicide of Stacy Williams, the new "facts upon which the [instant new evidence] claim is predicated," namely the information from Steven Anderson who Kelly only learned of through the disclosure of the Williams H File, "were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." *See* 42 Pa. C.S. § 9545(b)(1)(ii)

91.     This PCRA petition is also being filed within one year of the Commonwealth's production of the Hughtson H File on August 30, 2021, within one year of the production of the

Williams H File on March 15, 2022, and within one year of counsel's August 11, 2022 interview with Steven Anderson, satisfying the requirements of 42 Pa. C.S. § 9545(b)(2).

### *Eligibility For Relief*

92.     Kelly is also eligible for relief under the PCRA because he has alleged a *prima facie* case of a miscarriage of justice as required by *Commonwealth v. Lawson*—namely that "the proceedings which resulted in his conviction were so unfair that a miscarriage of justice occurred which no civilized society could tolerate, or that he was innocent of the crimes charged." *Commonwealth v. Morales*, 701 A.2d 516, 520-21 (Pa. 1997).

93.     Kelly is currently serving a life sentence at the State Correctional Institute at Somerset (Inmate #DB5777), 1590 Walters Mill Road Somerset, PA 15510-0001. *See* 42 Pa. C.S. § 9543(a)(1)(i).

## CLAIMS

### I.     The Commonwealth Suppressed Material and Exculpatory Evidence in Violation of Kelly's State and Federal Due Process Rights.

94.     The PCRA provides for relief for a petitioner who proves by a preponderance of the evidence that his conviction and sentence resulted from "[a] violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa. C.S. § 9543(a)(2)(i).

95.     The United States Supreme Court has long held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the prosecution to disclose evidence favorable to the accused. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Commonwealth v. Weiss*, 986 A.2d 808, 814 (Pa. 2009); s*ee also Commonwealth v. Smith*, 615 A.2d 321 (Pa. 1992) (applying same principle to Pennsylvania Constitution, Article I, Section 9).

96.     The prosecution's duty to disclose under *Brady* extends to exculpatory evidence known to the police even if it is unknown to the prosecutor. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *see also Commonwealth v. Burke*, 781 A.2d 1136, 1140-41 (Pa. 2001).

97.     There are three elements to a *Brady* claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the government must have suppressed the evidence, whether intentionally or inadvertently; and (3) the suppressed evidence was material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see also Burke*, 781 A.2d at 1141.

98.     To establish materiality, a petitioner "need not show that he 'more likely than not' would have been acquitted if the new evidence is admitted." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) *(per curiam)*. Rather, evidence is material "when there is any *reasonable* likelihood it could have affected the judgment of the jury." *Id.* (emphasis added) (citations and internal quotation marks omitted); *see also, e.g.*, *Dennis v. Sec'y, Pa. Dep't of Corrections*, 834 F.3d 263, 285 (3d Cir. 2016) *(en banc)* (the "touchstone of materiality is a reasonable probability"). "The adjective is important." *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*; *see also Weiss*, 986 A.2d at 815. It follows that a petitioner can still prevail even if "the undisclosed information may not have affected the jury's verdict." *Wearry*, 577 U.S. at 392 n.6.

99.     The *Brady* materiality standard is co-extensive with *Strickland v. Washington*, 466 U.S. 668 (1984), prejudice. *See Marshall v. Hendricks*, 307 F.3d 36, 53 (3d Cir. 2002). *Strickland* prejudice is established, like *Brady* materiality, by a showing of less than a

24

preponderance of the evidence. Because a reasonable probability is one "sufficient to undermine confidence in the outcome," *Strickland*, 466 U.S. at 694, the *Strickland* prejudice standard is not "stringent;" it is, in fact, "less demanding than the preponderance standard," *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (*Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered").

100.    In assessing materiality, the Court does not examine the impact of each piece of suppressed evidence. Rather, the impact of the suppressed exculpatory evidence is viewed cumulatively. *Kyles*, 514 U.S. at 419 ("stressing" that materiality is considered "**collectively, not item by item**" (emphasis added)); *Dennis*, 834 F.3d at 360 (same).

101.    None of the evidence on which this petition is based has previously been disclosed to Kelly, his trial counsel, or the various attorneys who have represented Kelly throughout the last 27 years.

102.    The Commonwealth's suppression of multiple items of material exculpatory evidence revealing the substantial connections between key Commonwealth witness Ernestine Williams and alternative perpetrator Thomas Lockwood as well as the critical impeachment evidence regarding Colie Baxter's pre-trial identification of Thomas Lockwood as the driver of the identified getaway vehicle, violated Kelly's federal and state due process rights in violation of *Brady* and its progeny.

**A.    The Commonwealth Suppressed Evidence That Before Trial Key Witness Colie Baxter Identified Thomas Lockwood, Not James Kelly, As The Driver Of The Getaway Vehicle.**

103.    The Commonwealth's suppression of evidence that before trial key witness Colie Baxter identified Thomas Lockwood as the driver of the getaway vehicle violated Kelly's state and federal due process rights.

104.    *First*, this undisclosed identification is exculpatory as it points to someone else as the driver, the role Kelly was alleged to have played, and it also would have been critical impeachment evidence in response to Baxter's surprise in-court identification.

105.    *Second*, the information was suppressed. The document supporting this claim is an undated police report that indicates Baxter was interviewed and picked Tommy Lockwood's photograph out of a lineup. *See* Undated Police Report. This document is not listed in the letters itemizing the discovery provided to Kelly and his counsel before trial and trial counsel has confirmed he did not receive them. *See* ¶¶ 5(a), 57, *supra*; *see also* 11/9/1995 Discovery Letter (attached as Exhibit 36); Geoffrey Seay Certification ("Seay Cert.") ¶¶ 6, 7 (attached as Exhibit 37).

106.    Although the prosecution produced Baxter's January and October 1993 statements to police to Kelly's trial counsel, neither of these statements indicated that Baxter had ever identified anyone as the driver of the getaway vehicle before trial.

107.    *Third*, this prior identification evidence is material. As Justice William Brennan noted, "There is *almost nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Commonwealth v. Walker*, 92 A.3d 766, 779 (2014) (citing *Watkins v. Sowders*, 449 U.S. 341, 352 (1981) (Brennan, J. dissenting) (quoting Elizabeth F. Loftus, Eyewitness Testimony (1979)).

108.     Here, the Commonwealth's case against Kelly rested entirely on the credibility and perceived reliability of its two key witnesses, Colie Baxter and Ernestine Williams. In fact, during closing arguments, the Commonwealth argued that the fact that both Williams and Baxter, two people who did not know one another, identified the same two men (Mullins and Kelly) was corroborating evidence of their accuracy. *See* N.T.8/19/1996, 41-42.

109.     As trial counsel has confirmed, *see* Seay Cert. ¶ 7, had he been armed with Baxter's pre-trial identification of Lockwood, he could have impeached Baxter's surprise in-court identification of Kelly and pointed out that Lockwood, who was 19 years old and 6'0" at the time of the offense, more closely fit Baxter's original description of the assailants.

110.     Moreover, had this pre-trial identification information been disclosed, it would have "significantly changed [his] pre-trial investigation strategy," allowing him to investigate Lockwood's potential connection to the offense. *Id.*; *see also Commonwealth v. Boyle*, 368 A.2d 661, 669 (Pa. 1977) ("It is well established that proof of facts showing the commission of the crime by someone else is admissible."); *Dennis*, 834 F.3d at 305 (granting habeas relief based on suppression of alternate perpetrator evidence).

111.     The suppression of this critical information hindered the jury's ability to properly assess Baxter's credibility. Accordingly, there is no question that this evidence was exculpatory and material to Kelly's defense. *See, e.g.*, *Dennis*, 834 F.3d at 311 ("Alterations in defense preparation and cross-examination at trial are precisely the types of qualities that make evidence material under *Brady*.").

112.     Had the jury been presented with this information directly calling into question the reliability and accuracy of one of the Commonwealth's key witness' identification, there is a reasonable probability that the outcome in this case would have been different.

27

**A.**    **The Commonwealth Suppressed Evidence That Alternative Perpetrator
Thomas Lockwood Was Known To Own And Drive At Least Four White Or
Light-Colored Vehicles Matching The Description Of The Getaway Vehicle
Given By Several Witnesses On The Night Of Hughston's Murder.**

113.    The Commonwealth's suppression of information that Thomas Lockwood was

known to own and drive several white or light-colored vehicles that matched the description of

the vehicle used to flee the scene of the Hughston homicide, *see* ¶ 59, *supra*; *see also* n.6, *supra*,

violated Kelly's state and federal due process rights.

114.    *First*, this information is exculpatory because it links an alternate suspect to the

type of car involved in Hughston's murder.

115.    *Second*, this information was suppressed. The material supporting this claim

comes from fugitive task force police activity sheets detailing the attempts to locate and arrest

Lockwood for the Williams's homicide. *See* 6/4/1994 Fugitive Task Force Police Activity Sheet;

12/13/1993 Police Activity Sheet; Handwritten notes; 6/6/1994 Police Activity Sheet. According

to these documents, Lockwood owned or was associated with at least four white or light-colored

vehicles, all potentially matching the witness descriptions of the car used to flee the Hughston

homicide scene. *Id.* Although the fugitive task force compiled this information during its search

for Lockwood in late 1993 through early 1995, these documents were not listed in the letters

documenting the discovery produced before Kelly's trial and trial counsel has confirmed he did

not receive them. *See* 11/9/1995 Discovery Letter; Seay Cert. ¶ 8.

116.    *Third*, this information is material. While information existed linking Thomas

Lockwood to vehicles similar in description to the getaway vehicle associated with the Hughston

homicide, no evidence ever connected Kelly to a matching vehicle. This evidence thus, would

have supported Kelly's alternate perpetrator defense, especially in conjunction with Colie

Baxter's identification of Lockwood as the driver of the alleged vehicle. According to trial

28

counsel, this information "especially in conjunction with Mr. Baxter's identification of Lockwood as the driver of the getaway vehicle, . . . would have informed [his] pre-trial investigation strategy and enabled [him] to further call into question Mr. Baxter's surprise in-court identification of [his] client, Mr. Kelly, as the driver." *See* Seay Cert. ¶ 8.

117.    There is a reasonable probability that the outcome at trial would have been different if the jury had this information.

**C.    The Commonwealth Suppressed Evidence That At The Time Of Travis Hughston's Homicide, Key Witness Ernestine Williams Lived In A Home Owned By Alternative Perpetrator Thomas Lockwood.**

118.    The Commonwealth's suppression of information that at the time of Travis Hughston's homicide, key witness Ernestine Williams lived in a home owned by alternative perpetrator Thomas Lockwood, *see* ¶¶42, 46, 60, *supra*, violated Kelly's state and federal due process rights.

119.    *First*, this information is favorable because it is impeachment material that would have exposed Williams' potential fear of Lockwood or bias to protect Lockwood and thus to implicate someone else, namely Kelly.

120.    *Second*, the information regarding Ernestine Williams' connection to Thomas Lockwood was suppressed. The evidence supporting this claim comes from a record of the Philadelphia Police Department's attempts to locate and arrest Lockwood for the Williams's homicide. *See* 6/14/1994 Philadelphia Police Fugitive Task Force Activity Sheet re: 2023 N. Bambrey Street. According to police activity sheets, Philadelphia real estate records indicated that Thomas Lockwood owned 2023 N. Bambrey Street. This information spurred police to visit 2023 N. Bambrey and interview Ernestine Williams and her then boyfriend Kevin Mathis, in an attempt to locate Lockwood. *See* 6/15/1994 Ernestine Williams Interview (attached as Exhibit

29

38). Neither the real estate records nor the police activity sheets are listed in the letters documenting the discovery produced before Kelly's trial, and trial counsel has confirmed he did not receive them. *See* 11/9/1995 Discovery Letter; Seay Cert. ¶ 9.

121.    In fact, it appears that the only information regarding Williams's residence during Kelly's trial came from Detective Hoffner's testimony. He testified that he was "aware" that Williams did not own 2023 N. Bambrey, but he did not say who did. *See* N.T. 8/16/1996, 37. This testimony was incomplete and insufficient to alert counsel to the relationship between Williams and Lockwood.

122.    *Third*, as discussed above, the information that a central Commonwealth witness was directly connected to an alternative suspect is material to Kelly's defense. Although defense counsel cross-examined Williams and police investigators on her inconsistencies and the basis for her identification, counsel lacked an obvious explanation for why Williams might have come to falsely accuse Kelly. *See* Seay Cert. ¶ 9. In fact, during closing arguments, the Commonwealth balked at defense counsel's assertion that Williams' may have been approached by the actual shooters and told to keep quiet. "Defense counsel in their opening said to you, the reason why she's saying its these two men is that there were two other men involved and that they paid her a visit and she's afraid of them. What does that—if she's afraid of them, them right out there, them, what good does that do her to come in here and identify these two defendants?" N.T. 8/19/1996, 52

123.    The suppressed real estate records, however, demonstrated that Williams had a direct relationship to Lockwood—one that may have motivated her to both conceal what she knew about his involvement and to identify Kelly after consistent police "harras[ment]." *See* 7/20/1995 Ernestine Williams Interview with Jerry Benoff.

30

124.    As confirmed by trial counsel, had the Commonwealth disclosed these records, it would have "significantly changed [his] pre-trial investigation strategy", would have enabled him to "fully cross examine [] Williams" regarding her connection to Lockwood, and would have allowed him to provide the jury with an alternative and more concrete explanation of her fear and why she may have been biased or motivated to change her statements throughout the investigation and to testify against Kelly. *See* Seay Cert. ¶ 9; *see also Commonwealth v. Mullins*, 665 A.2d 1275, 1278 (Pa. 1995) (The "opportunity to impeach a witness is particularly important when the determination of a defendant's guilt or innocence depends on the credibility of the questioned witness."); *Commonwealth v. Davis*, 652 A.2d 885, 887 (Pa. 1995) (witness may be cross-examined as to any matter tending to show interest or bias.).

125.    Had this information, in conjunction with Baxter's identification, been disclosed, there is a reasonable probability that the outcome in this case would have been different.

### D.    The Commonwealth Suppressed That Thomas Lockwood Was Convicted Of A Similar Homicide Occurring Just Four Blocks Away And Within Mere Months Of The Hughston Murder.

126.    The Commonwealth's suppression of information that in February 1995 Thomas Lockwood was arrested for and subsequently convicted of the Stacy Williams homicide, a murder that shared a number of factual similarities with the Hughston offense and occurred at a nearly identical location during the same time period in 1993, *see* ¶¶ 61-72, *supra*, violated Kelly's state and federal due process rights.

127.    *First*, this information is favorable to Kelly because it would have allowed him to point to Thomas Lockwood as an alternative suspect, who, unlike Kelly, had ties to the drug trade in the neighborhood where Hughston's murder took place.

31

128.    *Second*, this information was suppressed. The evidence supporting this claim comes from the evidence that the Commonwealth relied on to convict Lockwood of Williams's homicide, including records of police activity, witness statements, and arrest information. *See* n.6, *supra*; *see also* Thomas Lockwood Arrest Photo (attached as Exhibit 39). Lockwood's trial for the Williams homicide occurred in March 1996, five months before Kelly's August 1996 trial. *See* Docket, *Commonwealth v. Lockwood*, No. CP-51-CR-0209951-1995.

129.    As confirmed by trial counsel, none of this material was included in the discovery provided before trial. *See* Seay Cert. ¶ 10; *see also* 11/9/1995 Discovery Letter. Defense counsel had no way to access the information from the Williams H File and had no reason to know or suspect the connection between the two murders.

130.    *Third*, this information is material. During Kelly's trial, the Commonwealth theorized that Hughston was killed following a dispute over drug territory. *See* N.T. 8/14/1996, 36-37. However, the Commonwealth was not able to provide the jury with any evidence that connected Kelly, a full-time city employee without any prior connection to the sale or distribution of narcotics and who did not fit the physical description of either of the alleged perpetrators,[10] to the illegal sale of drugs.

131.    By contrast, the information contained in the Williams' H File illustrates that Thomas Lockwood had an extensive connection to the immediate vicinity of both the Hughston

---

[10] In both the Hughston and William homicides, witnesses consistently described seeing either two or three young black males, ranging in age from late teens to early twenties, with slim builds, standing approximately 5'7" to 6'0." Witnesses described similar behavior following each homicide, with the men fleeing the scene on foot before leaving the area in a light-colored getaway and also described one of the assailants wearing similar clothing in each of the homicides, namely a 3/4 length black trench coat. As discussed above, ¶¶ 17, 19, n.7, *supra*, Lockwood was a much closer fit to these descriptions than Kelly in age, height, build, and access to a vehicle matching the description of the car used to flee both scenes. *See also* Lockwood Arrest Photo.

32

and Williams homicides.[11] For example, growing up, Thomas Lockwood lived with his mother, father, and siblings just a half block away from the Hughston murder scene at 2554 Page Street and, as noted above, owned the property where Ernestine Williams lived, located just two doors down from where Hughston was shot. *See* Thomas Lockwood Arrest Photo (providing Lockwood's address); 6/14/1994 Philadelphia Police Fugitive Task Force Activity Sheet.

132.    Additionally, numerous witnesses, including Steven Anderson, told police that Thomas Lockwood was engaged in frequent incidents of violence in an effort to control particular disputed drug corners in the area.[12]

133.    Kelly's defense at trial was severely prejudiced where the Commonwealth suppressed evidence of an alternate suspect who had direct connections to the violent drug trade in the area and had been convicted of a homicide based on the very type of drug territory dispute the Commonwealth accused Kelly of participating in.

134.    Specifically, if Kelly had the information regarding Lockwood's conviction for the Williams homicide, he could have broadened his pre-trial investigation strategy to include witnesses to that murder, like Steven Anderson and others who were acquainted with and could provide a physical description of Thomas Lockwood as well as describe the various on-going drug territory disputes Lockwood was involved in. *See* Seay Cert. ¶ 10; *see also* Anderson Certification.

135.    It is well established under both Pennsylvania and federal law that "the protection of Brady extends to the defendant's ability to investigate alternate defense theories and to formulate trial strategy." *Commonwealth v. Cam-Ly*, 908 A.2d 61, 76 (Pa. 2009); *see also*

---

[11] *See* n.7, *supra*.

[12] *See* n.7, *supra*; *see also* ¶¶ 61-72.

33

*Dennis*, 834 F.3d at 308 (evidence of another lead was material because it "would have impacted the course of the trial, which includes investigative activities").

136.    The availability of this material would also have allowed trial counsel to cross-examine witnesses on Lockwood's similarity to the described suspects, Lockwood's connection to the neighborhood, and whether Lockwood may have had a motive to kill Hughston.

137.    As confirmed by trial counsel, this information in conjunction with all of the suppressed information detailed above, would have enabled him to present the jury with a far more robust alternative perpetrator theory. *See* Seay Cert. ¶ 10; *see also Natividad v. Beard*, No. 08-449, 2021 WL 3737201, at *10-12 (E.D. Pa. Aug. 24, 2021) ("[T]here is a reasonable probability that had the jury heard an 'other person' defense, the result of the proceeding would have been different.").

138.    Additionally, Kelly could have cross-examined law enforcement witnesses on the thoroughness of their investigation and their efforts to investigate Lockwood and rule him out as a suspect. *See* N.T. 8/16/1996, 53-55. *See, e.g., Kyles*, 514 U.S. at 446-51 ("[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation . . . and we may consider such use in assessing a possible *Brady* violation"); *Dennis*, 834 F.3d at 311 (holding alternate perpetrator lead was material because defense counsel "could have used the information contained in the . . . documents to challenge detectives at trial regarding their paltry investigation of the lead").

139.    For example, Detective Hoffner testified that, although investigators had been given the names of many potential suspects, including the name of Thomas Lockwood's family member, Daniel, none of these alternative perpetrators were investigated as law enforcement was focused only on Kelly and Mullins by the middle of 1993.

34

140.    Had this information been disclosed, especially in conjunction with Williams'

connection to and Baxter's previous identification of Lockwood, there is a reasonable probability

that the outcome in this case would have been different.

**II.    Kelly Is Entitled To Relief Because The Cumulative Effect Of The Constitutional Violations At His Trial Rendered It Fundamentally Unfair, Violating His Due Process Rights Under The United States And Pennsylvania Constitutions**

141.    In the alternative, should the Court decide that Kelly is not entitled to relief based

on any individual constitutional claim he has raised for failure to show prejudice, it should

nevertheless grant him relief because the cumulative effect of the constitutional errors he raises

rendered his trial fundamentally unfair, violating his right to due process. *See Commonwealth v.*

*Hutchinson*, 25 A.3d 277, 319 (Pa. 2011) ("cumulative prejudice from individual claims may be

properly assessed in the aggregate when the individual claims have failed due to lack of

prejudice"); *see also, e.g.*, *Albrecht v. Horn*, 485 F.3d 103, 138-39 (3d Cir. 2007) ("We

recognize that errors that individually do not warrant habeas relief may do so when combined.").

In particular, *Brady* material must "be considered collectively, not item by item." *Kyles*, 514 U.S.

at 436-37; *see also Wearry*, 577 U.S. at 394 (holding that "state postconviction court improperly

evaluated the materiality of each piece of evidence in isolation rather than cumulatively").

142.    The suppression of the four Thomas Lockwood related facts outlined above

robbed Kelly of his ability to adequately prepare for and defend himself at trial.

143.    *First,* Kelly and his defense team were unable to conduct a focused pre-trial

investigation and thus were unprepared to present the jury with a concrete alternative perpetrator

theory. *See Cam-Ly*, 908 A.2d at 76; *Dennis*, 834 F.3d at 308.

144.    Had the required information been disclosed, Kelly's defense team could have

explored whether Thomas Lockwood matched the physical description of Hughston's shooters,

investigated Lockwood's connection to the neighborhood, determined what types of vehicles he

drove or was associated with, and investigated whether he had any prior connection to the sale of drugs in the community.

145.    As it stood, however, Kelly's defense team was left to merely speculate regarding some unknown uninvestigated alternative perpetrator.

146.    *Second*, as detailed above, at trial the Commonwealth effectively rested the entirety of its case on the testimony of Baxter and Williams as the only witnesses who linked Kelly to the murder. The failure to disclose the suppressed material robbed Kelly of his ability to fully confront his accusers and prevented the jury from performing its critical task of making a full and fair credibility assessment of the witnesses presented before it. The suppressed information undermined both witnesses, demonstrating a direct relationship between Williams and Lockwood and critically undermining Baxter's in-court identification testimony. If defense counsel had the suppressed material "the value of [] those witnesses would have been substantially reduced or destroyed." *Kyles*, 514 U.S. at 441.

147.    Moreover, defense counsel called only one witness on Kelly's behalf—the victim's brother, Kenyatta Hughston. Kenyatta critically testified that in the days immediately after his brother's shooting, Williams told him that "**Tommy**, Kendall, and Boochie" were responsible for his brother's death. N.T. 8/16/1996, 65. (emphasis added). During closing arguments, however, the Commonwealth questioned the accuracy of Kenyatta's memory as well as his motivations for coming forward—"You have to think about what his motivations were then and now. . . . This is someone who supposedly gave him all kinds of critical information. Was it Ernestine Williams? Oh yeah, that's it. Five minutes later he can't even remember her name." N.T. 8/19/1996, 59-60.

36

148.    Had the jury known about Williams' underlying connection to Lockwood and
Lockwood's substantial ties to the community, Kenyatta's testimony regarding this conversation
may well have been given more weight by the jury.

149.    Taken together, the suppression of this critical evidence resulted in a trial in
which no reliable adjudication of guilt or innocence could have taken place.

## III.    Newly Discovered Evidence Further Linking Thomas Lockwood To The Hughston Homicide Entitles Mr. Kelly To A New Trial.

150.    The PCRA provides relief for a petitioner who proves by a preponderance of the
evidence that his conviction resulted from the "unavailability at the time of trial of exculpatory
evidence that has subsequently become available and would have changed the outcome of the
trial if it had been introduced." 42 Pa. C.S. § 9543(a)(2)(vi).

151.    To be eligible for relief based on newly-discovered evidence, a petitioner must
demonstrate that the evidence: (1) could not have been obtained before the conclusion of trial by
the exercise of due diligence; (2) is not merely corroborative or cumulative; (3) will not be used
solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if
a new trial were granted. *Commonwealth v. Padillas*, 997 A.2d 356, 363 (Pa. Super. 2010). All
of these elements are met here.

152.    *First*, the information contained in Steven Anderson's September 21, 1993 police
statement, as well as the additional information he provided to undersigned counsel on August
11, 2022, could not have been obtained before the conclusion of trial with the exercise of due
diligence. As detailed above, the Commonwealth suppressed all information related to
Lockwood and his connection to the Stacy Williams homicide. Accordingly, Kelly's defense
counsel simply had no indication that Steven Anderson existed, let alone possessed critical
information linking Thomas Lockwood to the Hughston homicide, until the DAO produced the

Williams H File in March 15, 2022, that Kelly even knew of Anderson's name and the information he might be able to provide. *See* Seay Cert. ¶¶ 6, 8, 10.

153.    *Second*, the information Anderson has provided about Lockwood and his connection to drug dealers and disputes in the neighborhood, as well as to light-colored vehicles, is not cumulative of any evidence presented at trial because the Commonwealth suppressed all information related to Lockwood and the Williams homicide. Defense counsel attempted to point to other potential perpetrators through the testimony of the victim's brother Kenyatta Hughston but had no concrete evidence to back up this up.

154.    Moreover, the Supreme Court has made clear that the fact that evidence was introduced at trial on a topic does not automatically render later evidence on that topic merely cumulative. Instead, if the evidence is of a different and 'higher' grade or character, though upon the same point . . . it is not 'merely' corroborative or cumulative and may support the grant of a new trial based on newly discovered evidence." *Commonwealth v. Small*, 189 A.3d 691, 674 (Pa. 2018). Thus, even though Kelly attempted to mount an alternative perpetrator defense, the detailed information Anderson has now provided about Lockwood is of a "different and 'higher' grade or character" than that presented at trial.

155.    *Third*, the new evidence is not being offered solely for impeachment because it is affirmative evidence of an alternative perpetrator.

156.    *Fourth*, if a new trial were granted, Anderson's testimony connecting Lockwood to the neighborhood and the violent drug disputes occurring there, as well as to a **specific** description of the getaway vehicle used in the Hughston offense, would likely lead the jury to render a different verdict in this case.

157.    The Commonwealth speculated that Hughston was killed because of an

38

ongoing drug territory dispute. N.T. 8/14/1996, 35-37; N.T. 8/19/1996, 33. According to Anderson, Thomas Lockwood was a well-known drug dealer in the neighborhood at the time of the shooting and worked for high level drug dealers, Abdul "Boochie" King and Kendall Harris. DeLosa Cert. ¶¶ 6, 8. Lockwood violently defended his drug territory, and Anderson described specific instances of violence that were related to Lockwood's drug activity, including the Stacy Williams homicide and the Antonio Williams shooting. *Id.* at ¶¶ 5-7.

158.    Additionally, Anderson recalls that Lockwood drove a vehicle matching the description of the getaway vehicle used in the Hughston offense: a white Buick with sun visors in the rear windshield. *Id.* at ¶ 9; *see also* 1/1/1993 Baxter Statement at 2 (describing a "small white car, about a 1982 model, with those sun guards in the back window").

159.    Individually and collectively, this new evidence is of a fundamentally different, and more compelling, character than the evidence presented at trial. It provides a credible basis to connect Lockwood to the vehicle used in the offense and the Commonwealth's speculative motive would likely lead the jury to a different result.

## IV.    Kelly Is Entitled to Relief Under The United States And Pennsylvania Constitutions Because Both Prohibit The Incarceration Of One Who Is Actually Innocent.

160.    The Supreme Court has indicated that a claim of actual innocence may be a cognizable and free-standing basis for relief under the Eighth or Fourteenth Amendments to the United States Constitution. *See Herrera v. Collins*, 506 U.S. 390, 406 (1993) (outlining what a freestanding actual innocence claim, one not tied to an underlying claim of constitutional error at trial, would require and evaluating petitioner's claim of actual innocence on its merits); *see also House v Bell*, 547 U.S. 518, 536-37 (2006).

161.    The Pennsylvania Constitution also provides two separate potential avenues for relief based upon actual innocence: Article I, Section 13 (prohibiting "cruel punishments") and Article I, Section 9 (providing that trials must follow the "law of the land").

162.    Under Article I, Section 13, where a sentence is so severe as to "shock the moral conscience of the community," it is unconstitutional. *Commonwealth v. Sourbeer*, 422 A.2d 116, 123 (Pa. 1980) (upholding mandatory life sentence for first-degree murder).

163.    The continued incarceration of an individual who is actually innocent of a crime would "shock the moral conscience of the community," and is therefore a violation of Article I, Section 13 of the Pennsylvania Constitution. *Cf. People v. Hamilton*, 979 N.Y.S.2d 97, 107 (N.Y. App. Div. 2014) (recognizing a freestanding innocence claim where "punishing an actually innocent person is inherently disproportionate to the acts committed by that person, such punishment also violates the provision of the New York Constitution which provides for vacating a judgment which was obtained in violation of an accused's constitutional rights").

164.    Article I, Section 9 of the Pennsylvania Constitution is the functional equivalent of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and is referred to as "the due process clause of our state constitution." *Commonwealth v. Heck*, 535 A.2d 575, 576 (Pa. 1987). Where an interpretation of Article I, Section 9 is involved, "most cases which shed light on the question are analyses of the strictures imposed by the due process clause of the Fourteenth Amendment of the United States Constitution." *Commonwealth v. Davis*, 586 A.2d 914, 915-16 (Pa. 1991).

165.    However, the federal due process clause "may not be controlling if the due process clause of the Pennsylvania Constitution sets a higher standard." *Id.* at 916. As a matter of substantive due process, appellate courts in the Commonwealth have regularly held that the

40

Pennsylvania Constitution provides greater protection to the individual than its federal

counterpart. *See, e.g., Davis*, 586 A.2d at 917 (finding "no doubt that the due process clause of

the Pennsylvania Constitution prohibits the deprivation of liberty solely on the basis of hearsay

evidence" while acknowledging "doubt" whether the Fourteenth Amendment would as well);

*Commonwealth v. Kohl*, 615 A.2d 308, 314 (Pa. 1992) ("Article I, Section 8 has an identity and

vitality that is separate and distinct from that of the Fourth Amendment.").

166.    Pennsylvania's history of fierce protection of citizens' rights against "arbitrary"

action of the state supports the recognition of a free-standing innocence claim under Article I,

Section 9. *See, e.g., Commonwealth v. Davidson*, 938 A.2d 198, 207 (Pa. 2007).

167.    Instructively, numerous other states have recognized a free-standing innocence

claim under their own state due process clauses. The Supreme Court of Illinois, for example,

found that "[i]mprisonment of the innocent would also be so conscience shocking as to trigger

operation of substantive due process." *People v. Washington*, 665 N.E.2d 1330, 1336 (Ill. 1996)

(recognizing a free-standing innocence claim under Illinois Constitution); *see also Summerville

v. Warden, State Prison*, 641 A.2d 1356, 1369 (Conn. 1994) (holding that "a substantial claim of

actual innocence is cognizable by way of a petition for a writ of habeas corpus, even in the

absence of proof by the petitioner of an antecedent constitutional violation"); *State ex rel.

Amrine v. Roper*, 102 S.W.3d 541, 543-44 (Mo. 2003) (recognizing that "the continued

imprisonment and eventual execution of an innocent person is a manifest injustice" so "a habeas

petitioner under a sentence of death may obtain relief from judgment of conviction . . . upon a

clear and convincing showing of actual innocence"); *Montoya v. Ulibarri*, 163 P.3d 476, 484

(N.M. 2007) (holding that "the conviction, incarceration, or execution of an innocent person

violates all notions of fundamental fairness implicit within the due process provision of" the New

41

Mexico Constitution); *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996) (granting state habeas relief alleging actual innocence as an independent ground for relief), *superseded by statute on other grounds as stated in Ex parte Blue*, 230 S.W.3d 151, 162 n.46 (Tex. Crim. App. 2007).

  168. Indeed, a New York appellate court recognized a free-standing innocence claim where, among other things, the state due process clause provided "greater protection than its federal counterpart as construed by the Supreme Court." *Hamilton, supra*, 979 N.Y.S.2d at 107 (internal quotation marks omitted); *see also id.* ("Since a person who has not committed any crime has a liberty interest in remaining free from punishment, the conviction or incarceration of a guiltless person, which deprives that person of freedom of movement and freedom from punishment and violates elementary fairness, runs afoul of the Due Process Clause of the New York Constitution. . . ." (internal citations omitted)). The court additionally held that, "with respect to a claim of actual innocence, as distinguished from a specific constitutional violation, a constitutional violation occurs only if there is clear and convincing evidence that the defendant is innocent." *Id.* at 108.

  169. Unlike New York, the federal courts have never articulated the precise burden for a freestanding actual innocence claim but have indicated that it is "extraordinarily high." *Herrera*, 506 U.S. at 391. Before the disclosure of the previously suppressed material, the Commonwealth's case against Kelly was weak and based entirely on the identification testimony of two witnesses with significant credibility issues. After the exculpatory evidence was produced, no reliable evidence remains. The newly disclosed evidence that Baxter identified an entirely different person before trial critically undermines his surprise in-court identification. Similarly, the newly disclosed evidence that Williams had a direct relationship to another

potential suspect suggests she had a motivation to lie about Kelly in order to protect herself. This motivation is particularly damaging to the Commonwealth's case because Williams initially denied seeing anything and gave dramatically different accounts of the crime over repeated interviews. No other evidence at trial implicated Kelly. Moreover, other suppressed evidence demonstrates that the man Baxter identified, Thomas Lockwood, is a viable alternative suspect in the Hughston homicide.

170.    Should this Court find that, given all of the above, Kelly is "actually innocent" of the charges for which he was convicted, this is an appropriate case in which to recognize a freestanding actual innocence claim and grant immediate relief.

## V.    THE ISSUES RAISED HEREIN HAVE NEITHER BEEN PREVIOUSLY LITIGATED NOR WAIVED

171.    Under the PCRA, "the petitioner must plead and prove by a preponderance of the evidence . . . that the allegation of error has not been previously litigated or waived." 42 Pa. C.S. § 9543(A)(3). When, as in this case, a PCRA petition does not rely exclusively on previously litigated evidence, the Court must reach the merits of the petitioner's claims. *See Commonwealth v. Miller*, 716 A.2d 592, 602 n.9 (Pa. 2000).

172.    The information that supports this petition was previously unknown and was disclosed to Kelly for the first time on August 30, 2021 and March 15, 2022, respectively. Accordingly, Kelly has never before had the opportunity to raise the *Brady* claims and new evidence claims revealed from information in these files.

173.    The *Brady* claims raised here are based on material that was previously suppressed. Likewise, because of the Commonwealth's suppression, the facts supporting the new

43

evidence claim simply could not have been ascertained before trial through the exercise of due diligence.

174.    Therefore, Kelly's present claims are distinct from any claims he raised or could have raised at trial, on direct appeal, and in his previous PCRA and habeas corpus petitions.

## VI.    KELLY IS ENTITLED TO AN EVIDENTIARY HEARING AND/OR A NEW TRIAL

175.    Kelly is entitled to an evidentiary hearing under Pennsylvania Rule of Criminal Procedure 902.

176.    Kelly would call the following witnesses to testify:

A.    Geoffrey Seay, Esq.;

B.    William Stanton; and

C.    Steven Anderson.

177.    Kelly requests an evidentiary hearing to show the jurisdiction of this Court and to establish his claims. *See* Pa. R. Crim. P. 908(A)(2) (providing that PCRA court "*shall* order a hearing" "when the petition for post-conviction relief or the Commonwealth's answer, if any, raises material issues of fact") (emphasis added).

178.    Counsel who will represent Kelly in the Court of Common Pleas of Philadelphia County on this petition are:

Nilam A. Sanghvi
Attorney No. 209989
Ryan Becker
Attorney No. 331376
THE PENNSYLVANIA INNOCENCE PROJECT
1515 Market St., Suite 300
Philadelphia, PA 19102
Tel: 215-204-4255

Elizabeth DeLosa
Attorney No. 309521

44

THE PENNSYLVANIA INNOCENCE PROJECT
Tribone Center
914 Fifth Avenue
Pittsburgh, PA 15219
Tel: 412-482-2069

## VII.    CONCLUSION AND REQUESTED RELIEF

Based on the information presented above, Kelly presents credible evidence that his trial

was fundamentally unfair because of significant violations of his due process rights. The

Commonwealth denied him powerful exculpatory evidence that undermined his ability to

investigate, prepare a defense, and challenge the only witnesses connecting him to the offense

with significant evidence of bias and inconsistencies. This denial of his basic right to defend

himself was even more prejudicial where the suppressed evidence pointed to a credible

alternative perpetrator who had direct connections to the Commonwealth's speculative theory of

the crime. Had the jury been provided with this exculpatory information a different verdict in this

case would likely have been achieved. As such, a new trial is required.

WHEREFORE, Petitioner James Kelly prays that this Honorable Court will grant relief

in the form of an arrestment of judgment and/or a new trial. Petitioner asks this Court to order an

evidentiary hearing on the allegations in this Petition.

Respectfully submitted,

_____

Nilam A. Sanghvi
Attorney No. 209989
Ryan Becker
Attorney No. 331376
The Pennsylvania Innocence Project
1515 Market Street, Suite 300
Philadelphia, PA 19102

45

Elizabeth DeLosa
Attorney No. 309521
The Pennsylvania Innocence Project
Tribone Center
914 Fifth Avenue
Pittsburgh, PA 15219

Counsel for James Kelly

Dated: August 29, 2022

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| Respondent | : | |
| | : | |
| | : | |
| v. | : | CP-51-CR-1011621-1995 |
| | : | |
| JAMES KELLY, | : | |
| Petitioner | : | |

**ATTORNEY VERIFICATION**

The facts set forth in this Petition are true and correct to the best of the undersigned's
personal knowledge, information, and belief and are verified subject to the penalties for unsworn
falsification to authorities under Pennsylvania Crimes Code Section 4904 (18 Pa. C.S. § 4904).
Counsel have been authorized to file this Post Conviction Relief Act Petition on Petitioner James
Kelly's behalf. Counsel have not yet obtained a verification from Kelly. A verification will be
filed to support this petition as soon as practicable.

_____
NILAM A. SANGHVI, ESQ.
Date of Birth: 11/09/1977

Date: August 29, 2022

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,  :
Respondent                                            :
                                                              :
                                                              :
                v.                                        :          CP-51-CR-1011621-1995
                                                              :
JAMES KELLY,                                     :
Petitioner

### PROOF OF SERVICE

Nilam A. Sanghvi, hereby states and avers that she is counsel for petitioner James Kelly in the above-captioned matter and that she has served by the Court's electronic filing system and by first-class mail upon:

> Thomas Gaeta, Esq.
> Assistant District Attorney
> Philadelphia District Attorney's Office
> 3 South Penn Square
> Philadelphia, PA 19107

A copy of the Petition for Post-Conviction Relief being filed on behalf of the petitioner in the above-captioned matter.

_____
Nilam A. Sanghvi
Counsel for James Kelly

Date:  August 29, 2022

**CONFIDENTIAL
INFORMATION
FORM**

 

FILED
08/29/2022 06:46:10 PM
Post Trial Unit
By: K. JOH

*Case Records Public Access Policy of the Unified Judicial System of Pennsylvania*
204 Pa. Code § 213.81
www.pacourts.us/public-records

Commonwealth
(Party name as displayed in case caption)

CP-51-CR-1011621-1995
Docket/Case No.

Vs.

James Kelly
(Party name as displayed in case caption)

Court of Common Pl. - Philadelphia
Court

This form is associated with the pleading titled Petition for Post Conviction Re, dated August 29, 2022 , .

Pursuant to the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania*, the Confidential Information Form shall accompany a filing where confidential information is **required by law, ordered by the court, or otherwise necessary to effect the disposition of a matter**. This form, and any additional pages, shall remain confidential, except that it shall be available to the parties, counsel of record, the court, and the custodian. This form, and any additional pages, must be served on all unrepresented parties and counsel of record.

| This Information Pertains to: | Confidential Information: | References in Filing: |
|---|---|---|
| Colie Baxter<br>(full name of adult)<br><br>OR<br><br>This information pertains to a<br>minor with the initials of ____<br>and the full name of<br><br>(full name of minor)<br><br>and date of birth: 01/17/19 | Social Security Number (SSN):<br>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<br><br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN 1<br><br>Alternative Reference:<br>FAN 1<br><br>Alternative Reference:<br>DLN 1<br><br><br>Alternative Reference:<br>SID 1 |
| George Patterson<br>(full name of adult)<br><br>OR<br><br>This information pertains to a<br>minor with the initials of ____<br>and the full name of<br><br>(full name of minor)<br><br>and date of birth: 03/14/19 | Social Security Number (SSN):<br>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<br><br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN 2<br><br>Alternative Reference:<br>FAN 2<br><br>Alternative Reference:<br>DLN 2<br><br><br>Alternative Reference:<br>SID 2 |

Rev. 7/2018          **THIS FORM IS CONFIDENTIAL**

## CONFIDENTIAL INFORMATION FORM



Additional page (if necessary)

| This Information Pertains to: | Confidential Information: | References in Filing: |
|---|---|---|
| Tameka Ledbetter<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of _____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 08/16/72 | Social Security Number (SSN):<br><br>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<br>Financial Account Number (FAN):<br><br>_____<br>Driver License Number (DLN):<br><br>_____<br>State of Issuance:<br><br>_____<br>State Identification Number (SID):<br><br>_____ | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |
| Ernestine Williams<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of _____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 10/29/61 | Social Security Number (SSN):<br><br>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<br>Financial Account Number (FAN):<br><br>_____<br>Driver License Number (DLN):<br><br>_____<br>State of Issuance:<br><br>_____<br>State Identification Number (SID):<br><br>_____ | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |
| Anna Lighty<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of _____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 04/27/65 | Social Security Number (SSN):<br><br>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<br>Financial Account Number (FAN):<br><br>_____<br>Driver License Number (DLN):<br><br>_____<br>State of Issuance:<br><br>_____<br>State Identification Number (SID):<br><br>_____ | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |

**THIS FORM IS CONFIDENTIAL**

**CONFIDENTIAL
INFORMATION
FORM**



Additional page (if necessary)

| This Information Pertains to: | Confidential Information: | References in Filing: |
|---|---|---|
| Tameka Ledbetter<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 08/16/72 | Social Security Number (SSN):<br>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<br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |
| Ernestine Williams<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 10/29/61 | Social Security Number (SSN):<br>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<br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |
| Anna Lighty<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 04/27/65 | Social Security Number (SSN):<br>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<br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |

**THIS FORM IS CONFIDENTIAL**

# CONFIDENTIAL INFORMATION FORM



Additional page (if necessary)

| This Information Pertains to: | Confidential Information: | References in Filing: |
|---|---|---|
| Tameka Ledbetter<br>_(full name of adult)_<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>_(full name of minor)_<br><br>and date of birth: 08/16/72 | Social Security Number (SSN):<br><br>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<br>Financial Account Number (FAN):<br><br>_____<br>Driver License Number (DLN):<br><br>_____<br>State of Issuance:<br><br>_____<br>State Identification Number (SID):<br><br>_____ | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br><br>Alternative Reference:<br>SID ___ |
| Ernestine Williams<br>_(full name of adult)_<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>_(full name of minor)_<br><br>and date of birth: 10/29/61 | Social Security Number (SSN):<br><br>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<br>Financial Account Number (FAN):<br><br>_____<br>Driver License Number (DLN):<br><br>_____<br>State of Issuance:<br><br>_____<br>State Identification Number (SID):<br><br>_____ | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br><br>Alternative Reference:<br>SID ___ |
| Anna Lighty<br>_(full name of adult)_<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>_(full name of minor)_<br><br>and date of birth: 04/27/65 | Social Security Number (SSN):<br><br>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<br>Financial Account Number (FAN):<br><br>_____<br>Driver License Number (DLN):<br><br>_____<br>State of Issuance:<br><br>_____<br>State Identification Number (SID):<br><br>_____ | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br><br>Alternative Reference:<br>SID ___ |

# CONFIDENTIAL INFORMATION FORM



Additional page (if necessary)

| This Information Pertains to: | Confidential Information: | References in Filing: |
|---|---|---|
| Tameka Ledbetter<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 08/16/72 | Social Security Number (SSN):<br><br>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<br>Financial Account Number (FAN):<br><br><br>Driver License Number (DLN):<br><br><br>State of Issuance:<br><br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br><br>Alternative Reference:<br>SID ___ |
| Ernestine Williams<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 10/29/61 | Social Security Number (SSN):<br><br>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<br>Financial Account Number (FAN):<br><br><br>Driver License Number (DLN):<br><br><br>State of Issuance:<br><br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br><br>Alternative Reference:<br>SID ___ |
| Anna Lighty<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 04/27/65 | Social Security Number (SSN):<br><br>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<br>Financial Account Number (FAN):<br><br><br>Driver License Number (DLN):<br><br><br>State of Issuance:<br><br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br><br>Alternative Reference:<br>SID ___ |

**THIS FORM IS CONFIDENTIAL**

# CONFIDENTIAL INFORMATION FORM



Additional page (if necessary)

| This Information Pertains to: | Confidential Information: | References in Filing: |
|---|---|---|
| Tameka Ledbetter<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>(full name of minor)<br><br>and date of birth: 08/16/72 | Social Security Number (SSN):<br>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<br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |
| Ernestine Williams<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>(full name of minor)<br><br>and date of birth: 10/29/61 | Social Security Number (SSN):<br>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<br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |
| Anna Lighty<br>(full name of adult)<br><br>OR<br>This information pertains to a minor with the initials of ____ and the full name of<br><br>(full name of minor)<br><br>and date of birth: 04/27/65 | Social Security Number (SSN):<br>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<br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |

**THIS FORM IS CONFIDENTIAL**

## CONFIDENTIAL INFORMATION FORM



Additional page (if necessary)

| This Information Pertains to: | Confidential Information: | References in Filing: |
|---|---|---|
| Tameka Ledbetter<br>(full name of adult)<br><br>OR<br><br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 08/16/72 | Social Security Number (SSN):<br>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<br><br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |
| Ernestine Williams<br>(full name of adult)<br><br>OR<br><br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 10/29/61 | Social Security Number (SSN):<br>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<br><br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |
| Anna Lighty<br>(full name of adult)<br><br>OR<br><br>This information pertains to a minor with the initials of ____ and the full name of<br><br>_____<br>(full name of minor)<br><br>and date of birth: 04/27/65 | Social Security Number (SSN):<br>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<br><br>Financial Account Number (FAN):<br><br>Driver License Number (DLN):<br><br>State of Issuance:<br><br>State Identification Number (SID): | Alternative Reference:<br>SSN ___<br><br>Alternative Reference:<br>FAN ___<br><br>Alternative Reference:<br>DLN ___<br><br><br>Alternative Reference:<br>SID ___ |

**THIS FORM IS CONFIDENTIAL**

**CONFIDENTIAL INFORMATION FORM**



Additional page(s) attached. _____ total pages are attached to this filing.

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

_Elizabeth DeLosa_
Signature of Attorney or Unrepresented Party

08/29/22
Date

Name: Elizabeth DeLosa

Attorney Number: (if applicable) 309521

Address: 914 Fifth Avenue

Telephone: (412) 482-2069

Pittsburgh, PA 15219

Email: elizabeth.delosa@painnocence.org

*NOTE:* **Parties and attorney of record in a case will have access to this Confidential Information Form. Confidentiality of this information must be maintained.**

Rev. 7/2018        **THIS FORM IS CONFIDENTIAL**

## CONFIDENTIAL INFORMATION FORM



### Instructions for Completing the Confidential Information Form

The following information is confidential and shall not be included in any document filed with a court or custodian, except on a Confidential Information Form filed contemporaneously with the document:

1.  Social Security Numbers

2.  Financial Account Numbers, except an active financial account number may be identified by the last four digits when the financial account is the subject of the case and cannot otherwise be identified. "Financial Account Numbers" include financial institution account numbers, debit and credit card numbers, and methods of authentication used to secure accounts such as personal identification numbers, user names and passwords.

3.  Driver License Numbers

4.  State Identification (SID) Numbers

5.  Minors' names and dates of birth except when a minor is charged as a defendant in a criminal matter (see 42 Pa.C.S. § 6355). "Minor" is a person under the age of eighteen.

6.  Abuse victim's address and other contact information, including employer's name, address and work schedule, in family court actions as defined by Pa.R.C.P. No. 1931(a), except for victim's name. "Abuse Victim" is a person for whom a protection order has been granted by a court pursuant to Pa.R.C.P. No. 1901 et seq. and 23 Pa.C.S. § 6101 et seq. or Pa.R.C.P. No. 1951 et seq. and 42 Pa.C.S § 62A01 et seq. **If necessary, this information must be provided on the separate Abuse Victim Addendum. Please note there are separate instructions for the completion of the Addendum located on the form.**

Please note this form does not need to be filed in types of cases that are sealed or exempted from public access pursuant to applicable authority (e.g. juvenile, adoption, etc.).

- **The best way to protect confidential information is not to provide it to the court. Therefore, only provide confidential information to the court when it is required by law, ordered by the court or is otherwise necessary to effect the disposition of a matter.**

- Do not include confidential information in any other document filed with the court under this docket.

- If you need to refer to a piece of confidential information in a document, use the alternate references. If you need to attach additional pages, sequentially number each alternate reference – i.e. SSN 3, SSN 4, etc.

- This form, and any additional pages, must be served on all unrepresented parties and counsel of record.

A court or custodian is not required to review or redact any filed document for compliance with the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania.* A party's or attorney's failure to comply with this section shall not affect access to case records that are otherwise accessible.

If a filed document fails to comply with the requirements of the above referenced policy, a court of record may, upon motion or its own initiative, with or without a hearing, order the filed document sealed, redacted, amended or any combination thereof; a magisterial district court may, upon request or its own initiative, redact, amend or both. A court of record may impose sanctions, including costs necessary to prepare a compliant document for filing in accordance with applicable authority.

Rev. 7/2018          **THIS FORM IS CONFIDENTIAL**

**CONFIDENTIAL
INFORMATION
FORM**



# Abuse Victim Addendum

**Instructions for Completing the Abuse Victim Addendum:** The Abuse Victim Addendum shall accompany a filing where confidential information is being provided by an abuse victim, as defined in this policy, **in family court actions** (see Pa.R.C.P. No. 1931(a)), **as required by law, ordered by the court, or otherwise necessary to effect the disposition of a matter**. This addendum, and any additional pages, shall only be provided to the court and shall remain confidential. The best way to protect confidential information is not to provide it to the court. Therefore, only provide confidential information to the court when it is required by law, ordered by the court or is otherwise necessary to effect the disposition of a matter.

| Type of Family Court Action | | |
|---|---|---|
| ☐ Divorce, Annulment, Dissolution of Marriage | | ☐ Child Custody |
| ☐ Support | ☐ Paternity | ☐ Protection from Abuse |
| **This Information Pertains to:** | **Confidential Information:** | **References in Filing:** |
| _____ (full name of abuse victim) | AV Address: | Alternative Reference: AV 1 Address |
| | AV Employer's Name & Address: | Alternative Reference: AV 1 Employer's Name & Address |
| _____ Docket/Case No. of Protection Order | AV Work Schedule: | Alternative Reference: AV 1 Work Schedule |
| _____ Court/County | AV Other contact information: | Alternative Reference: AV 1 Other contact information |

Attach additional page(s) if necessary.

**THIS FORM IS CONFIDENTIAL**

**CONFIDENTIAL
INFORMATION
FORM**



## Abuse Victim Addendum

Additional page (if necessary)

| Type of Family Court Action | | |
|---|---|---|
| ☐ Divorce, Annulment, Dissolution of Marriage | | ☐ Child Custody |
| ☐ Support | ☐ Paternity | ☐ Protection from Abuse |
| **This Information Pertains to:** | **Confidential Information:** | **References in Filing:** |
| | AV Address: | Alternative Reference:<br>AV __ Address |
| _____<br>(full name of abuse victim) | AV Employer's Name & Address: | Alternative Reference:<br>AV __ Employer's Name & Address |
| _____<br>Docket/Case No. of Protection Order | AV Work Schedule: | Alternative Reference:<br>AV __ Work Schedule |
| _____<br>Court/County | AV Other contact information: | Alternative Reference:<br>AV __ Other contact information |

| Type of Family Court Action | | |
|---|---|---|
| ☐ Divorce, Annulment, Dissolution of Marriage | | ☐ Child Custody |
| ☐ Support | ☐ Paternity | ☐ Protection from Abuse |
| **This Information Pertains to:** | **Confidential Information:** | **References in Filing:** |
| | AV Address: | Alternative Reference:<br>AV __ Address |
| _____<br>(full name of abuse victim) | AV Employer's Name & Address: | Alternative Reference:<br>AV __ Employer's Name & Address |
| _____<br>Docket/Case No. of Protection Order | AV Work Schedule: | Alternative Reference:<br>AV __ Work Schedule |
| _____<br>Court/County | AV Other contact information: | Alternative Reference:<br>AV __ Other contact information |

**THIS FORM IS CONFIDENTIAL**

FILED
08/29/2022 06:46:10 PM
Post Trial Unit
By: K. JOH



# First Judicial District of Pennsylvania Municipal and Common Pleas Courts of
## Philadelphia County Trial Division - Criminal

| | |
|---|---|
| **Comm. v. Kelly, James** | **CP-51-CR-1011621-1995** |

## PRAECIPE TO PROCEED IN FORMA PAUPERIS

### TO THE CLERK OF COURTS:

Kindly allow, <u>Kelly, James H.</u>, (plaintiff) (defendant), to proceed in forma pauperis.

I, <u>NILAM AJIT. SANGHVI</u>, attorney for the party proceeding in forma pauperis, certify that I believe the party is unable to pay the costs and that I am providing free legal service to the party.

08/29/2022                                 NILAM AJIT. SANGHVI
_____                _____
**Date**                                          **Attorney**

FILED
08/29/2022 06:46:10 PM
Post Trial Unit
By: K. JOH

# EXHIBIT 1

TO      : Commanding Officer, Homicide Division

FROM    : Commanding Officer, Police Radio

SUBJECT : TELEPHONE & RADIO TAPE TRANSMITTAL-NORTHCENTRAL DIVISION-1-1-93

Time: 8:08:40 PM                          Caller: Female

Radio   : Police, 129. May I help you?
Caller  : Hello. Um, eh, there was a shooting outside, right on 23rd,
          twe um, 23rd, um, 25th and Bambrey street. There's a guy
          shot. He dead, he laying on the ground. Some guy in a black
          shirt shot him.
Radio   : 25th and Bambrey?
Caller  : Bambrey....Bambrey street?
Radio   : (unreadable)
Caller  : Right off of 25th and Diamond. It's, it's by Page and Stillman
          street...It's...(unreadable).
Radio   : It's Bembrey street?
Caller  : Please hurry up. Bamberry. B-A-M-B-R-E-Y.
Radio   : Bamberry.
Caller  : Bamberry. Please hurry up...Oh God!
Radio   : Where, okay, where's he shot at?
Caller  : I don't know. It looks like it's from his head. (unreadable)
          (to someone else: (unreadable) )
Radio   : Okay. The person who shot him, is he still there?
Caller  : No, he ran around the corner. He ran towards 20, he ran
          towards Clenwood Avenue.
Radio   : All right. Hold on and talk to rescue.
FD      : Rescue.
Caller  : (unreadable).Hello.
FD      : Rescue.
Caller  : Yes um, can I have a rescue squad on um, 25th and Bambrey,
          right off of 25th and um, Norris street on Stillman and Page.
          It's a guy shot. He laying on the ground, he might be dead,
          he's shot in the head.
FD      : Shot in his head?
Caller  : Yes.
FD      : Yeah, they'll be there.
Caller  : Huh?
FD      : They'll be there.
Caller  : Okay.

Time: 8:08:42 PM                          Caller: Male

Radio   : Police, 299. Can I help you?
Caller  : Please send a police car to 2276 Edgley street.
Radio   : 2276 Edgley? House or apartment?
Caller  : (unreadable)
          ...man on the floor in my House.
          Is there anyone with him?

NORTHCENTRAL DIVI. NET TRANSMITTAL1 1 93                              10

...                    .....
D. ..                  .....
HPO          . Yeah, 215, all we can get is the first name.
R..          ..  that.
RPC          . Ah, his first name is Travis, and ah, no, last name unknown.
R.P..        . First name is......Say, ah, spell it....215....2215....2205,
             did you copy what he gave you?......

Time: 8:32:53 PM

EPW          : 201
...          : 201
EPW          : Okay. We got a negative on Edgley street. Yeah, we'll go over
             there now. (inre: another job)
Radio        : Okay. Ah, 22...2210 and 2218 you can disregard. 2201, can you
             give me paper for the hospital case on Edgley?

NORTHCENTRAL DIVISION WAS MONITORED FROM 8:08 PM TO 9:33 PM MR. ELICHASE
1255, POLICE RADIO.

EWO. CASSETTE

LATER   EPW   TRANSMISSION

EPW..

CONFIDENTIAL DIVISION TRANSMITTAL1 1 93                                    3

No'l    . I don't know. Okay...

<u>Time: 6:10:18 PM</u>                                    <u>Caller: Female</u>

Radio   : Police radio, 329.
Caller  : Yea...Yea. Someone got shot on the 2000 of Bambrey street. I
          don't know if he's dead, if he li. He's just laying there.
          He won't move. I don't know what's going on...okay?
Radio   : There's somebody out there? Did you see the guy with the gun?
Caller  : Ah, I did na, ah, the only thing I know, I was in the house,
          an' I hear' this...you know, I'm not gonna go to the door.
          When everything went over, when I went to the door, and I
          called the lady over the street 'cause she's a old lady, and
          she said she sees somebody laying on the ground. So I just
          called the cops.
Radio   : Okay. Is that in front of your house?
Caller  : No, it's not in front of my house. It's just...He's laying on
          the ground and, and...(someone in background: (unreadable)
          He's hurting) I don't know. I don't know who's the address on,
          okay?
Radio   : In front...I have to have an idea when we tell rescue, we have
          to have an idea.
Caller  : Yeah. It's th' 2000 block of Bambrey street.
Radio   : All right. I' ld on for the rescue squad.
Caller  : I can't.
Radio   : Hold on.
Caller  : It's Bambrey street.
Radio   : I got it, Bambrey street.
Caller  : Okay. B A M B R E-Y street.
Radio   : Hold on for rescue....
Caller  : Okay?
Radio   : I know how to spell it, Ma'am. Hold on.
Caller  : Okay.
FR      : Fire department.
Radio   : They're on th' line. Give them the address.
Caller  :                     here. Never mind....The cops is here.
R   di   : At    right, F  ay, it's the cor...
                              ' shot.
                          s. We need a ambulance though.

                              Is on the way there.
                              ...ay.
                              I know he hurt, B  lie?

<u>Time: 6:12:50 PM</u>                                    <u>Caller: Female</u>

                              : Come here.)
                              ....re?
                              please send somebody to 20 Bab , ut, Bamb,
                              indred' of Bambrey, the b dy out here. Th  '

Caller:   : I don't know. He bleeding like from the head.
Rescue:   : Hold the line and talk to me now. PD, conscious, or
           unconscious?...
          : Uh, he's unconscious. I think. I'm not sure. 'cause he ain't
           moving.
          : You don't know what happened to him? What, you just saw...?
           What's gone on?
Caller:   : I was upstairs sleeping. They woke me up. I don't know what's
           gone on. I know he's laying on the floor bleeding ... and ...
           From the head.
          : Rescue.
          : Uh, can you send a cop out to 2236 Edgley street?
          : Wait a minute. Slow down. What's the address?
Caller:   : 2236 Edgley street.
          : 2236 Edgley?
          : Yes.
          : Is that a house or an apartment?
Caller:   : That's a house.
          : Okay. What's the problem there?
Caller:   : There's a man in my mother's house laying on the floor
           bleeding to death from... If I I I don't know what I ..., he's
           sleeping. They woke me up...
          : Uh, he's ... is he you, I mean awake?
          : No. He's still unconscious a little bit on the floor.
          : And he's bleeding from the head, right?
          : Yes... Yeah.
          : Do you know the person?
          : Huh?
          : Do you know the person?
          : Yeah, I know him...
          : Do you have any idea what happened to him?
          : He's on the floor now.
          : ... I mean do you know what happened to him?
          : ...
          : Okay. Somebody'll ... there...
          : ... All right....

## Time: 5:10:51 PM

5

## Time: 5:...:22 PM

NORTHCENTRAL STATION TRANSCRIPTION ...

| | |
|---|---|
| Caller | : Uh? |
| Radio | : Where's this person at? |
| Caller | : Right laying outside. (unreadable) |
| Radio | : Where? Where? Just calm yourself down and give me the address |
| Caller | : Oh!....Oh? |
| Radio | : Ma'am, give me the address. |
| Caller | : Um, they uh, laying out in front of h.....someone in background: (unreadable) at 26, I think 2627, it's a abandoned house. |
| Radio | : In front of the abandoned house? |
| Caller | : Yes. |
| Radio | : Okay. Now the person with the gun, where is he? |
| Caller | : I don't know. I don't know what happened. They just went out the door and we shot at greet. I don't know what happened. We just heard gunshots ... there were some (unreadable) |
| Radio | : (unreadable) |
| Caller | : We looked out the window and saw all the still down in the street (unreadable). I don't know, I don't know what happened (unreadable). |
| Radio | : Okay, Ma'am, look...Ma'am, calm yourself down. I'm gonna connect you to rescue. Okay?.... |
| Caller | : (someone in background: unreadable) ? |
| Radio | : You listening to me? |
| Caller | : Yes. |
| Radio | : I'm gonna connect you to rescue. I want you to give them the address. |
| Caller | : Okay...(to someone in background: unreadable) Here. (unreadable)...I don't know what address to give them |
| | |
| Voice | : Hello. |
| Rescue | : Hold on, it's ringing....Give them the address when they answer.... |
| PFD Disp | : I think the address is..... |
| Rescue | : Hold on, it's still ringing. |
| Voice | : Oh, okay. |
| ? | : This is Phila Fire D |
| Rescue | : Well, could you send a rescue to 2627 ... ... ...  |
| ? | : 2627 Poplar? |
| ? | : Ri... |
| ? | : What's the problem |
| ? | : ...  |
| ? | : Where there's ... |
| ? | : Uh, a shooting ... ... ... |
| ? | : up ... ... ... |
| ? | : ... |
| ? | : nothing. I don't know |
| ? | : really, I don't know ... |

CONFIDENTIAL DIVISION TRANSMITTAL1 1 93                                    5

```
EPW        : Ah, 207.
Radio      : 2207
EPW.       : Be advised, uh, we're on that 2000 Bambrey now. Something,
             there's a crowd out here, see what's going on...we're not
             going to Edgley yet.
Radio      : Okay. And also, rescue's enroute now to Bambrey and Diamond...
RPC        : 2215
R. 213     : 215
RPC        : Yeah. Hospital case transported to Saint Joseph by Medic 22B
             (inre: another Job). Uh, (unreadable) We're starting over.
RPC        : 22 (unreadable)
Radio      : Okay. You're gonna go over to Edgley or Bambrey?
RPC        : We'll go over to Edgley. What's the numbers on Edgley?
Radio      : Ah, 2 2 0 6.
EPW        : 205
Radio      : 207
EPW        : Yeah. We have a founded shooting on the highway here. Ah, it
             looks like we might have a scene, we're gonna try and scoop
             this guy and go....Start a car over.
Radio      : Okay. 2205, you have a male shot on the highway?...2215, did
             you copy him?
RPC        : Yeah, 215, we're enroute.
Radio      : Okay. Bambrey and Diamond I think he is.
RPC        : Okay...
Radio      : Yeah, 15, let me know if we got a scene, or we need a
             supervision there.
EPW        : 205
Radio      : 205
EPW        : Send somebody over to Edgley. Ah, he could possibly be the
             do...We're not sure yet.
RPC        : You want 17 to go over to Edgley, okay. 15, go over to Edgley
             first.....215....Eh 2215....
RPC        : 222
Radio      : 222
RPC        : Yeah, advise 07, I believe rescue's coming up from Broad and
             ....... Turn me around to Temple also. (inre: another job)
Radio      : Okay. 2207, rescue's coming from around Broad and Susky. 2215,
             I got you out on Edgley.....
```

Time: 5:15:39 PM

```
...        : .....
...        : .... (unreadable)
EPW        : ..... gunshot victim. He doesn't look good. We're
             ...... enroute to MCP. Let'em know.
...        : Yeah, 15, EPW from Bambrey and Diamond. 22 Barney.
...        : ....... Advised, I'm enroute.
...        :
...        : ...... MCP know. I'm here now. Withey, 257.
...        : ...... (unreadable)
...        :
           : ...... me to Edgley first. We're ....... go .... 
             .... scooped him up. He's enroute to Broad and .....
```

[illegible]

Radio : [illegible] All right, [illegible]
BPW : 15, can you send us another [illegible] the [illegible] a possible suspect in one of these houses.
Radio : Got a possible suspect, okay. [illegible]
EPW : 2201
Radio : 2201
EPW : Yeah. We're gone to the [illegible]. That's his location?
Radio : Okay. [illegible] (unreadable)
EPW : 207
Radio : 205
EPW : Let 15 know...(unreadable) that she, the person in the [illegible] the door.
Radio : [illegible] in the house [illegible] also collapsed bleeding from the [illegible], I'll put you out with 15, 2220 [illegible] 2210.
Radio : 210
Radio : Would you go to Bambrey and Diamond. [illegible] it might be a scene.
EPW : Okay.
Radio : And 220, let me know if you need anything.
EPW : 215, from a [illegible] ....the ah, possible door.
EPW : 05, the suspect is not in the house. The person in the house [illegible] the whole thing. She [illegible] information.
EPW : Which one (unreadable)? The old lady or the male?....
EPW : What was that?
Radio : The old lady that's in that house, or the male that's (unreadable).
EPW : (unreadable) Girlfriend [illegible]
Radio : Girlfriend...
EPW : 2219
Radio : 15, a girlfriend...22[illegible].
EPW : Yeah, where's he shot [illegible]
Radio : What part of his body, 0[illegible]....[illegible]
EPW : 05, we don't know.
Radio : They don't know 10...[illegible]
EPW : 22[illegible]
Radio : 22[illegible]
EPW : Ok[illegible]
[illegible]
[illegible] the male [illegible]
[illegible]

SUPPLEMENTAL SERVICE TRANSMITTAL 1 1-93

| | |
|---|---|
| Unit | : 15', ah 3 action out there. |
| Radio | : It's there, okay. |
| RPC | : 2.7 |
| R. Li. | : Hah, 227 |
| RPC | : There's a 5h 11 out here, Bambrey and Diamond...Hold me out. |
| R. dis | : 210...Sir...(unreadable) |
| RPC | : 216 |
| R. Ho | : Yea. Where are you? |
| RPC | : Enroute. |
| R. Ho | : Okay, 10, you can resume. 5's on that location. |
| RPC | : Okay. |
| R. Ho | : Thank you.... |

Time: 9:19:34 PM

| | |
|---|---|
| RPC | : 215 |
| R. 10. | : 217 |
| RPC | : The ah flash that I got right now is ah, black male, approximately 6'. He had on a black trench coat, and red pants. Direction was taken was ah,...That's west on Diamond from ah Bambrey. |
| Radio | : Okay, it's a black male, ah, 16 years of age wearing a black trench coat, and west on Diamond from Bambrey. |
| RPC | : 15, that was 6'. I didn't get a age, but 6' in height... Direction is a black trench coat and red pants. |
| Radio | : Black trench coat and red pants. Do they know his name? |
| RPC | : That's a negative. |
| Radio | : West on Diamond from Bambrey, and they definitely saw the ah (unreadable) .....Okay. 2215....Okay. (unreadable) |
| RPC | : 2014 (inre: another job) |
| R. 26 | : Stand by just a second. Black male, 6', we're looking for, black trench coat, red pants, west on Diamond from Bambrey, to 10 minutes.. Ah, west on Diamond from Bambrey, armed with a gun it, that's, 6' tall, black trench coat, and red pants. 214 _ 10.5.' |

Time: 9:20:40 PM

| | |
|---|---|
| Unit | : appeared to be two males in a white ah, (unreadable) (unreadable) rear of the door. |
| Unit | : two males in a white white ah |
| RPC | : ah with white a (unreadable) |
| Unit | : ing, off badly.... |

Time: 9:21:36 PM

| | |
|---|---|
| Radio | : try your message again....Car...okay 5's on this flash from 15....215. 215. |
| | : nothing saying about a 5's anything"... and |
| | : thing to add other than the description pant." |
| | : from a witness saw it's a thing you's |

NORTHCENTRAL DIVISION TRANSMITTAL 1-93

|       |   |
|-------|---|
|       | small car, possibly a foreign vehicle. It has a slim scoop on the back of the window. And the male should be approximately 19 to 20... |
| Radi | : Okay. We're looking for a white two door small car, possibly a foreign car, with a slim scoop in the rear, and the male's about 20? |
| RPC  | : Between 19 and 20 years. Two young black males. |
| Radio | : There's two of them, and we have clothing description on one. A black trench coat, and red pants... |
| RPC  | : Correct radio. |
| Radio | : Okay. Additional information on that founded shooting at Bambrey and Diamond about 10 minutes old now. We're looking for two black males fif, 19 to 20 years of age. Description on number one, he's 6' tall wearing a black trench coat, and red pants. They went west on Diamond from Bambrey, they had a white two door small car, possibly a foreign car, with a slim scoop in the rear. |
| RPC  | : (unintelligible) 19, what's in the rear of the car? |
| Radio | : He said a slim scoop. I guess a air scoop.... |

Time: 8:23:25 PM

|       |   |
|-------|---|
| RPC  | : If, you broke off. What's in the rear of that car? |
| Radio | : Oh. Ah, he, it sound like he said a slim scoop. |
| RPC  | : 219 |
| Radio | : 217 |
| RPC  | : Yeah. It' like a sunvisor, but it's ah, it covers the rear window to keep the sun off.... |
| Radio | : Oh, like a sunvisor in the rear. |
| RPC  | : Yeah. Like a hatchback. |
| RPC  | : Correct. |

Time: 8:24:11 PM

|       |   |
|-------|---|
| RPC  | : 217 |
| Radio | : 217 |
| RPC  | : Well, We're on location up here. Ah, we'll make notification. Okay. |
| Radio | : Okay 217. Thank you. |
| RPC  | : Yep. |
|       | : Okay, but ah there was nothing at that location at 2222 Earp, right? |
|       | : We didn't determine that yet.... |
| RPC  | : Okay. We got was there. They just took a hospital case out. Some type of cut over the head. We don't even have a name and everything. |
|       | : Barney.... |
|       | : message for the Serg.? |
|       | : Yeah, they said rescue just took someone out of 2222 Earp. I don't have anything further on it. We don't know. The man with the cut on the head. |
|       | : I'm know. |
|       | : an older gentleman that took him there that's a... |

# EXHIBIT 2

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | | CASE NO. |
|---|---|---|---|
| | | | INTERVIEWER Mangoni # 642 |

| NAME Pol. Mark Alston # 6876 | AGE | RACE | OOB |
|---|---|---|---|
| ADDRESS 22nd District    # 2 Platoon | APARTMENT NO. "B" | | PHONE NO. |
| NAME OF EMPLOYMENT/SCHOOL | | | SOC. SEC. NO. |
| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | | PHONE NO. |

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

| ADDRESS | | PHONE NO. | |
|---|---|---|---|
| PLACE OF INTERVIEW Rm # 104 PAB Homicide Division | | DATE 1-1-93 | TIME 9:30PM  AM PM |
| BROUGHT IN BY | | DATE | TIME  AM PM |

WE ARE QUESTIONING YOU CONCERNING
The shooting incident which too place on this date at 2000 Bambrey St.

| WARNINGS GIVEN BY | DATE | TIME  AM PM |
|---|---|---|

ANSWERS

    (1)        (2)        (3)       (4)        (5)        (6)        (7)

Q. Officer, would ypou please tel;l me what your tour of duty and assignmen

    was on thius date?

A. I was working the 4P-12 A tour of duty and assigned to # 2215 RPC with

    my partner Pol. Redding # 3571.  At approx. 8:10 P,M. responded to a

    a radio call of Shooting and a hospital case at 2000 N. Bambrey St.

    Up½on arrival  I received information from 2205 EPW that there was a

    founded shooting .  The victim was already in 2205 EPW.  At that time

    we started tosecure the scene.  My partner found a scene  at 2027 N.

    Bambrey St.  Theee was a pool of blood outside of 2007 N. Bambrey St.

    on the pavement approx. 2 feet away from the above location.   It was

    towards the end of the North side of the house.  I didn't notice anything

    else at the scene.  I located two people inside of 2033 N. Bambrey St.

    I located  a female inside of that location.  Her name I don't recall

    at the time, but I transported her dow to the Homicide division. She

| RECORD ☐ Yes  ☐ No | CHECKED BY | |
|---|---|---|
| REVIEWED BY PAIP4359 | | |

| INVESTIGATION INTERVIEW RECORD<br>CONTINUATION SHEET | CITY OF PHILADELPHIA<br>POLICE DEPARTMENT | |
|---|---|---|
| NAME<br>Pol. Mark Alsotn # 6876 | PAGE<br>2 | CASE NO. |

cont..... takkdd to my partner.  I also located another male in front of

2031 N. Bambrey St.  I know his name is Corey Braxton.  I aslo transpoeted him

to the division.  He lives at ▓▓▓▓▓▓▓▓▓▓▓  He told me that he

saw two black males leave the area going North on 25th St. from Diamond St.

He said that he heard the shots, and saw a Black male with a long trench coat,

he didn't say what color.  He saw him going North on Bambrey St, and get into

a white two door foreign vehicle, with louvres on the back window.  He said

the car went North on 25th St.  He also said that he heardf about 5 shoits. He

thought that they came foom a semi automattc gun.  I transported him to theunit.


Q. Other than the blood did you notice any other items of any evidentiaryvalue?

A. No.


Q. Did you put out on any flash information?

A. Yes, I put out the flash on the vehicle, that came from Braxton.


Q. Did Corey Braxton tell you if he knew the decedent?

A. He didn't say anythging about knowing him.


Q. Do you know who was assigned to secure the crime scene?

A. I believe # 225 car.  Sgt. Doran was on the scene.


PAIP4360

75-483 A

# EXHIBIT 3

| INVESTIGATION INTERVIEW RECORD | | | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | | CASE NO. H93-1 | |
|---|---|---|---|---|---|---|
| | | | | | INTERVIEWER J. DOUGHERTY #342 | |
| NAME COLIE BAXTER | | | AGE 32 | RACE B | DOB | |
| ADDRESS | | | APARTMENT NO. FATHER's HSE | | PHONE NO. | |
| NAME OF EMPLOYMENT/SCHOOL | | | | | SOC. SEC. NO. | |
| ADDRESS OF EMPLOYMENT/SCHOOL | | | DEPARTMENT | | PHONE NO. | |
| DATES OF PLANNED VACATIONS | | | | | | |
| DATES OF PLANNED BUSINESS TRIPS | | | | | | |
| NAME OF CLOSE RELATIVE COLIE BAXTER SR.  (FATHER) | | | | | | |
| ADDRESS | | | | | PHONE | |
| PLACE OF INTERVIEW PAB - HOMICIDE DIVISION ROOM 104 | | | | | DATE 1-1-93 | TIME 9:15PM  AM PM |
| BROUGHT IN BY POLICE | | | | | DATE 1-1-93 | TIME  AM PM |
| WE ARE QUESTIONING YOU CONCERNING SHOOTING DEATH OF A MALE KNOWN AS TRAVIS HOUSTON IN THE 2000 BLOCK OF BAMBREY ST. | | | | | | |
| WARNINGS GIVEN BY | | | | | DATE | TIME  AM PM |
| ANSWERS (1)          (2)          (3)          (4)          (5)          (6)          (7) | | | | | | |

Q.   COLIE, are you known by any other names?

A.   No, Some people call me SARGE.


Q.   Could you go on in your own words and tell me what you know about the shooting death of

      TRAVIS HOUSTON which occurred earlier tonight in the area of 2000 W. Bambrey St?

A.   I was driving in my white Honda Civic on Diamond St., and I was stopped for the light

      at 25th & Diamond when I heard 5 or 6 gunshots.  As I drove up to the first little street

      from 25th, going towards 26th, I saw 1 guy come running from the little street.  I pulled

      my car over to the right side of Diamond because I could tell that the guy had just done

      something from the way he was running and the way he was holding one of his arms down by

      his side.  I saw this first guy run to a little white car that was parked on the street

      that comes into a angle to Diamond and got in the car.  Then I seen the second guy come

      running out of an alley onto the angle street, that I think is Glenwood, and he got in

      the car too.  The car came right up to Diamond and they stopped where I was parked at and

| RECORD ☐ Yes   ☐ No | CHECKED BY | |
|---|---|---|
| REVIEWED BY AIP2662 | | Colie Baxter Sr |

75-483 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA | | |
|---|---|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT | | |
| **NAME** COLIE BAXTER | | **PAGE** 2 | **CASE NO.** |

they looked over at me. I think they knew that I was trying to get their license tag, and then after they stopped by my car they took off swerving and turned up 25th towards Dauphin. While I was sitting there I saw a Police wagon come down Diamond from 25th and I honked my horn at them and told them there had been some kind of shooting up the little street right there. I knew that because while I was sitting there I heard a lot of screaming coming from that block and that was right where the 2 guys had come running from. I went up the street and helped them put the guy who was shot into the wagon.

Q. Would you describe the 2 males you saw run and get into the small white auto?

A. The first one I saw that came running from out of the little street was the one who jumped into the driver's seat, he was a Black male, brown skin, in his 20's, about 5'9", 180 lbs, and he was the one that was carrying something in his right hand by the way he was holding his arm to his side, he was wearing a dark hat, like a Kofu or maybe knit, a long black trench coat. The 2nd guy was a Black male, in his 20's too, but he was shorter, about 5'5", thin, dark brown complexion, he was wearing a light to medium blue sweat suit with some red in it.

Q. Had you ever seen either of these 2 males before?

A. Not that I remember.

Q. Would you describe the car they got into?

A. It was a small white car, about a 1982 model, with those sun guards in the back window, I would know the car if I saw it again, they didn't turn on the lights while I seen them. I didn't notice any damage to the car. It was a 2 door car.

*Colie Baxter 3df*

75-483A

PAIP2663

| INVESTIGATION  INTERVIEW  RECORD CONTINUATION  SHEET | CITY  OF  PHILADELPHIA POLICE  DEPARTMENT | |
|---|---|---|
| NAME | PAGE | CASE NO. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

75-483 A

PAIP2664

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|
| NAME COLLIE BAXTER | PAGE 2 | CASE NO. |

Q. Did you know the person who was shot, TRAVIS HOUSTON?

A. No, I didn't know him at all. I don't know anybody that lives in that block.


Q. Did you hear anyone say they had seen the victim get shot?

A. No. The block was empty when it happened. I think somebody ran out of a house and

started yelling for somebody to call the cops.


Q. Did you see any kind of weapon in the hands of the person who ran from the alley and got

into the passenger seat of the white car?

A. No, he had his hands in his pockets.


Q. Is there anything else you can add that would help this investigation?

A. No, that's about it. I know I would know that car if I see it again.


Collie Baxter CBx

PAIP2665

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|---|
| NAME | | PAGE | CASE NO. |
| | | | |

75-483 A

PAIP2666

# EXHIBIT 4

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. 493-1 |
|---|---|---|
| | | INTERVIEWER Snell / Vivarina |

**NAME** Colie Baxter    **AGE** 33    **RACE** Black    **DOB** ▮▮▮▮

**ADDRESS** ▮▮▮▮    **APARTMENT NO.**    **PHONE NO.**

NAME OF EMPLOYMENT/SCHOOL    SOC. SEC. NO.

ADDRESS OF EMPLOYMENT/SCHOOL    DEPARTMENT    PHONE NO.

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

ADDRESS    PHONE NO.

**PLACE OF INTERVIEW** Rm #104 - PAB    **DATE** 10/13/93    **TIME** 945 AM

**BROUGHT IN BY** Self    **DATE** 10/13/93    **TIME** 930 AM

**WE ARE QUESTIONING YOU CONCERNING** Shooting in 2000 Bambrey St of Mace Travis Houston

WARNINGS GIVEN BY    DATE    TIME

ANSWERS

(1)   (2)   (3)   (4)   (5)   (6)   (7)

Q/ You were interviewed on 1/1/93 Regarding this incident, has anything changed or have you remembered anything else?

A/ No

Q/ Is there anything that you wish to add to this interview at this time?

A/ No.

Q/ I am going to show you a group of photos of eight (8) Black males, I want you

RECORD [ ] Yes  [ ] No    CHECKED BY

REVIEWED BY    Colie Baxter 3rd

PAIP2667

75-483 (Rev. 7/82)

**INVESTIGATION INTERVIEW RECORD**
*CONTINUATION SHEET*

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME Colie Baxter

PAGE 2   CASE NO. 7493-1

Q) Con't .... to tell me if you recognize anyone?

A/ Yes #4,

Q) Who is the person that you recognize?

A/ He was the guy sitting in the passenger seat of the Tan Corolla. He got into the passenger side after he came out of the alleyway. I saw him come out of the alleyway and get into the passenger side of the Car and another guy came up the street + got into the driver side and then the Car pulled off. This happened after I heard the gunshots come from the street.

Q/ I want you to tell me the number that is on the bottom of the photo that I

75.483 A

PAIP2668

Colie Baxter 3rd

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|
| NAME | PAGE | CASE NO. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

75-483 A      PAIP2669

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME Colie Baxter

PAGE 3

CASE NO.

D/ Con't . . . am now showing you

A/ C748079 ( harry mullins )

D/ I want you to read this interview that is three (3) pages long, if it is correct sign the bottom of each page, if corrections are needed, make them & then initial the corrections do you understand ?

A/ Yes

Colie Baxter 3rd
10-13-93
10.00 AM

75-483 A

PAIP2670

| INVESTIGATION  INTERVIEW  RECORD CONTINUATION  SHEET | CITY  OF  PHILADELPHIA POLICE  DEPARTMENT | |
|---|---|---|
| NAME | PAGE | CASE  NO. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

75-483 A    PAIP2671

DRIVER'S SEAT (first guy)

Carrying something

: B/M

: BROWN SKIN

: 20's

: 5'8"

: 180 LBS

: hat

: LONG BLACK trench coat

PAIP2672

# EXHIBIT 5

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. _H/73-1_ INTERVIEWER |
|---|---|---|

NAME: P/o Tyrone Redding #3571

ADDRESS: 22 Dist.    RPC 2215

NAME OF EMPLOYMENT/SCHOOL: P.D.    PR# 192547

ADDRESS OF EMPLOYMENT/SCHOOL: | DEPARTMENT: | PHONE NO. |

SOC. SEC. NO.:

DATES OF PLANNED VACATIONS:

DATES OF PLANNED BUSINESS TRIPS:

NAME OF CLOSE RELATIVE:

ADDRESS: | PHONE NO. |

PLACE OF INTERVIEW: + AB Rm # 104 | DATE: 1-1-93 | TIME: 9:30 AM/PM |

BROUGHT IN BY: | DATE: | TIME: AM/PM |

WE ARE QUESTIONING YOU CONCERNING: Shooting death of Travis Hueston

WARNINGS GIVEN BY: | DATE: | TIME: AM/PM |

ANSWERS

(1) (2) (3) (4) (5) (6) (7)

Q. I want you to go on in your own words & tell me of your participation in this investigation?

A. On Friday 1-1-93 at about 8:10 PM while working RPC 2215 along with P/o Phelan #6870, we responded to a Rx of shooting, a Phila hospital case on the highway 2029 Bambrey St. On my way to EPW 2205 and just pulling off onto the highway I observed a group of black males gathered in front of 2029 N Bambrey St. I noticed that particular place was a hang out where they by male hang out and identified herself as ... The defendant ... was that ... from the ... location ... that a ... Rx ...

RECORD: ☐ Yes ☐ No    CHECKED BY:

REVIEWED BY:
PAIP4357

75-483 (Rev. 7/92)

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME: _P/o Tyrone Redding #35__ /     PAGE: 2     CASE NO: __3 - /_

A. long black trench coat & red pants. He was just shot. Her boyfriend. She said that male ran north on Smedley & west on Tioga St. She was requested to remain at the scene until she could be transported to Homicide. Myself & my partner then maintained the scene until relieved & directed to Homicide.

Q. Who is the 2nd witness you transported?

A. He was talking to my partner, P/o Waters, he told him he actually saw the investigation

Q. Did you observe any other evidence at the scene?

A. No, just the blood.

Q. Did you tell anyone the witness?

A. No.

Q. Is there anything else...

A. I just can't help you any...
... help the case...

PAIP4358

75-483 A

# EXHIBIT 6

**MEMORANDUM**

POLICE

CITY OF PHILADELPHIA
Date: 01 01-93

**TO** : Commanding Officer, Homicide Division

**FROM** : Commanding Officer, Police Radio

**SUBJECT** : TELEPHONE & RADIO TAPE TRANSMITTAL-NORTHCENTRAL DIVISION-1-1-93

Time: 8:08:40 PM                                Caller: Female

| | |
|---|---|
| Radio | : Police, 129. May I help you? |
| Caller | : Hello. Um, eh, there was a shooting outside, right on 23rd, two um, 23rd, um, 25th and Bambrey street. There's a guy shot. He dead, he laying on the ground. Some guy in a black shirt shot him. |
| Radio | : 25th and Bambrey? |
| Caller | : Bambrey....Bambrey street? |
| Radio | : (unreadable) |
| Caller | : Right off of 25th and Diamond. It's, it's by Page and Stillman street...It's...(unreadable). |
| Radio | : It's Bambrey street? |
| Caller | : Please hurry up. Bamberry. B-A-M-B-R-E-Y. |
| Radio | : Bamberry. |
| Caller | : Bamberry. Please hurry up...Oh God! |
| Radio | : Where, okay, where's he shot at? |
| Caller | : I don't know. It looks like it's from his head. (unreadable) (to someone else: (unreadable) ) |
| Radio | : Okay. The person who shot him, is he still there? |
| Caller | : No, he ran around the corner. He ran towards 20, Thompson towards Glenwood Avenue. |
| Radio | : All right. Hold on and talk to rescue. |
| FB | : Rescue. |
| Caller | : (unreadable) Hello. |
| FB | : Rescue. |
| Caller | : Yes um, can I have a rescue squad on um, 25th and Bambrey, right off of 25th and um, Norris street on Stillman and Page. It's a guy shot. He laying on the ground, he might be dead, he's shot in the head. |
| FB | : Shot in his head? |
| Caller | : Yes. |
| FB | : Yeah, they'll be there. |
| Caller | : Huh? |
| Radio | : They'll be there. |
| Caller | : Okay... |

Time: 8:09:12 PM                                Caller: Male

| | |
|---|---|
| Radio | : Police, 299. Can I help you? |
| Caller | : Please send a police car to 2236 Edgley street. |
| Radio | : 2236 Edgley? House or apartment? |
| Caller | : A house. |
| Radio | : What's wrong? |
| Caller | : Some man on the floor in my House. |
| Radio | : What's wrong with him? |



82-9-1 (Rev. 3/89) Response to this MEMORANDUM may be made hereon in longhand.

```
Caller  : I don't know. He bleeding like from the head.
Radio   : Hold the line and talk to rescue. Eh, conscious or
          unconscious?...
Caller  : Uh, he's unconscious I think. I'm not sure 'cause he ain't
          moving.
Radio   : You don't know what happened to him? What, you just came in?
          What's gone on?
Caller  : I was upstairs sleeping, they woke me up. I don't know what's
          gone on. I know he's laying on the floor bleeding to death...
          From the head.
FB      : Rescue.
Caller  : Uh, can you send a cop car to 2236 Edgley street?
FB      : Wait a minute. Slow down. What's the address?
Caller  : 2236 Edgley street.
FB      : 2236 Edgley?
Caller  : Yes.
FB      : Is that a house or an apartment?
Caller  : That's a house.
FB      : Okay. What's the problem there?
Caller  : There's a man in my mother's house laying on the floor
          bleeding to death from the head I don't know what went, I was
          sleeping. They woke me up....
FB      : Uh, he's...is he con, is he awake?
Caller  : No. He's still unconscious a little bit on the floor.
FB      : And he's bleeding from the head, right?
Caller  : Yes...Yeah.
FB      : Do you know the person?
Caller  : Huh?
FB      : Do you know the person?
Caller  : Yeah, I know him...
FB      : Do you have any idea what happened to him?
Caller  : He's on the floor now.
FB      : No, I mean do you know what happened to him?
Caller  : No.
FB      : Okay. Somebody'll be there.
Caller  : All right....
```

**Time: 8:10:5j PM**

```
Radio   : 2205
EPW     : 05
Radio   : Bambrey and Diamond, report of gunshots on the highway. No
          flash.
EPW     : 05 all right...
Radio   : Just one call....
```

**Time: 8:11:23 PM**

```
Radio   : And...2205, how close is that to 2236 Edgley?
EPW     : Ah....it's in that general vicinity.
Radio   : Okay.. A male just came into 2236 Edgley bleeding from the
          head. The caller doesn't know what's wrong with him. So if
          there's nothing at Bambrey and Diamond....
EPW     : All right. Well, we'll got to ah, Edgley first. It sounds
          like more of a emergency.
```

NORTHCENTRAL DIVISION TRANSMITTAL 1-1-93                                    3

Radio     : I don't know. Okay...

## Time: 8:12:18 PM                              Caller: Female

Radio     : Police radio, 339.
Caller    : Yea...Yes. Someone got shot on the 2000 of Bambrey street. I
            don't know if he's dead, if he ii. He's just laying there.
            He won't move. I don't know what's going on...okay?
Radio     : There's somebody out there? Did you see the guy with the gun?
Caller    : Ah, I did na, ah, the only thing I know, I was in the house,
            and I heard this...you know, I'm not gonna go to the door.
            When everything went over, when I went to the door, and I
            called the lady over the street 'cause she's a old lady, and
            she said she sees somebody laying on the ground. So I just
            called the cops.
Radio     : Okay. Is that in front of your house?
Caller    : No, it's not in front of my house. It's just...He's laying on
            the ground and, and...(someone in background: (unreadable)
            He's hurting) I don't know. I don't know who's the address on,
            okay?
Radio     : In front...I have to have an idea when we tell rescue, we have
            to have an idea.
Caller    : Look, it's the 2000 block of Bambrey street.
Radio     : All right. Hold on for the rescue squad.
Caller    : I can't.
Radio     : Hold on.
Caller    : It's Bambrey street??
Radio     : I got it, Bambrey street?
Caller    : Okay. B-A-M-B-R-E-Y street.
Radio     : Hold on for rescue....
Caller    : Okay?
Radio     : I know how to spell it, Ma'am. Hold on.
Caller    : Okay.
FB        : Fire department.
Radio     : They're on the line. Give them the address.
Caller    : Ah, uh...
Radio     : 2000 Bambrey.
Caller    : Oh, the cops is here. Never mind'...The cops i's here.
Radio     : All right. Rescue, it's the cor...
FB        : Somebody just got shot.
Caller    : Yeah. It's ah...We need a ambulance though.
Radio   . : Yeah.
FB        : Yeah. We're already on the way there.
Caller    : We need a ambulance.
Radio     : Rescue's on the way.
Caller    : (to someone else: I know he hurt, David)

## Time: 8:12:59 PM                              Caller: Female

Caller    " (to someone else: Come here.)
Radio     : You need the police?
Caller    : Yes. Uh, can you please send somebody to 20 Babe, um, Bambrey
            street 20 some hundred of Bambrey. Somebody got shot. They're
            laying outside.
Radio     : Okay Ma'am, hold on.

NORTHCENTRAL DIVISION TRANSMITTAL1 1-93                                    4

Caller   : Oh!
Radio    : Where's this person at?
Caller   : Right laying outside. (unreadable)
Radio    : Where? Where? Just calm yourself down and give me the address.
Caller   : Oh!....Oh!
Radio    : Ma'am, give me the address.
Caller   : Um, they uh, laying out in front of ah,...(someone in
           background: (unreadable)) 20, (unreadable)2027, it's a abandoned
           house.
Radio    : In front of the abandoned house?
Caller   : Yes.
Radio    : Okay. Now the person with the gun, where is he?
Caller   : I don't know. I don't know what
           happened. They just walked out the door and got shot...I
           guess. (I don't know what happened). We just heard gunshots and
           there were some (unreadable)
Radio    : (unreadable)
Caller   : We looked out the window and some girl who walked down the
           street (unreadable). I don't know, I don't know what happened
           (unreadable).
Radio    : Okay. Ma'am, look...Ma'am, calm yourself down. I'm gonna
           connect you to rescue. Okay?....
Caller   : (someone in background: (unreadable) )
Radio    : You listening to me?
Caller   : Yes.
Radio    : I'm gonna connect you to rescue. I want you to give them the
           address.
Caller   : Okay...(to someone in background: (unreadable) Here.
           (unreadable)...I don't know what address to give them)
#2 Male
Caller   : Hello.
Radio    : Hold on, it's ringing...Give them the address when they
           answer....
#2Caller : I think the address is....
Radio    : Hold on, it's still ringing.
#2Caller : Oh, okay.
FB       : Philadelphia Fire Rescue.
#2Caller : Yes. Could you send a rescue to 2027 Bambrey street?
FB       : 2027 Bambrey?
#2Caller : Right.
FB       : What's the problem?
#2Caller : There's a person been shot...
FB       : Where, where were they shot?
#2Caller : Ah, on 20...On Bambrey street.
FB       : What part of the body?
#2Caller : Oh, I can't tell. I, I haven't even touched the body or
           anything. I don't know. They're not...
FB       : Are they inside or out....
#2Caller : They don't look like they're moving.
FB       : Are they inside or outside?
#2Caller : Outside....
FB       : Okay. Somebody'll be there.
#2Caller : Thank you.....

**Time: 8:13:18 PM**

EPW    : Ah, 205
Radio  : 2205 (P.O. Sim Acre E McCUSKer)
EPW    : Be advised, uh, we're on that 2000 Bambrey now. Something,
         there's a crowd out here, see what's going on....we're not
         going to Edgley yet.
Radio  : Okay. And also, rescue's enroute now to Bambrey and Diamond...
RPC    : 2215 (P.O. REDDING)
Radio  : 215
RPC    : Yeah. Hospital case transported to Saint Joseph by Medic 22B
         (1nre: another Job). Uh, (unreadable) We're starting over.
RPC    : 22 (unreadable)
Radio  : okay. You're gonna go over to Edgley or Bambrey?
RPC    : We'll go over to Edgley. What's the numbers on Edgley?
Radio  : Ah, 2 2-3 C.
EPW    : 205
Radio  : 205
EPW    : Yeah. We have a founded shooting on the highway here. Ah, it
         looks like we might have a scene, we're gonna try and scoop
         this guy and go....Start a car over.
Radio  : Okay. 2205, you have a male shot on the highway?....2215, did
         you copy him?
RPC    : Yeah. 215, we're enroute.
Radio  : Okay. Bambrey and Diamond I think he is.
RPC    : Okay...
Radio  : And, 15, let me know if we got a scene, or we need a
         supervisor there.
EPW    : 205
Radio  : 205
EPW    : Send somebody over to Edgley. Ah, he could possibly be the
         doer. We're not sure yet.
P. ??  : You want 15 to go over to Edgley, okay, 15, go over to Edgley
         first.....215....Eh 2215....
RPC    : 223
Radio  : 223
RPC    : Yeah, advise 05, I believe rescue's coming up from Broad and
         Susky. Turn me around to Temple also. (1nre: another job)
Radio  : Okay. 2205, rescue's coming from around Broad and Susky. 2215,
         I got you out on Edgley.....

Time: 8:15:39 PM


EPW    : 05
Radio  : 05, go ahead.
EPW    : Uh, we got one gunshot victim. He doesn't look good. We're
         gonna be enroute to MCP. Let 'em know.
Radio  : Enroute to MCP from Bambrey and Diamond. 22 Barney. (Sgt. DORAN)
RPC    : 22 Barney received. I'm enroute.
Radio  : Okay. 2215....
RPC    : 219, I'll let MCP know. I'm here now. Mileage 157.
Radio  : Thanks 19. 22 (unreadable)
RPC    : 2-1-5
Radio  : Yeah, you're gone to Edgley first. We do have a gunshot
         victim. 05 wagon scooped him up. He's enroute to Women's Med.
RPC    : 2-1-5

PAIP4478

| | | |
|---|---|---|
| Radio | : | 2-1-5....All right, 2-1-5 you're breaking off. |
| RPC | : | 15, can you send us another car here to cover the back. We got a possible suspect in one of these houses. |
| Radio | : | Got a possible suspect, okay. 22 Barney's enroute. 2210.... |
| EPW | : | 2201 |
| Radio | : | 2201 |
| EPW | : | Yeah. We're gone to the scene. What's his location? |
| Radio | : | Okay. His location 22 (unreadable) |
| EPW | : | 2205 |
| Radio | : | 205 |
| EPW | : | Let 15 know...(unreadable) that why the person in the house saw the doer. |
| Radio | : | Person in the house definitely saw the doer? Okay, this male also collapsed bleeding from the head I believe. And 2205, I'll put you out with 15, 2236 Edgley. 2210. |
| Radio | : | 210 |
| Radio | : | Would you go to Bambrey and Diamond. Ah, stay there, it might be a scene. |
| RPC | : | Okay. |
| Radio | : | And 22B, let me know if you need anything. |
| RPC | : | 215, from a passby, we got that ah, the suspect is inside door ....the ah, possible door. |
| EPW | : | 05, the suspect is not in the house. The person in the house saw the whole thing. She could give them information. |
| RPC | : | Which one (unreadable)? The old lady or the male?.... |
| EPW | : | What was that? |
| Radio | : | The old lady that's in that house, or the male that's (unreadable). |
| EPW | : | (unreadable) Girlfriend of the guy that got shot. |
| Radio | : | Girlfriend... |
| RPC | : | 2219 |
| Radio | : | 15, a girlfriend...2219. |
| RPC | : | Yeah, where's he shot at? |
| Radio | : | What part of his body, 05?....2205 |
| EPW | : | 05, we don't know. |
| Radio | : | They don't know 19...Looks bad... |
| RPC | : | 22B |
| Radio | : | 22B |
| RPC | : | Okay. We have one person down at, ah, we had one person down at Bambrey and Diamond. Is there another location for the other male that 15 has? |
| Radio | : | Okay. Sir, what, the way we got it was Bambrey and Diamond a person shot on the highway. 05's got that one. 15,...Another job came in 2236 Edgley, report that a male came into the house bleeding from the head, and it's unknown how he got the injury. So ah, he's over there and also, from 05.... |
| RPC | : | And right now we don't know if they're related or not then? |
| Radio | : | Ah, 05 says there's a complainant inside Edgley street that knows something about (unreadable). |
| EPW | : | No, not Edgley street. He's (unreadable) |
| Radio | : | They broke off again. 05, not Edgley street? |
| EPW | : | No, there's a complainant inside Bambrey street where 15 is... That knows the doer. |
| Radio | : | That knows the doer, okay. I have 10 gone over to Bambrey street. There should be someone there that knows the doer. |

```
              : 215
              : 215
              : The ah, flash that I got right now is ah, black male,
                approximately 6'. He had on a black trench coat, and red
                pants. Direction was taken was ah,...That's west on Diamond
                from ah, Bambrey.
              : Okay. It's a black male, ah, 16 years of age wearing a black
                trench coat, and west on Diamond from Bambrey.
RPC           : 15, that was 6'. I didn't get a age, but 6' in height...
                Dressed in a black trench coat and red pants.
Radio         : Black trench coat and red pants. Do they know his name?
RPC           : That's a negative.
Radio         : West on Diamond from Bambrey, and they definitely saw the
                shooting?......
                ....Okay. 2215....Okay. (unreadable)
RPC           : 2214 (inref another job)
Radio         : Stand by just a second. Black male, 6', we're looking for,
                black trench coat, red pants, west on Diamond from Bambrey, 5
                to 10 minutes. Ah, west on Diamond from Bambrey, armed with a
                gun, black male, 6' tall, black trench coat, and red pants.
                311 go ahead.
```

**Time: 8:20:49 PM**

```
RPC           : There's supposed to be two males in a white ah, (unreadable)..
                with a possibly (unreadable) near of the door?
Radio         : Okay, there's two males in a white what?...
RPC           : (unreadable)...a white a (unreadable)
Radio         : Your breaking off badly....
```

**Time: 8:21:30 PM**

```
Radio         : 2215, you wanna try your message again....Cars stay off the
                air until I get this flash from 15....2215....215.
RPC           : 1-5
Radio         : Did you have something saying about a white something?....215
RPC           : 215
Radio         : Do you have anything to add other than that description,
                trench coat, red pants?
RPC           : Okay. All we got from a witness was it's a white, ah, two-door
```

NORTHCENTRAL DIVISION TRANSMITTAL1 1-93

small car, possibly a foreign vehicle. It has a slim scoop on the back rear window. And the male should be approximately 18 or 20.

| | |
|---|---|
| Radio | : Okay. We're looking for a white two door small car, possibly a foreign car, with a slim scoop in the rear, and the male's about 20? |
| RPC | : Between 18 and 20 years. Two young black males. |
| Radio | : There's two of them, and we have clothing description on one. A black trench coat, and red pants... |
| RPC | : Correct radio. |
| Radio | : Okay. Additional information on that founded shooting at Bambrey and Diamond about 10 minutes old now. we're looking for two black males fif, 18 to 20 years of age. Description on number one, he's 6' tall wearing a black trench coat, and red pants. They went west on Diamond from Bambrey, they had a white two door small car, possibly a foreign car, with a slim scoop in the rear. |
| RPC | : (unreadable) 18, what's in the rear of the car? |
| Radio | : He said a slim scoop. I guess a slim scoop... |

## Time: 8:23:25 PM

| | |
|---|---|
| RPC | : 18, you broke off. What's in the rear of that car? |
| Radio | : Okay. Ah, he, it sound like he said a slim scoop. |
| RPC | : 215 |
| Radio | : 215 |
| RPC | : Yeah. It's like a sunvisor, but it's ah, it covers the rear window to keep the sun off.... |
| Radio | : Oh, like a sunvisor in the rear. |
| RPC | : 18, like a hatchback. |
| RPC | : Correct. |

## Time: 8:24:11 PM

| | |
|---|---|
| EPW | : 205 |
| Radio | : 205 |
| EPW | : Yeah. We're on location up here. Ah, we'll make notifications from here. |
| Radio | : Okay 205. Thank you. |
| EPW | : 201 |
| Radio | : 201 |
| EPW | : Okay. So I gather there was nothing at that location at 2236 Edgley, right? |
| Radio | : No, we didn't determine that yet.... |
| EPW | : Okay. Rescue was there. They just took a hospital case outta there....It was some type of cut over the head. We didn't get the um, male's name and everything. |
| Radio | : Okay....22D....22Barney.... |
| RPC | : 215, you have a message for the Sarge? |
| Radio | : Yes. Just that 01 said rescue just took someone out of 2236 Edgley. We don't have anything further on that. We don't know if it's related. The man with the cut on the head. |
| RPC | : Okay. I'll let him know. |
| EPW | : Yeah. It, it was an older gentleman they took, they had in their wagon. |

NORTHCENTRAL DIVISION TRANSMITTAL 1-93                                    9

| | | |
|---|---|---|
| Radio | : | Okay. Ah, 2201, did you talk to people inside there? Were you able to do that? |
| EPW | : | Ah, negative. I'll go inside there now and see if they know anything. |
| Radio | : | Okay. |

## Time: 8:27:42 PM

| | | |
|---|---|---|
| RPC | : | 22B |
| Radio | : | 22B |
| RPC | : | Was Northcentral notified on this? |
| Radio | : | They're calling from the hospital. |
| RPC | : | They're calling from the hospital? |
| Radio | : | That's correct. |
| RPC | : | 22B |
| Radio | : | 22B |
| RPC | : | I didn't receive your message. |
| Radio | : | Yes sir...2205's at the hospital, they're making the notifications..... |

## Time: 8:29:44 PM

| | | |
|---|---|---|
| EPW | : | 205 |
| Radio | : | 205 |
| EPW | : | Yeah. Let the Sergeant know that that's a 5292. |
| Radio | : | 5292 at the hospital. 22B |
| RPC | : | 2B, I received. |
| EPW | : | And, 205, if ah, 15 has the information on this guy, if he can ah,...Get that to us. |
| Radio | : | Okay. Ah, we don't have a name. We have some flash. Ch, 15 20 guess, ah, you mean on the, the one that's at the hospital. |
| EPW | : | Yeah. On our ah, victim over here. See if they have his name and stuff. We don't have anything for the hospital. If he can ....Well, whatever it is. |
| Radio | : | Fif....2215.... |
| RPC | : | (unreadable) |
| RPC | : | 2219 (inre: another job) |
| Radio | : | Ah, stand by. 2215 |
| RPC | : | (unreadable) |
| Radio | : | Can't read your radio again. |
| RPC | : | 22B, I'm here with 15. What do you need? |
| Radio | : | Okay. 05, at the hospital, wants to know if we have a name on the victim. If anybody knows..... |
| EPW | : | Ah, 205, if they have access to a phone maybe they can call us with all the specifics.... |

## Time: 8:31:24 PM

| | | |
|---|---|---|
| EPW | : | 205 |
| Radio | : | 205 |
| EPW | : | Yeah. Is it ah, 15 has the scene, right? The ah, for the front desk, they wanted to know. |
| Radio | : | Okay. I think 5, and 15 is interviewing people. I have 5 and 15 showing out there on the scene with the Sergeant .... |

## Time: 8:31:50 PM

PAIP4482

RPC      : 215
Radio    : 215
RPC      : Yeah. 215, all we can get is the first name.
Radio    : Go ahead.
RPC      : Ah, his first name is Travise and ah, no last name unknown.
Radio    : First name is......Say, ah, spell it....215.....2215....2205,
           did you copy what he gave you?......

## Time: 8:32:53 PM

EPW      : 201
Radio    : 201
EPW      : Okay. We got a negative on Edgley street. Yeah, we'll go over
           there now. (Inte: another job)
Radio    : Okay. Ah, 22...2210 and 2218 you can disregard. 2201, can you
           give me paper for the hospital case on Edgley?

NORTHCENTRAL DIVISION WAS MONITORED FROM 8:06 PM TO 8:33 PM MR. DLICHASZ
#273, POLICE RADIO.

ENC: CASSETTE

ATTN: DET. REINHOLD

WB:bb

PAIP4483

# EXHIBIT 7

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H92-1 |
|---|---|---|---|
| | | | INTERVIEWER DET. J. DOUGHERTY 3342 |

| NAME GEORGE PATTERSON | AGE 35 | RACE B | DOB |
|---|---|---|---|

| ADDRESS | | APARTMENT NO. | PHONE NO. |
|---|---|---|---|

| NAME OF EMPLOYMENT/SCHOOL | SOC. SEC. NO. |
|---|---|

| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO. |
|---|---|---|

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE
ROSE GRANT  (NEIGHBOR)

| ADDRESS | | PHONE NO. | |
|---|---|---|---|
| **PLACE OF INTERVIEW** POLICE HOMICIDE DIVISION ROOM 104 | | **DATE** 1-1-93 | **TIME** 11:30PM AM PM |
| **BROUGHT IN BY** POLICE | | **DATE** 1-1-93 | **TIME** AM PM |

WE ARE QUESTIONING YOU CONCERNING
THE SHOOTING DEATH OF TRAVIS HOUSTON ABOUT 3:10PM ON THIS DATE IN THE 2000 block of BAMBREY

| WARNINGS GIVEN BY | | DATE | TIME AM PM |
|---|---|---|---|

| ANSWERS | | | | | | |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

Q.  GEORGE, are you known by any other names?

A.  No, just GEORGE.


Q.  Did you know the decedent, TRAVIS HOUSTON?

A.  Not personally, he had come to visit my neice TANIKA, once before.


Q.  Will you go on in your own words and tell me what you know about this shooting incident earlier tonight when TRAVIS HOUSTON was shot and killed?

A.  I didn't know him as TRAVIS,  I thought his name was ED, but he had come to see my neice about 45 minutes or so before all this happened.  I was leaving the house when he got there, I was going to my neighbor's house,  DENISE at [redacted] to get a piece for the Nintendo, and I came back in about 5 minutes.  TRAVIS stayed a while and we watched some of the football game on tv,  I think it was halftime and he just decided to leave.  My neice walked him to the door and he and just gone outside when we heard about 2 or 3

| RECORD  Yes  No | CHECKED BY |
|---|---|

RECEIVED PAIP4671

75-403 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | | |
|---|---|---|---|
| NAME GEORGE PATTERSON | PAGE 2 | CASE NO. | |

gunshots, we waited for a few seconds to pass and then we opened the door to see if any thing happened, at first I thought it was just some more gunfire for New Years, but when we opened the door I saw TRAVIS laying on the pavement and I saw one guy running in the street up Bambrey towards Diamond. He had on a long black coat. I ran my neice back into the house because I didn't know if it was over yet outside and then in about 3 minutes or so I figured it was safe so we went back out. My neice called the Police.

Q. Did you see any one else running or going up Bambrey towards Diamond right after the gunshots?

A. No. The only person I saw moving any way on Bambrey was the guy in the dark black coat.

Q. Did TRAVIS mention that he was having any kind of problems with anyone ?

A. No. Like I said we was just sitting there watching the game.

Q. Did TRAVIS have any kind of car with him today?

A. I don't know. Janita would probably know if he had a car.

Q. When was the last time you saw TRAVIS at your house?

A. At least over 2 weeks ago.   or longer

Q. Is he friendly with anyone else in your neighborhood?

A. I don't think so.

Q. Do you know how TRAVIS did for money?

A. I don't.

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|
| **NAME** GEORGE PATTERSON | **PAGE** 3 | **CASE NO.** |

Q.  Did TRAVIS make any phone calls while he was at your house?

A.  ~~Not that I know of.~~  NO

Q.  Did TRAVIS have a beeper on him?

A.  ~~Not that I saw.~~  I didn't see one

Q.  Was TRAVIS SUPPOSED TO come back tonight?

A.  It sounded like he was leaving for good by the way they was saying goodbye to each other.

Q.  Did anyone tell you that they saw what had happened to TRAVIS?

A.  No.

Q.  Do you know where TRAVIS lived?

A.  No.

Q.  Is there anything else you can add that would help this investigation?

A.  Not now but if I hear anything from the neighbors I will let you know.

G. George Patterson

# EXHIBIT 8

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H93-1 |
|---|---|---|
| | | INTERVIEWER MEE #9155 |

**NAME** TAMIKA LEDBETTER  **AGE** ▇  **RACE** B/F  **DOB** ▇

**ADDRESS** ▇▇▇▇▇▇  **APARTMENT NO.**  **PHONE NO.** ▇▇▇

**ADDRESS OF EMPLOYMENT/SCHOOL** ▇▇▇  **DEPARTMENT**  **PHONE NO.** ▇▇

**DATES OF PLANNED VACATIONS**

**DATES OF PLANNED BUSINESS TRIPS**

**NAME OF CLOSE RELATIVE**

**ADDRESS**  **PHONE NO.**

**PLACE OF INTERVIEW** Room 104 PAB  **DATE** 1-1-93.  **TIME** 9:30 AM

**BROUGHT IN BY** Police  **DATE** 1-1-93  **TIME** PM

**WE ARE QUESTIONING YOU CONCERNING** THE Shooting death of Travis Houston.

**WARNINGS GIVEN BY**  **DATE**  **TIME** AM PM

**ANSWERS**

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q. TAMIKA ARE YOU KNOWN by ANY OTHER NAME?

A. No.

Q. WHAT WAS YOUR RELATIONSHIP to THE decedent?

A. HE was A friend - we've been dating since the summer.

Q. Is that when You met him?

A. That's when I started talking to him. I've seen him in the neighborhood for a long time, but I didn't know him then.

Q. What name did You know him by?

A. We call him "Trav" but his real name is Travis Houston.

**RECORD** ☐ Yes ☐ No  **CHECKED BY** x Tameka Ledbetter

REVIEWED PAIP4674

75-483 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

| NAME | PAGE | CASE NO. |
|---|---|---|
| TAMIKA LEDBETTER | 2 | H93-1 |

Q. When was the 1st time that you saw "Butter?"

A. Tonight. Just before the happened. He Just walked out my door. He'd only been outside for a few seconds when I heard the gunshots.

Q. Tell me what happened.

A. He had been at my house, and was going home. He had Just walked out & I had closed the door & was getting ready to lock it when he came back. He had forgot his door key. I got it from table in the living Room & gave it to him. He was still on the front step. He left & I closed the door & locked it. This when I heard the gunshots. I think there was 3 shots. I went to open the door & my uncle told me Not to. I opened the door, look away & saw Butter laying on the sidewalk, like 2 door down from me. At first I didn't see any blood. I thought he might be ducking from the gunshots. I walked over to him & thats when I saw the blood. It looked like it was coming from his head. I tried to get someone to check his pulse but nobody would. & I cld I knew he was dead.

Q. When she first came to the door did you going seen outside?

A. Yes. I there was no body the front. I watched him walk toward his car. I saw a car with a long black coat standing on the corner. I cld I say he saw him ... the

Tamika Ledbetter

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|

NAME _____ Tamika Ledbetter

| | PAGE 3 | CASE NO. H 93-1 |
|---|---|---|

same guy that I saw later, but Miss Cathy told me that
it was, she told me that the guy that had been on the
corner, is the same one that shot Butter.

---

Q. Who is Miss Cathy & where does she live?

A. She lives right across the street from me - she in a white
sheet st..

---

Q. Tell me about the guy with the long black coat.

A. He was on the corner of Bambrey + Pine, He was just standing
there.

---

Q. Did you see him again?

A. I can't say positive that it was him, but it looked like
the same guy to me.

---

Q. When was this?

A. Right after the shooting, I opened the door & he was right
there in front of me. He was on the sidewalk walking in
front of my door. He was going towards Dimona & then he
turned onto Clermont. I heard a car start up & then he
drove past on Dimona. I saw the drive guy - he was
changing & things, his hat off. There was another guy there
too - in the car & I think they picked someone up the
block.

X Tamika Ledbetter

75-483 A

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | PAGE | CASE NO. |
|---|---|---|
| TAMIKA LEDBETTER | 4 | H 93-1 |

Q. Do you recall ever seeing either of the male before?

A. I can't say for sure. I didn't see the guy in the other guy at all.

Q. Describe the male you saw?

A. He was maybe your height - my complexion (med brown) average build. He had on a blk. skull cap on & a long blk. trench coat, the kind with the shoulder pads in it.

Q. Did you see any weapon?

A. Yeah. As he ran past I could see he had a gun - it was in his right hand & he was putting it inside his waistband on the left side.

Q. Describe the car?

A. It was a white car, like a Hyundai, a 4 door type, square like.

Q. What kind of car does Butter own & where was it parked?

A. It's like Gray or d. blue; I can't know what kind. It was parked on the corner of my block, right where the guy was standing.

Q. What can you tell me about Butter's personal life?

A. He's been selling drugs - not out on the street. He has others do that for him.

X Tamika Ledbetter

PAIP4677

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | | PAGE | CASE NO. |
| TAMIKA LEDBETTE- | | 5 | H93-1 |

Q. Where do they sell?

A. I don't know - I don't even know who work for him.

Q. Do you know where he would get his drug supply?

A. No.

Q. What about his friends?

A. He'd usually be with me, or his brother, Ken, and with Dave - I think that's his cousin. They're related some kind of way.

Q. Do you know of any problem that Butter was having?

A. Back in November there was a lot of shooting going on or on Berks St. & they was saying that it was because of Butter — but me & him had been away.

Q. Do you know who it was that got shot in November?

A. A guy named Terry & a guy named Curt. There's 2 other guys that got shot too. & one of them was in jail now.

Tamika Ledbetter

# EXHIBIT 9

INVESTIGATION INTERVIEW RECORD

PHILADELPHIA
POLICE DEPARTMENT
HOMICIDE DIVISION

CASE NO. 493-01

INTERVIEWED DET. R. Reinhold

NAME Ernestine WILLIAMS

AGE ☐   RACE B

DOB ☐

APARTMENT NO.

PHONE NO.

NAME OF EMPLOYMENT/SCHOOL /

SOC. SEC. NO.

ADDRESS OF EMPLOYMENT/SCHOOL

DEPARTMENT

PHONE NO.

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

BROUGHT IN BY /

DATE     TIME

WE ARE QUESTIONING YOU CONCERNING The murder of Travis Houston at 2000 Bambrey St.

WARNINGS GIVEN BY

DATE     TIME

ANSWERS

(1)     (2)     (3)     (4)     (5)     (6)     (7)

Q. Ernestine, tell me what you know about the shooting at 2000 Bambrey St on 1-1-93 at about 8 AM.

A. I was upstairs in my bedroom with my boyfriend Kevin Mathis. I heard gunshots I said "Kevin what was that — and he looked out the window. After he looked out he turned to me and said they're was somebody laying out there. Then I looked out the window and saw a man laying on his side on the sidewalk and I saw a woman standing against the gate. — She was crying and screaming. I didn't recognize her.

Ernestine Williams

RECORD  ☐ Yes  ☐ No

CHECKED BY

REVIEWED BY

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME Ernestine Williams

PAGE 2

CASE NO 93-01

Q  Did you know the man who was laying on the sidewalk?

A  No.

Q  Did you see anyone with a gun?

A  No.

Q  Did you see anyone running away from where the man was laying on the sidewalk?

A  No.

Q  Do you know Travis Houston?

A  No.

Q  Was your car broke down out front in the middle of the street?

A  Yes. That was about a 1/2 hour before the shooting. As soon as I pulled out of the parking place with my neighbors son the car conked out. Then Kevin walked up the street he sat in the car too. Before Kevin come. Kevin went into my house. Then about 3 minutes later a gray station wagon pulled up and parked. He couldn't get by because I was blocking the street.

75-483 A

Ernestine Williams

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | PAGE | CASE NO. |
| Ernestine Williams | 3 | 493-01 |

A. A B/M wearing a nice Jacket and a chain around his neck, young, got out of his car and started walking down the street. I asked him to give me a Jump. He repeated what I said and then he kept walking and went into Tamika's house.

Q. Did he come back out again while you were out there?

A. No.

Q. Was that the man who was shot and laying on the sidewalk?

A. Yes.

Q. Did you see who shot him?

A. No.

Q. How long after you went in the house did you hear gunshots?

A. 5 minutes.

Q. Has anyone told you who shot Travis Houston?

A. No.

Ernestine Williams

75-48: A

# EXHIBIT 10

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER  Collins 9 030 |

| NAME  Ernestine Williams | AGE ██ ██ B | DOB ██ |
|---|---|---|
| ADDRESS | APARTMENT NO. | PHONE NO. |

| NAME OF EMPLOYMENT/SCHOOL | | SOC. SEC. NO. |
|---|---|---|
| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO. |

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

| PLACE OF INTERVIEW  Room 104 PAB | DATE  3-21-93 | TIME  6:25PM AM PM |
|---|---|---|
| BROUGHT IN BY  Reinhold/ Collins | DATE  3-21-93 | TIME  5:15PM AM PM |

WE ARE QUESTIONING YOU CONCERNING

Shooting death of Travis Houghston which occurred on 1-1-93 at 0 8:10PM

| WARNINGS GIVEN BY | DATE | TIME AM PM |
|---|---|---|

ANSWERS

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q. Ernestine, are you known by any other names?

A. No, just Ernestine.

Q. On 1-1-93, Travis Houghston was shot to death while on the 2000 block of N. Bambrey St. Would you please go on and tell me what you know about this murder?

A. About 7:30PM I left my house and got in my car that was parked in front of my house. I pulled out of a parking spot and the car went dead on me. I sat in the car for awhile and I saw two guys coming down the street. Before the two guys came down the street I saw Travis come out of a gray station wagon that he had parked in the spot that I left. I saw Travis get out and go to Mikas house. Then I saw the two guys come down the street coming from Glenwood and Diamond St. They walked past me and went to the speakeasy on Page St. I got out of the car and I went to Page St. I asked one of the males who did not go in the speakeasy if he had a par to give me a hot shot. He told me he couldn't help me. He started a conversation with me about that he knew me from somewhere and then he told me to take it easy and when the other guy came out the

| RECORD  ☐ Yes  ☐ No | CHECKED BY |
|---|---|

REVIEWED BY

*Ernestine Williams*

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME Ernestine Williams | PAGE 2 | CASE NO. |
|---|---|---|

speak easy they both walked away. They walked out Page and turned up Stillman St. About 20 minutes later, I saw the same two males with another male, a young guy his name is Devon. They were just sitting on the corner drinking beer. Then I saw Travis come out of Mikas house, walk to his car and get something out of his car and then walk back to Mikas house. About ten minutes later Travis came back out of Mikas house again and the guy in the black leathert coat came walking down the street towards Travis and Travis reached in his coat and gave him something, it was a brown bag. Then the guy took the bag and he my put a gun behind his ear and he shot him. Travis fell in his arms and the guy laid him on the ground and he pulled Travis coat over his face and he kept shooting him in the face, on the side of his face/ The guy ran through an abandoned house directly across from Mikas. It doesn't have any doors or windows in it. After that I fell on the floor and I told Kevin, look outside and see if theres a body in the street and he looked out and he said there was. Then then police came and they threw him in the truck.

Q. Please describe the man who shot Travis?

A. He was a B/M about 31 years old, 5'7", dark complexion, short haircut close and neat, mustache, stocky built about 21Rx 180 lbs, he's built. His head was kind of flat in the back, he was wearing a 3/4 length dull black leather coat, black shoes, black turtleneck and he had a thick gold chain around his neck. This was the male who went into the speak atMs. Delphines speak on Page St. and he bought a 40.

Q. Please describe #2, the man who was with the shooter?

A. He was a B/M, he had real big lips, box haircut, about 33 yrs. old, brown skinned, medium mustache, 5'11", thin, box hair cut. He may even be a little taller maybe 6'1", and he was wearing a beltge cashmere full lengthb coat and dress shoes.

3-483A

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO. |
|---|---|---|
| Ernestine Williams | 3 | |

Q. How about the male you know as Devon?

A. He's about 14 , no 15 yeras old, He goes to Franklin High School I think. XXXXXXXXXXX
He sells drugs on Page St. and on 25th & Norris STs.

Q. Did the male who shot Travis say anything to him?

A. No, they didn't talk at all. He just gave him the bag and the guy shot him.

Q. Did Devon and the male who shot Travis, were they together?

A. Yes.

Q. What did Devon and the second male do after Travis was shot?

A. Devon walked down the street with the male who shot Travis and the other guy stayed
on the corner of Bambrey and Page St. Devon stayed with the second male and then the
male in the leather jacket walked down the streeet by himself and shot Travis. XXXXXX He
ran throught the abandoned house and the other two ran out Page St. and upXXXXXXXXXXXX and
to Glenwood Ave.

Q. How well did you know Travis Houghston?

A. I didn't, never saw him until that day.

Q. Have you ever seen the man in the leather jacket or the cashmere coat before that day?

A. Never seen them in my life.

Q. Have you seen them since?

A. Just the one in the cashmere coat, he came out of Ms. Delphinos house and Was walkiing
Page St. and I was on PAge St. and he said "How you doing" and I said "How you doing" and I
just kept walking

Ernestine Williams

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|

| NAME Ernestine Williams | PAGE 4 | CASE NO. |
|---|---|---|

Q. When was that?

A. About two days after vthe shooting.


Q. How do you know Devon?

A. From around the neighborhood and from talking to my daughter. He lives around 25th & Norris STs.


Q. Is there anything else that you cam tell me?

A. I heard that one of Ms. Delphines neices used to go with the man in the leather jacket. I think it was Ann.


Q. Do you know the adress of the speakeasy, Ms. Delphines house?

A. Its on PAge St. brown wooden door, raggedy house


Q. Has anyone threatened you in regards to this ioncident?

A. Yes, a B/M came around and he said he was Travis brother and he told me that I hadseen who killed his brother. I told him I didn't know and he said, Bitch you do know and I started crying and then my friend Greg and told themm to leave me alone and we walked around Page St.


Q. Have you seen the male in the cashmare coat since the day he said "How you doin"

A. Yes, Iv'e seen him , the day of the shooting and a couple days later.


Q. They were the only two times that you saw him?

A. Yes.


*Ernestine Williams*

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|
| **NAME** Ernestine Williams | **PAGE** 5 | **CASE NO.** |

O. Can you describe the gun that the man in the leather jacket shot Travis with?

A. It was a big gun long, it was dark, I reember seeing the flash of light whenhe shot it.


O. Did you see what he did with the gun after he shot him?

A. No, he carried it he ran off, I didn't see him drop it.


O. Have you seen Devon since Travis was shot?

A. Yes, every day.


O. Has he said anything to you about the shooting?

A. No he don't even speak to me.


O. Have you heard why this shooting took place?

A. I heard it was over a drug corner, I herad Travis didn't want anyone selling on a certain corner so I guess they killed him.


O. Did you see any of the trthree males get into a car on the day of the shooting?

A. No, I didn't see anyone get in or get out of a car.


O. Have you seen Tamika?

A. I saw her after Travis funeralbut she moved away and I haven't seen her


O. Is there anytghing else you can add to what you have told me.?

No, wait, there have been some guys two of them in a blue thunderbird. They si in front of the playground at Diamond & Glenwood and when I leave my house they follow me

## INVESTIGATION INTERVIEW RECORD
### CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO. |
|------|------|----------|
| Ernestine Williams | 6 | |

A. for a little while. They never say anything to me and I have not seen there faces.

Its about an 85 T-Bird and I have no idea why they are following me but I think it

may bne because of this.

Q. Why have you waited until now to speak with the police?

A. Because I was scared that somebody might do somethin to me. I am scared and I

wouldn't have come to you WKIWXXX until you found me. My little brother was

killed and I know I am doing the right thing. I am happy to get it off my mind.

# EXHIBIT 11

## INVESTIGATION INTERVIEW RECORD

**PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION**

CASE NO. A 93-1

INTERVIEWER DET. H_____ER #9001

NAME ERNESTINE WILLIAMS   AGE 31   RACE B   DOB _____   PHONE NO. _____

APARTMENT NO.

NAME OF EMPLOYMENT/SCHOOL

SOC. SEC. NO.

ADDRESS OF EMPLOYMENT/SCHOOL   DEPARTMENT   PHONE NO.

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

ADDRESS   PHONE NO.

PLACE OF INTERVIEW HOMICIDE DIVISION   DATE 9-14-93   TIME 7 ⁰ AM/PM

BROUGHT IN BY DET. DEMBECK #989   DATE 9-14-93   TIME 6⁴⁵ AM/PM

WE ARE QUESTIONING YOU CONCERNING THE SHOOTING DEATH OF TRAVIS HOUSTON AT 2000 BAMBREY ST.

WARNINGS GIVEN BY   DATE   TIME AM/PM

ANSWERS (1) (2) (3) (4) (5) (6) (7)

Q- ERNESTINE, YOU HAVE INDICATED TO US, THAT YOU KNOW THE MAN WHO SHOT TRAVIS HOUSTON AT 2000 BAMBREY ST. ON 1-1-93, IS THAT CORRECT?

A- YES.

Q- TELL US WHAT YOU KNOW?

A- THE MAN WHO SHOT TRAVIS IS NAMED LARRY AND I SEE HIM AT THE CHINESE STORE AT 24TH AND NORRIS, ALMOST EVERY DAY. HE LIVES 3 DOORS FROM THE CHINESE STORE. THEY SELL CAPS OUT OF THE HOUSE. ABOUT A MONTH AFTER TRAVIS GOT KILLED, I SAW THE GUY WHO SHOT HIM AT 24TH + NORRIS AND HE SAID TO ME "DO YOU KNOW ME?" I SAID "NO." THEN HE

RECORD ☐ Yes ☐ No   CHECKED BY *Ernestine Williams*

REVIEWED BY

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

**CITY OF PHILADELPHIA**
**POLICE DEPARTMENT**

NAME: ERNESTINE WILLIAMS     PAGE: 2     CASE NO.: H 93-1

A - SAID "YOU SAW A MURDER, DIDN'T YOU"
I SAID "NO". I RECOGNIZED HIM RIGHT A
AS THE GUY WHO KILLED TRAVIS. I DIDN'
KNOW HIM WHEN HE SHOT TRAVIS. BUT A
I SEEN HIM AT 24TH & NORRIS I WOULD S
HIM ALMOST EVERY DAY. THE THIN GUY WITH
BIG LIPS WHO WAS WITH THE GUY WHO KILLED
TRAVIS WHEN HE WAS KILLED IS AT THE
HOUSE ON 24TH ST. ALL THE TIME AND LIVE
IN JOHNSON HOMES PROJECTS. EVERY BOD
FROM THE NEIGHBORHOOD SAY HIS NAME IS
LARRY - THE GUY WHO SHOT TRAVIS. -

Q - HOW COME YOU DIDN'T TELL THE POLICE, THIS
INFORMATION BEFORE?

A - BECAUSE I DIDN'T KNOW HIM WHEN I WAS FIR
INTERVIEWED. AFTER I SEEN HIM AGAIN I AM
AFRAID FOR MY LIFE AND I LIVE IN THE
NEIGHBORHOOD AND HE KNOWS I SEEN HIM
THAT NIGHT THAT TRAVIS GOT KILLED.

u Ernestine Williams

# EXHIBIT 12

**INVESTIGATION INTERVIEW RECORD**

**PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION**

CASE NO. H93-1

INTERVIEWER DET. HOFFNER #9001

NAME ERNESTINE WILLIAMS

AGE [redacted]  RACE B

ADDRESS [redacted]

APARTMENT NO.

PHONE NO.

NAME OF EMPLOYMENT/SCHOOL UNEMPLOYED

SOC. SEC. NO.

ADDRESS OF EMPLOYMENT/SCHOOL

DEPARTMENT

PHONE NO.

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

ADDRESS

PHONE NO.

PLACE OF INTERVIEW HOMICIDE DIVISION

DATE 9-15-93   TIME 4:05

BROUGHT IN BY DET. DEMBECK #989

DATE   TIME

WE ARE QUESTIONING YOU CONCERNING THE SHOOTING DEATH OF TRAVIS HOUSTON ON 1-1-93

WARNINGS GIVEN BY   DATE   TIME

ANSWERS

(1)  (2)  (3)  (4)  (5)  (6)  (7)

Q - ERNESTINE, I'M SHOWING YOU A PHOTO DISPLAY OF EIGHT MALES, DO YOU RECOGNIZE ANYONE?

A - YES, NUMBER 4 THAT'S LARRY.

Q - WHO IS LARRY?

A - THAT'S THE MAN WHO SHOT AND KILLED TRAVIS.

Q - ARE YOU SURE?

A - I'M POSITIVE.

(ERNESTINE WILLIAMS IDENTIFIED PP# 748079 LARRY MULLINS)

Q - ERNESTINE, I'M SHOWING YOU ANOTHER PHOTO DISPLAY OF EIGHT MALES. DO YOU RECOGNIZE ANYONE?

A - THAT'S HIM - NUMBER #4 HE'S THE GUY WITH LARRY THAT KILLED TRAVIS HOUSTON. HE'S OLDER NOW (IDENTIFIED PP# 54322 JAMES KELLY)

RECORD ☐ Yes ☐ No

CHECKED BY

REVIEWED BY FA 3076   Ernestine Williams

**INVESTIGATION INTERVIEW RECORD**
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: ERNESTINE WILLIAMS     PAGE: 2     CASE NO: H73-1

Q- ARE YOU SURE IT'S THE MALE.

A- YES, I'M POSITIVE. I WENT TO A WEDDING WHERE HIS BROTHER CALVIN GOT MARRIED AT 21$^{SD}$ & DIAMOND ON AUGUST 14TH AND HE WAS THERE.

*Ernestine Williams*

3-483 A    FAIP3077

# EXHIBIT 13

PAIP4897

CONTINUATION OF    OF PROBABLE CAUSE FOR ARREST WARRANT  *213995*

On 1-__-93 at approx. 9:30PM, TAMIKA LEDBETTER, ▉▉ ▉▉ ▉▉ ▉
▉▉▉▉▉▉ was interviewed by det. Mee #9199 and stated in summary
she was the girlfriend of the deceased in this case, TRAVIS HOUSTON,
B/M, 20, and that on 1-1-93 at approx. 8:20PM Travis had been with her
in the above residence, he had left and she had closed the door but
Travis came back because he had forgot his keys, she adds that as she
went to close the door a second time she noticed a black male in a
long black coat standing on the corner, she closed the door and locked
it and then heard gunshots, she opened the door and saw Travis laying
on the ground, she then saw a male, who she thought was the same male
that was on the corner, right in front of her door, he was going down
the street toward Diamond and then he turned onto Glenwood Ave. She
heard a car start up and then saw the same guy driving and taking his
hat off, and there was a second male in the car with him. She further
added that when she saw the male outside of her house he had a gun in
his hand and that he had put it into his waistband, She described the
car they left in as a white car, like a Hyundi.

On 7-00-93 ERNESTINE WILLIAMS, was reinterviewed by Det.
Cunningham #742 and GROSS # 731  and reviewed her interviews of
03-01-93, 8-14-93 and 8-15-93.
She related in summary  that on 1-1-93 at approx. 8PM she was on the
highway outside her house on Bambrey St. and that her car was broken
down in the middle of the street. She saw the deceased, Travis
Houston, park and go into Tamika's house, then she saw two black males
come south on Bambrey st. from Glenwood and Diamond Sts, and walk past
her to the speakeasy at 2552  Page St. One of the males went into the
speakeasy, Ernestine got out of her car and walked to Page St.
Ernestine asked the male outside, if he could give her a hot shot, he
stated he couldn't and then stated to her that he knew her from
somewhere. The other male came out of the speakeasy and both males
walked away. She adds that she saw the same two males sitting on the
steps about 20 minutes later drinking beer. About that time she saw
Travis come out of Tamika's house and walk to his car and then he went
back to Tamika's house and came out about ten minutes later. At this
time the second male gave a gun to the male in the black leather

_____

Michael Brown                731                   Homicide
                                                   DISTRICT/UNIT
                                                   5TH

_____

July                    ...scribed before me this _____
                        ...5                        (SEAL)

**Exhibit Q**

PAIP4898

CONTINUATION OF  OF PROBABLE CAUSE FOR ARREST WARRANT  213995

ERNESTINE WILLIAMS  Cont'd

The male in the black leather jacket came walking down the
street toward Travis.  Travis reached into his coat and gave him a
brown bag. The guy took the bag and he then put a gun behind Travis'
ear and shot him.  Travis fell into his arms and the guy layed Travis
down and pulled his coat over his head and then shot him again and
then ran through an abandon house across from Tamika Ledbetter's
house.

Williams  then states ,about a month after the Murder
she saw the male who shot TRAVIS on 1-1-93 .She saw him at 24th and
Norris and he said to her, "Do you know me." and she said no and the
male then said "you saw a murder, didn't you." and she said no again.
She went on to relate that she recognized him right away as the male
who shot Travis, that she learned in the neighborhood that his name
was Larry.She didn't know him when he shot Travis but has seen him
almost every day since the above encounter. She also related that the
second male who was with Larry when he killed Travis lives in the
Diamond homes projects and that she had seen him around 8/93 when she
attended a wedding and he was holding the brides gown. She believed
that he was related in some way to the bride or groom.  She added that
she did not know the male at the time of the incident and did not come
forward with this information before because the guys live in her
neighborhood and she feared for her safety. She was afraid mostly
because the male who controls the drugs in that immediate area (
Christopher SWAIN) lived in the speakeasy at 2552 W. Page st. and it
was the family that was at the wedding she attended. (Swain is now
Defendant D/C Number #94-369).

Ernestine was shown a photo array consisting of eight black males,She
positively identified  Photo # 748079 ,(Larry MULLINS) as Larry.
........ was shown a second photo array of eight black males and
positively identified photo# ( James KELLY ) As the male who passed
Larry the gun when killed Travis and the same male who she had seen at
the wedding.

Michael J. Lyons  731                   Nomier bd
            BADGE#                       DISTRICT/UNIT

               scribed before me this    5TH

       July                5.

                                         (SEAL)

Exhibit Q

# EXHIBIT 14

THE FOLLOWING IS A TRANSCRIPTION OF A TAPE RECORDED STATEMENT
TAKEN ON THURSDAY JULY 20, 1995.   7/24 - 8 7/26

Q. Ms. Williams my name is Jerry Benoff, I'm a licensed private
investigator, I'm working for the attorney Andrew Gay, who
represents one James Kelly in a homicide case and I would like
to record a statement from you do you give me permission to
record this statement?

A. Yes.

Q. Uh, would you identify yourself for the recording with your
full name and address?

A. I'm Ernestine Williams, I live ███ █ ████████.

Q. And that's in Philadelphia, correct?

A. Yes.

Q. Uh, Ms. Williams I am now instructing you just to answer
my questions truthfully, do you agree to that?

A. Yes.

Q. Ms. Williams tell me what you saw and heard regarding that
homicide that occurred approximately 9:00 P.M. on January 1,
1993 in the twenty hundred block of Bambrey Street.  Just go
on and tell me exactly what you saw and heard.

A. Well, I was getting ready to go to my mother's house to
a New Years party and I got in the car and I pulled out of the
parking place and the car cut off and I, I saw these two guys
coming down the street and um one went into the house on Page
Street and the other one just stood on the, against the wall
and I went over there and I talked to the tall guy, I asked
him to give me a jump and he told me that he know me from
somewhere and I told him no I didn't think so and he told, asked
me where did I live and I told him where I lived and the other
guy came out the house and he, they both walked off and then
um I went and got back in the car and then the guy that got
killed came, drove up and I asked him for a jump.

Q. Now stop a minute, the guy that got killed when he drove
up what did he do?

A. He got out the car.

Q. He parked his car?

A. Yea, he parked his car and got out of the car and I asked him when he come back could he give me a jump and he just like he didn't said no and he didn't say yea he just walked, jumpedand walked down the street.

Q. Did you stay in your car at that time?

A. After he told me no, after he said he wasn't sure he give me a jump I went into the house.

Q. And then what happened next?

A. When I went in the house I thought I heard another car trying to get by so I looked out the window and that's when I seen the dark skinned guy coming down the street and he took it, then the other guy that got killed I asked him do the guy came out of the house and um.......

Q. Now wait let's stop for a minute because I'm not really clear about what your saying. You said you saw the dark skinned guy come down the street, the dark skinned guy meaning one of the two guys you had seen earlier?

A. Yea.

Q. OK, now the guy that killed, your saying that came up the street around the same time as.........

A. Yea, they was both walking toward each other.

A. And where were you at that time?

A. In the window.

Q. Of your house?

A. Yea, I was just looking out the window to see if any cars were to come by, cause my car was in the middle of the street.

Q. OK.

A. In the meantime when I was looking the dark skinned guy locked up at me and he shook his head and he never said anything he just shook his head at me.

Q. Was your window open or closed?

A. It's open and uh as the two guys was meetin each other the dark skinned guy took the um the guy and shot him in his head.

Q. Tell me exactly how that happened.

PAIP4496

-3-

A.  Well the dark, the guy was coming up the street he gave him something.

Q.  Where were they standing when they gave him something?

A.  Next to my house, like right next to my house.

Q.  In front of your window?

A.  Yea, no, on the side.

Q.  Toward your front door?

A.  Yea, it was right near my steps.

Q.  And the guy that got shot handed something to.......

A.  Yea, he, to the dark skinned guy.

Q.  And what did the dark skinned guy do with it?

A.  He put it in his pocket.

Q.  And then what happened?

A.  He came out with a gun and he shot the guy in the head and then he laid him on the ground.

Q.  After he shot him, tell me exactly how he shot him?

A.  He pulled him to him and he shot him behind the ear.

Q.  And after the guy was shot behind the ear what happened to the guy that was shot?

A.  He fell in his arms and then he laid him on the ground and he stood back and kept shooting at him.

Q.  And you stood in the window and watched this?

A.  Yea, and after he shot him I fell on the floor, I didn't see nobody run and I just fell on the floor and I asked my friend look out the window and see was a body on the ground and he said yea then I started screaming and hollering and then I heard all these people outside screaming and hollering.

Q.  Did you see anybody with the dark skinned guy that did the shooting?

A.  No not....

-4-

Q.  Earlier you said there was a tall guy that you had asked
to get a jump off your car and uh while your were talking to
him the dark skinned guy came up and they walked off together.

A.  Yeah they did.

Q.  Did you see the tall guy at the time of the shooting?

A.  No.

Q.  Was he on the street at that time?

A.  He was down the street.

Q.  Where down the street?

A.  Like three doors from me sitting on the step.

Q.  On the same side of the street as you?

A.  Yeah.

Q.  Were you able to see that from your house?

A.  Yeah.

Q.  And had the tall guy and the short guy been together prior
to the shooting on the step?

A.  Yeah.

Q.  So that when the person who got shot was walking up the
street the two people were sitting on the step before that?

A.  Yep, it was sitting there like they was waiting for
something.

Q.  And then the shorter of the two got up and met?

A.  Yeah, they walked right toward each other and the other,
the guy that got shot act like he knew him, he walked right
to him and the other guy, the tall guy, he still was on the
step down the street he never walked up.

Q.  And that was about three houses from where you lived and
where was it that you lived at that time?

A.  ███.

Q.  ███████████?

A.  Yeah.

-5-

Q.  How long had you lived there then?

A.  Seven years.

Q.  What happened after the shooting?

A.  The cops came and um put the guy in the back of the truck
and he said who car is this move this dam car and they pushed
my car out of the way and everybody was just standing outside
screaming and hollering but I never went outside.

Q.  Did you talk to the police that night?

A.  Yeah, later on the detectives came and they said to me,
they asked me, for asked my friend for me by name and um.

Q.  What's your friend's name by the way?

A.  Kevin Mathis.

Q.  Where is Kevin Mathis now?

A.  Incarcerated.

Q.  Where?

A.  At Pittsburgh.

Q.  And the police came and asked Kevin Mathis where you were?

A.  Yeah, they said is Ernestine here and Kevin said, he told
me to come down stairs and when I came down stairs, they said
is that your car outside, I said yes, they said well, they
understand that I was sitting in the car at the time of the
shooting, and I said no I wasn't sitting in the car, my car
was stuck in the street but I wasn't in the car and he asked
me um did I know the deceased, I said no I didn't know him so
then, they came back again to get me the next day.

Q.  Where they plain cloths detectives?

A.  Yes.

Q.  OK, what happened next?

A.  They said they had to take me downtown and um ask me some
questions so I was telling them I didn't know anything about
it all I know I seen the guy outside on the ground dead so they
told me that uh I do know, because my neighbors told him that
I knew and um I went downtown and they just let me sit in a
room for hours and then they said to me that I better tell what
happened.

PAIP4499

I said I don't know what happened, so they told me, they let me sit there and they (unintelligible) these two white guys said to me well maybe you feel comfortable talking to your own kind so they brought in two black cops um detectives so the detectives said to me tell what you'd seen, I said I didn't see anything, they said I did, so after sitting there for hours I told them what I'd seen.

Q.  And how many times had they taken you down before you finally told them what you seen?

A.  Oh about six times.

Q.  And when was it that you finally told them what you seen?

A.  Um, about a year ago.

Q.  Did they ever show you a photograph of the defendant James Kelly?

A.  They didn't show me his photograph until I described the person that I'd talked to and the person that did the shooting when I described two guys that's when he started showing me some pictures.

Q.  And when was it that you first described the two guys to the uh police?

A.  After the sixth time they brought me down there.

Q.  And what time frame was that, like what time of the year was that?

A.  OK, um, um, April.

Q.  In around April, 1993, and what was the description that you gave them?

A.  I told them one was tall about in his late 30's around 6'1" and he had he was brown skinned like James Brown and he was, he had real big lips, I know he had large lips and um he had like a skinny face not a real full face that's the guy I was talking to and the guy that did the shooting he was about 5'7" real dark and he had like a flat head in the back and he had a mean look on his face.

Q.  And did you tell them how he was dressed?

A.  Yeah.

Q.  How were they dressed?

A.   They was well dressed the tall one had on a long beige
cashmere and um and some slacks I forget the color of the slacks
now but they was nice creased and that the one, the other one,
the dark skinned one had on a black leather three length, three
quarter length coat with a hood on it and both of them was well
dressed.

Q.   And............

A.   And they looked like mature men they wasn't they didn't
look like they was bad guys.

Q.   Now, after the shooting did you see either one of those
two guys again?

A.   Yeah, I seen the tall one.

Q.   And where did you see him and when?

A.   I seen him like three days, three or four days, after the
shooting cause it was a fire on Stillman Street and I went around
there to see did anybody get hurt with my girlfriend, and my
girlfriend left me so I was, I just walked back by myself because
I had a bad vib and on my way back home I seen the tall guy
coming down from ??Yasahomes??, from the project, and when I
seen him I act like I didn't know him and he spoke to me in
a way that he knew me but I spoke to him like I didn't know
him and I went, I went in the house and I closed the door and
I just sat there rocking like hoping that he didn't remember
me.

Q.   And when you say he spoke to you like he knew you?

A.   Yeah he said how you doing and I said hi.

Q.   Did you ever see the dark skinned, the short dark skinned
person after that?

A.   Um later on yeah I did see him like a week after, I seen
both of them walking together.

Q.   And where did you see them walking together?

A.   Around 25th and Norris they was going down 25th and Norris
together, I was cross the street and the dark skinned guy was
on a bike and the tall guy was just walking, they was both
fussing and they was like talking loud.

Q.   OK, now did you ever see either one of them after that?

A.   Yeah, I seen the tall guy at a wedding.

Q.   At whose wedding?

A.  Linda's wedding, my girlfriend Linda, she live across the
street her mother live across the street from me and uh she
told me she was getting married so I went to her wedding.

Q.  And when was that?

A.  Uh like January, I think, I know it was after the shooting,
after the shooting I went to the wedding and I seen the tall
guy walking with uh her husband mother.

Q.  And did you find out at that time who he was?

A.  I assumed that he was the brother or some relation to Linda's
husband.

Q.  And did you find out later that he was a relation to Linda's
husband?

A.  Yeah, and Linda husband told me.

Q.  And did you talk to him at the wedding?

A.  No, I seen him at the reception and he walked up behind
me and said did anybody (unintelligible) like Diana Ross and
I turned around and it was him and I said no and then later
on I said I told a friend of mine you know I was ready to go,
I told him I was ready to go and he asked me why I said I just
wanna go home.

Q.  And did you tell all this to the police what you just told
me?

A.  Yeah.

Q.  And did they eventually show you the photograph of the of
two people of the two people that you that you just spoke about?

A.  Yep.

Q.  And tell me the circumstances?

Q.  They asked me um is this one of the guys, he showed me the
tall guy picture.

Q.  When was that?

A.  Two weeks ago.

Q.  And was that picture in a group of photos?

A.  No, it was just one big picture, it was a large picture
like it was xeroxed.

Q. And how large was it?

A. Um, about the size of your book.

Q. That's about 8" X 11", 8" X 10"?

A. Yeah about that size.

Q. Now I want to go back to the night of the incident uh after your car broke down when you saw the two men walking together tell me exactly what happened uh before you asked the uh taller one to uh help you start your car.

A. OK, the shorter guy went into Miss Daulphin house and the tall guy he walked, he was standing like two doors away.

Q. Where's does Miss Daulphin live?

A. On ███████████.

Q. Do you know her address?

A. No.

Q. Do you know her last name?

A. No.

Q. And how long was the shorter guy in Ms. Daulphin's house?

A. He was in there for like five or six minutes.

Q. And what was the taller person doing?

A. He was standing on the other side, well I walked up to him while he was standing across the street, I walked over to him and I asked him to help me with my car, I asked him did he have a car, and he told me no, why, and I told him that I needed a jump, then he telling me, he asked me did he know me and that's when after a few minutes we sit there and talk, the dark skinned came out of Miss Daulphin's house and he came over to us and said what's up, and I said I need a jump, he said like in a mean way, and I said I need a jump and then he hit that guy, the tall guy, in the arm and they walked down Page Street together.

Q. When you say he hit him in the arm you mean he was like?

A. He nudged him with his elbow like let's go.

Q. Did the police ever tell you who the short guy was?

A. No.

-10-

Q. Did they ever tell you that they had him in custody?

A. Yeah. And when they showed me his picture, they said he's already locked up and you don't, they told me that I was lying at first, they told me that I know that these other guys did it, I was like what guys, they say Studder, you know Studder, I said I don't know no Studder.

Q. Well, when did they tell you that?

A. Two weeks ago.

Q. Are you saying that they told you that besides the two guys there was another guy involved named Studder?

A. Yeah, it was a, they was showing a couple of guys.

Q. That they thought were also involved you mean?

A. Yeah.

Q. What did they say?

A. They said to me that you know those guys that do that, I said I don't know those other guys and they say you do know because it's around the prison that you're taking money from these other guys that put it on somebody else.

Q. Now you're saying that the police told you that you were taking money from somebody and you were accusing.........

A. The wrong guys.

Q. The wrong guys?

A. Um, uh.

Q. Well explain that to me?

A. They was trying to tell me, which is a lie, that I'm taking money from these other guys, drug dealers, to put the blame on somebody else.

Q. What policeman said that to you?

A. The detectives at 8th and Race.

Q. Well, do you know their names?

A.  Uh, detective um, Lubby, and detective, um, um, I can't remember the other one name but I know him when I see him, but I know Detective Lubby the short stocky, mean one.  I told him that I'm leaving, I says they know who did it they didn't need my help, I said I'm leaving, he said well if you walk out we gonna arrest you, I said arrest me for what, he said we gonna arrest you for trespassing, I said you brought me in here I'm just leaving on my own, he told me to sit down.

Q.  When did this conversation take place?

A.  Um, about two weeks ago on a Tuesday, it was like right after the 4th of July, a Wednesday, cause the 4th of July was on a Tuesday, so it was the next, right after the 4th of July, oh no the 4th of July was on a Monday so they picked me up on a Tuesday.

Q.  Did they say who it was that uh was supposed to be paying you?

A.  Yeah, they said it was Studder.

Q.  Do you know who Studder is?

A.  No.

Q.  Did they show a picture of somebody that they........

A.  Yeah, they showed me a couple of guys pictures and they say you looking right at they faces, you know who they are don't you, I said I don't know none of these people on that, they had some photographs in front of me, and I was like I don't know none of these people on these pictures, so he say you're looking right at him, you know you're taking money from one of those guy, a couple of those guys on the picture, aren't you, I said no I ain't taking no money from nobody do I (unintelligible) be no where to be found, so he say yes you are.

Q.  Now what did you say about being found?

A.  I said If I was taking money from these guys I wouldn't be nowhere to be found.

Q.  So now are you telling me that they told you that they arrested somebody that they don't believe committed the crime?

A.  Yep.

Q.  Well why would they arrest them if they didn't believe that they committed the crime?

A.  I have no idea and they arrested a guy and they had, I read the paper and it said he supposed to have murdered him, I never told them that, that man murdered anybody.

Q.  Which man?

A.  The one they just arrested, um the tall guy.

Q.  James Kelly?

A.  Yeah, James, cause I read it in the paper that James Kelly was arrested charged with murder, I never told them that he killed nobody, I said that man was standing there and I asked him to give me a jump, I asked him did he have a car to help me get my car started, he told me he didn't have a car and he walked on down the street, I just told them who I'd seen that night, who I talked to. 

Q. And the taller person that you believe is James Kelly was sitting on the step?

A. Yeah, he never shot nobody.

Q.  Three houses away from the shorter guy who did the shooting?

A.  Right, I never seen him walk down the street, I never, I mean when they was doing the shooting I never seen him no more he wasn't near them and he wasn't with them then.

Q.  Where was he when the shooting occurred

A.  I don't known I was steady looking at them, I guess he was still down the street, I know when I looked out the window the first time before that guy got shot he was sitting on the step.

Q.  And when the dark skinned guy, short dark skinned guy walked up to the guy that was shot...............

A.  I never looked back to see if he was still there or not.

Q.  Prior to this incident did you ever see any of the people that were involved either the person that was shot or any of the other people that you saw that night?

A.  Did I ever see him before?

Q.  Did you ever see any of them before?

A.  Never, I never seen none of them before, I don't know and never seen them till that night it was the first time I'd see them.

Q.  Do you leave the area after the shooting?

PAIP4506

A.  Yep.

Q.  What did you do?  Where did you go?

A.  I left the uh I left like the next day, I left the next
day, I left and stayed with my girlfriend. 

Q.  Where?

A.  On ███████████████████████.

Q.  Whose you girlfriend, what's her name?

A.  Ur a its Kevin's sister.

Q.  Whose Kevin?

A.  My friend and was there when I told him to look out the
window.

Q.  OK.

A.  Um, his sister, I stayed over her house with her for like
uh three days and I am back home and when I came back home these
guys two guys was knocking on my door, well when Kevin left
me I told Kevin no to leave me but he left me in the house and
then I was coming out the door cause I didn't want to stay in
the house by myself, so I was going down the street, and as
I was going down the street which is like three doors from me
the other way, at um, I looked back and heard somebody knocking
on my door, I looked back and I'd seen two guys, they never
was on my step they was like standing against the wall knocking
on the door and I asked them who you looking for and they say
you Ernestine come here and I said I don't know you all what
do you want they like come here bitch and you know who killed
my brother and I said I don't know nothing about that, they
say yes you do, you know who killed him and they um I seen my
friend coming, I seen the guy live around the corner one of
my neighbors I said come here James they gonna do something
to me and um, um, James was like what's up, what do you all
want, she told you she ain't know nothing about it and they
was like we be back we gonna get you we be back and then I left
again.

Q.  How long were you gone?

A.  For about a year.   ✻

Q.  And where did you go?



-14-

A.  No before that I um I went, I came, I stayed there that's
when the detectives came back again, the detectives came the
next day and then I heard um, then I left and then I talked
to the detectives, that's when I told the detectives what
happened.

Q.  At that time you told the detectives what you saw and you
gave him a description?

A.  Um, um.

Q.  How long after the incident was that, that you gave him
the description of the two men?

A.  About a week.

Q.  And where did that take place, at 8th and Race or?

A.  Yeah, 8th and Race at the detectective division upstairs
and ride the elevator upstairs.

Q.  Now when you first gave him the description about a week
after the incident?

A.  They didn't believe me.

Q.  What do you mean?

A. When I first, after the um when they took me there I was
trying to tell him what I'd seen, everything that happened,
they told me that I was lying and um they told me that one of
them didn't believe me but the other one did.



ↄC. 1st statement

Q.  Which one, do you know the names, what it the same detective?

A.  No, these was two different ones.

Q.  Do you know their names?

A.  (unintelligible), um Wiggins, no I only known them when I
see them.

Q.  OK.  And what did they say to you?

A.  These two was saying um we don't believe you, he said well
one of them said my partner don't believe you I said well if
he know better than me he should go get them and stop harassing
me I'm tired, I'm tired of you all harassing me that why I just
broke down and want to tell you what happened because I'm tired
of you know of you all keep coming to get me and I'm tired of
being scarred because of these two guys who came to the house,
so he told me well we gonna, we want you to testify in court.

I said no I'm not gone to court, he said because you're telling a lie, I said no I'm not telling a lie I know they gonna get me if I tell that in court.

Q. Well, when you say they told you were telling a lie what is it that you told them that they didn't believe?

A. Who did it the two guys that I described.

Q. Did they show you pictures at that time?

A. They even pulled out the pictures and asked me if these are the two guys, I said yea, I said these are the two guys that I'd seen and I pointed the dark skinned one I said this the one that did the shootin.

Q. And that was a week after the incident?

A. Um, um. And he told me no it's not, he said that's not the guy, he tried to say it was Tommy.

Q. Tommy?

A. Yeah, guy live around the corner from me I've been knowing him for like seven or eight years.

Q. Tommy who?

A. Um, I forget they last name.

Q. Tommy a guy that lived, what street does he live on?

A. Page Street, he live right around the corner from me but he's incarcerated now too.

Q. Where is he incarcerated?

A. I don't know, I think he's at the Detention Center somewhere.

Q. So you don't know his last name?

A. No.

Q. Now this was within a week of the incident they told you after the, you identified two pictures the taller guy and the shorter guy, they told you they didn't believe you and they showed you a picture of a guy that lives around the corner from you named Tommy and said he did it?

A. Yep. These was the two different detectives now these not the same detectives that I'd talked to last week, two weeks ago.

-16-

Q. Now you told me uh a short time ago that they showed you
a picture of Kelly, James Kelly, that looked like a zerox picture
that was a blown up picture 8" X 10" or something like that?

A. They showed me his picture again they showed me his picture
twice.

Q. And the first time they showed his picture was a week after
the incident and was that in photo spread or was that in a single   *impossible*
picture?

A. It was in a, well it was two pictures of him, there was
like a small shot of his picture, like he was arrested before
but it was just his face on it, it wasn't in a photo spread,
they picked out of a, this envelope that I drawed his record
and they pulled out his photograph.

Q. Did you know his name at that time?

A. No, they said it.

Q. They told you his name?

A. Yeah, but I didn't rem, I didn't listen to his name, I just
looked at the picture and they said well this is such and such,
they said his name.

Q. And what name did they tell you?

A. I don't, his name, I don't, James, they said his name was
James but..............

Q. What about his last name, did they tell you his last name?

A. Yeah, James Kelly.

Q. And what about the other guy the short guy that did the
shooting?

A. Yeah, they showed me his picture too and they told me his
names but I forgot what his name is.

_____
I just turned this tape over it's 12:25 and we're continuingwith
the uh statement.

Q. Now you said that they, you, they told you the name of the
other person at that time also the short guy but you don't
remember the name?

A. No.

Q. And you're saying now that they knew the names of the two   *impossible*
people involved within a week of the shooting?

-17-

A.  Um, um.

Q.  But that James Kelly was only arrested a few weeks ago?

A.  Yeah because they didn't believe me.

Q.  Cause they didn't believe you?

A.  I guess, at first I left they couldn't find me for a while
I left for about a year, two years I've been gone after I told
them who the two guys was, I left because if they was to arrest
him I was afraid they friend somebody they was gonna tell that
I said I got him locked up so I left because the two guys they
(unintel) know cause they seen me standing there so they if
they get locked up they call their friends and tell I had
something to do with it.



Q.  Do you know if the police were trying to find you?



A.  Yeah.

Q.  How do you know?

A.  Because they called my mother.

Q.  Uh, tell me uh when you left the area to move to South Philly
like what month and year and when you came back.

A.  I left like in a October.

Q.  October of last year, 94?

A.  Yep.

Q.  And when did you come back to North Philly?

A.  Four months now in a um.

Q.  Around April?

A.  Yeah, no April it was like ?? no March.

Q.  In March is when you came back and how long were you back
on Bambrey street before the police came to talk to you?

A.  Um, a month, two months.

Q.  A month or two?

A.  Yeah and um after ?? because I'd had got my address changed
to ██.

Q.  When you say changed from one what?

A.  I had see I never got my address changed from my house.

Q.  You mean on your public assistance uh?

A.  Yeah, around my,yeah around I got my check transferred to █████and um it was like um a week after that now a couple of months after that they was knocking on the my old door where I used to live and um everbody the neighbors kept saying the detectives been around here looking for you.

Q.  Uh how many times did the police take you to 8th and Race before you finally identified the two people who uh?

A.  About five, about six or seven times.

Q.  Now you said that it was a week after the incident are you saying they took you down there six or seven times within one week?

A.  Yeah, they kept, coming and coming like every day they was there.

Q.  Everyday they was where?

A.  At my house.

Q.  And everyday they would take you to 8th and Race?

A.  Sometime I wouldn't I wouldn't answer the door and they be sitting outside they even came to my aunt house.

Q.  To your aunt's house?

A.  Yeah all the way up ████████████████.

Q.  Well how could they, how would they take you to 8th and Race eight times, seven or eight times within the first week of the incident?

A.  Well it wasn't about a week I guess it was a couple of weeks I know they kept coming a lot harassing me and bothering me they harassed me so much, I was so stressed out I really don't remember how many,when I told them but I know I told them.

Q. And was it after the two guys came to your house and threatened you that you told them?

A.  Yeah.

Q.  And how long after the incident did they come to your house?

A.  I can't recall, I stayed away for three days and I came
back, I stayed away for three days and I came back home it was
like that night so I guess it was like four days.

Q.  About four days, so you only talked to the police once within
the first four days because you weren't around, right?

A.  Yeah but see they kept get, coming to get me, first they
didn't believe me but yesterday they kept coming and pick me
up.

Q.  Was it the same ones that kept coming to get you?

A.  Yeah, until I left, when I, when they just came and got
me, OK, after.

Q.  Well what did they do each time that they came and got you,
uh didn't you sign a statement?

A.  No, only the very first time I signed a statement was it
the very first time of the shooting when they came to the house.

Q.  The first day?

A.  The first day.

Q.  And where, did they take you to 8th and Race that day?

A.  No, they interviewed me at home and I told them that, they
just asked me questions like did I know the guy that got shot,
I said no and um did I asked me did I see anybody I said no.

Q.  So that time you told that you didn't see anybody that's
was the only time that you signed a statement?

A.  Exactly.

Q.  And then after that they had you down there six or seven
times before you identified the photographs you're saying but
that was within a very short period of time from the time that
the incident occurred is that right?

A.  Um, um.

Q.  Within the first week or so two.

A.  Like two weeks.

Q.  Two weeks?

A.  It was like two weeks cause it was after the guy came to
my house.

Q.  Did you work at the time?

A.  Yeah.

Q.  Where did you work?

A.  At Seafood Shanty.

Q.  And did they come on your job?

A.  Yeah, they came to my job but they got there before I did
and they informed my um supervisor that I knew, they wanted
to talk to me about a shooting and they asked my supervisor
some questions about me cause my supervisor said they came and
asked him some things about me, how did he know me and um.

A.  And did you leave your job?

A.  Yeah, I didn't never go back after he told me that.

C.  How many times did they go on your job?

A.  Once and they saw that I gets from my social security number
but I never told them I worked.

Q.  Well there was other people in the neighborhood that probably
knew where you worked.

A.  Oh, yeah cause they the ones told them that I was sitting
in the car and I wasn't sitting in the car.

Q.  Who told them you were sitting in the car?

A.  My neighbors.

Q.  Do you know what neighbor told them that?

A.  No, they never told me they just always say your neighbors
um told us you know what happened and your neighbors told us
that you seen, everything that they say they tell me that my
neighbors told them, I said well if my neighbors know so much
you should then tell them to tell you who did it.

Q.  Now you said to me that you saw the tall guy and the short
guy uh sometime after the uh after the homicide on a bike
somewhere, right, how long after the incident was that when
you saw them?

A.  Um, it was like a couple of weeks.

Q.  A couple of weeks.  Did you tell the police that you saw
them together?

A.  No.

F AIP4514

Q.  Why?

A.  They didn't believe me anyway some of the things I was
that I told them, so.

Q.  Well what where some of the other things that you told them
that they didn't believe?

A.  When I told them that the short dark skinned guy when I
gave described the dark guy that shot him he told me I, that
wasn't the one that shot him.

Q.  Well who did he say was the one that shot him?

A.  Tommy.

Q.  Why do you think he said that?

A.  I guess cause Tommy shot some other people and Tommy live
around that area and they kept saying that the shooting was
with the people, drug dealers living in the area.

Q.  You said that the short guy that did the shooting uh was
incarcerated at the, the police told you that he was
incarcerated?

A.  Yeah, they told me they had him already.

Q.  Do you know when they had him?

A.  No, they didn't tell me that.

Q.  Do you know whether or not they arrested as a result of
your identification of the a of his picture?

A.  Nope I don't think so, they never they didn't say they did
anyway, they just told me they already had him incarcerated,
they got him incarcerated now that's what they told me right
after the 4th of July, they showed me his picture again, and
I say yeah that's him right there that did the shooting, they
said well we have him incarcerated already.

Q.  But you already saw his picture before and told them?

A.  Yep.

Q.  And when they showed you his picture the first time did
they tell you he was incarcerated?

-22-

A. No, he wasn't cause I had um seen him on a bike, so he wasn't incarcerated then but when I went the 4th of, after the 4th of July.

Q. This year?

A. This year, they told me that had him and when they showed me um the other guy picture who I was talking to they said well we gonna pick him up.

Q. And when they told you

A. But they said but you know that man's gonna be surprised when we go and lock him up, he gonna be surprised to see us, I said well he didn't do any shooting but I'd seen him.

Q. Well why did they say he would be surprised?

A. I don't know but that's what they said this man gonna be surprised cause we gonna pick him up.

Q. Who said that?

A. The detectives.

Q. What detective?

A. Detective Lubby

Q. Every time the detectives talked to you did they write down what you said?

A. No.

Q. Did they ever write down what you said except for that first time when you signed a statement?

A. Yeah, when I um picked them out.

Q. When you picked out the photographs?

A. Yeah.

Q. They wrote that down?

A. Uh, uh.

Q. And that was about a week or two after the homicide?

A. Yep.

Q. Did they ever write down any thing that you said after that, do you recall?

-23-

A.  No, the 4th of July I didn't sign anything before they locked um the man up last, two weeks ago I ant sign no papers or anything.

Q.  You mean before they locked up James Kelly?

A.  Right.

Q.  Two weeks ago?

A.  Before they locked him up they didn't I didn't sign anything they didn't even write down anything I said, they just said to me we gonna pick him up and he gonna be surprised.

Q.  OK, Ms. Williams that will be the end of this recorded statement, it's now uh twenty minutes of one, thank you very much.

A.  Your welcome.

PAIP4517

# EXHIBIT 15

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H93-1 |
|---|---|---|
| | | INTERVIEWER DET. R Keinhold |

**NAME** ERNESTINE Williams   **AGE** 34   **RACE** B   **DOB** ▮▮▮▮

**ADDRESS** ▮▮▮▮   **APARTMENT NO.**   **PHONE NO.** ▮▮▮▮

**NAME OF EMPLOYMENT/SCHOOL**   **SOC. SEC. NO.** ▮▮▮▮

**ADDRESS OF EMPLOYMENT/SCHOOL**   **DEPARTMENT**   **PHONE NO.**

**DATES OF PLANNED VACATIONS**

**DATES OF PLANNED BUSINESS TRIPS**

**NAME OF CLOSE RELATIVE** Mother Joyce Williams

**ADDRESS** ▮▮▮▮   **PHONE NO.**

**PLACE OF INTERVIEW** C.J.C.   **DATE** 10-31-95   **TIME** 10:15 AM

**BROUGHT IN BY**   **DATE**   **TIME** AM/PM

**WE ARE QUESTIONING YOU CONCERNING** the murder of Travis Houston

**WARNINGS GIVEN BY**   **DATE**   **TIME** AM/PM

**ANSWERS** (1) (2) (3) (4) (5) (6) (7)

Q Det Luby Just reviewed your statement taken by Det. Heffner. Is everything in there correct?

A. No. The part about the neighbors telling me his Name is Not true. Larry WAs selling drugs out of a hose At 24th & Morris St. I went there a couple of weeks after the shooting and I recognized him as the guy who shot Travis Houston. My girlfriend – well she's Not really my friend – she called him Larry.

Ernestine Williams

**RECORD** ☐ Yes ☐ No   **CHECKED BY**

**REVIEWED BY**

75-183 (Rev. 7/82)

Exhibit S

| INVESTIGATION INTERVIEW RECORD<br>CONTINUATION SHEET | CITY OF PHILADELPHIA<br>POLICE DEPARTMENT |
|---|---|

NAME Ernestine Williams          PAGE 2     CASE NO. H53-1

Q Is he the man you identified in the photo array as the shooter to Det Hoffner?

A. Yes.

Q What else did you see on 1-1-83 that is not in your statements?

A. I saw the big lip guy pass a gun to Larry at Page & Bambrey. Larry took that gun and walked to Travis and shot him in his head behind his ear. They had been waiting on a step for Travis to come out 3 door from my house

Q Did you see the big lip guy and identify him in the photo array to Det. Haffner?

A Yes    (PPN # 543223 - James Kelly)

Q Has anyone threatened you about this case?

A The big lip guy's brother is Calvin. He came to my girlfriends house a week after they picked his brother up and he told me I had to go see the big lip guy's lawyer. I said No

Ernostine William

75-183 A

FAIP4909

Exhibit S

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |

NAME: Ernestine Williams        PAGE 3        CASE NO. H93-1

A. AND he SAID I had to. He took me there. Somewhere on Broad St. He told me his brother's life was in my hands. They tape recorded a statement. I didn't want to go but he made me. I told the lawyer that too. He SAID I would be alright and he gave me candy and cigarettes.

Q. IS there anything else you can add?
A. N.

Ernestine Williams

75-183 A

Exhibit S

# EXHIBIT 16

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H-93-01 |
|---|---|---|

**INTERVIEWER** DET. C. BROWN # 9136

| NAME | AGE | RACE |
|---|---|---|
| Anna Mae LIGHTY | ▮ | B/F |

**DOB** ▮

| ADDRESS | APARTMENT NO. | PHONE NO. |
|---|---|---|
| ▮ | ▮ | No phone |

| NAME OF EMPLOYMENT/SCHOOL | SOC. SEC. NO. |
|---|---|
| Unemployed | ▮ |

| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO. |
|---|---|---|

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE
Aunt: Delphine HOWARD

| ADDRESS | PH ▮ |
|---|---|

| PLACE OF INTERVIEW ▮ | DATE 3-28-93 | TIME 5:15PM AM/PM |
|---|---|---|
| BROUGHT IN BY Dets. C. BROWN & P. REINHOLD | DATE 3-28-93 | TIME 5:40PM AM/PM |
| Inside Room 104, Homicide Div./PAB, 8th & Race Sts. | | |

WE ARE QUESTIONING YOU CONCERNING ANY INFORMATION CONCERNING THE SHOOTING DEATH OF TRAVIS HOUSTON WHICH OCCURRED ON FRIDAY, 1-1-93, AT ABOUT 8:10PM, ON THE HWY, 2027 N. BAMBREY ST.

| WARNINGS GIVEN BY | DATE | TIME AM/PM |
|---|---|---|

| ANSWERS | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|

Q. Are you known by anyother name or nickname?

A. "LITTLE ANN". Baby

Q. How far did you go in school and can you read, write and understand the English language?

A. I went to the 11th grade at William Penn H.S. Yes, I can read and write.

Q. ANNE, I've explained this investigation to you in that it concerns the Shooting Death of a Black Male known as TRAVIS HOUSTON.

Did you know this male?

A. I knew by the nickname of "BUD". I've known him for several years. Since he was little and I was a teenager. I know his father, TOM who has known me since I was a child.

Q. Do you recall the last time that you either saw or spoke to BUD?

A. I didn't see him on the day that he was shot. Usually, I'd see him everyother day when he came by his girlfriend's house and pick her up and drive her some place. He drove a grey station wagon. I might've seen him on the day he got shot (1-1-93) when he came

| RECORD ☐ Yes ☐ No | CHECKED BY _(signature)_ |
|---|---|
| REVIEWED BY | |

PYP4265

75-483 (Rev. 7/82)

| INVESTIGATION  INTERVIEW  RECORD<br>CONTINUATION  SHEET | CITY OF PHILADELPHIA<br>POLICE  DEPARTMENT | | |
|---|---|---|---|
| NAME<br>Anna Mae LIGHTY | PAGE<br>2 | CASE NO.<br>H-93-01 | |

A...or was going to see his girlfriend. It was during the evening, but I'm not sure of what time. Most of the time that I'd see BUD going to his girlfriend's house would be around the time that the sun goes down.

Q. ANNE, on New Years Night (Friday, 1-1-93) were you in your aunt Delphine HOWARD'S house at ████████████

A. I had been there all day.

Q. Were you at the house ████████ around 8:10PM, when BUD was shot?

A. I had just left. I had left the house maybe a little before 8 O'clock (PM) to go around the corner to see if my girlfriend was getting dressed to go out to the Club. I left her house around 9 O'clock (PM) cause I wanted to get back to my aunt's house to hurry up and washup and get dressed by 10 O'clock (PM).

Q. Before leaving your aunt's house who was there?

A. My grandmother, CARRIE EDWARDS; my aunt, Delphine HOWARD; my daughter, Stephanie Joanna JONES 16yrs, my cousin NIKKI HOWARD 16yrs, ANTHONY EDWARDS 16yrs, BOBBY HOWARD 16yrs, and NIKKI'S girlfriend EBONY 16yrs, guess I let her wear one of my outfits. It was a holiday and different cousins and relatives were coming in and out to say hellow to my grandmother.

Q. Before leaving the house at 8 O'clock (PM) did a man come in the house either with a 40 oz bottle of beer or receive a bottle of beer while in the house?

A. I don't remember if anybody bought a bottle in the house cause I was busy trying to get ready to go out to celebrate.

Q. Before leaving the house did a male come in that either you were dating or are presently dating?

A. I wasn't seeing anybody at the time, I had just delivered a baby that was around 4 weeks old.

| INVESTIGATION INTERVIEW RECORD<br>CONTINUATION SHEET | CITY OF PHILADELPHIA<br>POLICE DEPARTMENT | | |
|---|---|---|---|
| NAME<br>Anna Mae LIGHTY | | PAGE<br>3 | CASE NO.<br>H-93-01 |

A. I wasn't dating anyone throughout my pregnancy. A lot of people try to say that I was dating this guy DANIEL, whose mother live in the corner house of my aunt's block; but we were just friends.

Q. ANNA, what males were in your aunt's house other than relatives just before you left out near 3 O'clock (PM)?

A. I can't really recall. The people that I already named is all I remember. DANIEL might've come by but I can't say for sure of what time he came by. If I had been asked this maybe a day after the 1st, I might've remembered.

Q. ANNA, I'm going to show you a collection of photographs to see if you recognize anyone depicted.

A. WITNESS viewed photo display and pointed several pictures:

    I know this guy from the projects (RAMON ROSEN) we grew up together. But I don't know his name. (Identified photo of ARNELL MAXWELL PP# 783584)

    This is TOMMIE. I know him. That's DANIEL'S brother. Now, I member. Their last name is LOCKWOOD. (Identified a picture of THOMAS C. LOCKWOOD PP# 715277).

Q. Do you recall seeing TOMMIE either in your house as you left or outside as you walked to your girlfriend SOPHIA COLEFIELD'S house at ▮▮▮▮▮▮▮▮▮▮

A. He doesn't come to my aunt's house. I don't recall seeing him that night. Usually I'd see him everyday when he goes to see his mother. He has two (2) cars. A beige colored compact car; and also a blue or black car. I don't know the makes of cars.

| INVESTIGATION INTERVIEW RECORD | | CITY OF PHILADELPHIA | |
|---|---|---|---|
| CONTINUATION SHEET | | POLICE DEPARTMENT | |
| NAME | | PAGE | CASE NO. |
| Anna Mae LIGHTY | | 4 | H-93-01 |

Q. ANNA, how often does DANIEL LOCKWOOD come to your aunt's house?

A. Usually everyday. If he misses one day, he'd come the next day or whenever I'd call him.

Q. Did DANIEL LOCKWOOD come to your aunt's house on New Years Day?

A. He came earlier that day; not that night cause if he did I know that he'd have taken me out to the bar.

Q. Describe DANIEL LOCKWOOD?

A. He's around 31, 6'2" 250-300 lbs, he's a big man, medium brown skin, close cut hairstyle clean shaven with skin blotches on his face, he usually wears a green colored jacket almost like an Army jacket, but it's 3/4 length with a hood and Army boots. He also wears a full length Down filled coat.

Q. Do you know anyone that usually wears a beige Cashmere-type coat and thick gold chain?

A. No.

Q. ANNA, if your aunt and grandmother were upstairs New Years night; and you were busy getting ready to get dress and go out; who would sell beer to those that came to the house?

A. Most of the people that come to the house and like "drunks" who drink a lot. BOBBY or NIKKI would collect the money and go upstairs and get the beer. Sometimes, the little 9 or 10 year olds in the house would get the money and bring it upstairs.

Q. Do you know a young boy named DEVIN?

A. DEVIN is my cousin ANT THE (ANTHONY THOMAS EDWARDS 16yrs) friend. Sometimes, he comes to see my cousin BOBBY. I don't know his last name, but he lives around the corner btn ████████████

Q. When you came back to your aunt's house around 9 O' clock (PM) what did you see outside and what were you told happened?

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | PAGE | CASE NO. |
|---|---|---|
| Anna Mae LIGHTY | 5 | H-93-01 |

A. I seen the 'yellow tape' around where 'he' got shot at and the cops. See, as soon as I turned the corner my cousin NIKKI and my daughter JOANNA who were running to Bucknell St., at 24th & Norris St., and they yelled to me that "BUD GOT SHOT"! So, when I got to my block I saw the tape marking off where BUD got shot. Oh, MY daughter had asked me if I knew where "BUD' got shot and I said yeah and we went to his house, but nobody was there. We saw some people in the block and told them to tell his family thathe got shot. Then, we went to Judson St., and seen some of his friends and we told them tthatsBUD got shot.

Q. Did anyone tell you who shot BUD?

A. No. Only thing I heard was that there were two (2) guys. One guy went one-way and the other guy went the other? They said that the guys gotout of c ar that had been following BUD. The car parked on Diamond St., and one guy got out and or that after the shooting; one guy ran down Bambrey St. to Diamond and the other ran from down Page St. to Diamond St., and jumped in the car. My daughter JOANNA had been outside playing and she went in the house and heard the shots and came back out to see BUD laying on the ground.

Q. Is there anything else you can add to this interview?

A. No.

75-483 A    PAIP4269

| INVESTIGATOR'S AID TO INTERVIEW TO BE USED FOR ☐ DEFENDANTS ☐ WITNESSES ☐ COMPLAINANTS (Check One) | | POLICE DEPARTMENT PHILADELPHIA, PA. | PHILA. NO. |
|---|---|---|---|
| | | | MASTER NO. |

| DATE Sunday, 3-28-93 5:30PM | F.B.I. NO. | P.S.P. NO. | OTHER |
|---|---|---|---|

| SURNAME LIGHTY, | FIRST NAME Anna | MIDDLE Mae | SEX F | COLOR B | DATE OF BIRTH ▮▮▮ | PLACE OF BIRTH ▮▮▮ |
|---|---|---|---|---|---|---|

| ALIASES | NICKNAME "BABY ANN" | HEIGHT | WEIGHT | HAIR | EYES | COMPLEXION | BUILD |
|---|---|---|---|---|---|---|---|

| SCARS, MARKS, DEFORMITIES, OTHER PHYSICAL CHARACTERISTICS OR HABITS | NATUALIZATION DATE | DRESS | | |
|---|---|---|---|---|
| | PLACE | RELIGION | MARITAL STATUS Single | CITIZEN ☐ Y ☐ N |
| | NO. | | | |

| RESIDENCE | TYPE OF PREMISES | STATUS (Owner, Renter, Roomer, Guest) Own Apt. |
|---|---|---|

| OCCUPATION Unemployed | EMPLOYER | ADDRESS OF EMPLOYER |
|---|---|---|

| SOCIAL SEC. NO. | OPERATOR'S PLATE NO. | SERVICE IN ARMED FORCES | LENGTH | SERIAL NO. | TYPE OF DISCHARGE |
|---|---|---|---|---|---|

| EXTENT OF EDUCATION | VOCAT. SCHOOL OR COLLEGE | FOREIGN LANGUAGES KNOWN | CRIMINAL RECORD ☐ Yes ☐ No | CHIEF CRIMINAL ACTIVITY |
|---|---|---|---|---|

| CRIM. REGIST. ☐ Yes ☐ No | DATE REGISTERED | RELEASED | FROM | INST. NO. |
|---|---|---|---|---|

| PROBATION ☐ Yes ☐ No | PROBATION NO. | LENGTH PROB. | EXPIRES | PROBATION GRANTED BY | COURT NO. |
|---|---|---|---|---|---|

| PAROLE ☐ Yes ☐ No | PAROLE NO. | PAROLE EXPIRES | RELEASED | FROM | INST. NO. |
|---|---|---|---|---|---|

| MODUS OPERANDI (Methods Employed, Traits, etc.) | FREQUENTS |
|---|---|

| AUTO(S) USED (Registered Owner and Address) | MFG. SERIAL NO. | LICENSE NO. | YR.- MAKE-MODEL | COLOR |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**ASSOCIATES**

| NAME | ALIASES | NICKNAME | PHILA. NO. | ADDRESS |
|---|---|---|---|---|
| | | | | |

**CHANGE OF ADDRESS**

| DATE NOTIFIED | DATE MOVED | NEW ADDRESS | NEW CARD ISSUED |
|---|---|---|---|
| | | | |

PAIP4270

75-229 (Rev. 6/83)                                                                 (OVER)

| FAMILY AND RELATIVES | | | | | |
|---|---|---|---|---|---|
| RELATIONSHIP | SURNAME | FIRST NAME & INITIAL | MAIDEN NAME | ADDRESS | NAT. |
| Mother | Deceased | | | | |
| Aunt | HOWARD | Delphanie | Ph: ■■■■■ | ■■■■■■■ | |
| Daughter: | Jones | Stephanie Joanna | ■■■■ | | |
| Cousin | EDWARDS | Regina ■ | | ■■■■■■ ■ | |
| | | | | | |

BROUGHT IN BY _____ IN CONNECTION WITH _____

OTHER REMARKS *(Give brief story also any other pertinent information.)*

| INFORMATION COMPILED BY: | NAME<br>CHARLES BROWN | | RANK<br>DET. | NO.<br>9136 | UNIT<br>HOM. |
|---|---|---|---|---|---|
| DISTRICT/UNIT COMMANDER<br>PA P4271 | | DATE | DETECTIVE/DIVISIONAL COMMANDER | | DATE |

5-229 (Rev. 6/82) (Reverse)

FILED
08/29/2022 06:46:10 PM
Post Trial Unit
By: K. JOH

# EXHIBIT 17

## AFFADAVIT

COMMONWEALTH OF PENNSYLVANIA:



    I, Wanda Arrington, was with James Kelly on January 1, 1993 during the entire evening. James Kelly was with me on New Years Day and he did not leave the house, located at 3050 West Berks, Philadelphia, PA, that evening or night. Additionally, that evening Reverend James Becoat was with us at that location. Reverend Becoat had come for dinner and stayed until around 11:00 P.M. Both he and I were asked by Attorney Geoffrey Seay to testify as alibi witnesses but, on the day that we were supposed to testify, Attorney Geoffrey Seay told us that he didn't want us to testify. I was willing to and am still willing to testify to these facts at trial.

Wanda Arrington

Sworn to and Subscribed before me
the _____ for _____
of _____ 1997

Notary Public

SEP 19 1997

850 N. BROAD STREET
PHILADELPHIA, PA 19123

# EXHIBIT 18

# AFFIDAVIT

## COMMONWEALTH OF PENNSYLVANIA:
                                    SS

## PHILADELPHIA COUNTY:

I, Reverend James Becoat, affirm that on the evening of January 1, 1993, I was with Mr. James Kelly from about 6:00 p.m. until about 11:00 that evening. During that time, Mr. James Kelly did not leave the home. I was asked by Mr. Kelly's family to be an alibi witness at his trial. I agreed to do so. When I went to court to so testify, Mr. Kelly's lawyer told me that he didn't need me to testify. I was willing and able to testify to those facts during Mr. Kelly's trial and I am still willing and available to testify as one of his alibi witnesses.

REVEREND JAMES BECOAT

SWORN TO AND SUBSCRIBED BEFORE ME
the _____ day of _____, 1997.

NOTARY PUBLIC

# EXHIBIT 19

# EXHIBIT 20

Fugitive Sq

Re: Tommy Lockwin.

Kamel Brusbone - Enticent For P/c
Robinson, Miller, 39th Distric

vacant lot next door
Stays sometime at ████████████████
with girlfriend no name. She owns a
Burgundy Celebrity - Pl Lic# AFW-0669
He also stays at ████████████████
Ave                                    23720

He drives a Tan or Beige Cadillac
Pl Lic# ALT-9212, Has address at
Mich Beechward St. + #26 Clopper St

                                    23300

                            Don

Le Grand Frentin Jr

# EXHIBIT 21

File

Fugitive Squad    Sq qp    ACTIVITY SHEET                    Monday   12-17-93

H 93-314                    Sgt Leak  #550              Lt Colucci  #320

Deceased: Stacy Williams          Assg:  Richardson#870/Peraint#9186
Fugitive: Thomas Lockwood

Detective Richardson and Peraint went to ▮▮▮▮▮▮▮▮▮▮ and observed
a '91 Buick, white, Pa. Lic. ANZ1599 which is registered to this
fugitive. This vehicle was double parked in front of that location
but pulled away just as Detective pulled up. Detectives followed the
vehicle and stopped it at 22nd and Diamond St. The auto was being
operated by Annette Lockwood, 32B/f, ▮▮▮▮▮▮▮▮▮, the sister of
this fugitive and mother of Anthony Lockwood, the codefendant who was
previously arrested. Also in the car was Kim Henderson, ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮.

Annette Lockwood claimed that she bought this auto from her brother
and that she had forgotten to have the registration changed into her
name. Both her and Henderson denied having any knowledge of where
Thomas is staying.

Detective was sent to ▮▮▮▮▮▮▮▮▮▮▮ looking for a Maroon Chev.
Eurosport, Pa. Lic. AKZ7687. This tag belongs to a Pontiac and is
owned by Renee Lowery, aka Renee Harrington, ▮▮▮▮▮▮▮▮ at the above
location. Detective received information from the mother of the decedent,
that this fugitive has been seen in the area of 26th and Lehigh ave.,
driving this auto. Neither the vehicle nor the fugitive were
observed.

AL (HF) 000858

# EXHIBIT 22

AL (HF) 000863

# EXHIBIT 23

⟨#13⟩

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. 73-8 |
|---|---|---|

INTERVIEWER: Jackson / Reinhold

NAME: Tel Traylor

AGE: RACE: B

PHONE NO:

NAME OF EMPLOYMENT/SCHOOL: Careers U.S.A.

SOC. SEC. NO:

ADDRESS OF EMPLOYMENT/SCHOOL

DEPARTMENT: Temp. Help

DATES OF PLANNED VACATIONS: None

DATES OF PLANNED BUSINESS TRIPS: None

NAME OF CLOSE RELATIVE: Ruby Allen, Mother

ADDRESS

PHONE NO.

PLACE OF IN: Residence

DATE        TIME    AM PM

BROUGHT BY

DATE        TIME    AM PM

WE ARE QUESTIONING YOU CONCERNING: The shooting death of Travis Hughston on 1-1-93 at

WARNINGS GIVEN BY

DATE        TIME    AM PM

ANSWERS

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q. Tel did you know the man who got shot?

A. No.

Q. Did you see or hear anything about this shooting?

A. Yes, I heard about three (3) or four (4) gunshots, I was in the house watching TV with my children and nieces and nephews. I went to the door and observed someone running through the alley across from my house. The person ran to Glenwood Avenue, and I saw another person meet him at the end of the alley. Then a car pulled off of Glenwood Avenue onto Diamond Street. The

RECORD:  [ ] Yes  [ ] No    CHECKED BY

REVIEWED BY

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME _Jeff Taylor_

PAGE _2_

CASE NO _A93-1_

Car was a small car like a Honda, maybe Grey or Maroon in color.

Q. Could you describe the person you saw running?

A. He had on a beige jacket a 3/4, with a hood. I couldn't tell much else about him because he was almost at the other end of the alley.

Q. Could you tell if they were men or not and what race they were?

A. The one in the alley was a male and they were both black.

Q. Who told you about the shooting?

A. I seen my friend Chris he was in his house at the window - he yelled to call the cops somebody was shot.

Q. Did you see anyone else outside?

A. No.

_Jeff C. Taylor_

# EXHIBIT 24

*Fi&#769;c&#x25b;*

# EXHIBIT 25

# INVESTIGATION INTERVIEW RECORD

PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION

CASE NO. [illegible]

INTERVIEWER [illegible] #[illegible]

| | | | |
|---|---|---|---|
| NAME Jonathan Fuller | AGE [redacted] | RACE Blk | DOB [redacted] |
| ADDRESS [redacted] | APARTMENT NO. [redacted] | | PHONE NO. [redacted] |
| NAME OF EMPLOYMENT/SCHOOL Unemployed | | | SOC. SEC. NO. [redacted] |
| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | | PHONE NO. |
| DATES OF PLANNED VACATIONS | | | |
| DATES OF PLANNED BUSINESS TRIPS | | | |
| NAME OF CLOSE RELATIVE [illegible] | | | |
| ADDRESS [redacted] | | | PHONE NO. [redacted] |
| PLACE OF INTERVIEW [illegible] | | DATE [illegible] | TIME [illegible] AM PM |
| BROUGHT IN BY | | DATE | TIME AM PM |
| WE ARE QUESTIONING YOU CONCERNING The [illegible] of Stacey [illegible] | | | |
| WARNINGS GIVEN BY | | DATE | TIME AM PM |

ANSWERS

(1) (2) (3) (4) (5) (6) (7)

Q. Are you known by any other name?

A. No.

Q. What is your relationship to the deceased?

A. He was my friend - I've known him for most of my life.

Q. Were you with Stacey when the incident occurred?

A. Yes I was.

Q. [illegible]

A. [illegible]

[illegible]

RECORD ☐ Yes ☐ No

CHECKED BY Jonathan Fuller

REVIEWED BY

AL (HF) 000113

75-483 (Rev. 7/82)

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO |
|------|------|---------|

AL (HF) 000114

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

AL (HF) 000115

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
**POLICE DEPARTMENT**

| NAME | PAGE | CASE NO. |
|---|---|---|
| [illegible] | 4 | [illegible] |

Q. What happened [illegible] you [illegible]?
A. They got out of the car [illegible] the other way on 22nd when I [illegible] came [illegible] the [illegible]. The car was still there, but when I came back [illegible] was gone.

Q. How long have you known Tommy?
A. I've seen him around for years.

Q. How long have you known [illegible]?
A. I've seen him about two.

Q. Do you know what the argument may be about [illegible]?
A. [illegible]

Q. [illegible] there with [illegible]?
A. I [illegible]

Q. Did anyone else [illegible] with Tommy?

75-483 A

[illegible]

| INVESTIGATION INTERVIEW RECORD<br>CONTINUATION SHEET | CITY OF PHILADELPHIA<br>POLICE DEPARTMENT |
|---|---|

| NAME | PAGE | CASE NO. |
|---|---|---|
| Jonathan Fuller | 5 | [illegible] |

A. Tommy [illegible] he [illegible] the [illegible] Derrick [illegible]
[illegible]

Q. When the shooting began did they [illegible]?
A. [illegible] I just looked [illegible] they started [illegible].

Q. I'm going to now show you a [illegible] photo album. Tell me if you recognize anyone in the [illegible] album.
A. This Tommy (#6 – Thomas [illegible] PP #716277)

Q. How about this album?
A. This Ant – (#8 Anthony Lockwood PP #715?24)

Q. Are these the Tommy & Ant that you saw shoot and kill Marcus Gillam on 7-27-93?
A. Yes that's them.

Q. Do you know if Tommy & Ant are related?
A. [illegible] that's Tommy['s] nephew

Q. [illegible] tell [illegible] the [illegible] that [illegible] doing?
A. [illegible] I don't know [illegible].

Jonathan Fuller

75-483 A

# EXHIBIT 26

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER Det Santiago 82 |

NAME Frances Jones

AGE ▮  RACE ▮  DOB ▮

ADDRESS ▮  APARTMENT NO. ▮  PHONE NO. ▮

NAME OF EMPLOYMENT/SCHOOL None

SOC. SEC. NO. ▮

ADDRESS OF EMPLOYMENT/SCHOOL None  DEPARTMENT  PHONE NO.

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE Mother: Frances Jones

ADDRESS ▮  PHONE NO. ▮

PLACE OF INTERVIEW 8th & Race St., Homicide Div  DATE 9-22-93  TIME 4 0' AM/PM

BROUGHT IN BY Santiago & Ja Trombsk.  DATE 9-22-93  TIME AM/PM

WE ARE QUESTIONING YOU CONCERNING The Homicide by Shooting of Stacy Williams

WARNING GIVEN BY  DATE  TIME AM/PM

ANSWERS (1)  (2)  (3)  (4)  (5)  (6)  (7)

Q. Do you know the decedent - Stacy Williams?

A. Yes, I've known him from the neighborhood for four or five years.

Q. Can you read and write the English language?

A. A little.

RECORD ☐ Yes ☐ No  CHECKED BY

REVIEWED BY Frances Jones

**AL (HF) 000119**

75-483 (Rev. 7/82)

**INVESTIGATION INTERVIEW RECORD**
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME  Frances Jones

PAGE  2

CASE NO.

Q.  Are you under the influence of any drugs or alcohol right now?

A.  No

Q.  Did you witness the shooting when Stacy Williams was shot and killed?

A.  Yes, I was right there on the corner of Crosby and Morris when it happened.

Q.  Can you tell me who shot and killed Stacy Williams?

A.  It was Tommy, he had a "9" and but had a long 38", they were both shooting. They were shooting at Big and Stacy. Stacy and Jokes were sitting in Jokes car and the car got the window flown out.

AL (HF) 000120

Frances Jones

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME: Frances Jones

PAGE: 3

CASE NO.

Q   Do you know what the shooting was all about?

A   Yes, They're fighting over who sells drugs from the corner of Crosky and Norris. At one time or another everybody was selling from that corner. Right now Big, and Big's cousin Steve and Stoey were selling from the corner. Now Tommy his brother Derrick and their friend "Nat", wanted the corner.

Last Saturday 9-18 sometime in the afternoon around 3:30 or 4:00 pm "Ant" Derek come around stick up Steve who was selling caps at Crosky & Norris. They take his money and caps and then they shot at him. I was at a friend house and saw this through a window, right there at the corner of Crosky & Norris.

25-493 A

AL (HF) 000121

Frances Jones

| INVESTIGATION INTERVIEW RECORD<br>CONTINUATION SHEET | CITY OF PHILADELPHIA<br>POLICE DEPARTMENT |
|---|---|
| NAME Frances Jones | PAGE 4    CASE NO. |

Q. Frances, I'm showing you a photo,
who is this person
                    Johnathan Fuller PM·698533

A. That's Pig

Q. I'm now showing you a photo
array with '8' photos, do you
recognize anyone?

A. Number 6, that's Tommy. He had
the 9 and was shooting at Pig
and Stacy. (Thomas Lockwood PPN 716277)

Q. Do you know Ant's real name?

A. No, but his father lives on ████
at, about 7 houses in from ████

Frances Jones

75-483 A

**AL (HF) 000122**

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME: Frances Jones

PAGE: 5

CASE NO.:

Q. How long have you known Tommy and Ant?

A. I've know Tommy for a lot of years, and Ant for about one year.

Q. Can you tell me exactly where you were and what you during the shooting where Stacy was killed.

A. I was standing on the corner of Rosehill and Tioga and Peg and Stacy were selling caps there. They ran out and went to get more.
When Peg and Stacy left, Tommy pulls up in a blue Seville with Tinted windows. Anthony is sitting in the Passenger side and Derrick is sitting in the back seat.
Derrick got out of the car and starting selling 2" dollar caps.

Frances Jones

**AL (HF) 000123**

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME Francis Jones

PAGE 6

CASE NO.

Now this white guy named "Bob" calls up and buys us ten 2 dollar caps. When Derrick gives him the caps, Bob pulls off without paying. Tommy and Anthony pull off and go after Bob. Derrick stays and keeps selling. About five minutes later Tommy pulls up again with Anthony and park between Closky st, and 23rd st.

Now Shay and, Gerald, we call him Yates were seating in Shays car that was parked between 22nd and Closky streets on Norris. They had been seating there for a long while.

I saw Pig and Stacy turn th corner at 22nd + Norris and they were walking towards Shays car that had both th passengers and drivers side doors opened.

Francis Jones

AL (HF) 000124

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME  Frances Jones

PAGE  7    CASE NO.

A.    I then heard Big say to Tommy
hold up and lets talk. I saw Big
put both his hands up. I saw
Tommy going for his mine, and I
said "Wait, why don't you talk to
him." Then Tommy said to Big "Don't
do it" and Tommy pulled out his mine
and Ant pulled out his long 38 and
they both start shooting. When I
see this I slid across the street
and hid behind the Chinese steps.
      I heard maybe seven or more
shots and then I see Tommy and
Ant run up Crosby st and Derrick
jumps into the Blue Seville and
goes up Morris to 23rd and makes
a right.

      I see Big running up to
some peoples steps saying that Stacy
was shot. When I got back to the
n e corner, and Shay is pulling out.
I then see Stacy laying in the
sidewalk.

75-432 A

AL (HF) 000125

Frances Jones

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

| NAME | PAGE | CASE NO. |
| Frances Jones | 8 | |

Q. I walked up to Stacy and I could see the blood running from his head.

Q. Did you at anytime see Reg with a gun?

A. No.

Q. When Reg put his hands up and said he wanted to talk to Tommy did Reg have anything in his hands?

A. No.

☬. Statement read and had to Frances Jones by Det Frank? etc.

Q. Yes, is this statement that I just read had to you true and correct.

A. Yes

Frances Jones

AL (HF) 000126

# EXHIBIT 27

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER |

| NAME | AGE | RACE | DOB |
|---|---|---|---|

ADDRESS

NAME OF EMPLOYMENT/SCHOOL | SOC. SEC. NO.

ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO.

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

| ES | PHON |
|---|---|

| PLACE OF INTERVIEW | DATE | TIME AM/PM |
|---|---|---|

| BROUGHT IN BY | DATE | TIME AM/PM |
|---|---|---|

WE ARE QUESTIONING YOU CONCERNING

| WARNING GIVEN BY | DATE | TIME AM/PM |
|---|---|---|

ANSWERS

(1)   (2)   (3)   (4)   (5)   (6)   (7)

| RECORD | CHECKED BY |
|---|---|
| ☑ Yes ☐ No | |

REVIEWED BY

AL (HF) 000128

75-483 (Rev. 7/82)

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
**POLICE DEPARTMENT**

| NAME | PAGE | CASE NO. |
|---|---|---|
| [illegible] Davis | 2 | [illegible] |

A. [illegible] with a friend of mine named Leroy [illegible] 23 [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] medical [illegible] Leroy got out of the car to make a phone call, he was gone about 15 minutes. He came back [illegible] into the car. Then at the same time the [illegible] [illegible] a friend of [illegible] who I don't know [illegible] [illegible] the corner [illegible] [illegible] [illegible] to [illegible] [illegible] the same [illegible] the street [illegible] [illegible] [illegible] [illegible] [illegible] to me, said "[illegible] [illegible]" Just when he said that [illegible] [illegible] I [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] my [illegible] [illegible].

5 183 A

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |

**INVESTIGATION INTERVIEW RECORD**
**CONTINUATION SHEET**

CITY OF PHILADELPHIA
**POLICE DEPARTMENT**

| NAME | PAGE | CASE NO. |
|---|---|---|
| [illegible] | [illegible] | [illegible] |

Q. What part of your car did the bullet strike?

A. The right front windshield, right corner [illegible] was struck.

Q. I notice you have blood on your [illegible] hand & face what's that from?

A. When the windshield shattered the glass hit me.

Q. Did you see if your car was hit more than once?

A. [illegible]

[illegible]

[illegible]

Q. [illegible]

A. [illegible]

[illegible]

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

NAME

PAGE | CASE NO.

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

NAME _____   PAGE ____   CASE NO. _____

AL (HF) 000133

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | | PAGE | CASE NO. |
|---|---|---|---|

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. _H93-314_ |
|---|---|---|
| | | INTERVIEWER _Santagalski 8324_ |

| NAME _Beckie Davis_ | AGE | RACE _B/M_ | DOB |
|---|---|---|---|
| A ____ | APARTMENT ■ | | PHONE NO. |

| NAME OF EMPLOYMENT/SCHOOL | | SOC. SEC. NO. |
|---|---|---|

| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO. |
|---|---|---|

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

| ADDRESS | PHONE NO. |
|---|---|

| PLACE OF INTERVIEW | DATE | TIME | AM PM |
|---|---|---|---|

| BROUGHT IN BY | DATE | TIME | AM PM |
|---|---|---|---|

WE ARE QUESTIONING YOU CONCERNING

| WARNINGS GIVEN BY | DATE | TIME | AM PM |
|---|---|---|---|

ANSWERS

(1)    (2)    (3)    (4)    (5)    (6)    (7)

Q Beckie, you told me the person that was in your car with you at the time of the shooting was Jerry Davis. Is that true?

A No sir

Q Why did you give me that name?

A I didn't want to get the real person involved

Q What is the name of the male that was in your car that day?

A Jerald Yates.

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|
| REVIEWED BY | |

AL (HF) 000135

75-483 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME _Carline Davis_    PAGE _2_    CASE NO. _H93-217_

Q. Where does Donald Yates live?

A. On ▮▮▮▮▮▮▮▮▮▮▮▮ don't know the exact address.

Q. Who does he live with?

A. He rents a room as all I know

Q. Describe Yates for me?

A. Black male about 26, 5'3", medium weight.

Q. Do you know a male, white or brown in the area as Art?

A. I know what he looks like but I don't really know him

Q. Was Art the male that was with Tommy when Tommy shot Stacy William?

A. I don't know, I didn't get a good look at him.

Q. I'm showing you a photo, is this the male known as Art? (PPD 20714, photo of Anthony Redwood)

_Carline Davis_

INVESTIGATION  INTERVIEW  RECORD
CONTINUATION  SHEET

CITY OF PHILADELPHIA
POLICE  DEPARTMENT

NAME _Parker  Davis_

PAGE _3_

CASE NO. _1173-314_

Q - _Yes, thats act_

Q - _he act related to murry?_
A - _I dont know_

Q - _Is there anything else, about the_
_murder that you have telling me?_
A - _No._

AL (HF) 000137

FILED
08/29/2022 06:46:10 PM
Post Trial Unit
By: K. JOH

# EXHIBIT 28

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. ████ |
|---|---|---|
| | | INTERVIEWER |

| NAMI | AGE ████ | RACE ██ | DOB |
|---|---|---|---|

| ADDRESS ████████ | APARTMENT NO. | PHONE NO. ████ |
|---|---|---|

| NAME OF EMPLOYMENT/SCHOOL | SOC. SEC. NO. ████ |
|---|---|

| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO. |
|---|---|---|

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

| ADDRESS ████████████ | PHONE NO. ████ |
|---|---|

| PLACE OF INTERVIEW | DATE | TIME ___ AM PM |
|---|---|---|

| BROUGHT IN BY | DATE | TIME ___ AM PM |
|---|---|---|

WE ARE QUESTIONING YOU CONCERNING

| WARNING GIVEN BY | DATE | TIME ___ AM PM |
|---|---|---|

ANSWERS

(1)        (2)        (3)        (4)        (5)        (6)        (7)

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|

REVIEWED BY

75-483 (Rev. 7/82)

AL (HF) 000153

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME                                    PAGE        CASE NO.

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

| NAME | | PAGE | CASE NO. |

AL (HF) 000155

INVESTIGATION  INTERVIEW  RECORD
CONTINUATION  SHEET

CITY  OF  PHILADELPHIA
POLICE  DEPARTMENT

| NAME | PAGE | CASE NO. |
|------|------|----------|
| | | |

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION  SHEET | POLICE   DEPARTMENT |

NAME

PAGE

CASE NO.

AL (HF) 000157

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO. |
|------|------|----------|

AL (HF) 000158

INVESTIGATION   INTERVIEW   RECORD
CONTINUATION   SHEET

CITY OF PHILADELPHIA
POLICE   DEPARTMENT

| NAME | PAGE | CASE NO. |
|---|---|---|
| | 7 | |

AL (HF) 000159

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

| NAME | PAGE | CASE NO. |
|------|------|----------|

AL (HF) 000160

# EXHIBIT 29

**INVESTIGATION INTERVIEW RECORD**

**PHILADELPHIA POLICE DEPARTMENT**
**HOMICIDE DIVISION**

CASE NO.

INTERVIEWER

| | | |
|---|---|---|
| NAME | AGE | RACE | DOB |
| ADD | APARTMENT NO. | PHONE NO. |
| NAME OF EMP | | SOC. SEC. NO. |
| ADDRESS OF | DEPARTMENT | PHONE NO. |

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

| ADDRESS | PHONE NO. |
|---|---|

| PLACE OF INTERVIEW | DATE | TIME | AM PM |
|---|---|---|---|
| BROUGHT IN BY | DATE | TIME | AM PM |

WE ARE QUESTIONING YOU CONCERNING

| WARNINGS GIVEN BY | DATE | TIME | AM PM |
|---|---|---|---|

ANSWERS

(1)   (2)   (3)   (4)   (5)   (6)   (7)

RECORD

CHECKED BY

REVIEWED BY

AL (HF) 000162

75-483 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

AL (HF) 000163

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

| NAME | PAGE | CASE NO |
|---|---|---|

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | | PAGE | CASE NO. |

AL (HF) 000165

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT |
|---|---|

NAME

| | PAGE | CASE NO. |

AL (HF) 000166

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

NAME

PAGE

CASE NO.

AL (HF) 000167

# EXHIBIT 30

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER |

| NAME | AGE | DOB |
|---|---|---|
| ADDRESS | AREA          NO. | PHONE NO. |
| NAME          EMPLOYMENT/SCHOOL | | SOC. SEC. NO. |
| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO. |

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

| ADDRESS | PHONE NO. |
|---|---|

| PLACE OF INTERVIEW | DATE | TIME | AM PM |
|---|---|---|---|
| BROUGHT IN BY | DATE | TIME | AM PM |

WE ARE QUESTIONING YOU CONCERNING

| WARNINGS GIVEN BY | DATE | TIME | AM PM |
|---|---|---|---|

ANSWERS

(1)          (2)          (3)          (4)          (5)          (6)          (7)

| RECORD | CHECKED BY |
|---|---|
| ☐ Yes   ☐ No | Anthony Johnstons |
| REVIEWED B | |

AL (HF) 000173

75-483 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD<br>CONTINUATION SHEET | CITY OF PHILADELPHIA<br>POLICE DEPARTMENT |
|---|---|

| NAME | PAGE | CASE NO. |
|---|---|---|
| [illegible] | 2 | [illegible] |

Q. [illegible]

A. [illegible]

Q. [illegible]

A. [illegible]

Q. [illegible]

A. [illegible]

Q. [illegible]

A. [illegible]

Q. [illegible]

A. [illegible]

Anthony Johnston

75-483A

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | PAGE | CASE NO. |
| | | |

**AL (HF) 000175**

INVESTIGATION  INTERVIEW  RECORD
CONTINUATION  SHEET

CITY OF PHILADELPHIA
POLICE   DEPARTMENT

AL (HF) 000176

# EXHIBIT 31

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. H93-314 INTERVIEWER Det BUCKLEY #9282 |
|---|---|---|

| NAME | AGE | RACE | DOB |
|---|---|---|---|
| Felecia WILLIAMS | ▮ | B/F | |

| ADDRESS | APARTMENT NO. | PHONE NO. |
|---|---|---|
| ▮ | | |

| NAME OF EMPLOYMENT/SCHOOL | SOC. SEC. NO. |
|---|---|
| unemployed | ▮ |

| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE NO. |
|---|---|---|

DATES OF PLANNED VACATIONS
None

DATES OF PLANNED BUSINESS TRIPS
None

NAME OF CLOSE RELATIVE
Gloria WILLIAMS (mother)

| ADDRESS | PHONE NO. |
|---|---|
| ▮ | |

| PLACE OF INTERVIEW | DATE | TIME | |
|---|---|---|---|
| Homicide Division Interview Room C | 9-21-93 | 3:05PM | AM / PM |

| BROUGHT IN BY | DATE | TIME | |
|---|---|---|---|
| self | | | AM / PM |

WE ARE QUESTIONING YOU CONCERNING
The shooting death of Stacy WILLIAMS on the highway 22nd and Norris on 9-21-93

| WARNING GIVEN BY | DATE | TIME | |
|---|---|---|---|
| | | | AM / PM |

ANSWER:
(1)      (2)      (3)      (4)      (5)      (6)      (7)

Q.My name is Detective BUCKLEY and I am going to ask you some questions in reference

to the shooting death of Stacy WILLIAMS.Are you willing to answer these questions?

A.Yes

Q.Are you known by any other names or nicknames?

A.FEE

Q.How far did you go in school?

A.11Th Grade

Q.Can you read and write the English Language?

A.Yes

Q.Are you presently under the influence of drugs or alcohol?

A.No

Q.How did you know the decedent?

A.He's my brother.

| RECORD | CHECKED BY |
|---|---|
| ☐ Yes  ☐ No | |

REVIEWED BY

AL (HF) 000140

75-483 (Rev. 7/82)

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | PAGE | CASE NO |
|---|---|---|
| Felecia WILLIAMS | 2 | H93-314 |

Q. FELECIA, would you please go on in your own words and tell me what you know concerning the shooting death of Stacy WILLIAMS?

A. I didn't see the shooting, but DANA, (tyra IAWS) told me that Stact got shot. She told me that she was up in her house when she heard some shots and she said that she heard someone say, "TOMMY, TOMMY, get in the car." She told me that she called a girl named DONNA and DONNA called my family.

Q. When was the last time that you saw STACY?

A. This morning when we went to the store, it was about 10:30. When we came out of the store we went our seperate ways, I don't know where he went.

Q. When you talked to DANA today, did you hear anything else?

A. When I was out there, STEVE and PIG told me that they saw STACY get in SHAYS car and STEVE said he was trying to get STACY out of the car, but it pulled off. He didn't say why he was trying to get STACY out of the car. That's all they told me.

Q. Who are PIG and STEVE?

A. They work for MIKE selling drugs.

Q. Where do they sell drugs at?

A. Right at Croskey and Norris.

Q. Who is MIKE?

A. I don't know his last name, but his family lives on Croskey St between Norris and Berks, on the 22nd St side of Croskey. He's usually always at that house.

Q. Do you know PIGS' and STEVES' last names or where they live?

A. I don't know their last names. They both have babies by my cousins Yvonne and Cimmesel RORIE, and they (CIMMISEL and YVONNE) live with my mom at ▮▮▮▮▮▮▮▮▮▮ STEVE and PIG are usually there.

Q. Do you know if STACY was having any problems with anyone?

A. Yea, he was having problems with MIKE.

75 463 A

AL (HF) 000141

| INVESTIGATION INTERVIEW RECORD CONTINUATION SHEET | CITY OF PHILADELPHIA POLICE DEPARTMENT | |
|---|---|---|
| NAME Felecia WILLIAMS | PAGE 3 | CASE NO. H93-314 |

Q.Describe the problems STACY was having with MIKE?

A.They just had an arguement about two weeks ago. MIKE told STACY that he couldn't stand on the corner at Croskey and Norris if he wasn't gonna sell drugs and STACY said that he was gonna stand where he wanted and that he wasn't gonna sell drugs for anyone. STACY asked him if what MIKE was saying was a threat or a promise and MIKE told him to take it any way he wanted.

Q.Did you hear this arguement or did STACY tell you?

A.STACY told me and he had also asked me if I could get a gun in my own name and I told him no.

Q.Did STACY tell you why he wanted you to get a gun?

A.I guess because of MIKE.

Q.Has anyone else in your family had any problems in the area of Croskey and Norris?

A.My brother ANTONIO got shot yesterday in the arm at that corner by TOMMY?

Q.What did ANTONIO tell you about the shooting?

A.He said that TOMMY and the guys on the corner were arguing with PIG and STEVE and when ANTONIO went to run, TOMMY shot at him and hit him in the arm. He also told me that STEVE was wrestling with one of TOMMIES friends, and that TOMMIES friend had a gun and this is when TOMMY pulled out the gun and shot, but he had missed STEVE, and that TOMMY had fired again and hit him (ANTONIO).

Q.Do you know what the arguement was about?

A.It was all over drugs, TOMMY was telling everyone on the corner that it was his corner and that if they didn't want to sell for him, they couldn't be on the corner.

Q.Does ANTONIO sell drugs?

A.No, but STEVE and PIG do and he usually be with them on the corner.

Q.Do you know if STACY was having any problems with TOMMY?

A.No, TOMMY would just tell everyone on the corner that he would shoot anyone up that was selling on his corner.      _Felicia Williams_

5 483 A

AL (HF) 000142

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
| CONTINUATION SHEET | POLICE DEPARTMENT |

| NAME | PAGE | CASE NO |
|---|---|---|
| Fel cia WILLIAMS | 4 | H93-314 |

Q.D es STACY sell drugs?

A.N , he don't sell.

Q.D es SHAY sell drugs?

A.Ye , he sells at Croskey and Norris. He works for TOMMY.

Q.What is the relationship between MIKE and TOMMY?

A.TOMMY had shot at MIKE before, they both sell drugs. .MIKE has some guys selling on TOMMYS'

    corner and TOMMY has some guys selling on MIKES corner.

Q.What corner does MIKE sell at?

A.He sells on the same corner.MIKE has the south side of Norris and Croskey and TOMMY has the

    north side of Norris and Croskey.

Q.Do you know if SHAY was having any problems with anyone?

A.Not that I know of.

Q.Who does STACY usually hang with?

A.Usually with PIG and STEVE.

Q.Do you know if STACY was with PIG or STEVE today?

A.Not that I know of.

                              Felicia Williams

AL (HF) 000143

# EXHIBIT 32

| HOMICIDE CASE SUMMARY | CITY OF PHILADELPHIA POLICE DEPARTMENT DETECTIVE DIVISION | FILE NO. |
|---|---|---|
| | | DC NO. 93-22-51029 |

## DEFENDANT

| NAME | ADDRESS |
|---|---|
| Anthony Lockwood | |

| AGE | WT. 147 | HT. 5'7" | COL. Black | DEFORMITY None |
|---|---|---|---|---|

| DATE OF OCCURRENCE 9-21-93 | TIME OF OCCURRENCE 11;15am | PLACE OF OCCURRENCE 2200 W No___ st | ☐ INSIDE ☒ OUTSIDE |
|---|---|---|---|

| OCCUPATION None | WEATHER Rain, cold | STATEMENT ☐ YES | CRIMINAL RECORD ☒ YES ☐ NO |
|---|---|---|---|

| WEAPONS (Describe) 9 MM Handgun |
|---|

## DECEASED

| NAME Stacy Williams | MARITAL STATUS Single | ADD___ |
|---|---|---|

| AGE 19yrs | WT. 130 | HT. 6' | COL. blk. | DEFORMITY Non___ |
|---|---|---|---|---|

| STATEMENT ☐ YES ☒ NO | ☒ NO |
|---|---|

## POLICE ACTION

| TIME REPORTED | | | | TIME ARRIVAL A___CENE | | | |
|---|---|---|---|---|---|---|---|
| POLICE – Date 9-21-93 | Time 11;15am | HOMICIDE – Date 9-21-93 | Time 11;47am | POLICE – Date 9-21-93 | Time 11;20am | HOMICIDE – Date 9-21-93 | Time 12;10pm |

| HOSPITAL Dead at scene | DATE 9-21-94 | TIME 11;53am | TREATED BY DR. |
|---|---|---|---|

| NATURE AND EXTENT OF INJURIES Gunshot wound to the back |
|---|

| PRONOUNCED BY DR. Wheeler   O.M.E. | DATE 9-21-93 | TIME 11;53am | PLACE 2200 W norris   st |
|---|---|---|---|

| DATE AND TIME OF AUTOPSY 9-21-93   1;30pm | PATHOLOGIST DR. Mirchandoni |
|---|---|

## TECHNICAL

| BALLISTICS ☒ YES ☐ NO | CHEMICAL ☒ YES ☐ NO | FINGERPRINT ☐ YES ☒ NO | PHOTOGRAPH ☒ YES ☐ NO | OTHER (Describe) None |
|---|---|---|---|---|

## EVIDENCE (LIST)

| DESCRIPTION | CUSTODY OR LOCATION OF EVIDENCE |
|---|---|
| 9 MM Shell casings | Firearms Identification Unit |
| Blood Sample | Chemical Lab |

75-294 (Rev. 7/70)

AL (HF) 000107

| IDENTIFICATION WITNESSES | | | | | |
|---|---|---|---|---|---|
| NAME | ADDRESS | STATE-MENT | CRIM. RECORD | RELATIONSHIP/REMARKS | |
| Williams, Gloria | ▮▮▮▮▮▮ | No | No | Mother | |
| Williams, John | ▮▮▮▮▮▮ | No | No | Father | |

| CIVILIAN WITNESSES | | | | |
|---|---|---|---|---|
| Fuller, Johnathan  B/M | ▮▮▮▮▮▮ | Yes | Yes | Eyewitness/Friend |
| Jones, Frances   B/F | ▮▮▮▮▮▮ | Yes | Yes | Eyewitness |

| POLICE | | | | |
|---|---|---|---|---|
| RANK | NAME | NUMBER | UNIT | CHARACTER OF |
| P/O | Rivers, Nancy | 2354 | 22nd dist | 1st off. on scene |

**SUMMARY**

On 9-21-93, at approx. 11;15am, 22nd dist police responded to a radio call of a shooting and a hospital case on the highway in the 2200 block of W Norris sts. Upon arrival, police found the lifeless body of the victim, later identified as Stacy Williams, lying on the highway, and suffering from a gunshot wound to the back. Numerous 9mm shell casings were found on the highway at Croskey and Norris sts, which is approx. 50 yrds from where the victim was found. Investigation revealed that the shooting was a result of a dispute over the drug corner at Croskey and norris sts.

| INVESTIGATOR ASSIGNED | DATE OF REPORT |
|---|---|
| Det. FRank Jastrzembski #9224 | 3-15-94 |

75-294 (Rev. 7/73) (Reverse)

AL (HF) 000108

# EXHIBIT 33

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NO. |
|---|---|---|
| | | INTERVIEWER John Baugh 768 |

| NAME Karen SCHCOLFIELD | AGE | RACE/F | DOB |
|---|---|---|---|
| ADDRESS | APARTMENT NO. | | PHONE NO. |

| NAME OF EMPLOYMENT/SCHOOL | | S |
|---|---|---|
| ADD | DEPARTMENT Asst Teacher, Head | PHONE NO. Program |
| | Care | |

DATES OF PLANNED VACATIONS
None

DATES OF PLANNED BUSINESS TRIPS
None

NAME OF CLOSE RELATIVE
Sister in law  Leslie JOHNSON

| ADDRESS | PHONE |
|---|---|
| PLACE OF INTERVIEW Room 104 PAB | DATE 9-21-93 | TIME 1:30PM |
| BROUGHT IN BY Police | DATE | TIME |

WE ARE QUESTIONING YOU CONCERNING
The shooting at about  11:15AM today at the corner of 22nd & Morris Streets.

WARNINGS GIVEN BY

| | DATE | TIME |
|---|---|---|

ANSWERS
(1)    (2)    (3)    (4)    (5)    (6)    (7)

Q. Karen, where are you employed?

A. At the Frederick DOUGLAS  grade school at 22nd and Morris Streets, I am an

assistant teacher in the head start program.

Q. Tell me what happened this morning at about 11:15AM?

A. I was in the school officer, which is on the 22nd Street side of

the building, closer to Morris Street (NW corner of the building)

I was standing near the window. The office is on the first floor.

I heard about 6 or 7 gunshots and looked out the window. I saw

a male laying on the street, west on 22nd Street or Morris Street, that

would be the northwest corner of the intersection. There were three

males near this male in the street. Two of them were wearing black

jackets and the third male was wearing a brown jacket. The males

ran around the corner from Morris Street and they ran north on 22nd Street

on the sidewalk on the west side of the street.

RECORD       CHECKED BY
☐ Yes  ☐ No

REVIEWED BY

AL (HF) 000181

75-483 (Rev. 7/9)

| INVESTIGATION  INTERVIEW  RECORD | CITY OF PHILADELPHIA |
| CONTINUATION  SHEET | POLICE  DEPARTMENT |

| NAME Karen SCHOOLFIELD | | PAGE 2 | CASE NO |

The first two to run were the males in the black Jackets. The first male

was wearing a black 3/4 length cloth material jacket. The 2nd male was

wearing a black shiny jacket, like a silky material and his jacket was

waist length. When he was running I saw that his left arm was moving up and do

d wn in a running motion and he held his right arm straight at his hide.

He was carrying a hand gun in his right hand. The third male jogged

off in the same direction, but he wasn8t running as fast as the other two.

It was like he was unconcerned by this.

The three of them ran a short distance and they entered an alley between

some houses there. The first two waited for the third male and then the

three of them said something to each other. Then they went west through the

alley.

Q. Can you describe the males?

A. #1 was in his early 20s, I would say that none of the three appeared

to be no more than 24 years old. #1 had on the black cloth 3/4 length jkt

and dark pants, he was normal height and normal build, like thin to medium.

#2 the one with the gun, was wearing a shiny black waist length jacket,

like a silky material and he was about the same age and he was about

6 ' tall, medium build, not big and not skinny.

#3 was wearing a 3/4 length brown jacket with the hood up. When he ran

off the hood came down off his head. He was about the same age, about

6' tall, at least 6' tall, he was the tallest of the three and he had

broad shoulders, he was built nicer than the other two,

Q. Did you see a car out there?

A. Yes, when this happened the car was parked on Norris Street west

of 22nd Street on the north side of Norris Street. When I saw the car

AL (HF) 000182

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| CONTINUATION SHEET | POLICE DEPARTMENT |

NAME: Karen SCHOOLFIELD

PAGE 3    CASE NO.

there was nobody in it. It was a light grey car, looked like a CHRYSLER to

me it wasn;t new it was in the 1985, 86 range. After the guys ran off

I urned around to talk to the people in the office. and then somebody said,

Where are they going with the car? I looked again and the car was gone. The

back window of the car wasn't there, it was missing like it had been shot

out.

Q. Did you see the back window of the car break?

A. No.

Q. Did you see the male who was shot?

A. I saw him he was laying on his stomach but I didn't go close to him.

Q. Who called the police?

A. A lady named BONITA who was working in the officer called. She is here

at Homicide now.

Q. Did you pay attention to these males before you heard the gunshots?

A. No, I had just walked into the officer when I heard the shots.

I looked out the window right away.

463 A

Karen Schoolfield

AL (HF) 000183

# EXHIBIT 34

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## DOCKET



**Docket Number: CP-51-CR-0209951-1995**
## CRIMINAL DOCKET
### Court Case

Commonwealth of Pennsylvania
v.
Thomas C Lockwood

Page 1 of 3

### CASE INFORMATION

Judge Assigned: Latrone, Robert A.    Date Filed: 03/08/1995    Initiation Date: 03/08/1995

OTN: M 643157-4    LOTN:    Originating Docket No: 09502039011

Initial Issuing Authority:    Final Issuing Authority:

Arresting Agency: Philadelphia Pd    Arresting Officer: Affiant

Complaint/Citation No.:    Incident Number:

Case Local Number Type(s)    Case Local Number(s)

    Legacy Docket Number    C9502099511
    PSI Microfilm Number    960589
    Police Incident Number    9322051029
    Legacy Microfilm Number    97012283
    District Control Number    9322051029

### RELATED CASES

| Related Docket No | Related Case Caption | Related Court | Association Reason |
|---|---|---|---|
| **Joined Codefendant Cases** | | | |
| CP-51-CR-1223951-1993 | Comm. v. Lockwood, Anthony | CP-01-51-Crim | Joined Codefendant Cases |

### STATUS INFORMATION

Case Status:    Closed    Status Date    Processing Status    Arrest Date:    02/09/1995
    03/18/1996    Completed
    03/08/1995    Migrated Case (Active)

    Complaint Date:    03/08/1995

### DEFENDANT INFORMATION

Date Of Birth:    ▮▮▮▮▮▮▮    City/State/Zip: ▮▮▮▮▮▮▮▮

Alias Name
Lockwood, Thomas

### CASE PARTICIPANTS

Participant Type    Name
Defendant    Lockwood, Thomas C.

### CHARGES

| Seq | Orig Seq | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | | **18 § 2502** | MURDER | 09/21/1993 | M 643157-4 |
| 4 | 4 | M1 | **18 § 907** | Possessing Instruments of a Crime | 09/21/1993 | M 643157-4 |
| 5 | 5 | | **18 § 903** | CRIMINAL CONSPIRACY | 09/21/1993 | M 643157-4 |

CPCMS 9082    Printed: 08/29/2022

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0209951-1995**
# CRIMINAL DOCKET
### Court Case

Commonwealth of Pennsylvania
v.
Thomas C Lockwood

Page 2 of 3

### DISPOSITION SENTENCING/PENALTIES

Disposition

| Case Event | Disposition Date | Final Disposition |
| --- | --- | --- |
| Sequence/Description | Offense Disposition | Grade   Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |

**Migrated Disposition**

Migrated Dispositional Event                03/18/1996              Final Disposition

1 / MURDER                                  Guilty                            18 § 2502

  Larrone, Robert A.                       03/18/1996
    Confinement                          Min of 10.00 Years
                       Max of 20.00 Years

4 / Possessing Instruments of a Crime       Guilty                    M1        18 § 907

  Latrone, Robert A.                       03/18/1996
    Confinement                          Min of 1.00 Years
                       Max of 2.00 Years

5 / CRIMINAL CONSPIRACY                      Guilty                            18 § 903

  Latrone, Robert A.                       03/18/1996
    Confinement                          Min of 5.00 Years
                       Max of 10.00 Years

| **COMMONWEALTH INFORMATION** | **ATTORNEY INFORMATION** |
| --- | --- |
| Name:   Philadelphia County District Attorney's Office | Name:   Leonard David Biddison |
|         Prosecutor | Court Appointed |
| | Supreme Court No:   068070 |
| Supreme Court No: | Rep. Status:   Active |
| Phone Number(s): | Phone Number(s): |
| 215-686-8000   (Phone) | 215-235-5240   (Phone) |
| Address: | 215-235-6864   (Fax) |
| 3 South Penn Square | Address: |
| Philadelphia, PA 19107 | 230 S Broad St Ste 1501 |
| | Philadelphia, PA 19102-4103 |
| | Representing: Lockwood, Thomas C. |

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
| --- | --- | --- | --- |
| 1 | 03/08/1995 | | Unknown Filer |
| Held for Court | | | |

CPCMS 9082

Printed: 08/29/2022

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

## DOCKET



**Docket Number: CP-51-CR-0209951-1995**

# CRIMINAL DOCKET

### Court Case

Commonwealth of Pennsylvania

v.

Thomas C Lockwood

Page 3 of 3

### ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 03/18/1996 | | Migrated, Filer |
| Migrated Automatic Registry Entry (Disposition) Text | | | |
| 2 | 03/18/1996 | | Migrated, Filer |
| Disposition Filed | | | |
| 3 | 03/18/1996 | | Migrated, Filer |
| Migrated Sentence | | | |

### CASE FINANCIAL INFORMATION

Last Payment Date: 12/11/2008

Total of Last Payment: -$101.00

| Lockwood, Thomas C. Defendant | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| County Court Cost (Act 204 of 1976) | $86.00 | ($86.00) | $0.00 | $0.00 | $0.00 |
| Domestic Violence Compensation (Act 44 of 1988) | $10.00 | ($10.00) | $0.00 | $0.00 | $0.00 |
| Judicial Computer Project | $5.00 | ($5.00) | $0.00 | $0.00 | $0.00 |
| Costs/Fees Totals: | $101.00 | ($101.00) | $0.00 | $0.00 | $0.00 |
| Grand Totals: | $101.00 | ($101.00) | $0.00 | $0.00 | $0.00 |

** - Indicates assessment is subrogated

Printed: 08/29/2022

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports.  Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police.  Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# EXHIBIT 35

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,  :
Respondent                     :
                               :
                               :
      v.                       :      CP-51-CR-1011621-1995
                               :
JAMES KELLY,                   :
Petitioner                     :

## CERTIFICATION OF WITNESS STEVEN ANDERSON

Petitioner James Kelly herein submits the following certification of witness in support of
his *Post Conviction Relief Act Petition.*

1. My name is Elizabeth DeLosa. I was admitted to the Pennsylvania bar in October 2010,
   and I am the managing attorney of the Pittsburgh office of the Pennsylvania Innocence
   Project. I represent James Kelly in this Post Conviction Relief Act proceeding.

2. On August 11, 2022, as part of the Project's investigation of Mr. Kelly's case, I
   interviewed Steven Anderson by phone. I first learned that Mr. Anderson might have
   relevant information when reviewing the Philadelphia Police Department homicide
   investigation file for Stacy Williams' 1993 murder, which the Philadelphia District
   Attorney's Office produced to my office on March 15, 2022.

3. Mr. Anderson provided me with the following information.

4. In 1993, Mr. Anderson lived with his mother at ▬▬▬▬▬▬▬▬▬▬▬▬

   ▬▬▬▬▬▬▬. He grew up in and was familiar with the day-to-day happenings in this
   neighborhood.

5. On September 21, 1993, Thomas Lockwood (then 19 years old) and his cousin Anthony
   Lockwood (then 16 years old) shot Mr. Anderson's friend Stacy Williams to death.

1

6. At the time of Stacy Williams' death. Thomas Lockwood was a known drug dealer in Mr. Anderson's community. He was also known to frequently carry, and at times brandish, a gun.

7. During one incident immediately before Stacy Williams' death. Thomas Lockwood confronted Mr. Anderson, put a gun to his face, and told him to stay away from the corner of W. Norris and Croskey Streets—a contested drug corner at the time. This altercation resulted in Antonio Williams, Stacy Williams' younger brother, being shot in the arm. Mr. Anderson was not hurt.

8. Mr. Anderson was aware that Thomas Lockwood worked for and associated with Abdul "Boochie" King and Kendall Harris, two high ranking and well-known drug dealers in his neighborhood.

9. Mr. Anderson also recalled that in 1993 Thomas Lockwood drove several vehicles. Specifically, Mr. Anderson remembered seeing him drive a light blue Cadillac as well as a white Buick with sun visors in the rear windshield.

10. Mr. Anderson informed me that he would be willing to testify to this information if needed.

I verify that the facts set forth in this statement are true and correct to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section -904 of the Pennsylvania Crimes Code (18 Pa. C.S. §4904) relating to unsworn falsification to authorities. No one has promised, given me anything, or threatened me to make this statement.

Dated: 

Elizabeth DeLosa
D.O.B.

2

# EXHIBIT 36



**DISTRICT ATTORNEY'S OFFICE**
1421 ARCH STREET
PHILADELPHIA, PENNSYLVANIA 19102
686-8000

November 9, 1995

LYNNE ABRAHAM
DISTRICT ATTORNEY

Charles Mirarchi, Esquire
1526 Wolf Street
Philadelphia, PA 19145

Re:   **Commonwealth v. James Kelly**
**CP 95/10-1162**

Dear Mr. Mirarchi:

In response to your request for discovery in the above-captioned case, enclosed please find the following:

A.   Statements of

| | | | |
|---|---|---|---|
| 1. | Devon Gilliard | 15. | George Patterson |
| 2. | Rose Grant | 16. | Anna Lighty |
| 3a. | Colie Baxter, 1/1/93 | 17. | Tamika Ledbetter |
| 3b. | Colie Baxter, 10/31/95 | 18a. | Ernestine Williams, 3/21/93 |
| 4. | Andre Bracy | 18b. | Ernestine Williams, 9/14/93 |
| 5. | Melinda Fields | 18c. | Ernestine Williams, 9/15/93 |
| 6. | Kevin Mathis | 18d. | Ernestine Williams, 10/31/95 |
| | | 18e. | Ernestine Williams |
| 7. | Leonna Scott | 19. | P/O Redding |
| 8. | Angela Green | 20. | P/O Alston |
| 9. | Delphine Howard | 21. | P/O Patterson |
| 10. | Cathy Miller | 22. | P/O DeMalto |
| 11. | Arthur Dantzler | 23. | Sgt. Doran |
| 12. | Kenyatta Hughston | 24. | P/O McCusker |
| 13. | Lex Traylor | | |
| 14. | Solomon Jordan | | |

   B.   Warrant of Arrest #213995 with affidavit
   C.   Police 75-49
   D.   Defendant 75-229
   E.   Police 75-48's (2)
   F.   Property Receipt #s 396192, 396193, 410101, 410126, 408632
   G.   Telephone and Radio tape transmittal
   H.   Mobile Crime Detection Service Report with sketch
   I.   Criminal extract of defendant James Kelly
   J.   Medical Examiner's Report

Charles Mirarchi, Esquire
Page 2
November 9, 1995

Re:    **Commonwealth v. James Kelly** .

If these materials are not sufficient to meet your demands, you should seek a hearing
before Judge Temin. No other materials will be furnished without an Order from the Judge.

You may view photos and physical evidence by appointment. The burden is on you to
establish a date and time when you will be available to view same.

Since we are voluntarily turning over this discovery to you, which includes the names and
addresses of all eyewitnesses, we expect you to provide us with names, addresses, and statements
of any witnesses you will call at trial. If you fail to provide us with same, we will assume that
none exists. If you seek to introduce such evidence at trial, we will assert your failure to notify
us of such evidence as a bar to its admission.

Please forward reciprocal discovery.

Sincerely,

CHARLES F. GALLAGHER
Deputy District Attorney
Chief, Homicide Unit

/cl
Enclosure

# EXHIBIT 37

DocuSign Envelope ID: 35C84BAD-1065-4907-B9BE-BC77872248B1

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,  :
Respondent                          :
                                      :
             v.                     :     CP-51-CR-1011621-1995
                                        :
JAMES KELLY,                   :
Petitioner                     :

### CERTIFICATION OF WITNESS GEOFFREY SEAY

Petitioner James Kelly herein submits the following certification of witness in support of

his *Post-Conviction Relief Act Petition.*

1. My name is Geoffrey Seay. I am licensed to practice law in the Commonwealth of

   Pennsylvania. My Pennsylvania Bar ID is #57744.

2. In 1996, I represented James Kelly in his trial before the Court of Common Pleas in

   Philadelphia County, Pennsylvania.

3. I was retained by Mr. Kelly and his family to represent him in the above captioned case.

4. Prior to trial, it would have been my practice to make a formal request for discovery

   pursuant to the Pennsylvania Rules of Criminal Procedure.

5. I received discovery in this case and while I do not have a specific recollection of the

   discovery practice that I engaged in here, I do recall my defense strategy for the trial as

   well as the factual scenario underlying this case.

6. At no time prior to or after Mr. Kelly's August 1996 trial did the Commonwealth provide

   any information or documents regarding Thomas Lockwood.

7. Specifically, I was not aware and received no information or documents indicating that at

   some point prior to Mr. Kelly's August 1996 trial, key Commonwealth witness Colie

1

DocuSign Envelope ID: 35C84BAD-1065-4907-B9BE-BC77872248B1

Baxter identified Thomas Lockwood as the driver of the getaway vehicle he observed fleeing the scene of Travis Hughston's homicide. Had I had this information it would have significantly changed by pre-trial investigation strategy and would have given me the ability to impeach Mr. Baxter's surprise in-court identification of Mr. Kelly as the driver of the getaway vehicle.

8.  Additionally, at no time prior to or after Mr. Kelly's trial did I receive any documents or information indicating that Thomas Lockwood owned and was known to drive at least four (4) white or light colored cars similar to witness descriptions of the vehicle used to flee the Hughston homicide scene. Had I had this information, especially in conjunction with Mr. Baxter's identification of Lockwood as the driver of the getaway vehicle, it would have informed my pre-trial investigation strategy and enabled me to further call into question Mr. Baxter's surprise in-court identification of my client, Mr. Kelly, as the driver.

9.  Likewise, at no time prior to or after Mr. Kelly's trial did I receive any documents or information indicating that Thomas Lockwood owned ███████████████, ███████████, the home in which key Commonwealth witness Ernestine Williams resided at the time of Travis Hughston's homicide. Had I had this information, particularly in conjunction with Mr. Baxter's pre-trial identification of Lockwood, it would have significantly changed my pre-trial investigation strategy and would have enabled me to fully cross-examine Ms. Williams regarding this potential bias.

10. Lastly, at no time prior to or after Mr. Kelly's trial did I receive any documents or information indicating that in 1995 Mr. Lockwood had been arrested, prosecuted, and convicted of a homicide that not only shared a number of factual similarities to the

2

DocuSign Envelope ID: 35C84BAD-1065-4907-B9BE-BC77872248B1

Hughston homicide but occurred just blocks away and a few months later. Had I had this information it would have significantly changed my pre-trial investigation strategy as well as my pre-trial litigation and motion strategy. Additionally, this information in conjunction with all of the information above would have enabled me to present the jury with a solid alternative suspect defense.

I verify that the facts set forth in this statement are true and correct to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section 4904 of the Pennsylvania Crimes Code (18 Pa. C.S. §4904) relating to unsworn falsification to authorities. No one has promised, given me anything, or threatened me to make this statement.

Dated: 08-15-2022 | 9:44 AM EDT

DocuSigned by:

*Geoffrey Seay*
6D1ECE84CFE14CA...

Geoffrey Seay, Esquire
PA Bar ID 57744

# EXHIBIT 38

# EXHIBIT 39



AL (HF) 000796

# Exhibit B

| | |
|---|---|
| 1 | Apr. 21, 2008 Pro Se Writ of Habeas Corpus 2:08-CV-01073 |
| 2 | November 3, 2008 Amended Habeas Petition |
| 3 | Apr. 5, 2016 Pet'n for Successive habeas |
| 4 | Docket for 2008 Habeas |
| 5 | Docket for 2016 Habeas |
| 6 | Feb. 18, 2009 Report and Recommendation |
| 7 | Oct. 6, 2009 Order Adopting R&R |
| 8 | Feb 17, 2010. Order Denying Certificate of Appealability |
| 9 | Apr. 19, 2016 Opinion |

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FORM FOR USE IN APPLICATIONS FOR HABEAS CORPUS UNDER 28 U.S.C. § 2254
(eff. 12/1/04)

James Kelly _____ PETITIONER

(Full Name)     (Include name under which you were convicted)

                              vs.          Case No. 08-cv-1073 GP
                                           (Supplied by the Court)

Gerald L. Rozum _____ RESPONDENT

(Name of Warden, Superintendent, Jailor, or authorized person having custody of petitioner)
                              and
THE DISTRICT ATTORNEY OF THE COUNTY OF   Philadelphia _____
                              and
THE ATTORNEY GENERAL OF THE STATE OF ____ Pennsylvania _____
                                           ADDITIONAL RESPONDENT

James Kelly _____   DB-5777 _____
Name                                       Prison Number

SCI-Somerset · 1600 Walters Mill Road · Somerset, PA 15510

Place of Confinement

**(If petitioner is attacking a judgment which imposed a sentence to be served in the future, petitioner must fill in the name of the state where the judgment was entered. If petitioner has a sentence to be served in the future under a federal judgment which he wishes to attack, he should file a motion under 28 U.S.C. § 2255, in the federal court which entered the judgment.)**

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

INSTRUCTIONS–READ CAREFULLY

1. You must include all potential claims and supporting facts for which you might desire to seek review because a second or successive habeas corpus petition cannot be filed except under very specific and rare circumstances requiring certification by the Third Circuit Court of Appeals as set forth in instruction # 13.

2. Your Habeas corpus petition must be filed within the 1 – year statute of limitations time limit set forth in 28 U.S.C. §2244(d)(1). (There are limited circumstances in which the petition may be amended, within the one-year time period, to add additional claims or facts, see Federal Rules of

Civil Procedure 15; or amended after the one-year period expires, in order to clarify or amplify claims which were timely presented, see United States v. Thomas, 221 F. 3d 430 (3d Cir.2000.)

3. Any false statement of a material fact in your petition, in a motion for leave to proceed in forma pauperis, or in any other motion you file in this case may serve as the basis for prosecution and conviction for perjury.

4. This petition must be typewritten, printed, or legibly handwritten and signed by you as the petitioner or by your representative on Page 11. You should answer all questions concisely in the proper space of the petition. If you need more room to answer any question, you may write on the reverse blank sides of the petition.

5. You may not attach additional pages to the petition. You do not have to list or cite the cases or law that you are relying on. If you do want to cite the cases and law you are relying on and make legal arguments, you should do so in a separate concise brief or memorandum which should be filed along with the petition.

6. When you file your petition, you must include a filing fee of $5.00. If you cannot pay the full filing fee, you must request permission to proceed in forma pauperis as explained in instruction # 8.

7. Your petition will be filed if you have followed these instructions and it is in proper order.

8. To request permission to proceed in forma pauperis without paying the full filing fee, you must completely fill out pages 12 through 18 of the petition. You should answer all questions and sign where indicated on Pages 12 and 18. You should see to it that an authorized prison official completes the certification of Page 19. You must prove that you cannot pay the full filing fee and other costs because of poverty and a discharge in bankruptcy will not excuse you from this requirement. The Court will let you know if you may proceed in forma pauperis.

9. Only final judgments entered by one state court may be challenged in a single petition. If you seek to challenge judgments entered by different courts either in the same state or in different states, you must file separate petitions as to each court.

10. As required by 28 U.S.C. § 2254(b)(1), you must have exhausted all claims that you are making in your petition. This means that every claim must have been presented to each level of the state courts. If you file a petition that contains claims that are not exhausted, the federal court will dismiss your petition. 28 U.S.C. § 2254(b)(2) provides that if it is perfectly clear that no colorable claims are present, the federal court can also deny your petition on the merits.

11. As required by 28 U.S.C. § 2254(e)(1), a federal court, when considering your habeas corpus petition, must deem as correct a determination of fact made by a state court unless you rebut the presumption of correctness by clear and convincing evidence. Under 28 U.S.C. § 2254(e)(2), if

2

you have failed to develop the factual basis of a claim in state court proceedings, a federal court cannot hold an evidentiary hearing on that claim unless you show that:

> (i) the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the U.S. Supreme Court, that was previously unavailable,
> or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence.
> You must also show that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found you guilty of the offense in question.

12. As required by 28 U.S.C. § 2244(b)(1), a federal court must dismiss any claim in a second or successive habeas corpus petition that *was* presented in a prior habeas corpus petition.

13. As required by 28 U.S.C. § 2244(b)(2), a federal court must dismiss any claim in a second or successive habeas corpus petition that *was not* presented in a prior habeas corpus petition unless you show:

> (A) the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the U.S. Supreme Court, that was previously unavailable;
> or
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence, and (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found you guilty of the offense in question.
> Before such a second or successive petition may be filed in the district court, however, the petitioner must move the court of appeals for an Order authorizing the district court to consider the petition. Petitioner's motion for such an Order must be determined by a three judge panel of the court of appeals, which must grant or deny the motion within 30 days. The court of appeals may grant the motion only if it determines that the petition makes a prima facie showing that it satisfies either (A) or (B) above.

14. 28 U.S.C. § 2254(i) provides that ineffectiveness of counsel during post-conviction, habeas corpus and P.C.R.A. proceedings in state or federal court may not be grounds for relief in your petition.

15. When the petition is fully completed, the original and four copies must be mailed to the **Clerk of the United States District Court, Room 2609, 601 Market Street, Philadelphia, PA 19106**. You must return all pages, including these instructions.

3

## PETITION

1. (a) Name and location of court which entered the judgment of conviction under attack: _____

Court of Common Pleas · Philadelphia, Pennsylvania

   (b) Name of Prosecutor: ____ Richard Sax ____

   (c) Prosecution conducted by District Attorney's Office of ____ Philadelphia ____
      County

2. (a) Date of Judgment of conviction: ____ August 21, 1996 ____

   (b) Indictment number or numbers: ____ C.P. No. 9510-1162 ____

   Term: October, 1995 ____ Criminal Case Number: ____ 1162 ____

3. Length of sentence: Life, No Parole   Sentencing Judge: James A. Lineberger

4. Nature of offense or offenses for which you were convicted: First Degree Murder

(18 Pa.C.S. § 2502(a)); Criminal Conspiracy (18 Pa.C.S. § 903).

5. What was your plea? (Check one)
   (a) Not guilty (x)   (b) Guilty ( )   (c) Nolo contendere ( )

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details: _____

N/A

6. **If you pleaded not guilty**, what kind of trial?: (Check one)   (a) Jury (X)   (b) Judge only ( )

7. Did you testify at the trial? Yes ( )  No (X)

8. Did you appeal from the judgment of conviction?   Yes (X)   No ( )

9. If you did appeal, answer the following:

4

(a) Name of court: ___\*\* SEE PAGES 5a, 5b, 5c & 5d, ATTACHED \*\*___

(b) Result: _____"_____"_____

(c) Date of result and citation, if known: ____"_____"_____

(d) Grounds raised: _____"_____"_____

_____

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:
   (1)  Name of court: _____"_____"_____

   (2)  Result: _____"_____"_____

   (3)  Date of result and citation, if known: _____"_____"_____

   (4)  Grounds raised: _____"_____"_____

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

   (1)  Name of court: _____"_____"_____

   (2)  Result: _____"_____"_____

   (3)  Date of result and citation, if known: _____"_____"_____

   (4)  Grounds raised: _____"_____"_____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?    Yes (X)  No ( )

11. If your answer to 10 was "yes," give the following information:

   (a) (1)  Name of Court: ___\*\* SEE PAGES 5a, 5b, 5c & 5d, ATTACHED \*\*___

       (2)  Nature of proceeding: _____"_____"_____

_____

5

RESPONSES TO QUESTIONS 9 and 11

(NOTE: Because of the unusual and lengthy history of this case, all information requested in the above questions is set forth herein so that the reader can see the exact sequence of events without having to flip back and forth between numerous pages. The information herein lists all filings that occurred after the Petitioner was sentenced on August 21, 1996.)


06/30/1997  Petition for post Conviction Relief

    COURT: Court of Common Pleas for Philadelphia County ·
           First Judicial District of Pennsylvania · 1301
           Filbert Street · Philadelphia, PA 19107

    DOCKET NUMBER: C.P. 9510-1162

    GROUNDS RAISED: Request to file post-sentence motions and
                    appeal nunc pro tunc.

    EVIDENTIARY HEARING: Yes, on 01/08/1998

    RESULT: Granted on 01/23/1998

    APPEALED TO HIGHER COURT: No


01/16/1998  Post-Sentence Motions

    COURT: Court of Common Pleas for Philadelphia County ·
           First Judicial District of Pennsylvania · 1301
           Filbert Street · Philadelphia, PA 19107

    DOCKET NUMBER: C.P. 9510-1162

    GROUNDS RAISED: Verdict was against the weight of the
                    evidence; Evidence was insufficient to
                    sustain verdict; Verdict was inconsistent;
                    and Trial counsel was ineffective.

    EVIDENTIARY HEARING: No

    RESULT: Denied by operation of law on 05/27/1998

    APPEALED TO HIGHER COURT: Yes (Information follows)


06/05/1998  Appeal of denial of post-sentence motions

    COURT: Superior Court of Pennsylvania · 530 Walnut Street ·
           Suite 315 · Philadelphia, PA 19106


- 5a -

DOCKET NUMBER: 1799 Philadelphia 1998

GROUNDS RAISED: Evidence was insufficient to sustain
                conviction; Verdict was against the weight
                of the evidence; ineffectiveness of trial
                counsel; improper governmental
                interference; and Inconsistent verdict.

EVIDENTIARY HEARING: Not applicable

RESULT: Denied in part, remanded in part, on 07/09/1999.

APPEALED TO HIGHER COURT: No


12/06/1999 & 12/07/1999   Remand Hearings

    COURT: Court of Common Pleas for Philadelphia County ·
           First Judicial District of Pennsylvania · 1301
           Filbert Street · Philadelphia, PA 19107

    DOCKET NUMBER: C.P. 9510-1162

    GROUNDS RAISED: Ineffectiveness assistance of trial counsel

    EVIDENTIARY HEARING: Yes

    RESULT: Denied on 12/07/1999

    APPEALED TO HIGHER COURT: Yes (information follows)


12/30/1999  Appeal of denial of remanded issues

    COURT: Superior Court of Pennsylvania · 530 Walnut Street ·
           Suite 315 · Philadelphia, PA 19106

    DOCKET NUMBER: 152 EDA 2000

    GROUNDS RAISED: Ineffectiveness of trial counsel

    EVIDENTIARY HEARING: Not applicable

    RESULT: Denied on 08/24/2000

    APPEALED TO HIGHER COURT: Yes (information follows)


09/21/2000  Petition for Allowance of Appeal

    COURT: Pennsylvania Supreme Court

    DOCKET NUMBER: 579 EAL 2000

    GROUNDS RAISED: Superior Court's denial of 152 EDA 2000

EVIDENTIARY HEARING: Not Applicable

RESULT: Denied on 02/09/2001

APPEALED TO HIGHER COURT: No


09/26/2001   Petition for post Conviction Relief

    COURT: Court of Common Pleas for Philadelphia County ·
        First Judicial District of Pennsylvania · 1301
        Filbert Street · Philadelphia, PA 19107

    DOCKET NUMBER: C.P. 9510-1162

    GROUNDS RAISED: Ineffectiveness of trial counsel;
        Prosecutorial misconduct via Brady
        violation; and Ineffectiveness of direct
        appeal counsel.

    EVIDENTIARY HEARING: No

    RESULT: Denied on 02/19/2003

    APPEALED TO HIGHER COURT: Yes (information follows)


02/25/2003   Appeal

    COURT: Superior Court of Pennsylvania · 530 Walnut Street ·
        Suite 315 · Philadelphia, PA 19106

    DOCKET NUMBER: 755 EDA 2003

    GROUNDS RAISED: Ineffectiveness of PCRA counsel; Erroneous
        rulings of PCRA Court

    EVIDENTIARY HEARING: Not Applicable

    RESULT: Denied on 12/18/2006 with Judge Ford-Elliot
        dissenting

    APPEALED TO HIGHER COURT: Yes (information follows)


04/20/2007   Petition for Allowance of Appeal

    COURT: Pennsylvania Supreme Court

    DOCKET NUMBER: 221 EAL 2007

    GROUNDS RAISED: Superior Court's denial of 755 EDA 2003

    EVIDENTIARY HEARING: Not Applicable

- 5c -

RESULT: Denied on 10/26/2007

APPEALED TO HIGHER COURT: No

**** There has never been an appeal to the United States Supreme
Court.

(3) Grounds raised: \_\_\_\_ \*\* SEE PAGES 5a, 5b & 5c, ATTACHED \*\* \_\_\_\_

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ( ) No ( )

(5) Result: _____ " _____ " _____

(6) Date of result: _____ " _____ " _____

(7) Did you appeal the result to a higher court? Yes ( ) No ( )

Court Name(s) _____ " _____ " _____

Result(s) _____ " _____ " _____

Result Date(s) _____ " _____ " _____

(b) As to any second petition, application or motion give the same information:

(1) Name of Court: _____ " _____ " _____

(2) Nature of proceeding: \_\_\_\_\_ " _____ " _____

(3) Grounds raised: _____ " _____ " _____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ( ) No ( )

(5) Result:

_____ " _____ " _____

_____

6

(6) Date of result: _____ ** SEE PAGES 5a, 5b & 5c, ATTACHED ** _____

(7) Did you appeal the result to a higher court?    Yes ( )   No ( )

Court Name(s) _____ " _____ " _____

Result(s) _____ " _____ " _____

Result Date(s) _____ " _____ " _____

(c)    As to any third petition, application or motion give the same information:

(1) Name of Court: _____ " _____ " _____

(2) Nature of proceeding: _____ " _____ " _____

(3) Grounds raised: _____ " _____ " _____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ( )  No ( )

(5) Result:

_____ " _____ " _____

_____

(6) Date of result: _____ " _____ " _____

(7) Did you appeal the result to a higher court?    Yes ( )   No ( )

Court Name(s) _____ " _____ " _____

Result(s) _____ " _____ " _____

Result Date(s) _____ " _____ " _____

7

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

N/A

12. State *concisely* every ground on which you claim that you are being held unlawfully. Give specific facts supporting each ground.

*CAUTION*: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies, you should set them forth in this petition if you wish to seek federal relief. If you fail to set forth all such grounds in this petition, you may be barred from presenting them at a later date.

For information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted all your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure, (where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim).

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest, (where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim).

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to   the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: ** SEE PAGES 9a, 9b, 9c, 9d, 9e & 9f, ATTACHED **

_____

Supporting FACTS (state *briefly* without citing cases or law):

                              "                    "
_____

_____

_____

B. Ground two: _____ "              "  _____

_____

Supporting FACTS (state *briefly* without citing cases or law):

                              "                    "
_____

_____

_____

C. Ground three: _____ "              "  _____

_____

Supporting FACTS (state *briefly* without citing cases or law):

                              "                    "
_____

_____

_____

D. Ground four:_____ "              "  _____

_____

Supporting FACTS (state *briefly* without citing cases or law):

                              "                    "
_____

9

RESPONSES TO QUESTION 12

GROUND 1: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
          Trial counsel's investigator supplied him with the names
          and statement summaries of three alibi witnesses who would
          have testified that the Petitioner was with them at the
          time the crime was being committed. He also supplied him
          with the names of two witnesses who saw the men running
          from the scene of the crime and would have testified that
          neither of the men they saw were the Petitioner. Trial
          counsel advised his investigator that he was not going to
          do any more work on the case until he got paid all his
          money. Trial Counsel never filed an alibi notice, and never
          called any of the alibi witnesses or eyewitnesses that were
          provided to him by his investigator.

GROUND 2: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
          Trial counsel failed to secure character witnesses. Proof
          of good character is substantive evidence that, in and of
          itself, can preclude a finding that guilt has been
          established beyond a reasonable doubt and therefore warrant
          the entry of a verdict of "not guilty" by a fact-finder.

GROUND 3: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
          Trial counsel failed to move to preclude evidence of
          alleged witness tampering that was not attributable to
          Petitioner.

GROUND 4: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
          Trial counsel failed to object to the Court's jury
          instruction on accomplice liability, which permitted a
          conviction even in the absence of proof that the Petitioner
          himself possessed the specific intent to kill.

GROUND 5: VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE
          The Commonwealth's sole eyewitness, Ernestine Williams, was
          admittedly using crack-cocaine at the time of the incident
          and has given multiple stories as to what, if anything, she
          saw. These stories include, but are not limited to, (1) she
          didn't see anything, (2) that the police showed her a 8-1/2
          x 11 photo of the Petitioner, by itself, which was how she
          was then able to identify him, (3) that it wasn't the
          Petitioner and she doesn't know why the police arrested
          him, and (4) that she didn't know what the Petitioner
          handed to the shooter but that the police'told her it was a
          gun, which she agreed with. The Commonwealth also presented
          another witness, Colie Baxter, who was not able to identify
          the Petitioner's photo, yet came into court 3-1/2 years
          later and made an in-court identification.

GROUND 6: EVIDENCE WAS INSUFFICIENT TO SUSTAIN CONVICTION
          The supporting facts listed in Ground-5, above, are hereby
          incorporated by reference and made the facts in support of
          Ground-6.

GROUND 7: VERDICT WAS IMPERMISSIBLY INCONSISTENT
          In the present case, the entire theory of culpability
          rested on the Petitioner passing the murder weapon to the
          co-defendant immediately before the shooting. No evidence
          was ever produced to show what, if anything, was passed.
          The jury's verdict was based entirely on speculation and
          mere guessing.

GROUND 8: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF DIRECT APPEAL COUNSEL
          Direct appeal counsel failed to raise the issues of (1)
          trial counsel's failure to move to preclude evidence of
          alleged witness tampering, (2) trial counsel's failure to
          object to Court's erroneous charge on accomplice liability,
          (3) trial counsel's failure to secure character witnesses.

GROUND 9: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF DIRECT APPEAL COUNSEL
          Direct appeal counsel was ineffective for failing to
          preserve the sufficiency of the evidence claim by not
          seeking allowance of appeal from the Supreme Court of
          Pennsylvania.

GROUND 10: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
           EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
           Trial counsel failed to challenge the affidavit of probable
           cause in the arrest warrant, when the only statement made
           therein that linked the Petitioner to any crime was a
           proven fabrication on the part of the police.

GROUND 11: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
           EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
           Trial counsel, who knew that the brother of the deceased
           was told by eyewitness Ernestine Williams that "Boochie"
           "Tommy" and "Kendall" (not the Petitioner) were responsible
           for the murder, failed to request discovery and otherwise
           investigate the other individuals and establish their
           identity or confront Ms. Williams with this prior statement
           of identification.

GROUND 12: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
           EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
           Trial counsel failed to inform the Petitioner regarding an
           alibi defense and that he failed to file the requisite
           notice with the Court. Furthermore, trial counsel failed to
           inform the Petitioner that his investigator located two
           eyewitnesses who were willing to testify that they saw the
           individuals involved in the crime and that they are

positive the Petitioner was not one of them. This caused
the Petitioner to tell the Court that he didn't have any
witnesses that he wanted to call when the Court
suspiciously gave the Petitioner a colloquy on that topic.

GROUND 13: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
     Trial counsel, after reserving his opening statement until
     the close of the Commonwealth's case, failed to give it.

GROUND 14: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
     Trial counsel failed to object to the prosecutor's closing
     address and failed to request a mistrial and/or cautionary
     instruction to the comment by the prosecutor which shifted
     the burden of proof to the Petitioner to present evidence
     or call witnesses during the trial.

GROUND 15: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
     Trial counsel failed to realize that the police and/or
     prosecutor were withholding evidence. The discovery which
     was provided to the defense is void of any police
     investigation reports that detail the progress of the
     investigation that was ongoing for more than 2-1/2 years
     before the Petitioner was arrested. Statements by the
     Commonwealth's witness that the police told her that they
     heard that she was being paid to put the blame on the
     Petitioner, and that the shooter was somebody named
     "Tommy", supports this. It is also noted that this same
     witness told another witness that a "Tommy" was involved.
     The Police clearly had information that people other than
     the Petitioner were responsible and failed to turn it over.
     Trial counsel should have recognized this.

GROUND 16: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
     Trial counsel erroneously advised Petitioner that if he
     testified his criminal history would be used to impeach his
     credibility.

GROUND 17: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
     Trial counsel was ineffective for failing to preclude the
     in-court identification of the Petitioner by witness Colie
     Baxter. In the alternative, counsel should have moved for a
     mistrial when such identification was made.

GROUND 18: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
          EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
     Trial counsel failed to realize that the police and/or
     prosecutor were withholding evidence when they failed to
     disclose that Colie Baxter was previously shown a

- 9c -

photograph of the Petitioner and was not able to identify
him. According to police, Ernestine Williams identified the
photo's of Larry Mullins and the Petitioner on 09/15/1993.
Approximately 28 days later, the police showed Colie Baxter
some photographs to see if he could identify anyone. Colie
Baxter was only able to identify Larry Mullins. It is
beyond belief that the police would not have showed Colie
Baxter photograph's of the Petitioner along with that of
Larry Mullins. Counsel should have realized this and filed
the appropriate motions.

GROUND 19: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
Trial counsel failed to suppress the identification of the
Petitioner made by witness Ernestine Williams when Ms.
Willliams stated that the Petitioner's picture was not
shown with other photograph's but that "it was just one big
picture, it was a large picture like it was xeroxed". Ms.
Williams testimony clearly raises questions as to the
suggestiveness involved in identifying the Petitioner and
counsel should have filed a motion to suppress that
identification.

GROUND 20: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
Trial counsel failed to file a motion to declare Ernestine
Williams incompetent to testify under Pennsylvania Rule of
Evidence 601. Ms. Williams admitted that she was smoking
crack cocaine and drinking on the day when the crime that
she supposedly saw occurred and since that time has given
more than half a dozen completely different versions of
what happened and who was involved.

GROUND 21: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE
On the day of the shooting, the police were told by a
Tamika Ledbetter that the deceased was responsible for
"Terry" and "Curt" being shot in the back two months prior
to his death. Although this statement was given to the
police long before they had any suspects, there was no
documents turned over to the defense that show what, if
anything, they uncovered when they investigated the
information.

GROUND 22: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE
On the day of the shooting, the police were advised by
Solomon Jordan that the deceased had disagreements with the
Curry family after Wayne Curry got killed. Although this
statement was given to the police long before they had any
suspects, there was no documents turned over to the defense

- 9d -

that show what, if anything, they uncovered when they
investigated the information.

GROUND 23: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE

Ernestine Williams stated that the police told her that
they heard that she was being paid to put the blame on the
Petitioner, and that they heard that the shooter was
somebody named "Tommy". However, no documents were turned
over to the defense to show where or how the police
obtained this information.

GROUND 24: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE

The police failed to disclose that Colie Baxter was
previously shown a photograph of the Petitioner and was not
able to identify him. According to police, Ernestine
Williams identified the photo's of Larry Mullins and the
Petitioner on 09/15/1993. Approximately 28 days later, the
police showed Colie Baxter some photographs to see if he
could identify anyone. Colie Baxter was only able to
identify Larry Mullins. It is beyond belief that the police
would not have showed Colie Baxter photograph's of the
Petitioner along with that of Larry Mullins.

GROUND 25: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE

The prosecution failed to turn over any investigative
reports that documented how the police investigation was
going during the more than 2-1/2 years that they had not
made any arrests. These documents are prepared in all
homicide cases, also known as Activity Sheets, and in this
case absolutely none were turned over. This fact is all the
more unusual when there are witnesses, described above, who
are stating that they told the police about other possible
suspects and that the police are telling them that received
information from such and such a source.

GROUND 26: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE

Police Officer Mark Alston stated that he located
eyewitness Corey Braxton and transported him to the
homicide division. No information of any kind was ever
turned over to the defense regarding what exactly this
witness told the police. It is not believable that the
police would have decided to not take a statement from him.

GROUND 27: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF DIRECT APPEAL COUNSEL

Direct appeal counsel was ineffective when he failed to realize that the Superior Court erred when they refused to review the "weight of the evidence" claim because they didn't believe that it was properly raised in the first instance via a post-sentence motion. In fact, the claim was properly raised in the post-sentence motion, as it was number one.

GROUND 28: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF EFFECTIVE ASSISTANCE OF POST CONVICTION RELIEF COUNSEL
Post Conviction Relief counsel was ineffective when he failed to realize that the direct appeal counsel erred by not realizing that the Superior Court erred when they refused to review the "weight of the evidence" claim because they didn't believe that it was properly raised in the first instance via a post-sentence motion. In fact, the claim was properly raised in the post-sentence motion, as it was number one.

GROUND 29: UNCONSTITUTIONAL DENIAL OF A FAIR TRIAL DUE TO JUDICIAL MISCONDUCT
The trial court erred by not recusing himself from the case when he found out that the trial attorney for the Petitioner, and son of his long-time friend and former employer, who is rumored to be his god-son, and is now his employer, failed to file an alibi notice and otherwise procure witnesses on behalf of his client. Instead, the Judge devised a plan to attempt to cover for trial counsel by giving the Petitioner a colloquy that he was in no way, shape or form, able to respond to knowing and intelligently. The colloquy served but two purpose, and they were to protect the trial attorney, and to trick the Petitioner into waiving a serious claim of ineffective counsel that the Petitioner wasn't even aware existed.

GROUND 30: UNCONSTITUTIONAL DENIAL OF A FAIR TRIAL DUE TO JUDICIAL MISCONDUCT
The trial court erred by not recusing himself from deciding whether or not trial counsel was ineffective when he learned that the trial counsel in question was the son of his long-time friend and former employer, who is rumored to be his god-son, and is now his employer. Because the ruling was so bizarre and not based in law or facts, it was without question a ruling made solely to protect the trial attorney. This is especially true if the court knew at the time that he would be working for the trial attorney shortly thereafter, which it appears he did.


NOTE: All grounds raised herein have been further detailed, with supporting exhibits, in the Petitioner's Memorandum of Law, which accompanies this Petition. Accordingly, in the event that enough information has not been provided above, the corresponding sections of the Memorandum of Law are hereby incorporated by reference and made part of answers listed above.

- 9f -

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

_____

\** SEE PAGE 10a, ATTACHED **

_____

_____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?        Yes ( )   No (X)

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing: _____ \** SEE PAGE 10b, ATTACHED **_____

_____ * _____ * _____

(b) At arraignment and plea: _____ * _____ * _____

_____

(c) At trial: _____ * _____ * _____

_____

(d) At sentencing: _____ * _____ * _____

_____

(e) On appeal: _____ * _____ · * _____

_____

(f) In any post-conviction proceeding: ___ * _____ * _____

RESPONSE TO QUESTION 13

GROUNDS NOT PREVIOUSLY PRESENTED IN ANY COURT:

10, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and
30.

REASONS THAT GROUNDS WERE NOT PRESENTED:

The issues were not previously raised as the result of multiple
instances of ineffectiveness of counsel, as will be more fully
discussed in the Memorandum of Law that accompanies this
petition.

As a review of this matter will reveal, and the Petitioner has
highlighted by way of his Memorandum of Law, there exceeds a
reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different.

RESPONSES TO QUESTION 15

** ALL ADDRESSES ARE LAST KNOWN **


PRELIMINARY HEARING (M.C. No. 9507-0469) & ARRAIGNMENT (C.P. 9510-1162)

Andrew G. Gay, Esquire
Pennsylvania Supreme Court No. 02425
1731 Spring Garden Street
Philadelphia, PA 19130


TRIAL & SENTENCING (C.P. No. 9510-1162)

Geoffrey V. Seay, Esquire
1315 Walnut Street, Suite 732
Philadelphia, PA 19107
Ph. 215-545-7778


FIRST PCRA PETITION (C.P. No. 9510-1162), POST-TRIAL MOTIONS (C.P. No. 9510-1162), DIRECT APPEAL (1799 Philadelphia 1998) & REMAND HEARINGS (C.P. No. 9510-1162)

Randolph L. Goldman, Esquire
Pennsylvania Supreme Court No. 23307
1422 Chestnut Street, Suite 701
Philadelphia, PA 19102
Ph. 215-636-0303


REMAND HEARING APPEAL (152 EDA 2000), PETITION FOR ALLOWANCE OF APPEAL (579 EAL 2000), SECOND PCRA (C.P. No. 9510-1162) & BEGINNING OF PCRA APPEAL (755 EDA 2003)

Jules Epstein, Esquire
Pennsylvania Supreme Court No. 28569
The Cast Iron Building
Suite 501 - South
718 Arch Street
Philadelphia, PA 19106
Ph. 215-925-4400


END OF PCRA APPEAL (755 EDA 2003) & PETITION FOR ALLOWANCE OF APPEAL (221 EAL 2007)

James Kelly, Pro Se


- 10b -

(g) On appeal from any adverse ruling in a post-conviction proceeding: _____

       ** SEE PAGE 10b, HEREIN **

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?    Yes (X)  No ( )

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?    Yes ( )  No (X)

   (a) If so, give name and location of court which imposed sentence to be served in the future:

           Not Applicable

   (b) And give date and length of sentence to be served in the future:  Not Applicable

   (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?    Yes ( )  No (X)

   I declare under penalty of perjury that the foregoing is true and correct.

Executed on  _4 - 16 - 08_     _____
          Date                     Petitioner's Signature or
                             Signature of Petitioner's Representative
                             James Kelly, Pro Se

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)
  James Kelly, Pro Se

**2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES KELLY | : | |
| Plaintiff | : | CIVIL ACTION - LAW |
| | : | |
| | : | CIVIL RIGHTS |
| vs. | : | NO.: 08-cv-1073 GP |
| | : | |
| GERALD L. ROZUM, et al. | : | |
| | : | |
| Defendants | : | |

## AMENDED PETITION
## WRIT OF HABEAS CORPUS

The Petition of James Kelly respectfully represents:

1. James Kelly, Petitioner, is presently incarcerated at Pennsylvania State

Correctional Institution, Somerset, Prison Number DB-5777, 1600 Walters Mill Road,

Somerset, PA 15510.

2. The averments of his original petition are incorporated in this Petition, as will be

further set forth in the following paragraphs.

3. The Defendants are:

    a. Gerald L. Rozum, Superintendent, SCI, Somerset.
    b. The District Attorney of Philadelphia County
    c. The Attorney General of Pennsylvania
    d. Edward Rendell, Governor of Pennsylvania.

4. Petitioner is currently serving a life sentence for convictions of first degree murder, 18 Pa. C.S. §2502(a), and criminal conspiracy, 18 Pa. C.S. §903 and is being deprived of his liberty in violation of the Constitution of the United States on the following grounds:

    a.  He is being held without due process of law, in violation of the 5th and 14th Amendments to the United States Constitution;

    b.  He has been denied the effective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution; and

    c.  He has been deprived of the right to confront the witnesses against him, in violation of the Fifth Amendment to the United States Constitution.

5. In further explanation of paragraph 4a. hereof, the violation of the 5th and 14th Amendments are more fully set forth in Grounds 5, 6, 7, 21, 22, 23, 24, 25, 26, 29, and 30 of the original petition.

6. In further explanation of paragraph 4b. hereof, the violation of the Sixth Amendment right to counsel is more fully set forth in Grounds 1, 2, 3, 4, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 27, and 28 of the original petition.

7. In further explanation of paragraph 4c hereof, the violation of the confrontation clause of the Fifth Amendment is more fully set forth in Grounds 21, 22, 23, 24, 25, and 26 of the original petition.

8. Petitioner has exhausted the remedies available to him in the Courts of the Commonwealth of Pennsylvania, as more fully set forth in Responses to Question 9 and 11 in the original petition. Petitioner filed both direct appeals and petitions for Post-

Conviction Relief. He was obliged to file his direct appeal nunc pro tunc due to ineffective assistance of trial counsel.

9. The determinations of the Pennsylvania courts on Petitioner's constitutional claims was contrary to and/or involved an unreasonable application of clearly established Federal Law as more fully set forth in Petitioner's Memorandum of Law attached to his original petition.

10. The decisions of the Pennsylvania Courts were based on an unreasonable determination of the facts in light of all the evidence presented in the various proceedings. The evidence clearly demonstrates not only violations of the U. S. Constitution, but also that Petitioner is in fact innocent.

11. The Petitioner has produced such parts of the record as are available to him.

WHEREFORE, Petitioner respectfully requests this Honorable Court to grant the petition, and to set him free.

Respectfully submitted,

Lawrence E. Wood
Attorney I.D. #04955
Parke Barnes, Spangler, Oeste & Wood
126 West Miner Street
West Chester, PA 19382
Tel. 610-696-2208

I verify that the statements made in this Amended Petition are true and correct. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn falsification to authorities.

James Kelly

*3*

## Selected docket entries for case 16–1791

Generated: 08/30/2022 07:58:35

| Filed | Document Description | Page | Docket Text |
|-------|---------------------|------|-------------|
| 04/05/2016 | | | Application for Leave to File Second or Successive Petition pursuant to 28 U.S.C. Section 2244(b) filed. Notice filed by Petitioner James Kelly. Received in the Court of Appeals on 04/04/2016. (TYW) |
| | Case Opening Letter | 2 | |
| | Original Proceeding Docketed | 4 | |
| | Case Caption | 148 | |
| 04/19/2016 | Court Order Filed | 149 | ORDER (AMBRO, SHWARTZ and NYGAARD, Circuit Judges) denying Petitioner's appliction pursuant to 28 U.S.C. section 2244 to file a second or successive 28 U.S.C. section 2254 petition, filed. Panel No.: ALD−215. Shwartz, Authoring Judge. (TYW) |

OFFICE OF THE CLERK

**MARCIA M. WALDRON**
**CLERK**



**UNITED STATES COURT OF APPEALS**

FOR THE THIRD CIRCUIT
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995

April 5, 2016

Lawrence E. Wood, Esq.
Parke, Barnes, Spangler, Oeste & Wood
126 West Miner Street
West Chester, PA 19382

RE: In re: James Kelly
Case Number: 16-1791

**Effective December 15, 2008, the Court implemented the Electronic Case Files**
**System. Accordingly, attorneys are required to file all documents electronically.**
**See 3d Cir. L.A.R. 113 (2008) and the Court's CM/ECF website at**
**www.ca3.uscourts.gov/cmecf-case-managementelectronic-case-files.**
To All Parties:

We have docketed today a motion requesting permission to file a second or successive petition in
the United States District Court filed by **James Kelly** at **16-1791.** 28 U.S.C. Section 2244(b)
and/or 2255. This docket number must appear on all documents related to this case which are
submitted to this Court. A copy of the motion is enclosed for opposing counsel. All inquiries
should be directed to your Case Manager in writing or by calling the Clerk's Office at 215-597-
2995. This Court's rules, forms and case information are available on our website at
http://www.ca3.uscourts.gov.

Any response to the motion must be **received in the Office of the Clerk** within seven (7) days
from the date of this letter. Any motion authorizing filing of a second or successive petition must
be decided no later than 30 days after the filing of the motion. In light of the time period for
disposition, **absolutely no extensions of time will be granted**. If a response is received after the
expiration of the response period, the Court may reach its decision without consideration of the
untimely response.

**It should be noted that the grant or denial of an authorization by the Court of Appeals is**
**not appealable and cannot be the subject of a petition for rehearing or a writ of certiorari.**
**28 U.S.C. Section 2244(b)(3)(E).**

In the event the Court of Appeals authorizes the filing of a second or successive petition, Petitioner should attach a copy of this Court's order granting such permission to any petition which is to be filed in the district court.

Very truly yours,

*Marcia M. Waldron*

Marcia M. Waldron, Clerk

By: /s/ Tonya
Tonya, Case Manager
267-299-4938

cc:    District Attorney Philadelphia

**MOTION UNDER 28 U.S.C. § 2244 FOR ORDER AUTHORIZING DISTRICT COURT TO CONSIDER
SECOND OR SUCCESSIVE APPLICATION FOR RELIEF UNDER 28 U.S.C. § 2254 OR § 2255**

16-1791

## United States Court of Appeals for the Third Circuit

| Name of Movant<br>JAMES KELLY | Prisoner Number<br>DB-5777 | Case Number<br>(leave blank) |
|---|---|---|
| Place of Confinement<br>SCI  Somerset | | |

IN RE:  JAMES KELLY                    , MOVANT   *James Kelly*



RECEIVED
APR - 4 2016
U.S.C.A. 3rd. CIR

1. Name and location of court which entered the judgment of conviction from which relief is sought: _____

   PHILADELPHIA COURT OF COMMON PLEAS _____

2. Parties' Names: COMMONWEALTH _____ vs. ___ JAMES KELLY _____

3. Docket Number: _CP-51-CR-1011621-1995_   4. Date Filed: NOV. 7, 1995 _____   5. Date of

   judgment of conviction: AUGUST 21, 1996 _____   6. Length of sentence: __ LIFE _____   7. Nature of offense(s)

   involved (all counts): _MURDER; CARRYING FIREARMS WITHOUT A LICENSE; CARRYING FIREARMS ON PUBLIC_

   _STREET; POSSESSING INSTRUMENTS OF CRIME; CRIMINAL CONSPIRACY_

   _____

   _____

   _____

8. What was your plea? (Check one)          ☒ Not Guilty      ☐ Guilty        ☐ Nolo Contendere

9. If you pleaded not guilty, what kind of trial did you have? (Check one)  ☒ Jury      ☐ Judge only

10. Did you testify at your trial? (Check one)                    ☐ Yes        ☒ No

11. Did you appeal from the judgment of conviction? (Check one)        ☒ Yes      ☐ No

12. If you did appeal, what was the

   Name of court appealed to: _SEE ATTACHED MEMO_____

   Parties' names on appeal: _COMMONWEALTH_____ vs. _JAMES KELLY_____

   Docket number of appeal: _2000 EDA 0152;_ 152 EDA 2000  Date of decision: 755 EDA 2003 dtd DEC 18, 2006

   Result of appeal: _CONVICTION SUSTAINED_____

   _____

   _____

   _____

   _____

   _____

13. Other than a direct appeal from the judgment of conviction and sentence, have you filed any other petitions, applications for relief, or other motions regarding this judgment in any federal court?   ☒ Yes    ☐ No

14. If you answered "yes" to question 13, answer the following questions:
   A. FIRST PETITION, APPLICATION, OR MOTION
   (1) In what court did you file the petition, application, or motion? <u>EASTERN DISTRICT OF PA.</u>

   (2) What were the parties' names? <u>JAMES KELLY</u>        vs. <u>GERALD ROZUM et al.</u>

   (3) What was the docket number of the case? <u>08-1073</u>

   (4) What relief did you seek? <u>NEW TRIAL</u>

   (5) What grounds for relief did you state in your petition, application, or motion? _____

<u>INCOMPETENCE OF COUNSEL, IN A NUMBER OF PARTICULARS</u>

   _____

   _____

   (6) Did the court hold an evidentiary hearing on your petition, application or motion?   ☐ Yes    ☒ No

   (7) What was the result?        ☐ Relief granted        ☒ Relief denied on the merits

                    ☐ Relief denied for        ☐ Relief denied for procedural default
                       failure to exhaust

   (8) Date of court's decision: <u>OCT. 5, 2009</u>

   B. SECOND PETITION, APPLICATION, OR MOTION

   (1) In what court did you file the petition, application, or motion? <u>THIS IS SECOND APPLICATION</u>    (2) What were the parties' names? <u>KELLY</u>        vs. <u>WINGARD</u>    (3) What was the docket number of the case? <u>NONE</u>    (4) What relief did you seek? _____

      <u>NEW TRIAL</u>

   _____

   _____

   _____

3

C. **THIRD AND SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS**
For any third or subsequent petition, application, or motion, attach a separate page providing the information
required in items (1) through (8) above for first and second petitions, applications, or motions.

D. **PRIOR APPELLATE REVIEW(S)**
Did you appeal any order regarding your petitions, applications, or motions to a federal court of appeals having
jurisdiction over your case? If so, list the docket numbers and dates of final disposition for all subsequent petitions,
applications, or motions filed in a federal court of appeals.

First petition, application, or motion ☒ Yes Appeal No. 09-4290 Date 11/4/09 ☐ No
Second petition, application, or motion ☐ Yes Appeal No. _____ Date _____ ☐ No
Subsequent petitions, applications or motions ☐ Yes Appeal No. _____ Date _____ ☐ No
Subsequent petitions, applications or motions ☐ Yes Appeal No. _____ Date _____ ☐ No
Subsequent petitions, applications or motions ☐ Yes Appeal No. _____ Date _____ ☐ No
Subsequent petitions, applications or motions ☐ Yes Appeal No. _____ Date _____ ☐ No

If you did not appeal from the denial of relief on any of your prior petitions, applications, or motions, state which
denials you did not appeal and explain why you did not.

_____    _____

_____    _____

_____    _____

15. Did you present any of the claims in this application in any previous petition, application, or motion for relief under
28 U.S.C. § 2254 or § 2255? (Check one)    ☐ Yes    ☒ No

16. If your answer to question 15 is "yes," give the docket number(s) and court(s) in which such claims were raised
and state the basis on which relief was denied.

_____    _____

_____

_____17. If your answer to question

15 is "No," answer the following questions:

A. State the claims which you did not present in any previous petition, application, or motion for relief under
28 U.S.C. § 2254 or § 2255: ___SEE MOTION AND MEMORANDUM ATTACHED_____

_____    _____

_____

B. State the reasons why you did not present the above claims in any previous petition, application or    motion
for relief under 28 U.S.C. § 2254 or § 2255:* _____

___GROUNDS WERE UNKNOWN AT TIME_____

_____

4

*NOTE: This Court will grant you authority to file in the district court only if you show that you could not have presented your present claims in your previous § 2254 or § 2255 application because . . .

A. (For § 2255 motions only) the claims involve "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [you] guilty"; or,

B. (For § 2254 petitions only) "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [you] guilty of the offense"; or,

C. (For both § 2254 and § 2255 applicants) the claims involve "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court [of the United States], that was previously unavailable."

State how you meet the above requirements:

SEE MEMORANDUM ATTACHED

If it has been more than one year since either (1) your conviction became final; (2) you discovered the new evidence on which you rely; or (3) the United States Supreme Court case on which you rely was decided, state why you could not file your petition earlier:

MOVANT UNAWARE THAT WITNESS COULD IDENTIFY ACTUAL SHOOTER; THEREAFTER,

PETITIONER SOUGHT RELIEF THROUGH STATE PCRA SYSTEM; RELIEF DENIED ON

GROUNDS THAT INITIAL COUNSEL FAILED TO EXERCISE DILIGENCE ON PETITIONER'S

BEHALF

Movant prays that the United States Court of Appeals for the Third Circuit grant an Order Authorizing the District Court to Consider Movant's Second or Successive Application for Relief Under 28 U.S.C. §§ 2254 or 2255.

_____
Movant's Signature

I declare under Penalty of Perjury that my answers to all questions in this Motion are true and correct.

Executed on ___3-14-16___
[date]

_____
Movant's Signature

5

A copy of this motion and all attachments must be sent to the state attorney general (§ 2254 cases) or the United States Attorney for the United States judicial district in which you were convicted (§ 2255 cases).

I certify that on __March 28, 2016__   I mailed a copy of this motion and all attachments
               [date]

to __District Attorney of Philadelphia_____ at the following address:

__Three South Penn Square, Philadelphia, PA  19107-3499_____

Rev. 2/99

_____
        Movant's Signature

## INDEX TO EXHIBITS

A. Memorandum of Law

B. Proposed Petition for Habeas Corpus

C. Opinion of Judge Glenn Brobson dtd Feb. 21, 2014

D. Opinion of Pennsylvania Superior Court dtd Oct. 10, 2014

E. Order of the Pennsylvania Supreme Court denying allocatur dtd April 24, 2015

F. First Petition for Habeas Corpus 08-cv-1073, filed April 21, 2008

G. Report and Recommendation of Magistrate Judge Timothy Rice dtd Feb. 17, 2009

H. Opinion and Order of Judge Gene E.K. Pratter, U.S. District Court for the Eastern District of Pennsylvania dtd Oct. 5, 2009

I. Order of United States Court for the Third Circuit dtd Jan. 28, 2010

# EXHIBIT

# A

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

JAMES KELLY
        Movant     :     CIVIL ACTION - LAW
                     :
                     :     CIVIL RIGHTS
        vs.           :     NO.:
                     :
                     :

TREVOR WINGARD,     :
Superintendent of SCI Somerset,   :
           Respondent   :

### ,MEMORANDUM IN SUPPORT OF JAMES KELLY'S MOTION FOR LEAVE TO FILE PETITION FOR HABEAS CORPUS

### 1. History of the case
### a. The shooting

On New Year's Day, January 1, 1993, a man named Travis Hughston was visiting his girl friend, Tameka Ledbetter, at 2025 Bambrey Street in North Philadelphia. Tameka's uncle, George Patterson, was also present. Another niece of George Patterson, Elaine, was living with George Patterson. She had had a child by a man named Wayne Curry. Wayne Curry had, according to neighborhood rumor, been shot dead by Travis Hughston over drugs or drug money.[1]

Bambrey is a small, narrow street, about one block in length, in North Philadelphia. It comes off Diamond Street and runs south for one block to Page Street. Diamond Street is a larger thoroughfare, and intersects with North 25th Street near the end of Bambrey. The time was 7.30 to 8 p.m., and

---

[1] This assertion and some others in this memorandum are based on interviews conducted by Private Detective Eileen Law on behalf of James Kelly. Future references to these interviews will be designated "Law Interviews." They are summarized in an Appendix to this memorandum. Petitioner will offer Det. Law's testimony at a hearing, if a hearing is granted. All other factual assertions come from the various court records in this matter, and will be attributed where appropriate.

1

it was dark. Bambrey is serviced by only two streetlights, one at each end of the block.

A woman named Ernestine Williams, who was at the time a self-confessed crack addict, was living at 2023 Bambrey with her boy friend, Kevin Mathis. She decided to go to her mother's house for a New Year's Eve party. Somehow she got her car into the middle of the street, but it would go no further. Two men had arrived at the far end of Bambrey, and she saw them walking down the street towards 2025. Ernestine approached them and asked for a "jump," meaning she needed a loan of battery chargers to start her car. The two men ignored her request. One of the men went into "Mama Delphine's," a speakeasy located at the intersection of Page and Bambrey. N.T. 8/14/96, pp. 84-85.

Ernestine Williams then went back into the house at 2023 Bambrey. She was in her bedroom on the second floor, and says she happened to look outside and observe one of the two men hand the other a paper bag. The man with the bag then went towards 2025 Bambrey and approached Travis Hughston, who had come out of his girl friend's house. The second man pulled a pistol from the bag and shot Hughston in the head four or five times. Ernestine screamed and ducked below the window. *Id.*, pp. 86-87

As soon as she heard the shots, Tameka Ledbetter came out of her house. She saw her boy friend Travis lying on the ground in a pool of blood, and a man she had known most of her life, Sharif Curry,[2] walking away, sticking a pistol in his waistband. See Ledbetter statement attached hereto as Exhibit 1. She began screaming.

The shooter and the other man fled towards a car they had parked nearby. Immediately following the shooting, two people who knew James Kelly came to their doors and saw the two men running away. The two witnesses were Lex Traylor, who lived at 2556 West Page Street, and Denise Holsey, who lived at 2021 Bambrey. Both of them, in testimony given at a post-conviction hearing, testified that neither running man was James Kelly.[3] George Patterson, who came out of the house at 2025 Bambrey *after* Tameka Ledbetter, and who, oddly enough, was the only occupant of the household Hughston was visiting who the Commonwealth called as a

---

[2] Curry's real name was Anthony John Curry, a/k/a "Johnny," "A.J.," and "Sharif." He was the brother of Timothy "Wayne" Curry, referred to above. Law interviews.

[3] N.T. 12/6/99, pp. 56, 60.

2

witness, testified that he saw a man in a long black coat running away. He testified that it was not James Kelly. N.T. 8/15/96, pp. 122-23.

According to the testimony of one Colie Baxter, the two fleeing men ran to a nearby car and headed out to Diamond Street toward its intersection with 25th street, where the car stopped. At the same time, Baxter was driving west on Diamond, and he said he stopped opposite the two fleeing men. It was dark at that time of night on a poorly-lit North Philadelphia street, but at trial, he claimed to be able to identify Larry Mullins and James Kelly as driver and passenger in the getaway car. He was permitted to so testify even though he could not identify James Kelly from a photo array following the shooting, and even though his description of the clothing each man was wearing was at variance with the description of clothing given by Ernestine Williams.[4]

Following his alleged encounter with the getaway car, Baxter came to the scene of the shooting and immediately began questioning witnesses, asking what they had seen. He was allowed by the police to help put Travis Hughston's body in the police wagon, and then was permitted to sit in the back seat of the police car with a distraught Tameka Ledbetter as she was driven to the nearest police station to give her statement. N.T. 8/15/96, pp. 147-148.

Baxter is an interesting person, and it is remarkable that he was not considered a suspect in the slaying. He has had a number of arrests, including some for violent acts, and all have been withdrawn,[5] according to the Law Investigation.

Immediately after the shooting, Ms. Ledbetter gave a statement to the police. According to the affidavit which she later gave to Detective Eileen Law some years later she told the police officer who questioned her that Sharif Curry had done the shooting, but the officer kept insisting that someone else had done it. Finally, the officer wrote out a statement for her to sign which did not identify anyone as the shooter. Thereafter, neither the Commonwealth nor trial defense counsel contacted Ms. Ledbetter to ask her

---

[4] Both George Patterson and Ms. Williams had Mullins, the alleged shooter, wearing the long black coat, but Baxter described Kelly as wearing the long trench coat and carrying "something down by the side," while Mullins was in a sweat suit. N.T. 8/15/96, pp. 8, 14.

[5] In one instance, he even sued the police in Federal Court for arresting him. See *Baxter v. Melendez et al.*, E.D. Pa. No. 01-CV-2341. One wonders whether Baxter was a police informant, based on the circumstances of that case, and his fortunate string of nol prosses.

3

to appear at the trial of James Kelly and Larry Mullins. She did not speak to anyone connected with the trial about her statement until September of 2012, when Detective Law fortuitously contacted her. Although the Commonwealth did provide the Defendants with Tameka Ledbetter's sanitized statement, it did not inform the defense that she had actually identified the shooter.

. Ernestine Williams was questioned several times by the police after the shooting[6], and finally identified James Kelly and Larry Mullins from photo arrays. The photo array she was shown regarding James Kelly included a picture that was twenty years old. N.T. 8/16/96, p. 35. She claims to have seen both of them after the shooting. She had gone to the wedding of James Kelly's brother and said that she had seen the man who handed the bag to the other man at that wedding. James Kelly was arrested in July of 1995.

### b. The legal proceedings

At the preliminary hearing for James Kelly and Larry Mullins, Ms. Williams, who by then said she was "clean," was asked if she could identify James Kelly as the man who had given the bag to the actual shooter. She answered "no." N.T. 10/31/95, p. 28. The District Attorney then asked to be allowed to treat Ms. Williams as a hostile witness. N.T. 10/31/95, p. 31. Ms. Williams then decided that she could identify Kelly after all. Later on, she said that she was "afraid." *Id.* p. 37

When the case came on for trial, William Staton, who had been Kelly's investigator, brought Wanda Arrington and the Reverend James Becoat to the court house. Both of them were willing to testify that they had been with James Kelly at his home on Berks Street, twelve blocks from where the shooting took place, on the evening of January 1, 1993, at the same time as the shooting occurred. They were able to remember that event because the Rev. Becoat made it a practice to visit his parishioners on New Year's Day, and that evening was his time for visiting James Kelly's family.[7] However, according to William Staton, Geoffrey Seay, Kelly's trial

---

[6] Eileen Law questioned Ernestine Williams in 2012. Ms. Williams stated that: "The detectives tried to get me to say things," and in other ways used heavy police pressure to get her to identify James Kelly
[7] N.T. 12/6/99, pp. 75-76

4

defense counsel, stated that he felt he had done sufficient to make the jury
disbelieve Ernestine Williams, and besides, his fee hadn't been fully paid.
He therefore declined to call the alibi witnesses.[8]

In addition, neither Lex Traylor nor Denise Holsey nor Tameka
Ledbetter were even called to be present at James Kelly's trial. It is
significant that the Commonwealth called George Patterson, the *second*
person out the door after the shooting, but not Tameka Ledbetter, the first.
Interestingly, James Kelly has informed the undersigned that he asked his
then counsel, Geoffrey Seay, to interview Tameka Ledbetter, but that he
(Seay) failed to do so. What a different course the trial might have taken had
Seay done his job!

Seay also advised James Kelly not to testify, fearing that a couple of
prior convictions could be used to impeach him. In point of fact, those
convictions had occurred more than ten years previous to the trial, and the
sentences had been completed. The convictions could not have been used.
Pa. R. Evid. 609 (b). But, acting on his attorney's advice, James Kelly
missed his opportunity to offer his story of where he had been and what he
had been doing that fateful evening.

There was one final piece of trial evidence that had to have been
devastating for James Kelly's case. The investigator for a prior attorney
whom he had hired had had Ernestine Williams brought to the attorney's
office, and had asked her questions and taped her answers. Ms. Williams
claimed that some of her answers had been erased and taped over. This
testimony was presented as part of the prosecution's case in chief, and it
could only have been used to make it appear as if James Kelly was trying to
suborn perjury. But Kelly had had absolutely nothing to do with the taping –
he probably wasn't even aware that it had occurred, and the lawyer himself
was no longer involved. This testimony should never have been allowed as
part of the prosecution's case in chief because the defense never sought to
introduce the tape testimony. See Standard Pa. Criminal Jury Instruction
4.08C (PBI Publication, 1983 rev.), and *Com. v. Swint*, 488 Pa. 279, 288,
412 A. 2nd 507, 512 (1980) ("Evidence of consonant statements, if
admissible, are admissible only in rebuttal and then only for the purpose of
showing that that which the witness now testifies to has not been recently

---

[8] His excuse, at post-trial proceedings, was that he didn't want to put Kelly too close to the scene of the
shooting. N.T. 12/7/99. The shooting was 12 blocks away, and happened at a time for which Kelly had a
definite alibi. Seay had, in fact, failed to give notice of an alibi defense.

fabricated and not for the purpose of showing the truth of the present testimony"). This testimony was not only inadmissible, it was highly prejudicial.

Ernestine Williams also said at some point that she had seen a young man known as "Junior," talking to the two shooters before they came down the street for their fatal confrontation with Travis Hughston.[9] That person was originally thought to be one Devon Gilliard. During the course of the trial, Mr. Sax, the Assistant District Attorney, informed the court and counsel that Gilliard was "dead." N.T. 8/16/96, p. 107. In fact, Devon Gilliard is alive to this day.[10] He recently responded to Detective Law's efforts to contact him, and told her that the police had given him a lie detector test and then told him he failed it. This information was not given to the defense as well.

Much of this story has been set forth in Kelly's prior appeals. Except for the statement of Tameka Ledbetter, these issues have been briefed and argued before the various courts of Pennsylvania in various appeals[11] and PCRA applications, and before this court in the prior Habeas Corpus proceeding, and the courts so far have been unmoved. The briefs filed in those proceedings contain citations to the record where the facts may be found, and cases which support Kelly's position, and for that reason will not be repeated here. But the treatment of the Ledbetter statement has so far been presented only in state court, and because the significance of what she has to say can only be appreciated against the factual background of the proceedings so far, I have set out that history.

Not surprisingly, given the testimony of Ernestine Williams and Colie Baxter, and the lack of defense presented by James Kelly's trial counsel, he was convicted of first degree murder. He has now been in prison for twenty years, an innocent man.

---

[9] N.T. 8/15/96, p. 176. The "Junior" referred to in the court testimony was a young man named Devon Gilliard, and is named as such in Ms. Williams' statement to the police. However, at N.T. 238-39 of 8/14/96, she acknowledges that Devon Gilliard was not the "Junior" she was referring to. Eileen Law has since found out that in that neighborhood, a reference to "Junior" was ordinarily understood to be a reference to the son of Delphine Howard, who ran the speakeasy. This person was never interviewed, to counsel's knowledge, nor did his name appear on the list of interviewees provided by the police.

[10] I can represent to the court that I personally interviewed Devon Gilliard at his place of employment, a supermarket located at 22nd and Lehigh in Philadelphia, on November 4, 2015.

[11] The decision of the Superior Court with respect to James Kelly's original appeal from denial of post-conviction relief appears at 755 EDA 2003, and is attached hereto as an exhibit.

6

### c. The recent PCRA

James Kelly pursued both direct appeals and post-trial applications for relief following his conviction. He even filed a petition for Habeas Corpus in the U.S. Eastern District Court, before he was aware of the Ledbetter statement. See Exhibit F. Hence this application for permission to file a second Habeas Corpus. All appeals so far had come to nothing. It appeared that unless he was able to find new evidence, he would spend the rest of his life in jail for a crime he did not commit.

On September 18, 2012, Private Detective Eileen Law was following up a question she had about the last call Travis Hughston had received before he was shot to death, and she decided to visit Tameka Ledbetter. Ms. Ledbetter was Travis Hughston's girl friend at the time of the shooting, and had been the first one out the door when she heard the shots that killed Hughston. The defense had been given a statement by Tameka Ledbetter in which she said that she saw the shooter walk away, but the statement was in the form of question and answer, and the supposed interrogator, in the Q&A, never once asked Ms. Ledbetter if she could identify the shooter. Consequently, her identification of the shooter was not among the evidence that was given to the defense.

Ms. Law was interviewing Ms. Ledbetter when the latter volunteered that she could identify the man who shot Travis Hughston. She said she had come out her door when she heard the shots, and saw Sharif Curry walking away, stuffing a pistol in his waist band. She was positive it was Sharif Curry because she had known him her whole life. Based on this statement, current counsel, acting on Kelly's behalf, filed a PCRA Petition with the Court of Common Pleas of Philadelphia County within the 60 days required by the Commonwealth's PCRA statute. That petition was denied by Judge Bronson of the Philadelphia Court of Common Pleas on October 18, 2013. See Exhibit C. His decision was appealed to the Pennsylvania Superior Court, but the appeal was rejected by them on October 10, 2014. (Exhibit D) Allocatur to the Supreme Court of Pennsylvania was denied on April 24, 2015.(Exhibit E) At all levels of the latest round of PCRA applications, counsel raised the issue of trial defense counsel's ineffectiveness for failing to investigate Tameka Ledbetter as a potential witness. At all levels, the Pennsylvania courts rejected this claim.

Both the Common Pleas Court and the Superior Court issued opinions. In both instances, they rejected Kelly's PCRA application without hearing basically because the evidence given by Tameka Ledbetter could have been discovered at the time of trial, and the fact that trial defense counsel was ineffective for not having discovered the Ledbetter testimony was not enough to save it from Section 9545(b)(1)(ii) of the PCRA statute.

## 2. Jurisdiction

Jurisdiction in this petition is based on 28 U.S.C. Section 2244(d)(1)(A), a subsection of the "Anti-Terrorism and Effective Death Penalty Act," 28 U.S. Code §2241, *et seq.*.

## 3. Argument

### a. Ineffective assistance of counsel

James Kelly seeks leave from this court to file a second Petition for Habeas Corpus (Exhibit B) in the United States Court for the Eastern District of Pennsylvania, as required by the above statute section of the AEDPA. He seeks to bring this petition to solve a conundrum posed by the approach the Commonwealth of Pennsylvania has taken with regard to its statute governing post-conviction applications for relief (hereinafter PCRA). 42 Pa. C.S.A. §9541 *et seq.* Section 9545 (b) of that statute requires a post-conviction application to be filed within one year of conviction, in this case August 21, 1997. However, it acknowledges that a convicted person might not be aware that he has grounds for filing a PCRA application until more than one year following his conviction. In those instances, he is allowed to file after more than one year has elapsed, provided he files within 60 days of discovering the grounds for relief which he asserts [Section 9545(b)(2)], and provided also that those grounds could not have been discovered "by the exercise of due diligence" at the time of trial: 42 P.C.S.A. §9545(b)(1)(ii). However, in that case (i.e. the situation where the grounds could have been discovered by due diligence at the time of trial) an applicant for post-conviction relief is not allowed to assert as a ground that his attorney, at the time of trial, was ineffective. The two opinions are attached as exhibits to this memorandum.

8

The conundrum thus posed is that if a defense attorney, at trial, was ineffective in that he failed to discover some piece of evidence that he reasonably should have discovered, and if, because of that ineffectiveness, a convicted defendant is unable to discover that favorable evidence until many years after his conviction, he is nonetheless barred from getting relief. Instead, he is obliged to argue, in order to get relief, that counsel could not have discovered the missing piece of evidence in the exercise of due diligence, even though it is apparent that the opposite is in fact true, and that trial defense counsel could have, if he had exercised reasonable diligence, discovered the piece of evidence in question (in this case, the statement of Tameka Ledbetter).

Petitioner's argument here is simple: The Pennsylvania courts that have heard Kelly's latest petition for post-conviction relief have all denied such relief because Petitioner could have discovered, by the exercise of due diligence, that Tameka Ledbetter was available as a witness, and would have offered testimony that would have drawn the Commonwealth's theory of the case (and thus the truth-determining process) into serious doubt. In other words, the Pennsylvania statute, as interpreted by the Pennsylvania courts, is trying to trump the Sixth Amendment by saying "we know your attorney did not do a good job, but that's too bad – we can't give you any relief at this point."

Trial defense counsel is the responsible party in this analysis rather than James Kelly because, simply, James Kelly was in jail. He had no way of investigating his own case. The diligence that was "due" should be laid at the feet of Geoffrey Seay, and not at James Kelly's door. That's what counsel is there for, and if he fails to locate, interview, and call reasonably available witnesses helpful to the defense, he has been ineffective, and James Kelly has been denied his right to effective counsel under the Sixth Amendment to the U.S. Constitution.

To be sure, the AEDPA, in 28 U.S.C. §2254, appears to parallel the provision of state law in providing as a requirement for a hearing that the applicant shall first have established a record in state court. Otherwise, no hearing shall be held unless the claim is based on after-discovered evidence and the "factual predicate for the claim could not have been previously discovered through the exercise of due diligence." However, that limitation only applies if the applicant has not made a record in the state court. In this case, the applicant has made as much of a record as the state court would

9

permit. The applicant asked for a hearing, and a hearing was denied. We suggest that the bar of Section 2254(e)(2) should not be applicable here.

Counsel has discovered one case whose facts are arguably analogous to this case: *Lewis v. Wilson,* slip opinion April 8, 2011, U.S. Court of Appeals, Third Circuit. In *Wilson,* the applicant had been convicted of the murder of a man based on the testimony of a crack-addicted girl friend. Five years later he filed a Pennsylvania PCRA Petition based on exonerating statements made by a co-defendant and an acquaintance of his sister. He filed two PCRA petitions, and while the second one was pending, filed a Petition for Habeas Corpus in the Federal Eastern District Court. Lewis's federal petition was derailed, among other things, for failure to comply with various procedural requirements, including a lack of diligence in developing a record in state court and failure to pursue his claim properly through the state court system.. However, in the present case, as noted, the applicant has at every level (1) requested a hearing in order to develop a record, and (2) pursued his claim through the state courts up to and including a petition for allocatur in the state Supreme Court.

The court in *Lewis* relied on *Williams v. Taylor,* 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2nd 389 (2000), for guidance. *Williams,* in turn, quoted the leading case of *Strickland v. Washington,* 466 U.S. 668, for the proposition that in order to show ineffectiveness, one must show that "counsel's performance fell below an objective standard of reasonableness ..., and ...that the deficient performance prejudiced the defense," which requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Williams, supra,* 529 U.S. at 390.

In the Pennsylvania courts, failure to investigate and call witnesses whose testimony favors the defense position has been held to be ineffective assistance: *Commonwealth v. Washington,* 239 Pa. Super. 336, 361 A. 2nd 670 (1976). If counsel knows of exculpatory witnesses, he is obliged to call them. *Commonwealth v. Carbone,* 707 A. 2nd 1145 (Pa. Super. 1998). In *Carbone,* 707 A.2nd at 1155, the court granted PCRA relief because "there is a reasonable likelihood that (the uncalled witness's) testimony could have altered the verdict." The same likelihood attends Tameka Ledbetter's

testimony, certainly as to Larry Mullins,[12] and since the Commonwealth had specifically charged James Kelly with accompanying Larry Mullins on the day in question, as to James Kelly as well. The court in *Washington* quotes a Fourth Circuit case for the proposition that "a defendant who is subjected to the possibility of incarceration is entitled to have the avenues of defense explored by his counsel during the preparation of the case." 361 A.2[nd] at 675. That kind of representation is exactly what the Pennsylvania courts in this case have found that James Kelly was denied. Tameka Ledbetter's testimony would have had a devastating effect on the Commonwealth's case, because she would have undermined the theory on which that case was presented. If Ernestine Williams and Cole Baxter misidentified Larry Mullins, their identification of James Kelly (such as it was) is called into serious doubt.

It is clear that the performance of Geoffrey Seay fell below an objective standard of reasonableness. By finding that Tameka Ledbetter's testimony could have been discovered at the time of trial "by the exercise of due diligence," the Pennsylvania courts themselves have found that counsel's performance fell below the standard. Even before Tameka Ledbetter's observations became known to current counsel, the record made clear that Mr. Seay's representation was well below the standard expected of counsel in a case of any seriousness whatsoever. But with respect to Ms. Ledbetter, Mr. Seay was given her name, and he failed to have anyone interview her.[13] She was the first person out of the door after the shooting, and would surely have been a witness for defense counsel to interview. She has said that she was available and willing to testify. See Exhibit A. (Indeed, the fact that the *Commonwealth* did not call her as a witness is a suspicious circumstance in and of itself. It even seems possible that the prosecution knew she would put at naught the identification of Larry Mullins that they were so anxious to establish. This is among the many things we will never know unless James Kelly is given a hearing). When informed that Ms. Ledbetter was prepared to say that Sharif Curry was in fact the shooter, James Kelly advised present counsel that he had asked Mr. Seay to have her questioned, and still he did not do so, which makes Mr. Seay's ineffectiveness even more glaring.

---

[12] Counsel has been informed that Larry Mullins is pursuing state PCRA relief, but is not currently aware of the outcome of his efforts.

[13] James Kelly even asked Mr. Seay to interview Tameka Ledbetter. Although this assertion is not part of any record heretofore made in this case, it was made to me in a recent interview with James Kelly which occurred after the Pennsylvania appeal process had been completed.

Her testimony would surely have changed the course of the trial. The Commonwealth's case depended on the identification testimony of two people: Ernestine Williams and Colie Baxter. There was no physical evidence to connect them to the shooting, nor any evidence of a prior relationship of any sort between the victim and his alleged assailants. Both of them purported to identify both of the Defendants. Colie Baxter should not have been allowed to testify in the first place. He was unable to pick Kelly out of a photo array, so his first identification was in open court, something that should never have been allowed. See *Foster v. California,* 394 U.S. 440, 89 S. Ct. 1127 (1969). At the very least, the trial court should have followed the protocol for in-court identification set forth in *Com. v. Abdul-Salaam,* 544 Pa. 514, 678 A. 2nd 342 (June 18, 1996). Ernestine Williams was unable to identify James Kelly at the preliminary hearing until the DA threatened her with being a hostile witness. It is generally acknowledged among people who have studied the subject that eyewitness testimony itself is inherently weak, particularly where violence is involved. See, *e.g.*, *Commonwealth v. Walker,* 93 A. 3rd 766 (Pa. 2014). If it could have been shown that the identification testimony of the two of them was mistaken about who the shooter was, it could have been more clearly shown that their identification testimony of James Kelly was mistaken as well.

Both of the Pennsylvania courts that have dismissed the PCRA applications in this case have done so in part because they say that Ms. Ledbetter's testimony was at odds with an earlier statement she had given the police, and her most recent statement would not have changed the outcome of the trial. Both assertions misread the import of Tameka Ledbetter's first statement. In her first statement, she did not purport to identify the shooter, or say that she didn't know who the shooter was. The police officer who questioned her either did not ask her, or deliberately left out what she said. In her statement to Ms. Law, not only did she identify the shooter, she also implicated the Commonwealth in the suppression of favorable evidence.

### b. The Brady violation

The Pennsylvania Post-Conviction Relief Act also permits relief to be granted if it can be shown that "the failure to raise the claim previously was the result of interference by government officials with the presentation of the

12

claim in violation of the Constitution or ... laws of the United States." 42 Pa,
C.S.A. §9545(b)(1)(i). This Section of the statute encompasses failure of the
Commonwealth to turn over evidence favorable to the defense, a so-called
"Brady" violation. See *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194
(1963).

The Pennsylvania courts in this case relied heavily on the fact that
Tameka Ledbetter's original statement did not contain the name of Sharif
Curry. Neither Pennsylvania court considered the context in which Tameka
Ledbetter's earlier statement was made. She had just come out of her house
and seen her boyfriend shot to death with blood running out of wounds in his
head. She was "hysterical" when the police arrived. N.T. 8/15/96, p.130.
She was then placed in the back of a police vehicle and driven to the police
station *with another man, the mysterious Colie Baxter, seated beside her.*[14]
By any intelligent reckoning, Baxter should have been a suspect rather than
a privileged witness. He was on the scene asking if anyone had seen what
was going on. One can only imagine what he was saying to Tameka. Then
when Tameka arrived at the police station and said she knew who shot
Hughston, the interviewing officer said "no, no, you must be mistaken. We
think someone else did it." The officer then wrote out a statement and asked
her to sign it. Small wonder that she signed her name just so she could get
away from the police and get her nerves under control.

Her statement to the police immediately following the shooting is
literally not worth the paper it's written on. The statement which she made
to Detective Law has the ring of truth, considering the circumstances under
which it was made. It was volunteered by Ms. Ledbetter at a time when Ms.
Law was pursuing an entirely different line of questioning. It was clear and
unequivocal. Ms. Ledbetter was even willing sign a sworn affidavit attesting
to the truth of what she told Detective Law.

If, then, we give credence to Ms. Ledbetter's statement (which, I
argue, we must because its credibility has not been tested in any hearing), it
contains two assertions that call for a new trial: First, the shooter was Sharif
Curry. True, she couldn't identify the second man, but the Commonwealth's
theory was that James Kelly and Larry Mullins, acting in concert, did the
shooting. They were both identified by the same two witnesses, and if the

---

[14] *Id.,* at page 148.

identification of one was erroneous, the chances that the identification of the second was erroneous as well rise exponentially.

Secondly, Ms. Ledbetter's statement raises another issue that the Pennsylvania courts failed to acknowledge as having any merit. She says that she told the police officer who questioned her that she had seen Sharif Curry walking away from the shooting. This information was not provided to defense counsel. If what Ms. Ledbetter says was true, there has been an undoubted *Brady* violation. Yet the Pennsylvania Courts would not even give James Kelly a hearing to establish the credibility of Tameka Ledbetter.

The point that no court so far has been willing to accept is that we must at this point accept Tameka Ledbetter's statement as true for purposes of deciding whether to hold a hearing. There has been no hearing so far to test her credibility, so it is not enough to say, well, we don't really believe her, as the courts below seem to have done. We must accept that not only did someone named Sharif Curry do the actual shooting of Travis Hughston, but also that the government knew this and kept that very important fact from the defense. Viewed in that light, it is significant, not only that the defense failed to call Tameka Ledbetter as a witness, but that the Commonwealth also did not. The Commonwealth *did* call George Patterson as a witness. Why him and not Tameka? He came out the door *after* she did. Perhaps the reason was because he would not name names and she would. His niece was involved with a Curry, and he would have wanted to protect that family. And they knew Tameka would name the shooter and thus destroy the case the police had carefully constructed against Larry Mullins and James Kelly. If Tameka Ledbetter had testified, and stated that she could identify Sharif Curry because she had known him all her life, the supposed positive identification testimony of Ernestine Williams and Colie Baxter would have been called into serious question.

The Section of the Pennsylvania PCRA statute quoted above allows a petition for relief to be filed if the applicant can show that the failure to do so sooner was due to government interference. The government interference here was the failure of the police and prosecution to advise the defense that it had information favorable to the defense, to wit: that Tameka Ledbetter had identified the man who shot Travis Hughston.[15]

---

[15] In previous PCRA's, counsel have raised the fact that Mr. Sax, the prosecutor, insisted that Devon Gilliard was dead, when in fact he was and is not. I suggest that this may also be viewed as a form of

Based on Ms. Ledbetter's statement, which must for these purposes be accepted as true, she gave the name of the actual shooter to the police, and they suppressed it, in violation of *Brady*.

### c. Eyewitness testimony

As part of Petitioner's recent appeals, he has consistently raised the argument that Ms. Ledbetter's statement cast serious doubt on the identification testimony of Ernestine Williams and Colie Baxter. Even prior to the recent appeals, petitioner, through counsel, has consistently pointed out that Baxter's identification was made for the first time in open court, at the trial itself, in contravention of long-established law. See *Foster v. California, op. cit. supra.* Counsel has also consistently noted the fact that Ms. Williams was unable to identify Petitioner at his preliminary hearing, until the Commonwealth was allowed to treat her as a "hostile witness." During the trial itself, she acknowledged that she had given different statements to the police between the time of the shooting and James Kelly's arrest. N.T. 8/14/69, p. 189. Nevertheless, the Superior Court, at page 9 of its opinion, cited the certainty of the Williams identification as a reason for not having a hearing on the Ledbetter statement.[16]

In the recent case *Commonwealth v. Walker, op. cit. supra,* the Supreme Court of Pennsylvania had occasion to join the lengthy list of state and Federal courts which now allow expert testimony regarding eyewitness identification. The sense of that decision is to recognize that even the most positive identification is questionable and, in many cases, downright wrong, particularly where violence is involved, as is the case here.[17] Ms. Ledbetter's identification of Sharif Curry as the actual shooter, based on her life-long familiarity with him, sets at naught the identifications of Williams and Baxter of Larry Mullins as the shooter, and, as such, draws into serious question the identification offered by those two of Kelly being the one who handed the gun to the shooter. Given *Walker,* surely James Kelly is entitled

---

governmental interference in the defense's presentation of evidence, by steering trial defense counsel away from a witness who might have evidence helpful to the defense.

[16] The Superior Court quotes the portion of Ernestine Williams' testimony where she recalls the act of shooting Travis Hughston, and says "I remember that very well. And I'll never forget it." What Ms. Williams was saying was that she would never forget witnessing an act of murder. She was not saying she would never forget the faces of the men involved.

[17] See, *e.g.,* "Picking Cotton, " by Jennifer Thompson-Cannino and Ronald Cotton.

to a hearing at which he would be able to call upon the science of eyewitness identification in order to have a fair hearing on that critical element of the case. There is virtually nothing other than the Baxter and Williams identifications to tie Kelly to the death of Travis Hughston: no motive, no prior contact of any sort.

### d. Prejudice

As was set forth in the PCRA Petition filed in the Pennsylvania courts, both alleged eyewitnesses are still alive. Private Detective Eileen Law has personally interviewed Ernestine Williams, and she has attempted to interview Colie Baxter, although he avoided her contact.

### 4. Conclusion

Tameka Ledbetter stands ready to testify to two important facts: 1) the actual shooter of Travis Hughston was Sharif Curry, and not one of the two men who were convicted of that crime; and 2) she gave that information to the police, who failed to pass it along to defense counsel. The Pennsylvania courts gave little credence to these two critical assertions because they claim Kelly should have known about them earlier. How? The man was in jail, and his lawyer, who was paid, could not be bothered to track down this vital witness. This amounts to ineffective assistance of counsel under any interpretation of the Sixth Amendment, and should not be used as a device to *deny* Kelly a new trial. Instead, it should be a reason to *grant* a new trial, and to obtain the justice that has long been denied him.

Respectfully submitted,

_____/s/_____
Lawrence E. Wood, Esquire
Attorney I.D. #4955
126 West Miner Street
West Chester, PA 19382
Email: Lwood@parkebarnes.com
Tel: 610-696-2208

16

APPENDIX REGARDING POST-CONVICTION INVESTIGATION BY
DETECTIVE EILEEN LAW

Detective Eileen Law has found and interviewed additional persons
who were on Bambrey Street that night. Two of the witnesses were children
at the time (10 and 12 years old) who were hiding in Ernestine Williams'
broken down car. One of them, Lori Williams, gave a statement to
Detective Law on March 26, 2014 which she signed. Derrick is still too
afraid to get involved. She said they had just left Tameka Ledbetter's
Grandmother's house where she sold penny candy. She and her cousin,
Derrick Holsey, were sitting in Ernestine's car - he in the driver's seat and
she in the passenger seat - eating the candy when they saw "a guy walk past
me with a long black jacket on, his collar pulled up next to his ears. I looked
at his face and he scared me. I got on my porch and he was right in front of
Miss Margaret's house. I seen a light from his gun and heard the gunshot. I
turned the knob and ran into my house. My cousin was still in Ernestine's
car." Detective Law showed her the photo array police had shown others
and she could not identify anyone in there as the shooter. Note that both Mr.
Kelly's and co-defendant, Larry Mullins's photographs were in that array.
Detective Law showed her photographs of Mr. Kelly as he looked in 1993
and 1995. She said he was not the shooter and she had never seen him in her
life.

Detective Law has also located and interviewed Devon Gilliard and
Ernestine Williams. Ernestine Williams could not identify James Kelly as
the man who handed the bag to the shooter. She has attempted to interview
Colie Baxter, but he locked himself in an upstairs room and refused to talk to
her.

# EXHIBIT

# B

IN THE UNITED STATES COURT FOR THE EASTERN DISTRICT
OF PENNSYLVANIA

JAMES KELLY            :
          Plaintiff     :     CIVIL ACTION - LAW
                 :
                 :     CIVIL RIGHTS
       vs.           :     NO.:
                 :
                 :
TREVOR WINGARD,     :
Superintendent of SCI Somerset,     :
          Defendant    :

## PETITION FOR HABEAS CORPUS

1. James Kelly is currently a prisoner at the State Correctional Institution at
Somerset, Pennsylvania, located at 1600 Walters Mill Road, Somerset, Pennsylvania
15510-0001.

2. The Defendant is the Warden of SCI Somerset, to wit: Trevor Wingard, whose
mailing address is 1590 Walters Mill Road, Somerset, PA 15510-0001.

3. The docket number of his case in the Pennsylvania docketing system is CP-51-
CR-1011621-1995. His CP number is 9510-1162.

4. James Kelly was charged with first degree murder and conspiracy in
connection with the shooting death of one Travis Hughston, which occurred on January
1, 1993. He pleaded not guilty to all charges. He was tried by a jury and found guilty of
first degree murder and conspiracy in the Court of Common Pleas of Philadelphia
County, on August 20, 1996. On the following day, he was sentenced to life
imprisonment on the murder charge and two and one-half to five years concurrently on
the conspiracy charge.

5. On the advice of his trial defense attorney, he did not testify at trial.

### Previous applications for relief

6. He appealed from the judgment of conviction, and also filed Petitions for post-conviction relief. The first was a *pro se* motion because his trial defense counsel had not filed an appeal. This was granted, and he appealed citing ineffectiveness of counsel. The Pennsylvania Superior Court remanded the matter for a hearing which was held on December 6 and 7, 1999. Relief was denied and the Superior Court affirmed on August 24, 2000. Petitioner then sought post-conviction relief for failure to call available witnesses, and after relief was again denied, the Superior Court affirmed on December 18, 2006. Thereafter he filed a Petition for Writ of Habeas Corpus before this court, but his Petition was denied by Judge Gene K. Pratter on November 6, 2009. The Third Circuit denied a certificate of appealability on January 28, 2010. The various PCRA's and the Federal Petition were all based on the record as it was then known to Petitioner and counsel. That record did not include the statement of Tameka Ledbetter, on which the current petition is based.

### Current application for relief

7. In 2012, Petitioner, through the assistance of fellow inmates at SCI Somerset, was able to hire an investigator, Eileen Law. Ms. Law located a witness, Tameka Ledbetter, who, although her name was available to Petitioner's trial defense counsel, had never been interviewed or called as a witness by either side in the trial of James Kelly. Ms. Ledbetter was the first person on the scene of the shooting of Travis Hughston. She was able to positively identify the actual shooter as Sharif Curry. She informed the police that she could identify the shooter, but they wrote out a statement for her to sign which did not include his name. Although she could not identify the second person involved, the Commonwealth's theory was that James Kelly had conspired with Larry Mullins to commit the crimes. The identification testimony of Tameka Ledbetter would have seriously undermined the Commonwealth's identification testimony. A copy of her statement is attached as Exhibit A.

8. Petitioner then filed a third petition for post-conviction relief in state court based on the Ledbetter testimony. This petition was denied by the Philadelphia Court of Common Pleas on October 18, 2013, and (following appeal) by the Superior Court of

Pennsylvania on October 10, 2014. Those two opinions are attached as Exhibits B and C. Petitioner then filed a Petition for Allocatur to the Supreme Court of Pennsylvania which was denied on April 24, 2015. The basic reason for the denials by the Common Pleas and Superior Courts was that the Ledbetter statement constituted after-discovered evidence that could have been discovered at the time of trial if trial defense counsel had exercised due diligence. See 42 Pa. C.S.A. Section 9545 (b) (1) (ii).

9. Petitioner has exhausted all avenues of relief available in the courts of the Commonwealth of Pennsylvania.

10. In his original two PCRA Petitions, he was granted a hearing. In his Petition for Habeas Corpus in this court, and in his most recent Petition for Post Conviction Relief in state court, he was not granted a hearing.

### The grounds for relief

11. Petitioner was convicted jointly with a man named Larry Mullins. The Commonwealth's case was that Petitioner handed a paper bag to Larry Mullins, who then walked down Bambrey Street in North Philadelphia and shot one Travis Hughston to death. Immediately following the shooting, Travis Hughston's girlfriend, Tameka Ledbetter, came upon the scene and observed a man she had known her whole life as Sharif Curry walk away from the scene stuffing a pistol in his waistband. When questioned by the police shortly after the shooting, she told them that Sharif Curry had been the shooter. The police officer questioning her tried to get her to say that another person had done the shooting, and prepared a statement for her to sign which failed to include her identification of Sharif Curry.

12. A supposed eyewitness, Coley Baxter, arrived on the scene shortly thereafter and began questioning people present to see if they had seen anything. When the police arrived, he was permitted to help place the body of Travis Hughston in the back of the police van, and then to sit in the back seat of the police car with Tameka Ledbetter as she was driven to the police station. At trial, he was permitted to identify James Kelly as someone he had seen leaving the scene, even though he had previously been unable to pick him out of a photo array.

13. Although Tameka Ledbetter's name was given to trial defense counsel at the time of trial, he made no effort to locate her or interview her, despite the fact that James

Kelly had requested that he do so. She was not called as a witness by the Commonwealth even though she was the first person on the scene after the shooting. The fact that she had seen the actual shooter was not known to James Kelly or to any representative on his behalf until September 18, 2013. His petition for post-conviction relief based on the Ledbetter testimony was filed on November 15, 2013, within the sixty days allowed for filings based on after-discovered evidence by 42 Pa. C.S.A. Section 9545 (b) (2).

14. Although that evidence casts doubt on the Commonwealth's entire case, the various courts of Pennsylvania have failed to grant relief because they concluded that trial counsel could have, in the exercise of reasonable diligence, discovered what Tameka Ledbetter would have testified to at the time of trial.

15. This finding by the Pennsylvania Courts, by itself, amounted to a conclusion that trial counsel provided ineffective assistance in violation of the Sixth Amendment to the U.S. Constitution. Nevertheless, because of the way the courts of the Commonwealth have interpreted the provisions of Section 9545(b)(1)(ii) of the Pennsylvania Post Conviction Relief Act, the courts would not recognize that trial counsel's ineffectiveness constituted grounds for relief. Accordingly, Petitioner was deprived of his right under the Sixth Amendment to the United States Constitution to have effective counsel. Thus, he was denied relief based on an unreasonable determination of the facts as set forth in 28 U.S.C. Section 2254(d)(2).

16. Ineffectiveness of counsel was raised at every stage of Petitioner's most recent Post Conviction Petition. Indeed, all of Petitioner's post-conviction efforts have been attempts to demonstrate the constitutional inadequacy of Petitioner's trial defense counsel.

### Brady violation

17. If Tameka Ledbetter's statement is accepted as true (which it should have been by the Pennsylvania Courts, at least for purposes of deciding whether to grant a hearing), the Commonwealth also committed a *Brady* violation (*Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed. 2nd 215 [1963]) by not disclosing to defense counsel the fact that Ms. Ledbetter had identified Sharif Curry as the shooter.

## Conclusion

18. Unless this Court grants relief, Petitioner, who is innocent of this offense, will continue to be deprived of his freedom for the rest of his life.

Respectfully submitted,

/s/

Lawrence E. Wood, Esquire
126 West Miner Street
West Chester, PA  19382
Attorney I.D. No.  04955
Email:  Lwood@parkebarnes.com
Tel:  610-400-1583

## VERIFICATION

I, James Kelly, Petitioner in the attached Petition, affirm that the statements

contained therein are true to the best of my knowledge, information, and belief. I make

this statement subject tot the penalties for false statements to authorities set forth in 18

Pa. C.S.A. Section 4904.

/s/ _James Kelly_

James Kelly

COMMONWEALTH OF PENNSYLVANIA   : In the Court of Common Pleas

vs.              : Philadelphia County, Pennsylvania

JAMES KELLY                :

## AFFIDAVIT

I, TAMEKA LEDBETTER, 1661 South Yewdall Street, Philadelphia, Pennsylvania, verify that my statement made herein is true and correct and I understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A. ss 4904, relating to unsworn falsification to authorities.

I, TAMEKA LEDBETTER, was available and willing to testify at the criminal trial of James Kelly, and if I had been called as a witness, I would have testified that I saw Sharif Curry, whose real name is Anthony John Curry, walk from the area where Travis "Bud" Hughston had been shot on January 1, 1993, and that he put a gun in the waistband of his pants while walking to a light colored vehicle. I informed Philadelphia Police of this information, yet I was not called. Further, when questioned by Philadelphia Police, they showed me a book of photographs and I pointed to his picture. However, they continually pointed to another person whom I did not know and say someone else shot Bud. I knew Sharif Curry as I grew up with him.

_Tameka Ledbetter_
Tameka Ledbetter

Dated:

11/29/12

Witness:

EXHIBIT B

# EXHIBIT

# C



FILED

FEB 21 2014

Criminal Appeals Unit
First Judicial District of PA

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF          :          CP-51-CR-1011621-1995
PENNSYLVANIA             :
                         :
    v.                   :
                         :
JAMES KELLY              :

## OPINION

BRONSON, J.                                February 21, 2014

### I. PROCEDURAL BACKGROUND

On August 20, 1996, following a jury trial before the Honorable James A. Lineberger,

defendant James Kelly was convicted of one count of murder of the first degree (18 Pa.C.S. §

2502(a)) and one count of conspiracy (18 Pa.C.S. § 903).[1]  On August 21, 1996, the Court

imposed the mandatory sentence of life in prison for the murder charge (18 Pa.C.S. §

1102(a)(1)).  Defendant did not file post-sentence motions or an appeal.  Defendant was

represented at trial by Geoffrey Seay, Esquire.

On June 30, 1997, defendant filed his first *pro se* petition pursuant to the Post-Conviction

Relief Act ("PCRA").  Defendant sought reinstatement of his appellate rights *nunc pro tunc*.

Randolph Goldman, Esquire, was appointed to represent defendant, and filed an Amended

Petition on January 16, 1998.  Judge Lineberger granted defendant's PCRA petition and

reinstated his right to file both post-sentence motions and a direct appeal.  Defendant filed post-

sentence motions, which were denied by operation of law on May 27, 1998.  Defendant then

filed a direct appeal, in which he raised claims of ineffective assistance of trial counsel.  On July

---

[1] Defendant was jointly tried with co-defendant Larry Mullins, who was convicted of the same charges.

9, 1999, the Superior Court remanded the case to the trial court for an evidentiary hearing regarding defendant's claims of ineffective assistance of counsel. On December 7, 1999, Judge Lineberger held an evidentiary hearing and rejected defendant's ineffectiveness claims. Defendant retained new counsel, Jules Epstein, Esquire, and appealed. On August 24, 2000, the Superior Court affirmed defendant's judgment of sentence. Defendant filed a petition for *allocatur* to the Supreme Court, which was denied on February 9, 2001. Defendant's judgment of sentence thus became final on May 10, 2001, the last date on which he could have sought further review to the United States Supreme Court.

On September 26, 2001, defendant filed his first substantive PCRA petition, followed by a supplemental petition on October 17, 2001. Mr. Epstein remained as PCRA counsel. On February 19, 2003, Judge Lineberger dismissed defendant's petition. Defendant appealed. On December 18, 2006, the Superior Court affirmed the PCRA Court's dismissal of defendant's petition. Defendant filed a petition for *allocatur*, which was denied on October 26, 2007.

On March 3, 2008, defendant filed a *pro se* petition for writ of *habeas corpus* in United States District Court. On October 5, 2009, the District Court denied defendant's *habeas* petition.

On November 15, 2012, after retaining Lawrence Wood, Esquire, as counsel, defendant filed his third PCRA petition ("PCRA Petition"). As Judge Lineberger had retired from the bench, the matter was reassigned to the undersigned trial judge. On September 13, 2013, after reviewing defendant's PCRA Petition, the Commonwealth's Motion to Dismiss, and supplemental pleadings from both sides, this Court ruled that defendant's petition was untimely. On that date, pursuant to Pa.R.Crim.P. 907, the Court issued notice of its intent to dismiss the petition without a hearing ("907 Notice"). On October 18, 2013, the Court entered an order dismissing defendant's PCRA Petition as untimely.

2

Defendant has now appealed the Court's dismissal of his PCRA Petition, alleging that: 1) the PCRA Court erred in denying an evidentiary hearing regarding witness Tameka Ledbetter; 2) the PCRA Court erred in denying an evidentiary hearing regarding the "proposed testimony" of witness Devon Gilliard; 3) the PCRA Court erred in not finding that the assistant district attorney committed misconduct at trial; 4) the PCRA Court erred in failing to conclude that defendant is actually innocent; and 5) defendant's right to a fair trial was violated by various errors of trial counsel, misconduct by the assistant district attorney, insufficient evidence, and a verdict that was against the weight of the evidence. Concise Statement of Reasons for Appeal ("Statement of Errors") at ¶¶ 1-5.[2] For the reasons set forth below, defendant's claims are without merit, and the PCRA Court's order dismissing his PCRA Petition should be affirmed.

## II. FACTUAL BACKGROUND

The facts of this case are summarized in the Superior Court's opinion of July 9, 1999, affirming the trial court's judgment of sentence on direct appeal. *See* Superior Court Opinion, filed 7/9/1999 at pp. 1-2.

## III. DISCUSSION

An appellate court's review of a PCRA court's grant or denial of relief "is limited to determining whether the court's findings are supported by the record and the court's order is otherwise free of legal error." *Commonwealth v. Yager*, 685 A.2d 1000, 1003 (Pa. Super. 1996) (citing *Commonwealth v. Legg*, 669 A.2d 389, 391 (Pa. Super. 1995)). The reviewing court "will not disturb findings that are supported by the record." *Id.*

Under the PCRA, all petitions, "including a second or subsequent petition," must be filed within one year of the date that judgment on the case became final. 42 Pa.C.S. § 9545(b); *see*

---

[2] For ease of disposition, defendant's claims have been re-ordered and, in some cases, combined.

3

*Commonwealth v. Bennett*, 930 A.2d 1264, 1267 (Pa. 2007). This time limit is jurisdictional, and a court may only review an untimely petition if one of the three statutory exceptions to the timeliness requirement applies. 42 Pa.C.S. § 9545(b)(1); *Commonwealth v. Murray*, 753 A.2d 201, 203 (Pa. 2000). Furthermore, the statutory exceptions are themselves subject to a timeliness requirement, and must be invoked "within sixty days of the date the claim could have been presented." 42 Pa.C.S. § 9545(b)(2); *see Bennett*, 930 A.2d at 1267-68.

In the instant case, defendant's petition was clearly untimely, as it was filed more than ten years after defendant's judgment of sentence became final. Therefore, in order for this Court to have jurisdiction to review the merits of defendant's claim, defendant must plead and prove that one of the three statutory exceptions to the timeliness requirement applies to his case, and he must have filed his petition within sixty days of when the claim could have been presented. *See, e.g., Commonwealth v. Geer*, 936 A.2d 1075, 1077 (Pa. Super. 2007), *appeal denied*, 948 A.2d 803 (Pa. 2008).

### A. Tameka Ledbetter's Statement

Defendant claims that "[t]he learned trial judge failed to order a hearing on Petitioner's PCRA Application even though the statement of Tameka Ledbetter satisfied the two prongs of 42 Pa.C.S. Sec. 9545, to wit: That her testimony could not have been discovered sooner through the exercise of reasonable diligence, and that the failure to raise the claim previously was due to government interference. The police investigators tried to get her to say that someone else was responsible for the shooting and did not include the name of Sharif Curry, whom she had identified as the shooter, in the statement they prepared for her to sign." Statement of Errors at ¶ 1. Defendant therefore contends that Ledbetter's statement was sufficient to require an evidentiary hearing with respect to two of the exceptions to the timeliness requirement of the PCRA: 1) the exception for claims premised upon after-discovered evidence; and 2) the

4

exception for claims premised upon interference by government officials. Each of these claimed exceptions is discussed below.

### 1. After-discovered evidence

The PCRA provides for an exception to its timeliness requirement when "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." 42 Pa.C.S. § 9545(b)(1)(ii). Accordingly, to properly rely upon this exception, defendant must demonstrate that the instant Petition is premised upon facts that were newly discovered by defendant within sixty days of when he filed the Petition, and he must establish that he could not have discovered such facts previously through the exercise of due diligence. "To obtain a new trial based on after-discovered evidence, the petitioner must explain why he could not have produced the evidence in question at or before trial by the exercise of reasonable diligence....A defendant cannot claim he has discovered new evidence simply because he had not been expressly told of that evidence. Likewise, a defendant who fails to question or investigate an obvious, available source of information, cannot later claim evidence from that source constitutes newly discovered evidence." *Commonwealth v. Padillas*, 997 A.2d 356, 363 (Pa. Super.), *app. denied*, 14 A.3d 826 (Pa. 2010) (internal citations omitted). Further, when a defendant had been aware of a potential witness's identity, but failed to reasonably investigate that witness's version of the facts, the subsequent discovery of favorable evidence from that witness does not constitute newly-discovered evidence. *Commonwealth v. Kubis*, 808 A.2d 196, 201 (Pa. Super.), *app. denied*, 813 A.2d 839 (Pa. 2002).

Here, the after-discovered evidence upon which defendant relies consists of a statement by witness Tameka Ledbetter. Defendant asserts that Ledbetter, who was interviewed by a private investigator on defendant's behalf on September 18, 2012, has provided facts that could not have been obtained by the exercise of due diligence by defendant. Ledbetter was the

5

girlfriend of defendant's victim, Travis Hughston, who was killed immediately after leaving

Ledbetter's home on January 1, 1993. *See* PCRA Petition at ¶¶ II(1) & III(2). Police

interviewed Ledbetter less than two hours after Hughston's murder, and she stated that she did

not witness the shooting and was unable to identify anyone involved. *See* PCRA Petition at ¶

III(3); *see* Exhibit B to PCRA Petition. More than 19 years later, defendant sent a private

investigator to interview Ledbetter. *See* PCRA Petition at ¶¶ III(1)-(2). Ledbetter informed the

investigator that on the night of the murder, immediately after she heard gunshots, she ran onto

her porch and saw a man whom she knew, Anthony "Sharif" Curry, walking away from the

victim with a gun in his hand. *See* PCRA Petition at ¶ III(4). Ledbetter told defendant's

investigator that when she had given her statement to police in 1993, she had informed them that

Curry, who passed away on January 13, 1995, was the shooter, but police never wrote down the

name and insisted that the shooter was someone else. *See* PCRA Petition at ¶¶ III(7)-(8).

Despite filing post-sentence motions, an appeal, and two prior PCRA petitions, defendant

did not investigate Ledbetter's account of the shooting until September 18, 2012, nearly two

decades after the shooting took place. However, Ledbetter, who was interviewed by police on

the day of the murder, was an obvious and available witness at the time of the trial, with both the

Commonwealth and defendant being aware of her identity. Despite that fact, she was not

interviewed by defendant at the time of trial, nor called as a witness by either side. Ledbetter's

interview with defendant's investigator more than 19 years after she gave her statement to police

clearly does not amount to after-discovered evidence. *Kubis*, 808 A.2d at 201. Defendant

therefore cannot overcome the PCRA's time bar by the after-discovered evidence exception to

the PCRA's timeliness requirement.

Defendant also cannot avoid the time bar by blaming the lack of due diligence on

counsel. Evidence that would have been discovered by competent counsel is not evidence that

could not have been obtained through reasonable diligence. *Commonwealth v. Washington*, 927 A.2d 586, 598 (Pa. 2007).

### 2. Interference by Government Officials

The PCRA provides for an exception to its timeliness requirement when "the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States." 42 Pa.C.S. § 9545(b)(1)(i). To properly rely on this exception, defendant must demonstrate that his failure to raise the claim in a timely manner was the result of a constitutional violation by government officials, and he must demonstrate that he raised the claim within sixty days of when he discovered the violation. Here, defendant claims governmental interference by police in attempting to get Tameka Ledbetter to say that someone other than Sharif Curry was responsible for the shooting, and by omitting her identification of Sharif Curry as the shooter from the statement that she signed. Statement of Errors at ¶ 1.

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), exculpatory evidence not disclosed to the defense will give rise to a due process violation and will require a new trial if the exculpatory evidence is "material" either to guilt or punishment. 373 U.S. at 87; *see also* Pa.R.Crim.P. 573(B)(1)(a) (specifying, as mandatory discovery, "[a]ny evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth"). If the police possess evidence that is favorable to the defense, then the Commonwealth is deemed to be responsible for its disclosure even if it is solely in the possession of the police. *See Commonwealth v. Lambert*, 884 A.2d 848, 853 (Pa. 2005) (quoting *Brady*, 373 U.S. at 87). "Although a *Brady* violation may fall within the governmental interference exception, the petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could not have been obtained

7

earlier with the exercise of due diligence." *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1268 (Pa. 2008).

Here, the same lack of due diligence discussed in Section III(A)(1), above, bars defendant's governmental interference claim. Had defendant timely interviewed Tameka Ledbetter, he would have discovered the alleged *Brady* violation. Therefore, he cannot overcome the PCRA's time bar by the governmental interference exception to the PCRA's timeliness requirement. *Abu-Jamal*, 941 A.2d at 1268. Additionally, as with defendant's after-discovered evidence claim in Section III(A)(1), defendant cannot avoid the time bar by blaming the lack of due diligence on counsel. *Washington*, 927 A.2d at 598.

### B. Actual Innocence Claim

Defendant claims that "[t]he learned trial judge failed to conclude that, based on the entire record, James Kelly is actually innocent, per *McQuiggin v. Perkins*, 569 U.S. __, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)." Statement of Errors at ¶ 4. *McQuiggin*, however, addressed only the one-year statute of limitations applicable to federal habeas petitions under the Antiterrorism and Effective Death Penalty Act of 1996. 133 S.Ct. at 1928. It did not purport to create a federally mandated exception to jurisdictional timeliness requirements of state collateral relief statutes.

Moreover, even if *McQuiggin* were applicable, defendant could not make the requisite showing "that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 133 S.Ct. at 1928 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). Here, the fact that a witness who, on the day of a murder, denied having any relevant information, changed her story 19 years later to blame the killing on someone who is now deceased, hardly undermines confidence in the jury's verdict in this case.

8

### C. *Time-Barred Claims*

In addition to the timeliness exceptions raised above, defendant also raises numerous claims of trial counsel ineffectiveness, prosecutorial misconduct, and claims regarding the sufficiency and weight of the evidence. Statement of Errors at ¶¶ 2, 3, & 5(a)-(g). However, defendant fails even to allege how any of these claims fall within any of the exceptions to the timeliness requirement of the PCRA. Therefore, all of these claims were properly rejected.

### IV. CONCLUSION

For the foregoing reasons, the Court's order dismissing defendant's PCRA Petition as untimely should be affirmed.

BY THE COURT:

GLENN B. BRONSON, J.

# EXHIBIT

# D

J-S59027-14

## NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMES KELLY | |
| Appellant | No. 3544 EDA 2013 |

Appeal from the PCRA Order October 18, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-1011621-1995

BEFORE:   SHOGAN, J., LAZARUS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:          **FILED OCTOBER 10, 2014**

James Kelly appeals from the order of the Court of Common Pleas of Philadelphia County, denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. After careful review, we affirm.

In 1996, Kelly was convicted by a jury of first-degree murder and conspiracy and was sentenced to a mandatory term of life imprisonment. Kelly did not file post-sentence motions or an appeal; however, his post-sentence motion and appellate rights were subsequently reinstated *nunc pro tunc* following PCRA proceedings. Kelly's post-sentence motions were denied by operation of law and he subsequently filed an appeal, in which he raised,

---

[*] Retired Senior Judge assigned to the Superior Court.

EXHIBIT C

J-S59027-14

*inter alia*, claims of ineffectiveness of trial counsel. On July 9, 1999, this Court remanded Kelly's case to the trial court for an evidentiary hearing on the ineffectiveness claims, which the trial court ultimately rejected. This Court affirmed that ruling and the Supreme Court denied allowance of appeal on February 9, 2001.

Kelly, represented by counsel, filed his first PCRA petition on September 26, 2001. The PCRA court dismissed that petition by order dated February 19, 2003. That order was affirmed by this Court and the Supreme Court denied allowance of appeal. On March 3, 2008, Kelly filed a *pro se* petition for writ of habeas corpus with the United States District Court for the Eastern District of Pennsylvania. That petition was denied on October 5, 2009.

On November 15, 2012, Kelly filed his second PCRA petition, represented by new counsel. The PCRA court dismissed the petition as untimely, without a hearing, by order dated October 18, 2013. This timely appeal follows, in which Kelly raises the following issues, *verbatim*, for our review:[1]

> 1.    In a case seeking post-conviction relief based on after-discovered evidence in a shooting case, in which the evidence proffered by [Kelly], and which exonerates [Kelly], shows that

---

[1] In his brief, Kelly presented one additional claim. However the claim is substantively identical to his first claim and, accordingly, will not be addressed separately.

- 2 -

J-S59027-14

the police interfered with [Kelly's] ability . . . to discover the exonerating evidence until a time less than 60 days before he filed his [p]etition, should the [PCRA] court have held a hearing?

2.   Where the evidence in such a case demonstrates that the police arrested the wrong person as the shooter, and that they prevented the defense from discovering that fact until recently, should a new trial be awarded?

3.   In a case wherein the prosecutor misled the court and counsel by stating that a key witness was dead when the witness was still alive, should a new trial be awarded?

4.   In a case where counsel['s] ineffectiveness so permeates the record that it is unlikely that the jury reached a just decision, should a new trial be granted?

5.   In a case where the evidence of actual innocence is compelling, should a new trial be awarded?

Brief of Appellant, at 4.

We begin by noting that Kelly's brief does not comply with the Rules of Appellate Procedure.  In particular, Kelly entirely ignores the mandates of Rule 2119, requiring that:

[t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part – in distinctive type or in type distinctively displayed – the particular point treated therein, followed by such discussion and citation to authorities as are deemed pertinent.

Pa.R.A.P. 2119(a).  Here, Kelly's argument section headings in no way correspond to the issues raised in his statement of questions involved. Indeed, the organizational flow of Kelly's argument section bears no relation to the specific issues set forth in his Rule 2116 statement.  Facts are presented and arguments made without a clear connection to any particular

J-S59027-14

issue. As a result, we have been forced to piece together Kelly's arguments and to discern which arguments are intended to support each claim. It is particularly ironic, in a case in which it is strenuously alleged that "ineffectiveness of counsel . . . permeates the record," that current counsel would submit a non-compliant brief. It is within this court's power to quash or dismiss an appeal for clear violations of the Rules of Appellate Procedure. *Universal Underwriters Insurance Co. v. A. Richard Kacin, Inc.*, 916 A.2d 686, 689 n.6 (Pa. Super. 2007). However, because Kelly's brief is not so defective as to preclude effective appellate review, we decline to do so here. *Id.*

This Court's standard of review regarding an order dismissing a PCRA petition is whether the determination of the PCRA court is supported by evidence of record and is free of legal error. *Commonwealth v. Burkett*, 5 A.3d 1260, 1267 (Pa. Super. 2010) (citations omitted). In evaluating a PCRA court's decision, our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level. *Id.* We may affirm a PCRA court's decision on any grounds if it is supported by the record. *Id.*

We begin by addressing our jurisdiction to consider Kelly's PCRA petition, which, on its face, was untimely. A PCRA petition, including a second or subsequent petition, must be filed within one year of the date the underlying judgment of sentence becomes final. *See* 42 Pa.C.S.A. §

- 4 -

J-S59027-14

9545(b)(1); *see also Commonwealth v. Bretz*, 830 A.2d 1273, 1275 (Pa.
Super. 2003). A judgment is deemed final "at the conclusion of direct
review, including discretionary review in the Supreme Court of the United
States and the Supreme Court of Pennsylvania, or at the expiration of time
for seeking review." 42 Pa.C.S.A. § 9545(b)(3); *see also Commonwealth
v. Pollard*, 911 A.2d 1005, 1007 (Pa. Super. 2006). Here, Kelly's judgment
of sentence became final on May 10, 2001, upon the expiration of the
ninety-day period for filing a writ of *certiorari* with the United States
Supreme Court. *See* 42 Pa.C.S.A. § 9545(b)(3); U.S.Sup.Ct.R. 13. Thus,
Kelly had one year from that date, or until May 10, 2002, to file a timely
PCRA petition. *See* 42 Pa.C.S.A. § 9545(b). Kelly did not file the instant
petition until November 15, 2012, approximately 11½ years after his
judgment of sentence became final. Accordingly, the PCRA court had no
jurisdiction to entertain Kelly's petition unless he pleaded and proved one of
the three statutory exceptions to the time bar.[2]  *See* 42 Pa.C.S.A. §

---

[2] The statutory exceptions are as follows:

> (i) the failure to raise the claim previously was the result of
> interference by government officials with the presentation of the
> claim in violation of the Constitution or laws of this
> Commonwealth or the Constitution or laws of the United States;

> (ii) the facts upon which the claim is predicated were unknown
> to the petitioner and could not have been ascertained by the
> exercise of due diligence; or

*(Footnote Continued Next Page)*

- 5 -

J-S59027-14

9545(b)(1). A petition invoking one of the exceptions must be filed within sixty days of the date the claim could have been presented. 42 Pa.C.S.A. § 9545(b)(2).

Kelly's first issue on appeal concerns the governmental interference and after-discovered evidence exceptions to the time bar set forth in subsections 9545(b)(2)(i) and (ii). Specifically, he claims to have uncovered exculpatory eyewitness evidence allegedly suppressed by the police at the time of trial. Kelly asserts that he filed his PCRA petition within 60 days of discovering this evidence and that the trial court should, at the very least, have convened a hearing to determine whether relief was warranted. We find this claim to be without merit.

On September 13, 2013, a private investigator working on Kelly's behalf met with an individual named Tameka Ledbetter, who was the girlfriend of Travis Hughston, the victim killed in the shooting. Ledbetter told the investigator that, just after the shooting, she saw a man she knew, Sharif Curry, walking away from Hughston's body and stuffing a pistol in his waistband. Ledbetter claimed she had given police a statement identifying

_(Footnote Continued)_ ─────────────────

> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S.A. § 9545(b)(1).

- 6 -

J-S59027-14

Curry as the shooter, but that they had insisted another individual (who was never charged in the case) had done the shooting. Kelly submitted a written question and answer form that Ledbetter completed, acknowledging, *inter alia*, her identification of Curry as the actual shooter.[3]

In order to satisfy the government interference exception under section 9545(b)(1)(i), a petitioner must plead and prove that his failure to raise the claim previously was "the result of interference by government officials with the presentation of the claim[.]" *Id.* Where, as here, the petitioner claims that the prosecution withheld evidence he claims would have been beneficial to his defense, he must demonstrate that the prosecution failed to disclose material evidence that deprived him of a fair trial. *Commonwealth v. Johnson*, 815 A.2d 563, 573 (Pa. 2002). Evidence is "material" only where there is a reasonable probability that its disclosure during trial would have resulted in a different verdict. *Commonwealth v. Roney*, 79 A.3d 595, 607 (Pa. 2013). A petitioner must demonstrate that the information forming the basis of his claim could not have been obtained earlier with the exercise of due diligence. *Commonwealth v. Stokes*, 959 A.2d 306, 311 (Pa. 2008).

In order to establish the exception under section 9545(b)(1)(ii), a petitioner must plead and prove that "the facts upon which the claim is

---

[3] We note that Sharif Curry died in approximately 1995.

- 7 -

J-S59027-14

predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." *Id.* In order to prevail on such a claim, a petitioner must show that the evidence: (1) has been discovered after the trial and could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely for impeachment purposes; and (4) is of such a nature and character that a different verdict will likely result if a new trial is granted. *Commonwealth v. Johnson*, 841 A.2d 136, 140-41 (Pa. Super. 2003). Due diligence demands that a petitioner take reasonable steps to protect his own interests. *Commonwealth v. Carr*, 768 A.2d 1164, 1168 (Pa. Super. 2001). "A defendant who fails to question or investigate an obvious, available source of information, cannot later claim evidence from that source constitutes newly discovered evidence." *Commonwealth v. Padillas*, 997 A.2d 356, 364 (Pa. Super. 2010), citing *Commonwealth v. Chambers*, 599 A.2d 630, 642 (Pa. 1991).

A PCRA petition raising these claims must be filed within 60 days of the date the claims could have been presented. 42 Pa.C.S.A. § 9545(b)(2). A PCRA court may decline to hold a hearing on the petition if the petitioner's claim is patently frivolous and is without a trace of support either in the record or from other evidence. *Commonwealth v. Holmes*, 905 A.2d 507, 509 (Pa. Super. 2006) (holding no abuse of discretion where PCRA dismissed

- 8 -

J-S59027-14

petition without hearing where after-discovered evidence would not compel different verdict).

Here, both Kelly's claims must fail for the simple reason that Tameka Ledbetter's statement, even if testified to at trial, would not have exculpated Kelly and would not likely have changed the outcome of his trial. The Commonwealth's theory of the case was that Kelly handed his co-defendant, Larry Mullins, a gun, which Mullins subsequently used to shoot the victim. Ledbetter's statement, that she saw Sharif Curry walking away from the victim's body holding a gun, may have been exculpatory as to Mullins, but would not have benefitted Kelly, who was never accused of being the shooter.

Moreover, at trial, the Commonwealth presented the testimony of two eyewitnesses who identified Kelly and Mullins. The first, Ernestine Williams, witnessed Kelly hand an object to Mullins, who placed the object inside his jacket and held onto it inside the jacket as he approached the victim; he then removed his hand from his jacket, holding a gun, and shot the victim multiple times. Williams testified that there was "no doubt in [her] mind" that Kelly and Mullins were the individuals involved in the shooting. N.T. Trial, 8/14/96, at 132. Williams further testified as follows:

> [Williams]: I remember seeing [Kelly and Mullins] at the corner of my block making a transaction, and I remember seeing [Mullins] shoot [the victim], I seen him shoot him in his head behind his ear and he fell in his arms and he laid him on the ground and he stood back and he shot him again. **I remember that very well. And I'll never forget it.**

- 9 -

Case: 22-2612 Document: 2-2 Page: 454 Date Filed: 09/23/2022
Case: 16-1791 Document: 003112253444 Page: 54 Date Filed: 04/05/2016

J-S59027-14

> [Defense Counsel]: You saw these two men doing a transaction?
>
> A: Yes.
>
> Q: What kind of transaction?
>
> A: [Kelly] handed [Mullins] something. And [Mullins] never took his hand out until he got to [the victim].

*Id.* at 176 (emphasis added).

A second witness, Colie Baxter, testified that he was driving his car at the intersection of 25th and Diamond Streets when he heard "five to six shots." N.T. Trial, 8/15/96, at 8. He pulled his car over and then witnessed two men, who he later identified as Kelly and Mullins, run out of an alleyway, get into a car, and drive away. One of the men was "holding something down by [his] side." *Id.*

Accordingly, the Commonwealth presented sufficient evidence to establish Kelly's guilt, such that Ledbetter's identification of Sharif Curry as the shooter would not likely have changed the outcome of the trial. *See Roney, supra; Johnson, supra.*

Kelly next alleges that the prosecution misled the court by stating that Devon Gilliard, a "key witness," was dead when, in reality, he was, and is still, alive. Kelly claims he is entitled to a new trial. This claim is meritless.

In a statement to police, Ernestine Williams stated that she witnessed Kelly and Mullins talking to Devon Gilliard, a teenage drug dealer, just prior to the shooting. A witness named Andre Bracy also told police that he had

- 10 -

J-S59027-14

seen Gilliard in a "speakeasy" near the scene of the shooting after it had occurred. However, Gilliard gave a statement to the police indicating that he knew nothing about the shooting and was at home with his mother at the time it occurred. During trial, Gilliard's name came up during a conference outside of the jury's hearing, at which time the prosecutor indicated that Gilliard was dead and, therefore, the defense should not be allowed to mention his name in closing argument so as not to give the jury the impression that the Commonwealth had not called him to testify for some other reason. However, contrary to the statement by the prosecutor, Gilliard was not dead and is alive today.

We begin by noting that Kelly devotes a single paragraph in his argument section to his claim regarding Devon Gilliard. However, he provides no citation to case law or other legal argument in support of his claim. Rule of Appellate Procedure 2119(a) provides that "[t]he argument shall . . . have . . . the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). Failure by an appellant to discuss pertinent facts or cite legal authority will result in waiver. *Commonwealth v. Rhodes*, 54 A.3d 908, 915 (Pa. Super. 2012). Consequently, Kelly's underdeveloped argument is waived.

Moreover, even if the claim were not waived, it would be without merit. Kelly does not explain why he failed to raise this issue until his most

- 11 -

J-S59027-14

recent PCRA petition, which was filed 12 years after Gilliard executed an affidavit that was made part of the court record. *See* Brief of Appellant, at 12. Thus, Kelly has known, or could have known, since the year 2000 that Gilliard is not, in fact, dead.

In addition, despite having knowledge of Gilliard's current place of employment, *see* PCRA Petition, 11/15/12, at ¶ IV.2, Kelly failed to provide an affidavit from Gilliard indicating the facts to which he would testify if called at trial. Instead, Kelly presents only speculation as to what Gilliard might say and states, without basis, that he is a "valuable witness to what actually happened." Brief of Appellant, at 26.

Finally, Kelly presented no evidence whatsoever in support of his claim that the prosecutor's statement regarding Gilliard's death was anything more than an error on counsel's part. Indeed, his one-paragraph "argument" fails entirely to address the "governmental interference" aspect of the claim, focusing instead on the ineffectiveness of trial counsel for failing to locate and interview Gilliard. For these reasons, this claim is meritless.

Kelly's final two appellate issues raise rather nebulous claims regarding the general ineffectiveness of counsel and his actual innocence. A claim of ineffective assistance of counsel will not save an otherwise untimely PCRA petition for review on the merits. *Commonwealth v. Gamboa-Taylor*, 753 A.2d 780, 786 (Pa. 2000). Moreover, Kelly's ineffectiveness claims are either waived because he failed to present them at the first opportunity, or

- 12 -

J-S59027-14

have been previously litigated. *See* 42 Pa.C.S.A. § 9544. For example,
Kelly devotes nearly three pages of his brief to a discussion of his trial
counsel's alleged failure to present an alibi witness and other eyewitnesses.
*See* Brief of Appellant, at 24-26. However, this exact issue was raised on
direct appeal[4] and found to be meritless. *See Commonwealth v. Kelly*,
152 EDA 2000 (Pa. Super. filed August 24, 2000). Similarly, Kelly's
assertion that trial counsel was ineffective for failing to object to an allegedly
improper comment on his post-arrest silence is waived, as it could have
been raised on direct appeal.

Likewise, Kelly's broad claim of "actual innocence" affords him no
relief. The PCRA specifically states it is intended to "provide[] for an action
by which persons convicted of crimes they did not commit . . . may obtain
collateral relief." 42 Pa.C.S.A. § 9542. However, relief may only be
obtained within the parameters of the statute. Thus, a claim of "actual
innocence" does not, by itself, provide an exception to the time bar. *See* 42
Pa.C.S.A. § 9545(b). Although Kelly does not devote a separate portion of
the argument section of his brief to a discussion of this claim, it is apparent
that the claim is grounded in the statement of Tameka Ledbetter. We have

---

[4] Kelly filed his direct appeal in 2000. Prior to our Supreme Court's 2002
decision in *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), claims of
trial counsel ineffectiveness were required to be raised at the earliest
opportunity the defendant was no longer represented by trial counsel. Thus,
in this case, Kelly raised issues of trial counsel's ineffectiveness on direct
appeal.

- 13 -

J-S59027-14

already concluded that Ledbetter's statement, even if true, would neither have exculpated Kelly nor changed the outcome of his trial.

As Kelly's claims do not establish any exception to the time bar, his PCRA petition was properly dismissed without a hearing.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/10/2014

- 14 -

EXHIBIT

E

## IN THE SUPREME COURT OF PENNSYLVANIA
### EASTERN DISTRICT

COMMONWEALTH OF PENNSYLVANIA, : No. 565 EAL 2014

                                                                :
                         **Respondent**            :
                                                                : Petition for Allowance of Appeal from the
                                                                : Order of the Superior Court
          **v.**                                               :
                                                                :
                                                                :
**JAMES KELLY,**                              :
                                                                :
                         **Petitioner**             :

## ORDER

**PER CURIAM**

     **AND NOW**, this 24th day of April, 2015, the Petition for Allowance of Appeal is **DENIED.**

A True Copy
As Of 4/24/2015

Attest: ~~John W. Carson Jr., Esquire~~
Deputy Prothonotary
Supreme Court of Pennsylvania

# EXHIBIT

# F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FORM FOR USE IN APPLICATIONS FOR HABEAS CORPUS UNDER 28 U.S.C. § 2254
(eff. 12/1/04)

_James Kelly_____ **PETITIONER**

(Full Name)    (Include name under which you were convicted)

                                   vs.        Case No. _08-cv-1073 GP_
                                                       (Supplied by the Court)

_Gerald L. Rozum_____ **RESPONDENT**

(Name of Warden, Superintendent, Jailor, or authorized person having custody of petitioner)

and

THE DISTRICT ATTORNEY OF THE COUNTY OF___ _Philadelphia_____

and

THE ATTORNEY GENERAL OF THE STATE OF___ _Pennsylvania_____

                                          **ADDITIONAL RESPONDENT**

_James Kelly_____        _DB-5777_____

Name                                            Prison Number

_SCI-Somerset · 1600 Walters Mill Road · Somerset, PA 15510_

Place of Confinement

(If petitioner is attacking a judgment which imposed a sentence to be served in the future, petitioner must fill in the name of the state where the judgment was entered. If petitioner has a sentence to be served in the future under a federal judgment which he wishes to attack, he should file a motion under 28 U.S.C. § 2255, in the federal court which entered the judgment.)

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

INSTRUCTIONS–READ CAREFULLY

    1. You must include all potential claims and supporting facts for which you might desire to seek review because a second or successive habeas corpus petition cannot be filed except under very specific and rare circumstances requiring certification by the Third Circuit Court of Appeals as set forth in instruction # 13.

    2. Your Habeas corpus petition must be filed within the 1 – year statute of limitations time limit set forth in 28 U.S.C. §2244(d)(1). (There are limited circumstances in which the petition may be amended, within the one-year time period, to add additional claims or facts, see Federal Rules of

Civil Procedure 15; or amended after the one-year period expires, in order to clarify or amplify claims which were timely presented, see United States v. Thomas, 221 F. 3d 430 (3d Cir.2000.)

3. Any false statement of a material fact in your petition, in a motion for leave to proceed in forma pauperis, or in any other motion you file in this case may serve as the basis for prosecution and conviction for perjury.

4. This petition must be typewritten, printed, or legibly handwritten and signed by you as the petitioner or by your representative on Page 11. You should answer all questions concisely in the proper space of the petition. If you need more room to answer any question, you may write on the reverse blank sides of the petition.

5. You may not attach additional pages to the petition. You do not have to list or cite the cases or law that you are relying on. If you do want to cite the cases and law you are relying on and make legal arguments, you should do so in a separate concise brief or memorandum which should be filed along with the petition.

6. When you file your petition, you must include a filing fee of $5.00. If you cannot pay the full filing fee, you must request permission to proceed in forma pauperis as explained in instruction # 8.

7. Your petition will be filed if you have followed these instructions and it is in proper order.

8. To request permission to proceed in forma pauperis without paying the full filing fee, you must completely fill out pages 12 through 18 of the petition. You should answer all questions and sign where indicated on Pages 12 and 18. You should see to it that an authorized prison official completes the certification of Page 19. You must prove that you cannot pay the full filing fee and other costs because of poverty and a discharge in bankruptcy will not excuse you from this requirement. The Court will let you know if you may proceed in forma pauperis.

9. Only final judgments entered by one state court may be challenged in a single petition.    If you seek to challenge judgments entered by different courts either in the same state or in different states, you must file separate petitions as to each court.

10. As required by 28 U.S.C. § 2254(b)(1), you must have exhausted all claims that you are making in your petition. This means that every claim must have been presented to each level of the state courts. If you file a petition that contains claims that are not exhausted, the federal court will dismiss your petition. 28 U.S.C. § 2254(b)(2) provides that if it is perfectly clear that no colorable claims are present, the federal court can also deny your petition on the merits.

11. As required by 28 U.S.C. § 2254(e)(1), a federal court, when considering your habeas corpus petition, must deem as correct a determination of fact made by a state court unless you rebut the presumption of correctness by clear and convincing evidence. Under 28 U.S.C. § 2254(e)(2), if

you have failed to develop the factual basis of a claim in state court proceedings, a federal court cannot hold an evidentiary hearing on that claim unless you show that:

> (i) the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the U.S. Supreme Court, that was previously unavailable,
> or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence.
> You must also show that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found you guilty of the offense in question.

12. As required by 28 U.S.C. § 2244(b)(1), a federal court must dismiss any claim in a second or successive habeas corpus petition that *was* presented in a prior habeas corpus petition.

13. As required by 28 U.S.C. § 2244(b)(2), a federal court must dismiss any claim in a second or successive habeas corpus petition that *was not* presented in a prior habeas corpus petition unless you show:

> (A) the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the U.S. Supreme Court, that was previously unavailable;
> or
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence, and (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found you guilty of the offense in question.
> Before such a second or successive petition may be filed in the district court, however, the petitioner must move the court of appeals for an Order authorizing the district court to consider the petition. Petitioner's motion for such an Order must be determined by a three judge panel of the court of appeals, which must grant or deny the motion within 30 days. The court of appeals may grant the motion only if it determines that the petition makes a prima facie showing that it satisfies either (A) or (B) above.

14. 28 U.S.C. § 2254(i) provides that ineffectiveness of counsel during post-conviction, habeas corpus and P.C.R.A. proceedings in state or federal court may not be grounds for relief in your petition.

15. When the petition is fully completed, the original and four copies must be mailed to the **Clerk of the United States District Court, Room 2609, 601 Market Street, Philadelphia, PA 19106.** You must return all pages, including these instructions.

## PETITION

1. (a) Name and location of court which entered the judgment of conviction under attack: _____

Court of Common Pleas · Philadelphia, Pennsylvania

  (b) Name of Prosecutor:      Richard Sax

  (c) Prosecution conducted by District Attorney's Office of_____Philadelphia_____
  County

2. (a) Date of Judgment of conviction:_____August 21, 1996

  (b) Indictment number or numbers:_____C.P. No. 9510-1162

  Term: October, 1995_____ Criminal Case Number:___1162

3. Length of sentence: Life, No Parole  Sentencing Judge:___James A. Lineberger

4. Nature of offense or offenses for which you were convicted: First Degree Murder

(18 Pa.C.S. § 2502(a)); Criminal Conspiracy (18 Pa.C.S. § 903).

_____   _____

5. What was your plea? (Check one)
  (a) Not guilty (x)    (b) Guilty ( )    (c) Nolo contendere ( )

  If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details: _____

_____ N/A _____

_____   _____

6. If you pleaded not guilty, what kind of trial?: (Check one)    (a) Jury (X)    (b) Judge only ( )

7. Did you testify at the trial? Yes ( )  No (X)

8. Did you appeal from the judgment of conviction?    Yes (X)   No ( )

9. If you did appeal, answer the following:

4

(a) Name of court: **\*\* SEE PAGES 5a, 5b, 5c & 5d, ATTACHED \*\***

(b) Result: _____

(c) Date of result and citation, if known: _____

(d) Grounds raised: _____

_____

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1)  Name of court: _____

(2)  Result: _____

(3)  Date of result and citation, if known: _____

(4)  Grounds raised: _____

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1)  Name of court: _____

(2)  Result: _____

(3)  Date of result and citation, if known: _____

(4)  Grounds raised: _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?    Yes (X)  No ( )

11. If your answer to 10 was "yes," give the following information:

(a) (1)  Name of Court: **\*\* SEE PAGES 5a, 5b, 5c & 5d, ATTACHED \*\***

(2)  Nature of proceeding: _____

_____

Case: 22-2612    Document: 2-2    Page: 467    Date Filed: 09/23/2022
Case: 16-1791    Document: 003112253444    Page: 67    Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP   Document 6   Filed 04/21/08   Page 6 of 23

RESPONSES TO QUESTIONS 9 and 11

(NOTE: Because of the unusual and lengthy history of this case,
all information requested in the above questions is set forth
herein so that the reader can see the exact sequence of events
without having to flip back and forth between numerous pages. The
information herein lists all filings that occurred after the
Petitioner was sentenced on August 21, 1996.)


06/30/1997  Petition for post Conviction Relief

      COURT: Court of Common Pleas for Philadelphia County ·
            First Judicial District of Pennsylvania · 1301
            Filbert Street · Philadelphia, PA 19107

      DOCKET NUMBER: C.P. 9510-1162

      GROUNDS RAISED: Request to file post-sentence motions and
                  appeal nunc pro tunc.

      EVIDENTIARY HEARING: Yes, on 01/08/1998

      RESULT: Granted on 01/23/1998

      APPEALED TO HIGHER COURT: No


01/16/1998  Post-Sentence Motions

      COURT: Court of Common Pleas for Philadelphia County ·
            First Judicial District of Pennsylvania · 1301
            Filbert Street · Philadelphia, PA 19107

      DOCKET NUMBER: C.P. 9510-1162

      GROUNDS RAISED: Verdict was against the weight of the
                  evidence; Evidence was insufficient to
                  sustain verdict; Verdict was inconsistent;
                  and Trial counsel was ineffective.

      EVIDENTIARY HEARING: No

      RESULT: Denied by operation of law on 05/27/1998

      APPEALED TO HIGHER COURT: Yes (Information follows)

06/05/1998  Appeal of denial of post-sentence motions

      COURT: Superior Court of Pennsylvania · 530 Walnut Street ·
            Suite 315 · Philadelphia, PA 19106

Case: 22-2612   Document: 2-2   Page: 468   Date Filed: 09/23/2022
Case: 16-1791   Document: 003112253444   Page: 68   Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP   Document 6   Filed 04/21/08   Page 7 of 23

DOCKET NUMBER: 1799 Philadelphia 1998

GROUNDS RAISED: Evidence was insufficient to sustain
                conviction; Verdict was against the weight
                of the evidence; ineffectiveness of trial
                counsel; improper governmental
                interference; and Inconsistent verdict.

EVIDENTIARY HEARING: Not applicable

RESULT: Denied in part, remanded in part, on 07/09/1999.

APPEALED TO HIGHER COURT: No


12/06/1999 & 12/07/1999   Remand Hearings

COURT: Court of Common Pleas for Philadelphia County ·
       First Judicial District of Pennsylvania · 1301
       Filbert Street · Philadelphia, PA 19107

DOCKET NUMBER: C.P. 9510-1162

GROUNDS RAISED: Ineffectiveness assistance of trial counsel

EVIDENTIARY HEARING: Yes

RESULT: Denied on 12/07/1999

APPEALED TO HIGHER COURT: Yes (information follows)


12/30/1999  Appeal of denial of remanded issues

COURT: Superior Court of Pennsylvania · 530 Walnut Street ·
       Suite 315 · Philadelphia, PA 19106

DOCKET NUMBER: 152 EDA 2000

GROUNDS RAISED: Ineffectiveness of trial counsel

EVIDENTIARY HEARING: Not applicable

RESULT: Denied on 08/24/2000

APPEALED TO HIGHER COURT: Yes (information follows)


09/21/2000  Petition for Allowance of Appeal

COURT: Pennsylvania Supreme Court

DOCKET NUMBER: 579 EAL 2000

GROUNDS RAISED: Superior Court's denial of 152 EDA 2000

Case: 22-2612    Document: 2-2    Page: 469    Date Filed: 09/23/2022
Case: 16-1791    Document: 003112253444    Page: 69    Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP   Document 6   Filed 04/21/08   Page 8 of 23

EVIDENTIARY HEARING: Not Applicable

RESULT: Denied on 02/09/2001

APPEALED TO HIGHER COURT: No

09/26/2001  Petition for post Conviction Relief

COURT: Court of Common Pleas for Philadelphia County ·
 First Judicial District of Pennsylvania · 1301
 Filbert Street · Philadelphia, PA 19107

DOCKET NUMBER: C.P. 9510-1162

GROUNDS RAISED: Ineffectiveness of trial counsel;
  Prosecutorial misconduct via Brady
  violation; and Ineffectiveness of direct
  appeal counsel.

EVIDENTIARY HEARING: No

RESULT: Denied on 02/19/2003

APPEALED TO HIGHER COURT: Yes (information follows)

02/25/2003  Appeal

COURT: Superior Court of Pennsylvania · 530 Walnut Street ·
 Suite 315 · Philadelphia, PA 19106

DOCKET NUMBER: 755 EDA 2003

GROUNDS RAISED: Ineffectiveness of PCRA counsel; Erroneous
  rulings of PCRA Court

EVIDENTIARY HEARING: Not Applicable

RESULT: Denied on 12/18/2006 with Judge Ford-Elliot
 dissenting

APPEALED TO HIGHER COURT: Yes (information follows)

04/20/2007  Petition for Allowance of Appeal

COURT: Pennsylvania Supreme Court

DOCKET NUMBER: 221 EAL 2007

GROUNDS RAISED: Superior Court's denial of 755 EDA 2003

EVIDENTIARY HEARING: Not Applicable

Case: 22-2612   Document: 2-2   Page: 470   Date Filed: 09/23/2022
Case: 16-1791   Document: 003112253444   Page: 70   Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP   Document 6   Filed 04/21/08   Page 9 of 23

RESULT: Denied on 10/26/2007

APPEALED TO HIGHER COURT: No

**** There has never been an appeal to the United States Supreme Court.

Case: 22-2612    Document: 2-2    Page: 471    Date Filed: 09/23/2022
Case: 16-1791    Document: 003112253444    Page: 71    Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP   Document 6   Filed 04/21/08   Page 10 of 23

(3)  Grounds raised:_____ ** SEE PAGES 5a, 5b & 5c, ATTACHED **
_____
_____

(4)  Did you receive an evidentiary hearing on your petition, application or motion?
     Yes ( )  No ( )

(5)  Result:_____"_____"_____

(6)  Date of result: _____"_____"_____

(7)  Did you appeal the result to a higher court?        Yes ( )  No ( )

     Court Name(s) _____"_____"_____

     Result(s) _____"_____"_____

     Result Date(s) _____"_____"_____

(b)  As to any second petition, application or motion give the same information:

     (1) Name of Court:_____"_____"_____

     (2) Nature of proceeding:_____"_____"_____

     (3) Grounds raised: _____"_____"_____
     _____
     _____

     (4) Did you receive an evidentiary hearing on your petition, application or motion?
         Yes ( )   No ( )

     (5) Result:
     _____"_____"_____
     _____

(6) Date of result:_____ ** SEE PAGES 5a, 5b & 5c, ATTACHED ** _____

(7) Did you appeal the result to a higher court?    Yes ( )  No ( )

Court Name(s) _____ " _____ " _____

Result(s) _____ " _____ " _____

Result Date(s) _____ " _____ " _____

(c)  As to any third petition, application or motion give the same information:

(1)  Name of Court:_____ " _____ " _____

(2)  Nature of proceeding:_____ " _____ " _____

(3)  Grounds raised: _____ " _____ " _____

_____

_____

(4)  Did you receive an evidentiary hearing on your petition, application or motion?
Yes ( )  No ( )

(5)  Result:

_____ " _____ " _____

_____

(6)  Date of result:_____ " _____ " _____

(7)  Did you appeal the result to a higher court?        Yes ( )  No ( )

Court Name(s) _____ " _____ " _____

Result(s) _____ " _____ " _____

Result Date(s) _____ " _____ " _____

7

Case: 22-2612    Document: 2-2    Page: 473    Date Filed: 09/23/2022
Case: 16-1791    Document: 003112253444    Page: 73    Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP   Document 6   Filed 04/21/08   Page 12 of 23

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

---

**N/A**

---

12. State *concisely* every ground on which you claim that you are being held unlawfully. Give specific facts supporting each ground.

*CAUTION*: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies, you should set them forth in this petition if you wish to seek federal relief. If you fail to set forth all such grounds in this petition, you may be barred from presenting them at a later date.

For information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted all your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

    (a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
    (b) Conviction obtained by use of coerced confession.
    (c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure, (where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim).
    (d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest,  (where the state has not provided a full and fair hearing on the merits of the Fourth Amendment claim).
    (e) Conviction obtained by a violation of the privilege against self-incrimination.
    (f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to  the defendant evidence favorable to the defendant.
    (g) Conviction obtained by a violation of the protection against double jeopardy.
    (h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
    (i) Denial of effective assistance of counsel.
    (j) Denial of right of appeal.

A. Ground one: ** SEE PAGES 9a, 9b, 9c, 9d, 9e & 9f, ATTACHED **

Supporting FACTS (state *briefly* without citing cases or law):


B. Ground two: 

Supporting FACTS (state *briefly* without citing cases or law):


C. Ground three: 

Supporting FACTS (state *briefly* without citing cases or law):


D. Ground four: 

Supporting FACTS (state *briefly* without citing cases or law):


9

Case: 22-2612    Document: 2-2    Page: 475    Date Filed: 09/23/2022
Case: 16-1791    Document: 003112253444    Page: 75    Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP    Document 6    Filed 04/21/08    Page 14 of 23

RESPONSES TO QUESTION 12

GROUND 1: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
Trial counsel's investigator supplied him with the names
and statement summaries of three alibi witnesses who would
have testified that the Petitioner was with them at the
time the crime was being committed. He also supplied him
with the names of two witnesses who saw the men running
from the scene of the crime and would have testified that
neither of the men they saw were the Petitioner. Trial
counsel advised his investigator that he was not going to
do any more work on the case until he got paid all his
money. Trial Counsel never filed an alibi notice, and never
called any of the alibi witnesses or eyewitnesses that were
provided to him by his investigator.

GROUND 2: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
Trial counsel failed to secure character witnesses. Proof
of good character is substantive evidence that, in and of
itself, can preclude a finding that guilt has been
established beyond a reasonable doubt and therefore warrant
the entry of a verdict of "not guilty" by a fact-finder.

GROUND 3: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
Trial counsel failed to move to preclude evidence of
alleged witness tampering that was not attributable to
Petitioner.

GROUND 4: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
Trial counsel failed to object to the Court's jury
instruction on accomplice liability, which permitted a
conviction even in the absence of proof that the Petitioner
himself possessed the specific intent to kill.

GROUND 5: VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE
The Commonwealth's sole eyewitness, Ernestine Williams, was
admittedly using crack-cocaine at the time of the incident
and has given multiple stories as to what, if anything, she
saw. These stories include, but are not limited to, (1) she
didn't see anything, (2) that the police showed her a 8-1/2
x 11 photo of the Petitioner, by itself, which was how she
was then able to identify him, (3) that it wasn't the
Petitioner and she doesn't know why the police arrested
him, and (4) that she didn't know what the Petitioner
handed to the shooter but that the police told her it was a
gun, which she agreed with. The Commonwealth also presented
another witness, Colie Baxter, who was not able to identify
the Petitioner's photo, yet came into court 3-1/2 years
later and made an in-court identification.

- 9a -

Case: 22-2612    Document: 2-2    Page: 476    Date Filed: 09/23/2022
Case: 16-1791    Document: 003112253444    Page: 76    Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP    Document 6    Filed 04/21/08    Page 15 of 23

GROUND 6: EVIDENCE WAS INSUFFICIENT TO SUSTAIN CONVICTION
        The supporting facts listed in Ground-5, above, are hereby
        incorporated by reference and made the facts in support of
        Ground-6.

GROUND 7: VERDICT WAS IMPERMISSIBLY INCONSISTENT
        In the present case, the entire theory of culpability
        rested on the Petitioner passing the murder weapon to the
        co-defendant immediately before the shooting. No evidence
        was ever produced to show what, if anything, was passed.
        The jury's verdict was based entirely on speculation and
        mere guessing.

GROUND 8: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
        EFFECTIVE ASSISTANCE OF DIRECT APPEAL COUNSEL
        Direct appeal counsel failed to raise the issues of (1)
        trial counsel's failure to move to preclude evidence of
        alleged witness tampering, (2) trial counsel's failure to
        object to Court's erroneous charge on accomplice liability,
        (3) trial counsel's failure to secure character witnesses.

GROUND 9: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
        EFFECTIVE ASSISTANCE OF DIRECT APPEAL COUNSEL
        Direct appeal counsel was ineffective for failing to
        preserve the sufficiency of the evidence claim by not
        seeking allowance of appeal from the Supreme Court of
        Pennsylvania.

GROUND 10: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
        EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
        Trial counsel failed to challenge the affidavit of probable
        cause in the arrest warrant, when the only statement made
        therein that linked the Petitioner to any crime was a
        proven fabrication on the part of the police.

GROUND 11: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
        EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
        Trial counsel, who knew that the brother of the deceased
        was told by eyewitness Ernestine Williams that "Boochie"
        "Tommy" and "Kendall" (not the Petitioner) were responsible
        for the murder, failed to request discovery and otherwise
        investigate the other individuals and establish their
        identity or confront Ms. Williams with this prior statement
        of identification.

GROUND 12: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
        EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
        Trial counsel failed to inform the Petitioner regarding an
        alibi defense and that he failed to file the requisite
        notice with the Court. Furthermore, trial counsel failed to
        inform the Petitioner that his investigator located two
        eyewitnesses who were willing to testify that they saw the
        individuals involved in the crime and that they are

Case: 22-2612   Document: 2-2   Page: 477   Date Filed: 09/23/2022
Case: 16-1791   Document: 003112253444   Page: 77   Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP   Document 6   Filed 04/21/08   Page 16 of 23

positive the Petitioner was not one of them. This caused
the Petitioner to tell the Court that he didn't have any
witnesses that he wanted to call when the Court
suspiciously gave the Petitioner a colloquy on that topic.

GROUND 13: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
            EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
    Trial counsel, after reserving his opening statement until
    the close of the Commonwealth's case, failed to give it.

GROUND 14: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
            EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
    Trial counsel failed to object to the prosecutor's closing
    address and failed to request a mistrial and/or cautionary
    instruction to the comment by the prosecutor which shifted
    the burden of proof to the Petitioner to present evidence
    or call witnesses during the trial.

GROUND 15: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
            EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
    Trial counsel failed to realize that the police and/or
    prosecutor were withholding evidence. The discovery which
    was provided to the defense is void of any police
    investigation reports that detail the progress of the
    investigation that was ongoing for more than 2-1/2 years
    before the Petitioner was arrested. Statements by the
    Commonwealth's witness that the police told her that they
    heard that she was being paid to put the blame on the
    Petitioner, and that the shooter was somebody named
    "Tommy", supports this. It is also noted that this same
    witness told another witness that a "Tommy" was involved.
    The Police clearly had information that people other than
    the Petitioner were responsible and failed to turn it over.
    Trial counsel should have recognized this.

GROUND 16: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
            EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
    Trial counsel erroneously advised Petitioner that if he
    testified his criminal history would be used to impeach his
    credibility.

GROUND 17: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
            EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
    Trial counsel was ineffective for failing to preclude the
    in-court identification of the Petitioner by witness Colie
    Baxter. In the alternative, counsel should have moved for a
    mistrial when such identification was made.

GROUND 18: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
            EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
    Trial counsel failed to realize that the police and/or
    prosecutor were withholding evidence when they failed to
    disclose that Colie Baxter was previously shown a

- 9c -

photograph of the Petitioner and was not able to identify
him. According to police, Ernestine Williams identified the
photo's of Larry Mullins and the Petitioner on 09/15/1993.
Approximately 28 days later, the police showed Colie Baxter
some photographs to see if he could identify anyone. Colie
Baxter was only able to identify Larry Mullins. It is
beyond belief that the police would not have showed Colie
Baxter photograph's of the Petitioner along with that of
Larry Mullins. Counsel should have realized this and filed
the appropriate motions.

GROUND 19: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
Trial counsel failed to suppress the identification of the
Petitioner made by witness Ernestine Williams when Ms.
Willliams stated that the Petitioner's picture was not
shown with other photograph's but that "it was just one big
picture, it was a large picture like it was xeroxed". Ms.
Williams testimony clearly raises questions as to the
suggestiveness involved in identifying the Petitioner and
counsel should have filed a motion to suppress that
identification.

GROUND 20: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF TRIAL COUNSEL
Trial counsel failed to file a motion to declare Ernestine
Williams incompetent to testify under Pennsylvania Rule of
Evidence 601. Ms. Williams admitted that she was smoking
crack cocaine and drinking on the day when the crime that
she supposedly saw occurred and since that time has given
more than half a dozen completely different versions of
what happened and who was involved.

GROUND 21: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE
On the day of the shooting, the police were told by a
Tamika Ledbetter that the deceased was responsible for
"Terry" and "Curt" being shot in the back two months prior
to his death. Although this statement was given to the
police long before they had any suspects, there was no
documents turned over to the defense that show what, if
anything, they uncovered when they investigated the
information.

GROUND 22: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE
On the day of the shooting, the police were advised by
Solomon Jordan that the deceased had disagreements with the
Curry family after Wayne Curry got killed. Although this
statement was given to the police long before they had any
suspects, there was no documents turned over to the defense

- 9d -

that show what, if anything, they uncovered when they
investigated the information.

GROUND 23: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE

Ernestine Williams stated that the police told her that
they heard that she was being paid to put the blame on the
Petitioner, and that they heard that the shooter was
somebody named "Tommy". However, no documents were turned
over to the defense to show where or how the police
obtained this information.

GROUND 24: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE

The police failed to disclose that Colie Baxter was
previously shown a photograph of the Petitioner and was not
able to identify him. According to police, Ernestine
Williams identified the photo's of Larry Mullins and the
Petitioner on 09/15/1993. Approximately 28 days later, the
police showed Colie Baxter some photographs to see if he
could identify anyone. Colie Baxter was only able to
identify Larry Mullins. It is beyond belief that the police
would not have showed Colie Baxter photograph's of the
Petitioner along with that of Larry Mullins.

GROUND 25: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE

The prosecution failed to turn over any investigative
reports that documented how the police investigation was
going during the more than 2-1/2 years that they had not
made any arrests. These documents are prepared in all
homicide cases, also known as Activity Sheets, and in this
case absolutely none were turned over. This fact is all the
more unusual when there are witnesses, described above, who
are stating that they told the police about other possible
suspects and that the police are telling them that received
information from such and such a source.

GROUND 26: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL FAILURE OF
THE PROSECUTION TO DISCLOSE EVIDENCE FAVORABLE TO THE
DEFENSE

Police Officer Mark Alston stated that he located
eyewitness Corey Braxton and transported him to the
homicide division. No information of any kind was ever
turned over to the defense regarding what exactly this
witness told the police. It is not believable that the
police would have decided to not take a statement from him.

GROUND 27: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF DIRECT APPEAL COUNSEL

- 9e -

Direct appeal counsel was ineffective when he failed to
realize that the Superior Court erred when they refused to
review the "weight of the evidence" claim because they
didn't believe that it was properly raised in the first
instance via a post-sentence motion. In fact, the claim was
properly raised in the post-sentence motion, as it was
number one.

GROUND 28: CONVICTION OBTAINED BY THE UNCONSTITUTIONAL DENIAL OF
EFFECTIVE ASSISTANCE OF POST CONVICTION RELIEF COUNSEL
Post Conviction Relief counsel was ineffective when he
failed to realize that the direct appeal counsel erred by
not realizing that the Superior Court erred when they
refused to review the "weight of the evidence" claim
because they didn't believe that it was properly raised in
the first instance via a post-sentence motion. In fact, the
claim was properly raised in the post-sentence motion, as
it was number one.

GROUND 29: UNCONSTITUTIONAL DENIAL OF A FAIR TRIAL DUE TO
JUDICIAL MISCONDUCT
The trial court erred by not recusing himself from the case
when he found out that the trial attorney for the
Petitioner, and son of his long-time friend and former
employer, who is rumored to be his god-son, and is now his
employer, failed to file an alibi notice and otherwise
procure witnesses on behalf of his client. Instead, the
Judge devised a plan to attempt to cover for trial counsel
by giving the Petitioner a colloquy that he was in no way,
shape or form, able to respond to knowing and
intelligently. The colloquy served but two purpose, and
they were to protect the trial attorney, and to trick the
Petitioner into waiving a serious claim of ineffective
counsel that the Petitioner wasn't even aware existed.

GROUND 30: UNCONSTITUTIONAL DENIAL OF A FAIR TRIAL DUE TO
JUDICIAL MISCONDUCT
The trial court erred by not recusing himself from deciding
whether or not trial counsel was ineffective when he
learned that the trial counsel in question was the son of
his long-time friend and former employer, who is rumored to
be his god-son, and is now his employer. Because the ruling
was so bizarre and not based in law or facts, it was
without question a ruling made solely to protect the trial
attorney. This is especially true if the court knew at the
time that he would be working for the trial attorney
shortly thereafter, which it appears he did.


NOTE: All grounds raised herein have been further detailed, with
supporting exhibits, in the Petitioner's Memorandum of Law, which
accompanies this Petition. Accordingly, in the event that enough
information has not been provided above, the corresponding
sections of the Memorandum of Law are hereby incorporated by
reference and made part of answers listed above.

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

_____

** SEE PAGE 10a, ATTACHED **

_____

_____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?        Yes ( )    No (X)

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing: _____ ** SEE PAGE 10b, ATTACHED **

_____ * _____ * _____

(b) At arraignment and plea: _____ * _____ * _____

_____

(c) At trial: _____ * _____ * _____

_____

(d) At sentencing: _____ * _____ * _____

_____

(e) On appeal: _____ * _____ * _____

_____

(f) In any post-conviction proceeding: ____ * _____ * _____

10

Case: 22-2612   Document: 2-2   Page: 482   Date Filed: 09/23/2022
Case: 16-1791   Document: 003112253444   Page: 82   Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP   Document 6   Filed 04/21/08   Page 21 of 23

RESPONSE TO QUESTION 13

GROUNDS NOT PREVIOUSLY PRESENTED IN ANY COURT:

10, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30.

REASONS THAT GROUNDS WERE NOT PRESENTED:

The issues were not previously raised as the result of multiple instances of ineffectiveness of counsel, as will be more fully discussed in the Memorandum of Law that accompanies this petition.

As a review of this matter will reveal, and the Petitioner has highlighted by way of his Memorandum of Law, there exceeds a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Case: 22-2612   Document: 2-2   Page: 483   Date Filed: 09/23/2022
Case: 16-1791   Document: 003112253444   Page: 83   Date Filed: 04/05/2016

Case 2:08-cv-01073-GEKP   Document 6   Filed 04/21/08   Page 22 of 23

RESPONSES TO QUESTION 15

\*\* ALL ADDRESSES ARE LAST KNOWN \*\*

PRELIMINARY HEARING (M.C. No. 9507-0469) & ARRAIGNMENT (C.P. 9510-1162)

Andrew G. Gay, Esquire
Pennsylvania Supreme Court No. 02425
1731 Spring Garden Street
Philadelphia, PA 19130

TRIAL & SENTENCING (C.P. No. 9510-1162)

Geoffrey V. Seay, Esquire
1315 Walnut Street, Suite 732
Philadelphia, PA 19107
Ph. 215-545-7778

FIRST PCRA PETITION (C.P. No. 9510-1162), POST-TRIAL MOTIONS (C.P. No. 9510-1162), DIRECT APPEAL (1799 Philadelphia 1998) & REMAND HEARINGS (C.P. No. 9510-1162)

Randolph L. Goldman, Esquire
Pennsylvania Supreme Court No. 23307
1422 Chestnut Street, Suite 701
Philadelphia, PA 19102
Ph. 215-636-0303

REMAND HEARING APPEAL (152 EDA 2000), PETITION FOR ALLOWANCE OF APPEAL (579 EAL 2000), SECOND PCRA (C.P. No. 9510-1162) & BEGINNING OF PCRA APPEAL (755 EDA 2003)

Jules Epstein, Esquire
Pennsylvania Supreme Court No. 28569
The Cast Iron Building
Suite 501 - South
718 Arch Street
Philadelphia, PA 19106
Ph. 215-925-4400

END OF PCRA APPEAL (755 EDA 2003) & PETITION FOR ALLOWANCE OF APPEAL (221 EAL 2007)

James Kelly, Pro Se

- 10b -

(g) On appeal from any adverse ruling in a post-conviction proceeding: _____

               \*\* SEE PAGE 10b, HEREIN \*\*

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?        Yes (X)  No ( )

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?                Yes ( )  No (X)

   (a) If so, give name and location of court which imposed sentence to be served in the future:

                       Not Applicable

   (b) And give date and length of sentence to be served in the future:  Not Applicable

   (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?        Yes ( )  No (X)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___4 - 16 - 08___
          Date

                              Petitioner's Signature or
                 Signature of Petitioner's Representative
                 James Kelly, Pro Se

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

Signature of Attorney (if any)
  James Kelly, Pro Se

# EXHIBIT

# G

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES KELLY, | : | CIVIL ACTION |
| Petitioner | : | |
| | : | |
| v. | : | No. 08-1073 |
| | : | |
| GERALD L. ROZUM, et al., | : | |
| Respondents | : | |

## REPORT AND RECOMMENDATION

TIMOTHY R. RICE                                                February 17, 2009
U.S. MAGISTRATE JUDGE

     Petitioner James Kelly, a prisoner at the State Correctional Institution in Somerset,

Pennsylvania, has filed this counseled petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. For the following reasons, I respectfully recommend Kelly's claims be denied as

procedurally defaulted, non-cognizable, or meritless.

## FACTUAL AND PROCEDURAL HISTORY

     On August 20, 1996, after a joint trial, a jury found Kelly guilty of first-degree murder

and criminal conspiracy. See Verdict, Pennsylvania v. Kelly, CP 9510-1162 (Ct. Com. Pl. Phila.

entered Aug. 20, 1996). On August 21, 1996, the trial court sentenced Kelly to life imprisonment

for the murder conviction and two and one-half-to-five years imprisonment for the conspiracy

conviction. The sentences were concurrent.

     At the trial, Ernestine Williams and Colie Baxter testified. Williams testified that, prior

to the shooting, she saw and talked with Kelly on the same block on which the shooting occurred.

Aug. 14, 1996 Transcript at 85:10-25, Commonwealth v. Kelly, CP 9510-1162 (Ct. Com. Pl.

Phila.) [hereinafter Transcript]. She saw Kelly pass a brown bag to Larry Mullins, Kelly's co-

1

Case: 22-2612    Document: 2-2    Page: 487    Date Filed: 09/23/2022

Case 16-1731  Document 003112253444 26  Page 92 Date Filed: 01/05/2016
Case 2:08-cv-01073-GEKP  Document 26  Filed 02/18/09  Page 2 of 45

defendant. See id. at 87:17-20. Mullins placed this brown bag under his coat and did not

immediately remove his hand. Id. at 249:2-21. When Mullins removed his hand, he held a gun,

which he used to shoot the victim, Travis Hughston. Id. at 249:21-23. Baxter testified he saw

Kelly and Mullins run from the scene, enter a car, and drive away. See Aug. 15, 1996 Transcript

at 38:13-16, 12:20-22: 11:2-15.

Kelly did not file timely post-sentence motions or an appeal. Kelly filed a petition under

the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. § 9541, seeking

reinstatement of his appellate rights and leave to file post-sentence motions. See Petitioner's

Memorandum of Law in Support of Petition for Leave to File Post-Sentence Motion and for

Appeal Nunc Pro Tunc and for other Post-Conviction Relief, Pennsylvania v. Kelly, CP 9510-

1162 (Ct. Com. Pl. Phila. filed Jul. 14, 1997). The court granted the requested relief and Kelly

filed post-sentence motions arguing: (1) the verdict was against the weight of the evidence; (2)

the evidence was insufficient to sustain the verdict; (3) the jury rendered an inconsistent verdict;

and (4) ineffective assistance of counsel for failing to adequately investigate the case or interview

witnesses, failing to present at least one witness, failing to investigate the alibi defense, failing to

present an opening statement to the jury; and failing to request proper final instructions and

failing to object to the trial court's instructions. See Post Sentence Motions, Pennsylvania v.

Kelly, 1162-1995 (Ct. Com. Pl. Phila. filed Jan. 16. 1998) [hereinafter Post Sentence Motions].

Counsel then filed supplemental post-sentence motions alleging counsel ineffectiveness

for failing to call witnesses and/or expert witnesses to testify the shooting could not have

occurred in a manner consistent with Williams' testimony, failing to conduct a meaningful cross-

examination of Williams, and abandoning the defense and investigation of the case. See

2

Supplemental Post-Sentence Motions, <u>Pennsylvania v. Kelly</u>, 1162-1995 (Ct. Com. Pl. Phila. filed Feb. 18, 1998) [hereinafter Supplemental Post-Sentence Motions]. The post-sentence motions were denied by operation of law on May 27, 1998. <u>See</u> Docket at 4, Court of Common Please Trial Division Appeals Unit, <u>Commonwealth v. Kelly</u>, 95-10-1162 (Ct. Com. Pl. Phila.).

Kelly filed a timely appeal claiming: (1) insufficient evidence to sustain the conviction; (2) the verdict was against the weight of the evidence; (3) counsel ineffectiveness for failing to investigate, including failing to interview witnesses and failing to call witnesses; (4) counsel ineffectiveness for failing to investigate a viable alibi defense, failing to file an alibi notice, and failing to present alibi witnesses; (5) counsel ineffectiveness for failing to inform the defendant that counsel neglected to file the alibi notice and preventing defendant from making a knowing and voluntary waiver of such defense; (6) counsel ineffectiveness for failing to present an opening address; (7) counsel ineffectiveness for failing to object to the prosecutor's closing address and failing to request a mistrial and/or cautionary instruction following the prosecutor's comment shifting the burden of proof to Kelly; (8) counsel ineffectiveness for failing to object to the court's charge to the jury that it could consider any prior inconsistent statement as substantive evidence; (9) deprivation of his right to an evidentiary hearing on post-sentence motions because the Commonwealth failed to transfer Kelly from the state correctional institution; and (10) the verdict was inconsistent. <u>See</u> Statement of Matters Complained of on Appeal Pursuant to Pa. R. A. Proc. 1925(b), <u>Commonwealth v. Kelly</u>, 1162-1995 (Ct. Com. Pl. Phila. filed June 25, 1998) [hereinafter Pre-Remand Appeal]. The Superior Court of Pennsylvania affirmed the judgment of sentence, but remanded for an evidentiary hearing on whether trial counsel was ineffective for failing to call alibi witnesses and eyewitnesses and for failing to make an opening statement.

3

Commonwealth v. Kelly 1799 Philadelphia 1998 (Pa. Super. Ct. filed July 9, 1999)

(Memorandum Opinion) [hereinafter Remand Opinion].

At the evidentiary hearing on December 6, 1999 and December 7, 1999, counsel argued

counsel ineffectiveness for failing to call alibi witnesses and eyewitnesses, but did not address

counsel's failure to present an opening statement. See Dec. 6, 1999 Evidentiary Hearing

Transcript at 4:6-18, Commonwealth v. Kelly, 95-10-1162 (Ct. Com. Pl. Phila 1999). The court

denied Kelly's motion for a new trial. See Dec. 7, 1999 Evidentiary Hearing Transcript at 57:25,

58:1-17; Commonwealth v. Kelly, CP 9510-1162 1/1 (Ct. Com. Pl. Phila. filed Dec. 8, 1999)

(Memorandum Opinion) [hereinafter Court Common Pleas Post Remand Decision].

Kelly obtained new counsel and appealed the trial court's ruling. See Brief for Appellant,

Pennsylvania v. Kelly, 2000 EDA 0152 (Pa. Super. Ct. filed Mar. 22, 2000) [hereinafter Post-

Remand Brief]. Kelly argued: (1) counsel ineffectiveness and denial of a fair trial when counsel

failed to secure or present alibi evidence and eyewitness testimony; (2) counsel ineffectiveness

and denial of a fair trial when counsel failed to move in limine to preclude evidence of alleged

pressuring of a witness that was not attributable to Kelly; (3) counsel ineffectiveness and denial

of a fair trial when trial counsel failed to object to the trial court's instruction on accomplice

liability; (4) counsel ineffectiveness and denial of a fair trial when counsel failed to secure

character witnesses; (5) counsel ineffectiveness and denial of a fair trial when direct appellate

counsel failed to raise the legal issues identified above, and failed to challenge the lack of proof

of specific intent to kill or preserve the insufficient evidence claim by seeking allowance of

appeal from the Supreme Court of Pennsylvania. See Post-Remand Brief at 4. The Superior

4

Court affirmed. See Commonwealth v. Kelly, 152 EDA 2000 (Pa. Super. Ct. filed Aug. 24 2000) (Memorandum Opinion) [hereinafter Superior Court Post-Remand Opinion].

On September 21, 2000, Kelly filed a petition for review by the Pennsylvania Supreme Court alleging: (1) the Superior Court erred by approving trial counsel's failure to secure and present witnesses; (2) the Superior Court erred by refusing to review claims raised by new counsel; and (3) a defendant cannot be bound by an answer in a colloquy that he did not want to call witnesses if trial counsel fails to locate and interview witnesses. See Petition for Allowance of Appeal at 2-3, Kelly v. Commonwealth, No. 2000 EDA 0152 (Pa. filed Sept. 21, 2000) [hereinafter Petition for Allowance of Appeal]. The Pennsylvania Supreme Court denied allocatur on February 9, 2001. Commonwealth v. Kelly, 871 A.2d 141 (Pa. 2001) (table).

On September 26, 2001, Kelly filed a petition for post conviction relief pursuant to 42 Pa. C.S.A. § 9543, see Petition for Post-Conviction Relief Pursuant to 42 Pa. C.S.A. § 9543, Commonwealth v. Kelly, C.P. 9510-1162 (Ct. Com. Pl. Phila. filed Sept. 26, 2001) [hereinafter PCRA Petition], and on October 17, 2001, he filed a supplement to the previously filed petition. See Petitioner's Supplement to Previously Filed Petition for Post-Conviction Relief Pursuant to 42 Pa. C.S.A. § 9543, Commonwealth v. Kelly, C.P. 9510-1162 (Ct. Com. Pl. Phila. filed Oct. 17, 2001) [hereinafter Supplement to PCRA Petition]. Kelly alleged: (1) counsel ineffectiveness and denial of a fair trial when counsel failed to move in limine to preclude evidence of alleged pressuring of a witness not attributable to Kelly; (2) counsel ineffectiveness and denial of a fair trial when counsel failed to object to trial court's jury instruction on accomplice liability; (3) counsel ineffectiveness and denial of a fair trial when trial counsel failed to secure character witnesses; (4) counsel ineffectiveness and denial of a fair trial when trial counsel failed to request

5

discovery and investigate an alternate suspect; (5) the prosecution violated Brady v. Maryland, 373 U.S. 83 (1963) because it failed to disclose files relating to an alternate suspect; (6) counsel ineffectiveness and denial of a fair trial when direct appellate counsel did not raise the above issues and failed to challenge the lack of proof of specific intent to kill or preserve the insufficient evidence claim; (7) counsel ineffectiveness and denial of the right to testify when trial counsel advised Kelly his criminal record could be used to impeach his credibility if he testified. See id. The court dismissed Kelly's petition on February 19, 2003. See Commonwealth v. Kelly, No. 9510-1162 (Ct. Com. Pl. Phila. filed Jan. 28, 2004) [hereinafter PCRA Opinion].

Kelly waived his right to appellate counsel, and filed a pro se appeal alleging: (1) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for omitting certain rebuttal testimony; (2) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for allowing the admission of irrelevant and prejudicial testimony and prosecutor misconduct; (3) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for not fully utilizing the prior statements of prosecution witnesses on cross examination; (4) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for allowing the jury to see Kelly's "mug shot" from a prior arrest; (5) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for allowing an in-court identification of Kelly which lacked independent basis and failing to object to the court's instruction; (6) PCRA counsel ineffectiveness for waiving claims related to Kelly's second alibi witness; (7) PCRA counsel ineffectiveness for failing to raise first appellate counsel's ineffectiveness for inadequately questioning trial counsel at the evidentiary hearing, failing to object to the prosecutor's

6

examination of Kelly and his witnesses, and the hearing court's deviation from its mandated

function; (8) denial of due process when PCRA court ruled appellate counsel effective despite

failing to raise trial counsel ineffectiveness for not challenging admissibility of witness

pressuring testimony and not presenting character witnesses; (9) denial of due process when trial

court found no hearing was necessary to resolve Kelly's PCRA claims. See Brief for Appellant

at 5, Commonwealth v. Kelly, 755 EDA 2003, (Pa. Super. Ct. filed Nov. 2, 2004) [hereinafter

PCRA Appeal].

On December 18, 2006, the Superior Court rejected Kelly's claims. See Commonwealth

v. Kelly, 755 EDA 2003 (Pa. Super. Ct. Dec. 18, 2006) (Memorandum Opinion) [Superior Court

PCRA Opinion]. The Honorable Kate Ford Elliott filed a dissenting opinion contending Kelly

had not waived his claims and was entitled to a new trial because his counsel was ineffective for

failing to challenge the admissibility of witness-pressuring testimony and failing to call character

witnesses. Commonwealth v. Kelly, 755 EDA 2003 (Pa. Super. Ct. Dec. 18, 2006) (dissenting,

Elliott, J.) (Memorandum Opinion) [hereinafter Superior Court Dissent]. The Pennsylvania

Supreme Court denied allocatur on October 26, 2007. Commonwealth v. Kelly, 934 A.2d 1277

(Pa. 2007) (table).

On April 21, 2008, Kelly filed a habeas corpus petition alleging: (1) counsel

ineffectiveness for failing to investigate witnesses, file an alibi notice, and present alibi

witnesses; (2) counsel ineffectiveness for failing to secure character witnesses; (3) counsel

ineffectiveness for failing to move to preclude evidence of witness tampering; (4) counsel

ineffectiveness for failing to object to the court's jury instruction on accomplice liability; (5) the

verdict was against the weight of the evidence; (6) insufficient evidence to sustain the verdict; (7)

the verdict was inconsistent; (8) appellate counsel ineffectiveness for failing to raise trial

counsel's (a) failure to move to preclude evidence of witness tampering, (b) failure to object to

the court's instruction on accomplice liability,(c) failure to secure character witnesses; and (d)

failure to raise a weight claim; (9) appellate counsel ineffectiveness for failing to preserve the

insufficient evidence claim; (10) counsel ineffectiveness for failing to challenge the affidavit of

probable cause; (11) counsel ineffectiveness for failing to request discovery for, or investigate, an

alternate suspect; (12) counsel ineffectiveness for failing to inform Kelly regarding the alibi

defense, failing to file a notice of alibi defense, and failing to inform Kelly the investigator

located two eyewitnesses; (13) counsel ineffectiveness for failing to give an opening statement;

(14) counsel ineffectiveness for failing to object to the prosecutor's closing argument and failing

to request a mistrial and/or a cautionary instruction to prosecutor comment which shifted the

burden to Kelly; (15) counsel ineffectiveness for failing to realize the police and/or prosecutor

were withholding evidence; (16) counsel ineffectiveness for advising Kelly his criminal history

would be used to impeach his credibility if he testified; (17) counsel ineffectiveness for failing to

preclude the in-court identification of Kelly and for failing to move for a mistrial after such

identification; (18) counsel ineffectiveness for failing to allege the police and/or prosecutor were

withholding evidence when they failed to disclose that Baxter was previously unable to identify

Kelly in a photograph array; (19) counsel ineffectiveness for failing to suppress the identification

of Kelly made by Williams; (20) counsel ineffectiveness for failing to file a motion to declare

Williams incompetent to testify; (21) the prosecution failed to disclose evidence favorable to the

defense, i.e., investigation documents relating to a witness's statement the victim was responsible

for the shootings of "Terry" and "Curt"; (22) the prosecution failed to disclose evidence

8

favorable to the defense, i.e., investigation documents relating to disagreements the victim had

with the Curry family; (23) the prosecution failed to disclose evidence favorable to the defense,

i.e., documents relating to the police statement to Williams that they heard she was paid to blame

Kelly and the shooter was someone named "Tommy"; (24) the prosecution failed to disclose

evidence favorable to the defense, i.e., Baxter was unable to identify Kelly when previously

shown a photograph; (25) the prosecution failed to disclose evidence favorable to the defense,

i.e., investigation reports documenting the two-and-one-half-year investigation; (26) the

prosecution failed to disclose evidence favorable to the defense, i.e., information gained from

witness Corey Braxton; (27) appellate counsel ineffectiveness for failing to allege the Superior

Court erred by refusing to review the weight of the evidence claim; (28) PCRA counsel

ineffectiveness for failing to allege the Superior Court erred by refusing to review the weight of

the evidence claim; (29) denial of a fair trial due to judicial misconduct because the judge failed

to recuse himself even though Kelly's attorney was the son of a long-time friend and former

employer, is rumored to be the judge's godson, and is now his employer; (30) denial of a fair trial

due to judicial misconduct because the judge did not recuse himself from deciding whether trial

counsel was ineffective. See Petition for Writ of Habeas Corpus by a Person in State Custody at

9(a) -9(f), Kelly v. Rozum, 08-1073 (E.D. Pa. filed Apr. 21, 2008) [hereinafter Petition];

Memorandum of Law in Support of Petitioner's Petition for Writ of Habeas Corpus, Kelly v.

Rozum, 08-1073 (E.D. Pa. filed Apr. 21, 2008) [hereinafter Kelly's Memorandum of Law].

Kelly obtained counsel on October 10, 2008, and counsel filed an amended petition on December

9, 2008, reiterating the above-listed claims. See Amended Petition Writ for Habeas Corpus,

Kelly v. Rozum, No. 08-1073 (E.D. Pa. filed Dec. 9, 2008).

For the reasons set forth below, I recommend Kelly's claims be dismissed as procedurally defaulted, non-cognizable, or meritless.

## **DISCUSSION**

I.      Procedurally Defaulted

A.      Kelly waived claims not properly presented to the state courts

A federal court may not grant habeas relief to a state prisoner unless the prisoner exhausted her available remedies in state court. 28 U.S.C. § 2254(b); O'Sullivan v. Boerkel, 526 U.S. 838, 839 (1999); Picard v. Connor, 404 U.S. 270, 275 (1971); Nara v. Frank, 488 F.3d 187, 197 (3d Cir. 2007); Slutzker v. Johnson, 393 F.3d 373, 379 (3d Cir. 2004). A state prisoner must complete "the State's established appellate review process" to "give the state courts one full opportunity to resolve any constitutional issues." O'Sullivan, 526 U.S. at 845; Nara, 488 F.3d at 197; see also Woodford v. Ngo, 126 S.Ct. 2378, 2386-87 (2006).[1] A petitioner "shall not be deemed to have exhausted the remedies available . . . if [s]he has the right under the law of the [s]tate to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

A claim "fairly presented" to the state courts is exhausted. Baldwin v. Reese, 541 U.S. 27, 29 (2004); O'Sullivan, 526 U.S. at 848; Nara, 488 F.3d at 197; Cristin v. Brennan, 281 F.3d 404, 410 (3d Cir. 2002); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996). The relevant inquiry is whether the petitioner presented in state courts the legal theory and supporting facts asserted in the federal habeas petition. Nara 488 F.3d at 198; Keller v. Larkins, 251 F.3d 408,

---

[1] Pennsylvania Supreme Court Order No. 218 declares federal habeas petitioners no longer have to appeal to the state supreme court to satisfy the exhaustion requirement. See Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).

10

413 (3d Cir. 2001); <u>see</u> <u>Revels v. DiGuglielmo</u>, 2005 WL 1677951, *4 (E.D. Pa. 2005) (DuBois, J.).

    "[I]f [a] petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred . . . there is procedural default for purposes of federal habeas . . . ." <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1 (1991); <u>McCandless</u>, 172 F.3d at 260. Although the issue is best addressed by the state courts, a federal court may dismiss a petition as procedurally barred if state law would unambiguously deem it defaulted. <u>Carter v. Vaughn</u>, 62 F.3d 591, 595 (3d Cir. 1995). Similarly, procedural default occurs when a petitioner presented the claim in the state system, but the state court refuses to address the claim on the merits because of "an established state rule of law independent of the federal claim and adequate to support the refusal." <u>Sistrunk v. Vaughn</u>, 96 F.3d 666, 673 (3d Cir. 1996) (citing <u>Coleman</u>, 501 U.S. at 750). This procedural default doctrine prohibits federal courts from reviewing a petitioner's claim defaulted in state courts on an independent and adequate state law ground. <u>Coleman</u>, 501 U.S. at 729; <u>see</u> <u>Leyva v. Williams</u>, 504 F.3d 357, 365 (3d Cir. 2007); <u>Nara</u>, 488 F.3d at 199; <u>Griggs v. DiGuglielmo</u>, 2007 WL 2007971, at *5 (E.D. Pa. Jul. 3, 2007) (Yohn, J.).

    An adequate state law ground exists if: "(1) the state procedural rule speaks in unmistakable terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions." <u>Doctor v. Walters</u>, 96 F.3d 675, 683-84 (3d Cir. 1996). It must be a rule of general applicability which is "firmly established, readily ascertainable, and regularly followed." <u>See</u> <u>Leyva</u>, 504 F.3d at 366 (quoting <u>Szuchon v. Lehman</u>, 273 F.3d 299, 327 (3d Cir. 2001)). The purpose of the

11

procedural default rule is to prevent habeas petitioners from avoiding the exhaustion doctrine by

defaulting their federal claims in state court. Coleman, 501 U.S. at 732.

An issue is waived if a petitioner fails to raise it and it could have been raised before trial,

at trial, on appeal, in a habeas corpus proceeding, or in a prior proceeding.  42 Pa. Cons. Stat. §

9544(b); see also Sistrunk v. Vaughn, 96 F.3d 666, 671 n.4 (3d Cir. 1996) ("the rules [of

Pennsylvania's appellate procedure] dictate that an issue raised at the trial level but not preserved

on appeal will not be considered by any subsequent appellate court"); Commonwealth v.

D'Collanfield, 805 A.2d 1244, 1245 (Pa. Super. 2002) (issue not preserved on appeal waived).

Moreover, the PCRA provides collateral actions must be filed within one year of the date on

which the conviction became final.  42 Pa. Cons. Stat. § 9545(b)(1).  Such state law waiver and

PCRA statute of limitation rules are independent and adequate state law grounds that bar federal

habeas review. Peterson v. Brennan, 196 Fed. Appx. 135, 142 (3d Cir. Sept. 26, 2006); Griggs,

2007 WL 2007971, at *5; Frey v. Stowitzky, 2007 WL 1574768, at *2 (E.D. Pa. May 31, 2007)

(Giles, J.) (claims procedurally defaulted in federal court because petitioner's direct appeal was

dismissed for failure to file a brief and his PCRA petition was untimely); Clymer, 2005 WL

711651, at *4-5 (claim procedurally defaulted because state court has consistently found issues

waived if defendant fails to properly brief the issues).  They are rules of general applicability

which are "firmly established, readily ascertainable, and regularly followed." See Leyva, 504

F.3d at 366 (quoting Szuchon, 273 F.3d at 327).

12

### 1.    Claims not presented to the state courts

Kelly failed to present the following claims to the state court: appellate counsel

ineffectiveness for failing to raise a weight claim (ground 8, in part),[2] see Kelly's Memorandum

of Law at ¶131, 109-119; counsel ineffectiveness for failing to challenge the affidavit of probable

cause (ground 10); counsel ineffectiveness for failing to inform Kelly about the alibi defense and

the eyewitnesses (ground 12); counsel ineffectiveness for failing to raise a claim the prosecution

withheld evidence, including questions posed by police to Williams and various police activity

sheets (ground 15); counsel ineffectiveness for failing to seek and/or review discovery regarding

whether Baxter was unable to identify a photograph of Kelly prior to trial (ground 18); counsel

ineffectiveness for failing to move to suppress Williams' identification of Kelly (ground 19);

counsel ineffectiveness for failing to file a motion to bar Williams from testifying because she

was incompetent (ground 20); Brady violation for the prosecution's failure to disclose

investigation documents relating to a witness's statement the deceased was responsible for the

shootings of "Terry" and "Curt" (ground 21); Brady violation for the prosecution's failure to

disclose investigation documents relating to disagreements the victim had with the Curry family

(ground 22); Brady violation for the prosecution's failure to disclose documents relating to the

police officers' statement to Williams that they heard she was paid to blame Kelly and the

shooter was someone named "Tommy" (ground 23); Brady violation for the prosecution's failure

to disclose Baxter was unable to identify Kelly when previously shown a photograph (ground

---

[2] Kelly's appellate counsel claimed Kelly's conviction was against the weight of the
evidence in his post-sentence motions, see Post Sentence Motions, and on appeal, see Pre-
Remand Appeal. Therefore, it appears Kelly is arguing counsel ineffectiveness for failing to
raise this claim to the Pennsylvania Supreme Court.

24); <u>Brady</u> violation for the prosecution's failure to disclose investigation reports documenting

the two-and-one-half-year investigation (ground 25); <u>Brady</u> violation for the prosecution's failure

to disclose information gained from witness Corey Braxton (ground 26);[3] appellate counsel

ineffectiveness for failing to allege the superior court erred when it refused to review the weight

of the evidence claim (ground 27); PCRA counsel ineffectiveness for failing to allege appellate

counsel ineffectiveness for failing to allege the superior court erred by refusing to review the

weight of the evidence claim (ground 28); and denial of a fair trial because the trial judge did not

recuse himself from the trial and the evidentiary hearing (grounds 29 and 30).

      Kelly waived these claims when he failed to raise them on direct appeal or during PCRA

review. <u>See</u> 42 Pa. Cons. Stat. § 9544(b); <u>see also</u> <u>Sistrunk v. Vaughn</u>, 96 F.3d at 671 n.4. Kelly

is now passed the one-year limitations period for PCRA. <u>See</u> Pa. Cons. Stat. § 9544(a). Such

independent and adequate state law ground preclude review here, <u>see</u> <u>Peterson</u>, 196 Fed. Appx. at

142, and the claims are procedurally defaulted because he can no longer raise them in state court,

<u>see</u> <u>Coleman</u>, 501 U.S. at 735 n.1.

      2.    <u>Claims not preserved on appeal to the Superior Court or on PCRA review</u>

      Kelly first raised ground 4, trial counsel ineffectiveness for failing to object to the court's

jury instruction on accomplice liability, on his post-remand appeal. <u>See</u> Post-Remand Brief at

22. The Superior Court denied review because it was beyond the scope of the limited review

granted to petitioner. <u>See</u> Post-Remand Superior Court Opinion at 4, 4 n.4 (finding issues

---

[3] In state court, Kelly asserted only a <u>Brady</u> violation for the prosecution's failure to
disclose the full name and criminal background of Boochie. <u>See</u> PCRA Petition at ¶ 10f. Kelly
does not raise this claim here. <u>See</u> Petition. Even if he had, Kelly failed to raise it on appeal in
state court. <u>See</u> PCRA Appeal at 5. Therefore, he waived the claim, 42 Pa. Cons. Stat. § 9544(b),
and it is now procedurally defaulted, <u>see</u> <u>Coleman</u>, 501 U.S. at 735 n.1.

waived, but noting review of these issues would not automatically be precluded under the PCRA). Kelly abandoned this claim by failing to present it in any other appellate[4] or PCRA proceeding. See 42 Pa. Cons. Stat. § 9544(b).

Kelly raised direct appellate counsel ineffectiveness for failing to object to the court's instructions on accomplice liability, ground 8, in part, in his post-remand appellate brief, see Post-Remand Brief at 4, and PCRA petition, see PCRA Petition at 2. Kelly waived the claim, see 42 Pa. Cons. Stat. § 9544(b), however, when he failed to raise it on his PCRA appeal, see PCRA Appeal at 5.

In his post-remand brief, Kelly raised ground 9, counsel ineffectiveness for direct appellate counsel's failure to seek allowance of appeal to the Supreme Court for review of Kelly's insufficient evidence claim. See Post-Remand Brief at 4. The Superior Court found the claim unreviewable because it was beyond the scope of remand. See Superior Court Post-Remand Opinion at 4. In addition, although Kelly raised the claim in his PCRA Petition, see PCRA Petition at 2, he did not pursue this claim on PCRA appeal, see PCRA Appeal at 5. Kelly, therefore, waived the claim. See 42 Pa. Cons. State. § 9544(b).

Ground 11, in part, alleges trial counsel ineffectiveness for failing to investigate and request discovery on alternate suspects Boochie, Tommy, and Kendall, and failing to present evidence "Boochie" was a real person with a long and violent arrest record. See Petition at 9b, Kelly's Memorandum of Law at ¶ 142-152. Kelly raised this claim in his PCRA petition, and the

---

[4] In his petition for review to the Pennsylvania Supreme Court, Kelly alleged Superior Court error in failing to review the claim. See Petition for Allowance of Appeal at 2-3. The Supreme Court, however, did not grant review, Kelly, 871 A.2d at 141, and Kelly failed to raise this ineffectiveness claim on PCRA, see PCRA Petition.

PCRA court rejected the claim. See PCRA Petition at 2-3. Kelly did not appeal this ruling. See PCRA Appeal at 5. Kelly, therefore, waived the claim. See 42 Pa. Cons. Stat. § 9544(b).

Kelly first raised ground 13, trial counsel ineffectiveness for failing to deliver an opening statement, on direct appeal. See Pre-Remand Appeal. The Superior Court remanded the claim for an evidentiary hearing. See Remand Opinion. The trial court found the claim meritless because Kelly failed to show he was prejudiced by counsel's failure to make an opening statement. See Common Pleas Court Post Remand Opinion at 3. Kelly did not raise this claim on appeal, see Post-Remand Appeal Brief, or on PCRA, see PCRA Petition, and, therefore, waived it, see 42 Pa. Cons. Stat. § 9544(b).

Ground 16 alleges trial counsel ineffectiveness for advising Kelly his criminal history would be used to impeach his credibility if he testified. See Petition at 9c. On PCRA, Kelly claimed trial counsel ineffectiveness for advising Kelly not to testify. See Supplemental PCRA Petition at ¶3. The PCRA court rejected the claim. See PCRA Opinion at 7. Kelly waived this claim when he failed to appeal it to the Superior Court. See 42 Pa. Cons. Stat. § 9544(b); PCRA Appeal.

Kelly is now passed the one-year limitations period for PCRA. See Pa. Cons. Stat. § 9544(a). Such independent and adequate state law grounds preclude habeas review. See Peterson, 196 Fed. Appx. at 142. Because he can no longer raise these claims in state court, they are procedurally defaulted. See Coleman, 501 U.S. at 735 n.1.

### 3. Claim not raised to the Pennsylvania Supreme Court

Before May 9, 2000, a petitioner failed to exhaust a claim unless he filed a petition for allowance of appeal to the Pennsylvania Supreme Court. Pennsylvania Supreme Court Order

16

218, issued on May 9, 2000, provides "a litigant shall not be required to petition for rehearing or allowance of appeal following an adverse decision by the Superior Court in order to be deemed to have exhausted all available state remedies." See Wenger v. Frank, 266 F.3d 218, 224-25 (3d Cir. 2001). Petitioners, therefore, are no longer required to raise their claims to the Pennsylvania Supreme Court to satisfy the exhaustion requirement. See Lambert, 387 F.3d at 233-34. This rule, however, does not apply where "the time to petition for review by the state supreme court expired prior to the date of the order." See Wenger, 266 F.3d at 226.

On July 9, 1999, the Superior Court issued an order in Kelly's case which affirmed the trial court's judgment, remanded for further proceedings, and relinquished jurisdiction. See Judgment, Commonwealth v. Kelly, 1799 PHL 1998 (Pa. Super. Ct. dated Jul. 9, 1999). This was a final order as to all claims not remanded. See Pa. R. App. Proc. R. 1112(b) (a superior court order is final when order concludes an appeal, even if it remands an appeal, unless the Superior Court retains jurisdiction). Kelly, therefore, had until August 8, 1999, thirty days following this order, to petition for allowance of appeal to the Supreme Court to challenge the claims not remanded. See Pa. R. App. P. R. 1113. He failed to do so.

Kelly raised ground 14, counsel ineffectiveness for failing to object to the prosecutor's closing argument or failing to move for a mistrial due to the argument, in his appeal from his post-sentence motions. See Pre-Remand Appeal. The Superior Court did not list this claim as raised in his 1925(b) statement and, therefore, did not address the issue.[5] See Superior Court

---

[5] Even if he had not waived this claim when he failed to appeal to the Supreme Court, Kelly waived it when he did not raise it on PCRA. See 9544(b). Because the Superior Court did not address the merits, the issue would not have been found previously litigated and Kelly could have raised it on PCRA. 42 Pa. C.S.A. § 9544(a).

Remand Opinion. Kelly raised ground 6, insufficient evidence to sustain the conviction, in his post-sentence motions and on appeal to the Superior Court. See Post Sentence Motions; Pre-Remand Appeal. Kelly raised ground 5, alleging the verdict was against the weight of the evidence, in his post-sentence motions,[6] see Post Sentence Motions, and on appeal to the Superior Court,[7] see Pre-Remand Appeal. Kelly waived these claims when he failed to petition for allowance of appeal to the Pennsylvania Supreme Court. See Wenger, 266 F.3d at 226.

Kelly is now passed the one-year limitations period for PCRA. See Pa. Cons. Stat. § 9544(a). Such independent and adequate state law grounds now preclude review, see Peterson, 196 Fed. Appx. at 142, and the claims are procedurally defaulted because he can no longer raise them in state court, see Coleman, 501 U.S. at 735 n.1.

### B.    Cause and Prejudice or a Miscarriage of Justice

Kelly may obtain federal habeas review of claims defaulted pursuant to independent and adequate state procedural rules only if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; Smith

---

[6] The Superior Court ruled Kelly waived this claim by failing to include it in his post-sentence motions. See Remand Opinion at 10. It appears, however, Kelly raised this claim in his post-sentence motion. See Post Sentence Motion at ¶ 1. The Commonwealth argues the document "did not appear on the Court of Common Pleas docket, . . . and apparently was not made part of the official record in this matter," and, therefore, the Superior Court could not consider it. See Commonwealth's Reply at 26 n.10. Although it appears the document was not on the docket, see Docket at 3-4, it is a part of the state court record.

[7] In addition, a claim alleging the verdict is against the weight of the evidence is not cognizable on federal habeas. Mattis v. Klopotoski, 2008 WL 2909859, at *4 (E.D. Pa. July 28, 2008) (Fullam, J.) (citing Tibbs v. Florida, 457 U.S. 31, 37-38 (1982)); accord Ming v. Tennis, 2007 WL 1030329, at *2 n.1 (E.D. Pa. Feb. 13, 2007) (Restrepo, J.); Willis v. Varner, 2004 WL 1109780, at *10 (E.D. Pa. May 13, 2004) (Angell, J.); Smith v. Vaughn, 1997 WL 338851, at *8 (E.D. Pa. Jun. 17, 1997) (Yohn, J.).

v. Murray, 477 U.S. 527, 533 (1986); see also Murray v. Carrier, 477 U.S. 478, 485 (1986);

Leyva, 504 F.3d at 362 n.6, 366; Griggs, 2007 WL 2007971, at *5. This requirement is grounded

in the need for finality and comity, i.e., ensuring state courts have an adequate opportunity to

review a case on the merits. Smith, 477 U.S. at 533.

    To constitute cause to excuse default, Kelly must show "some objective factor external to

the defense impeded counsel's efforts to comply with the State's procedural rule." Coleman, 501

U.S. at 753 (quoting Murray, 477 U.S. at 488); Sistrunk, 96 F.3d at 675. To establish prejudice,

Kelly must show "actual prejudice resulting from the errors of which [s]he complains."

McClesky v. Zant, 499 U.S. 467, 494 (1991) (quoting United States v. Frady, 456 U.S. 152, 170

(1982)). Actual prejudice exists if the alleged errors "worked to [his] actual and substantial

disadvantage, infecting [her] entire trial with error of constitutional dimensions." Frady, 456

U.S. at 170.

    To establish the requisite fundamental miscarriage of justice, Kelly must demonstrate

"actual innocence," Schlup v. Delo, 513 U.S. 298, 324 (1995); Leyva, 504 F.3d at 366, i.e., "new

reliable evidence," such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or

critical physical evidence" not presented at trial, Schlup, 513 U.S. at 324; Hubbard v. Pinchak,

378 F.3d 333, 339 (3d Cir. 2004) (addressing claim of actual innocence but rejecting it on the

merits), that would make it more likely than not that "no juror, acting reasonably, would have

voted to find [petitioner] guilty beyond a reasonable doubt." See House v. Bell, 547 U.S. 518,

538 (2006); Schlup, 513 U.S. at 329 (even a "concededly meritorious constitutional violation" is

not sufficient to establish a miscarriage of justice to excuse procedural default absent new

evidence of innocence). Kelly must show no reasonable juror would have found him guilty, and not merely that a reasonable doubt exists in light of the new evidence. Schlup, 513 U.S. at 329.

Kelly does not establish cause or prejudice to excuse the default of his claims. Kelly alleges ineffective assistance of counsel as cause for his default. See Petition at 10a. Ineffective assistance of counsel on direct appeal is an independent constitutional claim and will not establish cause for procedural default of another claim unless the ineffective assistance of counsel claim was first raised in state court. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Line v. Larkins, 208 F.3d 153, 167 (3d Cir. 2000). In addition, no constitutional right exists to counsel in state collateral proceedings. Pennsylvania v. Finley, 481 U.S. 551, 555 (1987); Tillet v. Freeman, 868 F.2d 106, 108 (3d Cir. 1989). Thus, any alleged PCRA counsel ineffectiveness cannot establish cause for Kelly's failure to raise his claims in state court. See Cristin v. Brennan, 281 F.3d 404, 420 (3d Cir. 2002).

Kelly also claims a miscarriage of justice because he is innocent. See Petitioner's Reply to Respondent's Response to Petition for Writ of Habeas Corpus at 5, 6-7, Kelly v. Rozum, 08-1073 (E.D. Pa. filed Sept. 8, 2008) [hereinafter Petitioner's Reply]. Kelly, however, presents no new evidence to show that no reasonable juror would have found him guilty. See Schlup, 513 U.S. at 329.

II.    Non-Cognizable Claim

Habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle, 502 U.S. at 67-68; ; Taylor v. Horn, 504 F.3d 416, 448 (3d Cir. 2007); Smith v. Horn, 120 F.3d 400, 426 (3d Cir. 1997); accord, 28 U.S.C. §

2241(c). Thus, Kelly must allege a federal constitutional claim in his federal petition to obtain habeas review.

Ground 7 alleges an unconstitutionally inconsistent verdict because the jury found Kelly guilty of murder, but not guilty of possessing an instrument of a crime. See Petition at 9b; Kelly's Memorandum of Law at ¶¶ 124-28. Inconsistent verdicts do not present a federal constitutional question unless the jury convicted the defendant of two crimes and those crimes are mutually exclusive. United States v. Gross, 961 F.2d 1097, 1107 (3d Cir. 1992); see United States v. Powell, 469 U.S. 57, 68-69 (1984); Buehl v. Vaughn, 166 F.3d 163, 178-79 (3d Cir. 1999); Laird v. Horn, 159 F. Supp. 2d 58, 88 (E.D. Pa. 2001) (challenge to the consistency of the verdict will not be considered unless petitioner demonstrates the "verdicts are logically inconsistent" (quoting Masoner v. Thurman, 996 F.2d 1003, 1005 (9th Cir. 1993)).

Kelly has not alleged he was convicted of two mutually exclusive crimes because he does not argue he was convicted of two crimes, one of which he could not have committed by virtue of his conviction for the other. See Gross, 961 F.2d at 1107. Rather, Kelly argues his acquittal on the possession of an instrument of a crime charge is inconsistent with his homicide conviction. See Petition at 9b. Accordingly, Kelly fails to present a cognizable federal habeas claim. See Powell, 469 U.S. at 69 (verdict not unconstitutional where jury found defendant not guilty of conspiracy to possess cocaine and possession of cocaine but guilty of using a telephone to facilitate those offenses); Dunn v. United States, 284 U.S. 390, 393 (1932) (verdict not unconstitutionally inconsistent where found guilty of keeping intoxicating liquor for sale but not guilty of unlawfully possessing and unlawful sale of such liquor); Gross, 961 F.2d at 1107 (Powell foreclosed defendant's argument that his acquittal was inconsistent with his conviction).

21

## III.    Meritless Claims

State court decisions merit substantial deference. See 28 U.S.C. § 2254(d)(1). A writ of

habeas corpus cannot be granted unless I find the state court's adjudication of Kelly's claims (1)

"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States," or (2)

"resulted in a decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." § 2254(d).  I must presume the state

court's findings of fact are correct and Kelly must rebut that presumption of correctness by clear

and convincing evidence. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003);

Porter, 276 F. Supp. 2d at 296.

A state court ruling is "contrary to" clearly established Supreme Court precedent for the

purposes of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law" set

forth in Supreme Court cases, or "if the state court confronts a set of facts that are materially

indistinguishable from" a Supreme Court decision and nevertheless arrives at a result different

from its precedent. Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Jamison v. Klem, 544 F.3d

266, 274 (3d Cir. 2008).  The state court judgment must contradict clearly established decisions

of the Supreme Court, not merely law articulated by any federal court, Williams, 529 U.S. at 405,

although district and appellate federal court decisions evaluating Supreme Court precedent may

amplify such precedent, Hardcastle v. Horn, 368 F.3d 246, 256 n.3 (3d Cir. 2004) (citing Matteo

v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999)).  The state court is not required

to cite or even have an awareness of governing Supreme Court precedent "so long as neither the

22

reasoning nor the result of [its] decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002); Jamison, 544 F.3d at 274-75.

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court cases, but "unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407; Jamison, 544 F.3d at 275 (quoting Matteo, 171 F.3d at 887). When making the "unreasonable application" inquiry, I must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409; see also Matteo, 171 F.3d at 891 (whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under Supreme Court precedent). A court that unreasonably extends an established rule to a new context where it should not apply, or unreasonably fails to extend such a rule to a new context where it should apply, may be deemed to have unreasonably applied the correct rule. Williams, 529 U.S. at 407; Jamison, 544 F.3d at 275 (quoting Matteo, 171 F.3d at 887). A showing of clear error is not sufficient. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); see also Douglas v. Cathal, 456 F.3d 403, 417 (3d Cir. 2006) (grant of writ inappropriate where state determination was not objectively unreasonable, even where reasonable jurists may disagree about the correct disposition of the underlying claim). I may also not grant habeas relief merely because the state court applied federal law erroneously or incorrectly. Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005); Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Clearly established federal law governing ineffectiveness claims is set forth in the two-part test of Strickland v. Washington, 466 U.S. 668 (1984). See Bell v. Cone 535 U.S. 685, 698

23

(2002); <u>United States v. Otero</u>, 502 F.3d 331, 334 (3d Cir. 2007). First, the "defendant must

show counsel's performance was deficient," which requires showing "counsel made errors so

serious [he] was not functioning as the 'counsel' guaranteed by the Sixth Amendment."

<u>Strickland</u>, 466 U.S. at 687. Second, the defendant must show "the deficient performance

prejudiced the defense," which requires showing the "errors were so serious as to deprive the

defendant of a fair trial." <u>Id.</u>; <u>see generally</u> <u>Outten v. Kearney</u>, 464 F.3d 401, 413-14 (3d Cir.

2006); <u>Thomas</u>, 428 F.3d at 499. "Unless a defendant makes both showings, it cannot be said

that the conviction or . . . sentence resulted from a breakdown in the adversary process that

renders the result unreliable." <u>Strickland</u>, 466 U.S. at 687. Pennsylvania applies the same test

for ineffective assistance of counsel as the <u>Strickland</u> test used in federal courts.[8] <u>Werts</u>, 228

F.3d at 203; <u>Commonwealth v. Sneed</u>, 899 A.2d 1067, 1075-76 (Pa. 2006).

Counsel's effectiveness is measured objectively considering all the circumstances. <u>Id.</u> at

687-88; <u>Otero</u>, 502 F.3d at 334. In evaluating counsel's performance, I must be "highly

deferential" and "indulge a strong presumption" that counsel's challenged actions might be

considered sound strategy under the circumstances. <u>Strickland</u>, 466 U.S. at 689. "<u>Strickland</u> and

its progeny make clear that counsel's strategic choices will not be second guessed by post hoc

determinations that a different trial strategy would have fared better." <u>Rolan</u>, 445 F.3d at 681-82

(citing <u>Strickland</u>, 466 U.S. at 689). The relevant inquiry is not whether Kelly's counsel was

---

[8] In Pennsylvania, the standard to determine whether counsel was constitutionally
ineffective requires the petitioner to "rebut the presumption of professional competence" by
demonstrating: "(1) his underlying claim is of arguable merit; (2) the particular course of conduct
pursued by counsel did not have some reasonable basis designed to effectuate his interest; and (3)
but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the
proceedings would have been different." <u>Sneed</u>, 899 A.2d at 1076. If the petitioner fails to
satisfy any of the standard's prongs the claim will be rejected. <u>Id.</u>

prudent, appropriate, or perfect. Marshall v. Hendricks, 307 F.3d 36, 91 (3d Cir. 2002). Rather,

the focus is simply to ensure Kelly received a fair trial. See id.

To establish prejudice, the defendant must demonstrate "a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome."

Strickland, 466 U.S. at 694. Prejudice must be evaluated in light of the "totality of the evidence

presented at trial" and "a verdict of conclusion only weakly supported by the record is more

likely to have been affected by errors than one with overwhelming record support." See Rolan,

445 F.3d at 982 (quoting United States v. Gray, 878 F.2d 702, 712 (1989)).

Review of ineffectiveness claims is "doubly deferential when it is conducted through the

lens of federal habeas." Yarborough v. Gentry, 540 U.S. 1, 6 (2003). Therefore, if the state court

addressed counsel's effectiveness, Kelly must show the state court's decision was objectively

unreasonable. Woodford v. Visciotti, 537 U.S. 19, 25 (2002). It is not enough to convince a

federal habeas court that, in its independent judgment, the state court erred in applying

Strickland. Bell, 535 U.S. at 698-99. Kelly, therefore, must do more than show he would have

satisfied Strickland if his claims were being analyzed here in the first instance.

A.   The state court's finding the counsel ineffectiveness claim regarding witnesses
     was meritless was not contrary to, nor an unreasonable application of, federal law

Kelly raised ground 1, counsel ineffectiveness for failing to call alibi witnesses and eye

witnesses and failing to file an alibi notice, in state court. See Post-Sentence Motion at ¶4;

Statement of Matter Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b) at ¶3. After an

evidentiary hearing, the state court found these claims meritless, see Post-Remand Court

Common Pleas Opinion at 2-3, the Superior Court affirmed, see Post-Remand Superior Court

25

Opinion at 6-7, and the Supreme Court denied his petition for allowance of appeal, see Kelly, 871 A.2d at 141.

### 1.    Alibi Witnesses

In state court, Kelly claimed counsel ineffectiveness for failing to call alibi witnesses Reverend James Becoat and Joan Arrington and for failing to file an alibi notice. See Post-Sentence Motion at ¶4; Statement of Matter Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b) at ¶3; Post-Remand Brief at 4.

Because the decision whether to call an alibi witness usually involves trial strategy, counsel's failure to present an alibi witness is not ineffective assistance of counsel per se. Commonwealth v. Brown, 767 A.2d 576, 581 (Pa. Super. 2001) (citing Commonwealth v. Auker, 681 A.2d 1305, 1319 (Pa. 1996)). To prevail on his alibi ineffectiveness claim, Kelly was required to prove: (1) the witness existed; (2) the witness was available; (3) counsel was informed of the witness's existence or counsel should otherwise have known of the witness; (4) the witness was prepared to cooperate and testify for the defendant at trial; and (5) the absence of the testimony prejudiced defendant so as to deny him a fair trial. Commonwealth v. Lopez, 739 A.2d 485, 496 (Pa. 1999); accord Commonwealth v. Petras, 534 A.2d 483, 485 (Pa. Super. Ct. 1987).

After an evidentiary hearing, the state court found Kelly's claim meritless because the court questioned Kelly at the close of the Commonwealth's case as to whether he would like to

call any witnesses, and Kelly replied he would not.[9] See Post-Remand Court Common Pleas

Opinion at 2-3.

The Superior Court discussed trial counsel's decision not to present Reverend Becoat.

See id. At the hearing, trial counsel noted he was not confident Reverend Becoat would be able

to place Kelly in his presence at the time of the crime. See id. In addition, counsel noted the

Commonwealth had a "bad witness" and he had effectively cross-examined her. See id. The

state court, therefore, found counsel, "as a matter of strategy," "emphasize[d] the

Commonwealth's failure to meet its burden of proving guilt beyond a reasonable doubt, rather

than attempt the more difficult task of establishing an alibi defense." See Post-Remand Superior

Court Opinion at 6-7. The Superior Court also noted Kelly acquiesced to trial counsel's strategy

because the court asked Kelly whether he wished to call witnesses and he responded he did not.

---

[9] At the close of defense's case, the court conducted the following colloquy:

"THE COURT: Are there any additional witnesses that you wanted to be called at
this trial that Mr. Seay did not call?
DEFENDANT KELLY: Well, no. There is a witness, but my defense feels as though
it was no need for him, you know.
THE COURT: So you discussed it with Mr. Seay?
DEFENDANT KELLY: Yes, I did.
THE COURT: And based on that discussion, you decided that witness would not be
called?
DEFENDANT KELLY: Yes, I did.
THE COURT: Was it because it would have been cumulative or - - I don't want to
know why. But you discussed it with him.
Is there anything about your trial which you told your attorney to do that was not
done?
DEFENDANT KELLY: No.
THE COURT: Are you satisfied with Mr. Seay's representation of you so far?
DEFENDANT KELLY: Yes, I am."

See Aug. 16, 1999 Transcript at 100:14-25, 101:1-12.

27

See Post-Remand Superior Court Opinion at 7 n.5. The Superior Court concluded counsel "had a reasonable basis for deciding against presenting Reverend Becoat's testimony." See id. at 7.

Even though a detective had already testified Kelly lived close to the scene of the crime, trial counsel's strategy was not unreasonable where it was unclear whether Reverend Beacoat could testify Kelly was with him and where the defense was the presence of reasonable doubt. Thus, the state court determination trial counsel was not ineffective for failing to call the alibi witnesses was not an unreasonable application of federal law because the trial strategy was not objectively unreasonable. See Williams, 529 U.S. at 407; Rolan, 445 F.3d at 681-82 (habeas court will not second guess trial counsel's strategic choices).

Although the Superior Court failed to mention Joan Arrington, Kelly's common law wife,[10] this claim is also meritless. The state court found trial counsel's decision not to present an alibi defense was a reasonable strategy. See Post-Remand Court Common Pleas Opinion at 7. Therefore, it also was reasonable not to call Joan Arrington as alibi witness.[11]

---

[10] It appears Kelly did not raise counsel ineffectiveness for failing to call Wanda Arrington in state court. See Post-Remand Brief (claiming ineffectiveness for failing to call alibi and eye witnesses, discussing Wanda and Joan Arrington, but arguing counsel should have called Reverend Beacoat); Pre-Remand Appeal at ¶ 1b (claiming counsel failed to call the witnesses, referencing affidavits from Reverend Beacoat and Joan Arrington); Post-Sentence Motions at ¶ 5b (claiming counsel failed to subpoena alibi witnesses). The Superior Court failed to mention Wanda and Joan Arrington, and the trial court mentioned only Reverend Beacoat and Joan Arrington. Regardless, the claim is meritless.

[11] Although trial counsel testified he would have presented the alibi witnesses if he had specific information of Joan and Wanda Arrington's corroborative testimony, See Dec.7, 1999 Evidentiary Hearing Transcript at 31:16-20, the court credited trial counsel's testimony, which stated he did not know of the testimony, id. at 37:4-7, 36:21:22, and found counsel's decision not to raise an alibi defense was reasonable, see Post-Remand Superior Court Opinion at 7.

## 2.    Eye Witnesses

Kelly raised trial counsel ineffectiveness for failing to investigate and call eye witnesses

Denise Holsey Miller and Lex Traylor in state court. See Post-Sentence Motion at ¶ 4; Statement

of Matter Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b) at ¶ 3.

As with the alibi witnesses, the trial court found the claim meritless because at trial Kelly

stated he did not want his counsel to call witnesses. See Post-Remand Court Common Pleas

Opinion at 2-3. The trial court's decision was made after an evidentiary hearing, in which it

heard conflicting testimony from trial counsel, the investigator, various witnesses, and Kelly.

See Campbell v. Vaughn, 209 F.3d 280, 288 (3d Cir. 2000) (noting the state court implicitly

discredited the petitioner's testimony); LaVellee v. Delle Rose, 410 U.S. 690, 692 (1973) (state

court did not make credibility findings, but finding "it can scarcely be doubted from its written

opinion that respondent's factual contentions were resolved against him"). Thus, the trial court's

factual findings merit deference here absent clear and convincing evidence to the contrary. See §

2254 (e)(1).

The Superior Court noted trial counsel testified he did not know of Traylor and Holsey

Miller, and counsel cannot be found ineffective for failing call witnesses he did not know

existed. See Post-Remand Superior Court Opinion at 6 (citing Commonwealth v. Woods, 710

A.2d 626, 629 (Pa. Super. 1998)). The state court determination that counsel cannot be

ineffective for failing to call witness of whom he did not know was not contrary to, nor an

unreasonable, application of, federal law. See Williams, 529 U.S. at 407; Commonwealth v.

Lopez, 739 A.2d at 496 (to be found ineffective for failing to call a witness, the lawyer must be

know of the witness).

Kelly, nevertheless, alleges the state court incorrectly found trial counsel did not know

Traylor and Holsey Miller existed. See Kelly's Memorandum at ¶ 87. The state court credited

trial counsel's testimony he did not know of their existence. See Post-Remand Court Common

Pleas Opinion at 2-3; Post-Remand Superior Court Opinion at 6; Campbell, 209 F.3d at 288

(noting the state court implicitly discredited the petitioner's testimony). Absent clear and

convincing evidence, I am bound by that factual determination. See 28 U.S.C. § 2254(e). To

satisfy the clear and convincing standard, a petitioner must show evidence so "clear, direct,

weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of

the truth of the precise facts in issue."[12]  See Porter v. Horn, 276 F. Supp. 2d 278, 296 n.10 (E.D.

Pa. 2003) (Kelly, J.) (quoting Attica, 2001 WL 827455, at *3).

Traylor's name and statement were transmitted to trial counsel during discovery, see

Post-Remand Brief at Ex. B, Prosecutor's Response to Defendant's Discovery Request, and

Holsey Miller was listed as a possible witness during voir dire, see August 9, 1996 Voir Dire

Transcript at 14:18, Commonwealth v. Kelly, No. 1162 (Pa. Ct. Com. Pl. Phila. Aug. 9, 1996;

August 12, 1996 Voir Dire Transcript at 16:9, Commonwealth v. Kelly, No. 1162 (Pa. Ct. Com.

---

[12] In addition, habeas relief would be available only if the claim "resulted in a decision
that was based on an unreasonable determination of the facts in light of the evidence presented at
trial." 28 U.S.C. § 2254(d)(2). As Judge Strawbridge noted, even if Kelly prevailed under §
2254(e)(1), § 2254(d)(2) permits relief only if, in light of the state court's unrebutted factual
determinations, its adjudication of the claim was unreasonable. Sterling v. Tennis, 2006 WL
1409719, at *4 (E.D. Pa. May 18, 2006) (citing Lambert, 387 F.3d at 235, 236 n.19). Section
2254(d)(2), restricts review of "the state court's factual determination to the evidence . . .
presented to the state court." Sterling, 2006 WL 1409719, at *4 (citing Lambert, 387 F.3d at
235). Additionally, a factual determination should be adjudged "unreasonable under 2254(d)(2)
only if [I find] a rational jurist could not reach the same finding on the basis of the evidence in
the record." § 2254(d)(2); see Porter, 276 F. Supp. 2d at 296 (§ 2254(d)(2) requires federal
habeas courts to objectively examine state court decisions for their reasonableness similar to the
unreasonable application of law clause in § 2254(d)(1)).

Pl. Phila. Aug. 12, 1996). These facts cast serious doubt on trial counsel's testimony, and were not addressed by either the trial court or the Superior Court.

Nevertheless, even if this evidence constitutes clear and convincing evidence sufficient to rebut the presumption of correctness, Kelly's ineffectiveness claim fails even under a de novo review. Kelly cannot establish he was prejudiced by counsel's failure to call Traylor and Holsey Miller. Traylor did not see the shooting. The statement Traylor gave to the police the night of the shooting noted he saw two black males enter a car at the end of the alley. See Evidentiary Hearing Transcript at Ex. C-2, Investigation Interview Record for Lex Traylor. Traylor stated the person he saw running "had on a beige jacket . . . with a hood, [he] couldn't tell much else . . . because he was almost at the other end of the alley," and "the one in the alley was a male and they were both black." Id. This was the only information trial counsel had in his possession before trial, and it failed to exculpate Kelly.[13]

At the evidentiary hearing, however, Traylor offered a new version. He claimed the man he had seen running down the alley was darker, shorter, and smaller than Kelly, but he was unable to see the person's face. See Transcript of Evidentiary Hearing at 43:1-24, Commonwealth v. Kelly, No. 1162 (Ct. Com. Pl. Phila. Dec. 6, 1999) [hereinafter Dec. 6, 1999 Evidentiary Hearing]. Traylor testified the other person "was a distance away" but was darker than Kelly and Traylor "assumed" he was shorter than Kelly. Id. at 44:4-13.

_____

[13] The trial court credited trial counsel's testimony he did not receive the investigator's interview notes. Even if he did, the notes of the interview with Traylor merely state he saw a 5'6" tall male of medium build in a grey hoodie run from the scene. He ran to a car parked at the end of an alley where he met with another black male of about the same height and build, wearing a white jacket. See Evidentiary Hearing Transcript at Ex. D-2.

Traylor also submitted a post-trial affidavit. Even if Traylor testified consistent with his post-trial affidavit, the statement most helpful to Kelly, he would have testified that after the shooting, he went to his door and saw a man run away from the scene, the man met up with another man at the end of the alley and enter a car. See Affidavit of Lex Traylor. Both men were around five feet six inches tall with medium builds and neither was Kelly. Id. The testimony in the affidavit was inconsistent with Traylor's police statement made when events were fresh in his mind, and his testimony would have been subject to further impeachment because of the distance and lighting conditions in the alley. See Dec. 6, 1999 Evidentiary Hearing at 52:1-7.

Similarly, Holsey Miller did not see the shooting. Although Holsey Miller's testimony arguably would have been inconsistent with Williams' testimony at trial, Kelly has not shown he was prejudiced by counsel's failure to present such testimony. Holsey Miller testified she saw three strange men fifteen minutes prior to the shooting, and did not see anyone when she looked outside following the gunshots. Dec. 6, 1999 Evidentiary Hearing at 69:10-16. She failed to mention the three men to a police officer when questioned at the scene. Id. at 65:15-17. After she learned Kelly had been arrested for this murder, she did not inform the authorities that Kelly was not on the street fifteen minutes before the shooting. Id. at 69:14-25, 70:1-18, 71:1-8. Moreover, she testified that, although she spoke with the investigator, she did not recall all statements contained in the statement, did not review it after it was written, and had not seen it prior to her testimony at the evidentiary hearing. See Dec. 6, 1999 Evidentiary Transcript at 67-68.

Moreover, Miller's various versions of the evening's events are inconsistent. In her post-trial affidavit, she stated she went outside, saw three strange men, and saw Williams talking to

32

one of the men, who was on the steps. See Evidentiary Hearing at Ex. C-1 [hereinafter Holsey Affidavit]. At the evidentiary hearing, she testified she saw three strange men on the night of the shooting, neither of whom was Kelly, and saw Williams speak with one of the men. See Dec. 6, 1999 Transcript at 59-60. In her pre-trial statement to the investigator, however, she said she saw a person sitting on the steps, as well as other people on the street, but did not mention Williams' conversation with the man on the steps. See Evidentiary Hearing Transcript at Ex. D-1. Rather, she stated her nephew told her Williams had gone around the corner. Id. In addition, in her statement to the investigator, she said her nephew went to the store and returned home after she had already returned, id.; and in her post-trial affidavit, however, she said her nephew returned home with her, see Holsey Affidavit.

Therefore, at the time of trial, her testimony would have been that fifteen minutes prior to the shooting, she saw three men, neither of whom was Kelly. She did not see the shooting and did not see the individuals run from the scene. Although Holsey Miller testified she spoke with Williams the day following the shooting, and Williams stated she did not know the men responsible, see Dec. 6, 199 Transcript at 62; Holsey Affidavit, at trial Williams explained she did not come forward with descriptions of the shooters because she was afraid, see Aug. 14, 1996 Transcript at 92:14-25.

Kelly's conviction was based on the testimony of two witnesses, one witnessed the shooting and one saw Kelly run from the scene. The testimony of Traylor and Holsey Miller does not establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694. Such testimony does not "undermine the confidence in the outcome." See id. Compare Rolan, 445

F.3d at 683 (testimony provided at the habeas hearing "would have bolstered [petitioner's]

defense and undermined the prosecution's claims of a pre-meditated murder during a robbery).

Accordingly, Kelly cannot establish prejudice, as required by Strickland.

C.    Ineffectiveness claims not properly layered

Kelly raised the following trial counsel ineffectiveness claims on PCRA and PCRA

appeal: (1) failure to secure and call character witnesses (ground 2); (2) failure to raise trial

counsel's ineffectiveness for failing to secure and call character witnesses (ground 8, in part); (3)

failure to move in limine to preclude witness-pressuring evidence (ground 3); and (4) failure to

raise trial counsel's ineffectiveness for failing to move in limine to preclude witness tampering

evidence (ground 8, in part). The Superior Court found Kelly's claims waived because he failed

to properly layer them, which the Government argues is an independent and adequate state

procedural rule barring habeas review.

Federal habeas courts may not address a procedurally defaulted claim if "the state court

opinion includes a plain statement indicating that the judgment rests on a state law ground that is

both 'independent' of the merits of the federal claim and an 'adequate' support for the courts

decision." Campbell v. Burris, 515 F.3d 172, 176 (3d Cir. 2008) (citing Coleman, 501 U.S. at

729). A state rule is independent and adequate if "the 'rule speaks in unmistakable terms[,] all

state appellate courts refuse to review the petitioner's claim on the merits[, and] the state courts'

refusal [was] consistent with other decisions,' that is, the procedural rule was 'consistently and

regularly applied.'" Campbell, 515 F.3d at 176 (quoting Doctor v. Walters, 96 F.3d 675, 683-84

(3d Cir. 1996).

A rule is independent where "the state law alone provides everything necessary to support the court's judgment." Campbell, 515 F.3d at 177. A state procedural rule is adequate and bars federal habeas review "only if it is 'firmly established and regularly followed' by the state courts at the time of the petitioner's trial." Campbell, 515 F.3d at 179 (citing Ford v. Georgia, 498 U.S. 411, 424 (1991)). The rule ensures "state courts do not insulate disfavored claims from federal review, and . . . that federal habeas review is not barred unless the petitioners have fair notice of the steps they must take to avoid default.'" Campbell, 515 F.3d at 179 (citing Bronshtein v. Horn, 404 F.3d 700, 707-08 (3d Cir. 2005)). "[O]ccasional act[s] of grace by a state court" or "a willingness in a few cases to overlook the rule and address the claim on the merits" does not render a rule inadequate." Campbell, 515 F.3d at 179-80 (quoting Banks v. Horn, 126 F.3d 206, 211 (3d Cir. 1997)). Rather, "[a] rule can be adequate if the state supreme court faithfully applies it in 'the vast majority' of cases." Campbell, 515 F.3d at 180 (quoting Dugger, 489 U.S. at 410 n.6)).

Prior to 2002, if a petitioner first claimed ineffectiveness of trial counsel on PCRA appeal, the petitioner had to assert a "layered ineffectiveness claim."[14] To preserve an ineffectiveness claim, a petitioner must have pled appellate counsel ineffectiveness for failing to raise all prior counsel's ineffectiveness. Commonwealth v. Lopez, 854 A.2d 465, 468 (Pa. 2004).

---

[14] Trial counsel ineffectiveness claims were deemed waived on PCRA if petitioner had not raised the claim during post-trial or direct appellate proceedings. Commonwealth v. Rainey, 928 A.2d 215, 225 (Pa. 2007). In Commonwealth v. Grant, 813 A.2d 726, 738 (Pa. 2002), the Court found trial counsel ineffectiveness claims raised for the first time on PCRA will no longer be deemed waived. Grant, however, does not apply where, as here, petitioner's direct appeal concluded prior to Grant. Rainey, 928 A.2d at 225.

Although prior to September 2003 confusion existed as to how to properly present a

layered ineffectiveness claim, see Commonwealth v. McGill, 832 A.2d 1014, 1022 (Pa. 2003);

Holiday v. Varner, 176 Fed. Appx. 284, 287 (3d Cir. 2006) (not convinced a clearly established

procedural rule for pleading a layered ineffectiveness claim existed in 2001, when petitioner filed

PCRA petition), McGill resolved the issue.[15]  In McGill, the court explained that to properly raise

and prevail on a layered ineffectiveness claim, a petitioner must plead appellate counsel

ineffectiveness for failing to allege trial counsel ineffectiveness and "present argument on, i.e.,

develop, each prong of the [ineffectiveness] test as to [appellate counsel's] representation."  See

id. The McGill court noted because of the earlier confusion, "remand to the PCRA court may be

appropriate for cases currently pending in the appellate courts." McGill, 832 A.2d at 1024;

accord Commonwealth v. Jones, 912 A.2d 268, 245 (Pa. 2006). The court, therefore, "exempted

from McGill's rigid presentation requirements those cases pleaded and filed prior to the McGill

decision." Commonwealth v. Dennis, 950 A.2d 945, 955 (Pa. 2008).  Remand is not appropriate

if the underlying trial counsel ineffectiveness claim lacks merit. See McGill, 832 A.2d at 1022.

It appears the state court does not regularly apply this rule to appeals filed after McGill.

See Commonwealth v. Tedford, 960 A.2d 1, 11, 13 (Pa. 2008) (noting, where PCRA court

opinion not filed until July, 16, 2004, "a PCRA petitioner who fails to properly layer his claims

of ineffectiveness . . . should not have his petition dismissed on that ground without first being

provided the opportunity to amend his pleading"); Commonwealth v. Carson, 913 A.2d 220, 233

(Pa. 2006) ("it is necessary that a PCRA petitioner have the ability to amend his petition in order

to properly plead, and attempt to prove, layered claims where dismissal of the petition is

---

[15] Although Kelly's PCRA petition was filed 2001, see PCRA Petition; Supplement to
PCRA Petition, his PCRA appeal was filed in 2004, after McGill, see PCRA Appeal.

36

imminent on grounds that such claims were not adequately pled"); Commonwealth v. Jones, 876

A.2d 380, 385 (Pa. 2005) (remand may be necessary to allow petitioner an opportunity to correct

pleading and presentation errors); Superior Court Dissent at 1-2 (Kelly's ineffectiveness claims

are not waived). Therefore, it is unclear whether the requirement that a petitioner must layer

ineffectiveness claims is an independent and adequate state law ground precluding habeas

review. See Campbell, 515 F.3d at 179 (state procedural rule is adequate only if state courts

regularly follow the rule); but see Pitts v. Folino, 2007 WL 2071903, at *5 (E.D. Pa. July 12,

2007) (Dalzell, J.) (procedural default for failure to properly layer ineffectiveness claims "clearly

rests on an independent and adequate state law ground").

Because the claims are meritless, however, I need not determine whether waiver of

ineffectiveness claims not properly layered constitutes an independent and adequate state law

ground. See Medina v. Diguglielmo, 373 F. Supp. 2d 526, 552-53 (E.D. Pa. 2005) (Brody, J.)

(declining to determine whether Pennsylvania's layering requirement was an independent and

adequate state procedural rule because the underlying claim was meritless).

     1.     **Counsel was not ineffective for failing to motion to preclude evidence of witness pressuring**

Kelly claimed trial counsel ineffectiveness for failing to move to preclude evidence of

witness pressuring and appellate counsel ineffectiveness for failing to raise trial counsel

ineffectiveness for counsel's failure to move to preclude such evidence. On PCRA, the trial

court found Kelly's trial and appellate counsel ineffectiveness claims for failing to file a motion

to preclude witness tampering evidence were meritless because the underlying claim lacked

merit. See PCRA Opinion at 2-3. The court reasoned the testimony merely showed "Ms.

Williams was taken to an attorney's office for the purpose of giving a statement favorable to the

defendant." Id. at 3.  No one threatened her or suggested she testify in a specific manner.  Id.

The court found the defendant failed to prove the claim had arguable merit because it could not

conclude the jury could have drawn an inference adverse to the defendant from the testimony.  Id.

The court also found Kelly failed to prove the introduction of the evidence prejudiced him.  Id.

The court noted the Superior Court found the evidence sufficient to support a conviction without

referencing the complained of testimony and, therefore, Kelly failed to establish the evidence's

introduction resulted in the conviction of an innocent individual.  Id.  The court found post-

sentence counsel could not be ineffective for failing to raise this claim because the underlying

claim lacked merit.  PCRA Opinion at 3.

Absent "extraordinary and compelling circumstances," a habeas court should follow the

state court's determination of state law.  See Johnson v. Rosemeyer, 117 F.3d 104, 115 (3d Cir.

1997).  The state court found, under state law, the testimony was not evidence of witness

tampering and did not adversely affect Kelly.[16]  Kelly failed to present "extraordinary and

compelling circumstances" and, therefore, I am bound by the state court's determination.

Accordingly, because the underlying state law claim is meritless, counsel cannot be ineffective

for failing to raise the issue.  See Buehl, 166 F.3d at 174 (appellate counsel not ineffective for

failing to raise meritless claim of trial counsel ineffectiveness); Berberena, 2007 WL 1856877, at

*1 (counsel cannot be ineffective for failing to raise a meritless claim).

---

[16]  In Pennsylvania "threats by third persons against . . . witnesses are not relevant [and
thus not admissible into evidence] unless . . . the defendant is linked in some way to the making
of the threats."  Commonwealth v. Bryant, 462 A.2d 785, 788 (Pa. 1983) (quoting
Commonwealth v. Carr, 259 A.2d 165, 167 (Pa. 1969)).  An exception to this rule exists where
the evidence is offered to explain a prior inconsistent statement, not to prove the accused's guilt.
Id.  Such evidence rules are state law issues.  See Wilson v. Vaughn, 533 F.3d 208, 214 (3d Cir.
2008)

2.    Counsel was not ineffective for failing to secure and call character witnesses

Kelly also claims trial and appellate counsel ineffectiveness for failing to secure and call character witnesses. On PCRA, the trial court found the underlying issue, failure to present character witnesses, was meritless. See PCRA Opinion at 4. The court reasoned the defendant's prior robbery and retail theft convictions could have been used to impeach the credibility of the character witnesses. Id. The court noted a recent change in Pennsylvania law, but found the case was decided after Kelly's trial and found counsel cannot be deemed ineffective for failing to predict a change in the law. Id. at 5 (citing Commonwealth v. Tilley, 780 A.2d 649 (Pa. 2001)). Therefore, because trial counsel cannot be ineffective for failing to raise a meritless claim, appellate counsel cannot be ineffective for failing to raise trial counsel ineffectiveness. Id.

The state court's determination of state law is binding, see Johnson, 117 F.3d at 115, i.e., the character witness's credibility could have been impeached with the defendant's robbery and retail theft convictions, see PCRA Opinion at 4-5. Accordingly, it was not contrary to, or an unreasonable application of federal law to find counsel was not ineffective for failing to raise the meritless claim. See Buehl, 166 F.3d at 174 (appellate counsel not ineffective for failing to raise meritless claim of trial counsel ineffectiveness); Berberena, 2007 WL 1856877, at *1 (counsel cannot be ineffective for failing to raise a meritless claim).

D.     <u>Kelly's counsel ineffectiveness claim for failing to object to in-court identification is meritless</u>

On his PCRA appeal, Kelly alleged PCRA counsel ineffectiveness[17] for failing to allege appellate counsel ineffectiveness for failing to allege trial counsel ineffectiveness for failing to object to the in-court identification. <u>See</u> PCRA Appeal at 5. To the extent he raised ground 17, trial counsel ineffectiveness for failing to object to the in-court identification, in state court through his PCRA counsel ineffectiveness claim, the claim is meritless.[18]

The Superior Court did not address this claim, finding Kelly waived it when he did not raise it in his PCRA petition, and when he failed to layer the claims. As discussed above, failure to properly layer ineffectiveness claims likely is not an independent and adequate state procedural rule. <u>See</u> <u>supra</u> Part C. In addition, because PCRA appeal would be the first

----

[17] Although Kelly does not have a federal constitutional right to counsel for state collateral proceedings, <u>see</u> <u>Finley</u>, 481 U.S. at 555, he has a right to counsel in state collateral proceedings under Pennsylvania law, <u>see</u> Pa. R. Crim. P. 904(C); <u>Commonwealth v. Albrecht</u>, 720 A.2d 693, 699 (Pa. 1998).

[18] The circuits are split on whether a petitioner who exhausted an ineffectiveness claim in state court also exhausted the claim underlying the ineffectiveness claim. <u>Compare, e.g., Odem v. Hopkins</u>, 192 F.3d 772, 775-76 (8th Cir. 1999) (underlying <u>Brady</u> claim exhausted where petitioner argued in state court counsel ineffectiveness for failing to "conduct any substantial investigation . . ., make pretrial discovery requests and to request exculpatory evidence . . . ."), <u>with</u> <u>Wilder v. Cockrell</u>, 274 F.3d 255, 260-62 (5th Cir. 1999) (underlying claim unexhausted because the claim differed legally, logically, and mechanically from the ineffectiveness claim and the only cite to federal law was to add another basis counsel could have requested admission of statements). The Third Circuit has not decided the issue, but has suggested exhausting an ineffectiveness claim in state court does not exhaust the underlying claim. <u>Willis v. Vaughn</u>, 48 Fed. Appx. 402, 406 (3d Cir. 2002) (non-precedential) (underlying claim unexhausted because state court not on notice of the claim); <u>see</u> <u>Gattis v. Snyder</u>, 278 F.3d 222, 237 n.6 (3d Cir. 2002); <u>Senk v. Zimmerman</u>, 886 F.2d 661, 614, 614 n.5 (3d Cir. 1989); <u>Dooley v. Petsock</u>, 816 F.2d 885, 889 n.3 (3d Cir. 1987); <u>but see</u> <u>Veal v. Myers</u>, 326 F. Supp. 2d 612, 622 (E.D. Pa. 2004) (Brody, J.) (distinguishing the Third Circuit cases and finding underlying claim exhausted where state court discussed the merits of the underlying claim); <u>Harper v. Kyler</u>, 2005 WL 590617, at *10 (E.D. Pa. Apr. 22, 2005) (Surrick, J.) (same).

40

opportunity to raise PCRA counsel ineffectiveness, it is unclear whether a petitioner waives a PCRA counsel ineffectiveness claim by failing to raise it in the PCRA petition. See Commonwealth v. Jones, 815 A.2d 598, 610 (Pa. 2002) (discussing the tension between allowing review of PCRA counsel ineffectiveness on appeal and the strict time and serial petition restrictions); Commonwealth v. Hall, 872 A.2d, 1177, 1191 (Pa. 2005) (concurring, Castelle, J.) (noting question of whether PCRA counsel ineffectiveness claims raised for the first time on appeal are subject to the PCRA restrictions remains open). Compare Commonwealth v. Hall, 872 A.2d 1177, 1182-83 (Pa. 2005) (noting claims would be reviewable to the extent they raise PCRA counsel ineffectiveness but finding petitioner did not properly develop the claim), Commonwealth v. Albrecht, 720 A.2d 693, 701 (Pa. 1998) (reviewing PCRA counsel ineffectiveness claim), and Commonwealth v. Perry, 959 A.2d 932, 936-37 (Pa. Super. Ct. 2008) (addressing PCRA counsel ineffectiveness claim), with Commonwealth v. Hojnowski, 2008 WL 4491529 (Pa. Com. Pl. Aug. 25, 2008) (PCRA counsel ineffectiveness claims waived because not raised in the initial PCRA petition).

I need not resolve this issue because the underlying claim is meritless. See Jones, 815 A.2d at 610 (not determining whether PCRA counsel ineffectiveness claims must be raised on PCRA appeal or in a new PCRA petition because the claim was meritless). The claim underlying Kelly's counsel ineffectiveness claim, i.e., Baxter should not have been permitted to identify Kelly at trial, is meritless. A witness' inability to identify someone in a photograph array affects the weight and credibility of the in-court identification, not its admissibility. Commonwealth v. Washington, 927 A.2d 586, 602 (Pa. 2007) (failure to identify someone in line-up affects only the weight and credibility of the identification); accord Commonwealth v. Davis, 351 A.2d 642,

648 (1976). Therefore, Kelly's counsel ineffectiveness claim is meritless because counsel cannot be ineffective for failing to raise a meritless claim. See Buehl, 166 F.3d at 174 (appellate counsel not ineffective for failing to raise meritless claim of trial counsel ineffectiveness); Berberena, 2007 WL 1856877, at *1 (counsel cannot be ineffective for failing to raise a meritless claim).

IV.    Request for an Evidentiary Hearing

Kelly seeks an evidentiary hearing for his federal habeas petition. See Petitioner's Reply to Respondent's Response to Petition for Writ of Habeas Corpus at 10, Kelly v. Rozum, No. 08-1073 (E.D. Pa. filed Sept. 8, 2008). Kelly's request for an evidentiary hearing is denied.

An evidentiary hearing on federal habeas cannot be held where a petitioner developed the claim's factual basis in state court. Goldblum v. Klem, 510 F.3d 204, 220 (3d Cir. 2007). Moreover, if the petitioner "has failed to develop the factual basis of a claim in [s]tate court proceedings," section 2254(e)(2) limits the availability of an evidentiary hearing.[19] See Thomas, 428 F.3d at 498 (quoting § 2254(e)(2)); Miller v. Klem, 2007 WL 2306582, *2 (E.D. Pa. Aug. 8, 2007) (McLaughlin, J.). If a petitioner meets the limitations of section 2254(e)(2), a district court has discretion to grant an evidentiary hearing. Goldblum, 510 F.3d at 220-21.

Failing to develop a claim requires "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams, 529 U.S. at 432. In the usual case, a prisoner has not "failed to develop a claim if he requested an evidentiary hearing in state court

---

[19]    A federal court cannot hold an evidentiary hearing unless the applicant shows the claim relies on a new rule of constitutional law or a factual predicate that could not have been previously discovered, or the applicant shows the "facts underlying the claim would be sufficient to establish . . . that but for the constitutional error, no reasonable factfinder would have found the applicant guilty." § 2254(e)(2).

and the state court declined to provide him a hearing." See Thomas v. Varner, 428 F.3d at 498;

Lark v. Beard, 2006 WL 1489977, at *4 (E.D. Pa. May 23, 2006) (Padova, J.).

However, even if the petitioner is not barred from obtaining an evidentiary hearing by §

2254(e)(2), it does not mean a hearing is required. See Campbell v. Vaughn, 209 F.3d 280, 287

(3d Cir. 2000). A federal court's decision to hold an evidentiary hearing should focus on whether

the hearing would be meaningful, i.e., it would have the potential to advance the petitioner's

claim or evidence outside the record would help petitioner's cause. Id. A petitioner bears the

burden of showing the hearing would be meaningful. Id. An evidentiary hearing, however, "is

not required on issues that can be resolved by reference to the state record." Id. at 221 (quoting

Schiriro v. Landrigan, 127 S.Ct. 1933, 1940 (U.S. 2007)).

Most of Kelly's claims are not reviewable on federal habeas because the claims are

procedurally defaulted or non-cognizable. An evidentiary hearing would not advance these

claims because I do not have jurisdiction to review the claims.

Because the state court held an evidentiary hearing on Kelly's ineffective assistance of

counsel for failing to call eye witnesses and alibi witnesses in state court and Kelly developed the

factual record on this claim in state court, I cannot hold an evidentiary hearing on this claim. See

Goldblum, 510 F.3d at 220-21.

Kelly requested an evidentiary hearing for his counsel ineffectiveness claims for failing to

secure and call character witnesses and trial and appellate counsel ineffectiveness for failing to

move in limine to preclude witness-pressuring evidence, see Memorandum of Law in Support of

Petition for Post Conviction Relief Pursuant to 42 Pa.C.S.A. § 9543, Commonwealth v. Kelly,

No. 1162-1995 (Ct. Com. Pl. Phila. filed Sept. 26, 2001), and requested remand to the PCRA

court for an evidentiary hearing on these claims and his PCRA counsel ineffectiveness claim for
failing to raise prior counsel ineffectiveness for failing to object to Baxter's in-court
identification, see Superior Court PCRA Opinion. The PCRA court did not hold an evidentiary
hearing and the Superior Court denied Kelly's request for remand for an evidentiary hearing. See
Superior Court PCRA Opinion at 1. Thus, because he requested an evidentiary hearing in state
court, it appears Kelly is not barred from having an evidentiary hearing by § 2254(e)(2) on these
claims. See Thomas v. Varner, 428 F.3d at 498.

Kelly, however, has not explained how an evidentiary hearing would advance his claims.
As discussed above, the state court's decision Kelly's counsel was not ineffective because the
underlying claims counsel failed to raise lacked merit was not objectively unreasonable. See
Williams, 529 U.S. at 409; Woodford, 537 U.S. at 25. Thus, an evidentiary hearing to determine
whether his counsel's performance was deficient would be meaningless because Kelly cannot
satisfy the prejudice prong of Strickland. See United States v. Holloway, 187 Fed. Appx. 198,
204 (3d Cir. 2006) (petitioner failed to establish prejudice where underlying claim was
meritless); Ricks v. Pa. Bd. of Probation and Parole, 2009 WL 101699, at *10 (E.D. Pa. Jan. 14,
2009) (Tucker, J.) (same).

Accordingly, I make the following recommendation.

## RECOMMENDATION

AND NOW, this __th day of February, 2009, it is respectfully recommended Kelly's claims be DENIED with prejudice. It is further recommended that there is no probable cause to issue a certificate of appealability.[20] The petitioner may file objections to this Report and Recommendation within ten days after being served with a copy thereof. See Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights. See Leyva v. Williams, 504 F.3d 357, 364 (3d Cir. 2007).

BY THE COURT:

\s\ TIMOTHY R. RICE
TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

---

[20]    Jurists of reason would not debate my recommended procedural or substantive dispositions of the petitioner's claims. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). Therefore, no certificate of appealability should be granted. See id.

45

# EXHIBIT

# H

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES KELLY,** | : | **CIVIL ACTION** |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| **GERALD L. ROZUM, ET AL.,** | : | |
| Respondents | : | **NO. 08-1073** |

## ORDER

AND NOW, this 5th day of October 2009, upon careful and independent consideration of

Petitioner's Amended Petition for Writ of Habeas Corpus (Docket No. 24) and Respondents'

response thereto; the Report and Recommendation of United States Magistrate Judge Timothy R.

Rice dated February 17, 2009 (Docket No. 26); the Objections to the Report and

Recommendation filed by Petitioner's counsel and the related Letter filed by Petitioner

pro se (Docket Nos. 27 and 28) and Respondents' response thereto; and Petitioner's

supplemental Memorandum in support of his Amended Petition for Writ of Habeus Corpus

(Docket No. 32), as well as related correspondence from counsel, IT IS HEREBY ORDERED

that:

1. The Report and Recommendation is APPROVED and ADOPTED;

2. The Petition for Writ of Habeas Corpus is DENIED;

3. There is no probable cause to issue a certificate of appealability; and

4. The Clerk of Court shall mark this case CLOSED for statistical purposes.

BY THE COURT:

S/Gene E.K. Pratter
_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES KELLY,** | : | **CIVIL ACTION** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GERALD L. ROZUM, ET AL.,** | : | |
| **Respondents** | : | **NO. 08-1073** |

## MEMORANDUM

GENE E.K. PRATTER, J.                                    OCTOBER 5, 2009

Petitioner James Kelly was convicted of murder and conspiracy. Petitioner's § 2254
petition alleges that his trial counsel was ineffective. Magistrate Judge Rice reviewed the record
and the parties' submissions and issued a Report and Recommendation reflecting his conclusion
that all of Petitioner's claims should be denied as procedurally defaulted, non-cognizable, or
meritless. Petitioner objected to the Report and Recommendation.

There is an no apparent conflict regarding the applicable caselaw, and the Court
concludes that Judge Rice addressed all of the issues carefully and in depth. Nevertheless,
several of the arguments advanced by Petitioner, particularly regarding whether there would have
been a "reasonable probability of a different outcome" if defense counsel had called Rev. James
Becoat, Ms. Denise Holsey-Miller, Mr. Lex Traylor, and Ms. Joan Arrington to testify at the trial,
prompted the Court to address Petitioner's objections in additional detail. Accordingly, the Court
allowed supplemental briefing regarding Petitioner's objections to the Report and
Recommendation.

After receiving and reviewing all of the parties' submissions, the Report and
Recommendation, and the ample state court record, the Court determines that the parties have

had sufficient opportunity to articulate their arguments and that oral argument is not necessary.

For the reasons that follow, the Court shall approve and adopt Judge Rice's Report and

Recommendation.

## I.    Petitioner's Objections to the Report and Recommendation and Supplemental Briefing

In the initial objections, Petitioner's counsel asserted that his trial counsel was ineffective

because he failed to 1) "[p]rovide an alibi notice where the obvious defense was alibi"; 2) "[c]all

an alibi witness (Rev. BeCoat) [sic] who was actually present just outside the court room"; 3)

"[c]all two witnesses (Holsey Miller and Traylor) who knew petitioner and saw two men (neither

of them petitioner) who were highly probable as the actual shooters; these witnesses were known

to defense counsel, or should have been"; and 4) "[c]all petitioner as a witness, on spurious

grounds." No other grounds were listed in this initial set of objections. See Objections to Report

and Recommendations of Magistrate Judge Timothy R. Rice, Docket No. 27, at 2.

Petitioner then filed a letter, pro se, which included his own set of objections. See Letter

from Mr. Kelly, Docket No. 28. These objections were much more expansive than the objections

that his attorney had filed. Shortly thereafter, counsel sent a letter to the Court noting that he was

"happy to confirm and adopt Mr. Kelly's Objections as well as the ones [counsel] filed, if that

meets with your approval." March 12, 2009 Letter from Counsel. The Court allowed

supplemental briefing, and counsel submitted a more expansive, supplemental brief that

addressed additional claims that had been mentioned in Petitioner's pro se letter but were *not*

mentioned in counsel's original set of objections to the Report and Recommendation.

2

## II.    Defaulted Claims and/or Waived Claims

In the supplemental brief, Petitioner's counsel presents many arguments that were not addressed in his original set of objections to the Report and Recommendation, and that involve claims that Judge Rice properly found to be procedurally defaulted or waived. See Report and Recommendation at 13-15, 18.    For instance, Petitioner argues that the primary witness against him, Ernestine Williams, only identified Petitioner after going through a "flawed" and "suggestive" identification procedure. He also argues that his trial counsel failed to object to certain taped testimony, as he should have, and failed to file an appeal after the trial. Petitioner also questions the credibility of various snippets of testimony and other evidence, pointing out supposed "discrepancies" in what seems to be a "weight of the evidence" argument. He hints that the police may have committed various Brady violations. Finally, he argues that his trial counsel failed to call Petitioner to the stand, as he should have in light of Pennsylvania Rule of Evidence 609; indeed, Petitioner asserts that Petitioner was never even *asked* whether he wanted to testify on his own behalf. See Mem. on Behalf of Pet. James Kelly ("Kelly Supplemental Mem."), Docket No. 32, at 2-8.

Notably, Petitioner does not argue that these issues were *not* procedurally defaulted or waived. Instead, he merely states:

> I do not propose to analyze each instance where counsel dropped the ball in respect of the layering and wavier issues. Suffice it to say that I rely on the failure to present all available witnesses, and particularly Reverend Becoat, as a ground that has never been waived or abandoned. However, the other instances of ineffectiveness are important to show that Kelly's conviction was a "miscarriage of justice" under Pennsylvania law.

Kelly Supplemental Mem. at 10.

With the invocation of the phrase "miscarriage of justice," as Judge Rice surmises,

3

Petitioner seems to be alluding to a general argument that a petitioner may obtain federal habeus review of claims that were defaulted pursuant to independent and adequate state procedural rules if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental *miscarriage of justice*." See Report and Recommendation at 18-19 (emphasis added, and case citations omitted). However, Petitioner does not address the high threshold for showing "miscarriage of justice," and the Court agrees with Judge Rice that Petitioner has not offered anything to show that Petitioner has met this requirement. See Report and Recommendation at 18-20.[1] Indeed, Petitioner offers no evidentiary basis or legal analysis for the proposition that no reasonable juror could or would have found him guilty. Accordingly, the Court concludes that Judge Rice correctly declined to consider Petitioner's procedurally-defaulted and waived claims.

Even if the claim regarding the failure to call Petitioner to the stand were *not* procedurally defaulted, it would be unpersuasive, given the likelihood that Petitioner's criminal record would have either justified the professional judgment of counsel not to call Petitioner as a witness or, if Petitioner did testify, would have added to the substantial weight of the case against him. Petitioner argues that he should have been called to the stand and that his prior convictions would not have come out because he "had been convicted in 1978 of robbery and in 1984 for retail theft, and his time had been served." Kelly Supplemental Mem. at 7, n. 11. However, Petitioner does not specify *when* he was released from confinement for these convictions, which would bear

---

[1] For instance, counsel has not offered any new evidence to show that no reasonable juror would have found Petitioner guilty.

4

on when his "10-year look-back" term started. See Pa. R. Evid. 609. The decision not to call

Petitioner to the stand appears to be reasonable and within the exercise of trial counsel's

professional judgment.

### III.    Trial Counsel's Failure to Call Certain Witnesses at Trial

Petitioner's main argument regarding trial counsel's alleged ineffectiveness is that trial

counsel should have called Rev. Becoat, Ms. Holsey Miller, Mr. Traylor, and Ms. Joan Arrington

to testify at trial.

Petitioner asserts that Rev. Becoat should have been called at trial as an alibi witness.

Rev. Becoat allegedly would have testified that on the night of the shooting, he was with

Petitioner and others (including Ms. Joan Arrington, Petitioner's common law wife)[2] at

---

[2] Joan Arrington was supposedly present in Petitioner's house when Rev. Becoat was visiting, on the night of the shooting. The brief filed by Petitioner's counsel does not identify Joan Arrington by her first name, but just states that "the two Arringtons" were exculpatory witnesses and should have been called at trial. See Kelly Supplemental Mem., Docket No. 32, at 10 ("Beside Rev. Becoat and the two Arringtons, there were two other such [exculpatory] witnesses: Holsey Miller and Traylor. . . .Suffice it to say that I rely on the failure to present all available witnesses, and particularly Reverend Becoat, as a ground that has *never* been waived or abandoned.") (emphasis in original). Petitioner's counsel does not explain the "Arrington" claims in his brief, or why trial counsel's failure to present "the Arringtons" made him ineffective. Indeed, Petitioner's counsel did not mention the Arringtons at all in his official Objections to the Report and Recommendation. See Objections to Report and Recommendations of Magistrate Judge Timothy R. Rice, Docket No. 27. These factors suggest that the claims regarding "the Arringtons" may not have actually been raised in Petitioner's objections to the Report and Recommendation.

However, Petitioner himself mentioned Joan Arrington in a set of objections that he filed pro se shortly after Petitioner's counsel filed his official Objections to the Report and Recommendation. See Letter from Petitioner, Docket No. 28. Also, "the Arringtons" are arguably included in counsel's general assertion that trial counsel was ineffective for failing to present alibi witnesses.

The claim regarding Joan Arrington appears to have been raised in the state courts and is therefore arguably proper for this Court review. That said, Judge Rice correctly found the claim regarding Joan Arrington to be meritless for the same reasons as the claim regarding Rev. Becoat, that is, because trial counsel's decision not to present an alibi defense was a reasonable

5

Petitioner's home, 6 blocks away from the scene of the crime. Petitioner claims that Ms. Holsey

Miller and Mr. Traylor should have been called at trial. According to Petitioner, these witnesses

would have provided descriptions of the men they saw before the shooting, which would have

conflicted with a description of Petitioner.

Judge Rice carefully analyzed the potential testimony of the witnesses Petitioner claims

should have been called at trial, providing an analytic framework and an accurate summary of the

landscape of Petitioner's trial. See Report and Recommendation at 29-34. He persuasively

concluded that even if trial counsel had known of Ms. Holsey Miller and Mr. Traylor before

trial,[3] the ineffectiveness claims fail under a de novo review because Petitioner was not

prejudiced by trial counsel's failure to present Ms. Holsey Miller and Mr. Traylor at trial. Judge

Rice correctly determined that the absent witnesses would have provided testimony that was

internally inconsistent, and that there were substantive differences between the information

contained in the witnesses' pre-trial statements, the information presented in their affidavits, and

---

strategy. See Report and Recommendation at 28.

As Judge Rice notes, any claim regarding Wanda Arrington was waived because
Petitioner did not raise it in state court. See id.

[3] At the December 7, 1999 evidentiary hearing, trial counsel testified that he did not
know of these witnesses before trial, and the state court credited this testimony. A state court's
factual determination is entitled to a presumption of correctness unless there is "clear and
convincing evidence" to the contrary.

Judge Rice noted, and the Court agrees, that there was significant evidence to question
the credibility of trial counsel's testimony on this point. For instance, Mr. Traylor's name and
statement were given to trial counsel during discovery, and Ms. Holsey Miller was listed as a
possible witness during voir dire. However, even if this evidence was sufficiently "clear and
convincing" to rebut the presumption of correctness (which the Court concludes it was not) the
presentation of the two witnesses would not have presented "a reasonable probability that, but
for counsel's unprofessional errors, the result of the proceeding would have been different." See
Report and Recommendation at 28-33 (case citations omitted). In other words, trial counsel's
failure to present Ms. Holsey Miller and Mr. Traylor did not fundamentally prejudice Petitioner.

6

the information about which they testified at the state court evidentiary hearing.

As for Rev. Becoat, the Court agrees with Judge Rice that trial counsel's decision not to present an alibi defense for Petitioner was reasonable under the circumstances. This analysis extends to the proposed testimony of Ms. Joan Arrington as well, inasmuch as her testimony would have served the same function as that of Rev. Becoat, that is, placing Petitioner within 6 blocks of the location of the shooting on the night in question.

With respect to Ms. Holsey Miller and Mr. Traylor, neither saw the shooting, and at most they could have testified to seeing men who were not Petitioner near the location where the shooting took place, approximately fifteen minutes before the shooting. As Judge Rice observed in his Report and Recommendation, it is by no means clear what these individuals would have actually testified to, because the descriptions of the men they allegedly saw changed from one presentation to the next in terms of what the men were wearing, the description of the men's relative complexions, and the like. In particular, it appears that Ms. Holsey Miller's renditions varied greatly in the details of who she saw, when and where, and there were marked discrepancies between her statements to the police and her statements to the court regarding the events of the evening in question.

Trial counsel explained not calling Rev. Becoat by pointing to his trial strategy of not wanting to place Petitioner so near to the scene of the crime. He also thought that Ms. Williams was a particularly bad witness whom he could discredit through cross-examination. To that end, there was evidence presented that Ms. Williams was using illegal drugs around the time of the shooting, made an improper identification of Petitioner and changed her story during the investigation. Trial counsel also stated that he was not confident that Rev. Becoat could place

7

Petitioner in his presence at the time of the crime.

Trial counsel is afforded a wide degree of deference in his trial strategy and professional judgment, and Petitioner would have to show that he was prejudiced in order to prevail on his ineffectiveness claims. Trial counsel's strategy not to present the witnesses discussed above was not unreasonable, and did not prejudice Petitioner.

## IV.    Facts Not in Evidence

Petitioner's brief repeatedly suggests or refers to facts that are not in evidence. For instance, Petitioner's counsel refers to what he learned during an interview he conducted with Calvin Edwards, Petitioner's brother, but the notes from this interview are not in evidence. Counsel also speculates that "possibly someone helped [witness Colie Baxter] understand the implications of putting Kelly in the black jacket," and states that Colie Baxter assisted police in loading the victim's body onto the paddy wagon. Kelly Supplemental Mem., Docket No. 32, at 2-3. There is no evidence to support these assertions. Similarly, counsel represents, "I am told there are no red lights on Diamond, but I have not made a personal investigation." Id. at 3, n.4. Finally, in arguing that Colie Baxter's identification procedure was suggestive and improper, counsel states, "[w]e must presume that Kelly's picture was shown to Baxter." Id. at 4. However, counsel does not explain *why* "we must presume" this fact. These factual suggestions and references - whether proper or not - relate to claims that Judge Rice properly concluded to be procedurally defaulted or waived.

## V.    Conclusion

For the reasons discussed above, the Court will approve and adopt the Report and Recommendation issued by Magistrate Judge Timothy R. Rice, and deny the Petition for Writ of

8

Habeus Corpus.  An Order consistent with this Memorandum follows.

<div align="center">

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

</div>

# EXHIBIT

# I

**DLD-110**                                                    **January 28, 2010**

## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

### C.A. No. **09-4290**

### JAMES KELLY,
Appellant

### VS.

### GERALD L. ROZUM, ET AL.

### (E.D. Pa. Civ. No. 08-cv-01073)

Present:    FUENTES, JORDAN and HARDIMAN, Circuit Judges

Submitted are:

(1)    Appellant's request for a certificate of appealability under 28 U.S.C.
§ 2253(c)(1); and

(2)    Appellant's amended request for a certificate of appealability under
28 U.S.C. § 2253(c)(1)

in the above-captioned case.

Respectfully,


Clerk

MMW/DNH/mb

_____ORDER_____

The foregoing amended request for a certificate of appealability is denied, as jurists of
reason could not debate that the District Court properly denied his petition for a writ of
habeas corpus, for substantially the reasons set forth in its opinion. See Slack v.
McDaniel, 529 U.S. 473, 483-84 (2000).

By the Court,

/s/ Julio M. Fuentes
Circuit Judge

Dated:       February 17, 2010
MB/cc:       C. Richard Morton, Esq.
             Lawrence E. Wood, Esq.
             Molly S. Lorber Esq.

IN RE:  JAMES KELLY,

        Petitioner

**ALD-215**                                                    **April 14, 2016**

## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

### C.A. No. **16-1791**

IN RE: JAMES KELLY

   (E.D.P.A. Civ. No. 08-cv-01073)

Present:       AMBRO, SHWARTZ and NYGAARD, <u>Circuit Judges</u>

       Submitted is an application for second or successive petition

       in the above-captioned case.

                   Respectfully,

                   Clerk

MMW/AKP/tyw

_____ORDER_____

       The foregoing application pursuant to 28 U.S.C. § 2244 to filed a second or
successive 28 U.S.C. § 2254 petition is denied.  Appellant has not made a prima facie
showing that his proposed claims satisfy the § 2244 standard.  The claims that Appellant
seeks to present do not meet the § 2244(b)(2) requirements; none of his claims rely on a
new rule of constitutional law or involve a newly discovered factual predicate that could
not have previously been discovered through the exercise of due diligence, and moreover,
his claims are not based on facts that, "if proven and viewed in light of the evidence as a
whole, would be sufficient to establish by clear and convincing evidence that, but for
constitutional error, no reasonable factfinder would have found the applicant guilty of the
underlying offense."  <u>See</u> 28 U.S.C. § 2244(2)(A)-(B)(i)-(ii)

                   By the Court,

                   s/Patty Shwartz
                   Circuit Judge

Dated:     April 19, 2016
tyw/cc:    Lawrence E. Wood, Esq.
           DA Philadelphia

                                    A True Copy:

                                    <i>Marcia M. Waldron</i>

                                    Marcia M. Waldron, Clerk

**4**

CLOSED,HABEAS

# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:08-cv-01073-GEKP

KELLY v. ROZUM et al
Assigned to: HONORABLE GENE E.K. PRATTER
Case in other court: USCA THIRD CIRCUIT, 09-04290
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 03/03/2008
Date Terminated: 10/06/2009
Jury Demand: None
Nature of Suit: 530 Habeas Corpus: (General)
Jurisdiction: Federal Question

**Petitioner**

**JAMES KELLY**

represented by **LAWRENCE E. WOOD**
PARKE BARNES SPANGLER, OESTE & WOOD
126 W. MINER STREET
WEST CHESTER, PA 19382-3281
610-696-2208
Email: lwood@parkebarnes.com
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**GERALD L. ROZUM**

represented by **THOMAS W. DOLGENOS**
DISTRICT ATTORNEY'S OFFICE
THREE SOUTH PENN SQUARE
PHILADELPHIA, PA 19107-3499
215-686-5701
Email: DAFed.Lit@phila.gov
*ATTORNEY TO BE NOTICED*

**Respondent**

**THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA**

represented by **MOLLY SELZER LORBER**
PHILADELPHIA DISTRICT ATTORNEY'S OFFICE
3 SOUTH PENN SQUARE
PHILADELPHIA, PA 19107
215-686-5690
Fax: 215-686-5725
Email: DAFed.Lit@phila.gov
*ATTORNEY TO BE NOTICED*

**THOMAS W. DOLGENOS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Respondent**

**THE ATTORNEY GENERAL OF THE**        represented by **THOMAS W. DOLGENOS**
**STATE OF PENNSYLVANIA**                                           (See above for address)
                                                                                                  *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/03/2008 | 1 | PETITION for Writ of Habeas Corpus ( Filing fee $ 5 receipt number 946478.), filed by JAMES KELLY.(ks, ) . Modified on 3/12/2008 (ks, ). (Entered: 03/04/2008) |
| 03/11/2008 | 2 | ORDER THAT THE CLERK OF COURT IMMEDIATELY FURNISH PETITIONER JAMES KELLY WITH A BLANK COPY OF THIS COURT'S CURRENT STANDARD FORM FOR FILING A PETITION PURSUANT TO 28 U.S.C. SEC. 2254, AND IT IS FURTHER ORDERED THAT PETITIONER JAMES KELLY SHALL COMPLETE THE CURRENT STANDARD FORM AS DIRECTED BY LOCAL CIVIL RULE 9.3(b) AND THE RULE 2 OF THE RULES GOVERNING SECTION 2254 CASES IN THE U.S. DISTRICT COURTS BY SETTING FORTH A SUMMARY OF HIS ARGUMENT ON THE FORM ITSELF AND THEN SHALL RETURN THE COMPLETED FORM TO THE CLERK OF COURT WITHIN 30 DAYS OF THE DATE OF THIS ORDER, ETC.. SIGNED BY HONORABLE GENE E.K. PRATTER ON 3/11/08. 3/11/08 ENTERED AND COPIES MAILED.(fb) Modified on 3/12/2008 (ks, ). (Entered: 03/11/2008) |
| 03/12/2008 | 3 | MOTION BY JAMES KELLY FOR LEAVE TO AMEND PETITION FOR WRIT OF HABEAS CORPUS,CERTIFICATION OF SERVICE.(fb) Modified on 3/12/2008 (ks, ). (Entered: 03/12/2008) |
| 03/17/2008 | 4 | ORDER granting 3 PETITIONER'S MOTION TO AMEND/CORRECT PETITION FOR WRIT OF HABEAS CORPUS. MR. KELLY SHALL HAVE 30 DAYS FROM THE DATE OF THIS ORDER TO FILE AN AMENDED PETITION. IT IS FURTHER ORDERED THAT MR. KELLY SHALL FILE HIS AMENDED PETITION ON THE STANDARD FORM AS REQUIRED BY LOCAL CIVIL RULE 9.3(b) AND RULE 2 OF THE RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS. SIGNED BY HONORABLE GENE E.K. PRATTER ON 03/17/2008.03/17/2008 ENTERED AND COPIES MAILED.(rab) (Entered: 03/17/2008) |
| 03/20/2008 | 5 | ORDER THAT PETITIONER'S REQUEST TO ATTACH ADDITIONAL PAGES TO THE STANDARD FORM FOR FILING A PETITION FOR WRIT OF HABEAS CORPUS IS GRANTED. THE ATTACHMENT OF ADDITIONAL PAGES IN ORDER TO FULLY ANSWER THE QUESTIONS ON THE STANDARD FORM IS ACCEPTABLE SO LONG PETITIONER USES THE STANDARD FORM AND PROVIDES ANSWERS TO THE QUESTIONS ASKED THEREIN.. SIGNED BY |

| | | |
|---|---|---|
| | | HONORABLE GENE E.K. PRATTER ON 3/20/08. 3/21/08 ENTERED AND COPIES MAILED.(pr, ) (Entered: 03/21/2008) |
| 04/21/2008 | 6 | Amended Petition for Writ of Habeas Corpus against GERALD L. ROZUM, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA, THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA, filed by JAMES KELLY, memorandum, exhibits. (MEMORANDUM AND EXHIBITS ATTACHED AS HARD COPY).(fb) (Entered: 04/21/2008) |
| 04/28/2008 | 7 | ORDER THAT THE ABOVE-CAPTIONED CASE IS REFERRED TO THE HONORABLE TIMOTHY R. RICE FOR A REPORT AND RECOMMENDATION, ETC.. SIGNED BY HONORABLE GENE E.K. PRATTER ON 4/24/08. 4/28/08 ENTERED AND COPIES MAILED.(fb) (Entered: 04/28/2008) |
| 04/30/2008 | 8 | ORDER THAT: THE DISTRICT ATTORNEY OF PHILADELPHIA COUNTY SHALL FILE SPECIFIC AND DETAILED ANSWERS AND A SUPPORTING LEGAL MEMORANDUM WITHIN 45 DAYS FROM THE DATE OF THIS ORDER PURSUANT TO RULE 5, 28 U.S.C. FOL. SEC. 2254. THE CLERK OF QUARTER SESSIONS FOR THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY SHALL FILE WITH THE CLERK OF THIS COURT COPIES OF ALL RECORDS, INCLUDING TRANSCRIPTS OF NOTES OF TESTIMONY AT ARRAIGNMENT, TRIAL, SENTENCING, SUPPRESSION HEARINGS, POST CONVICTION HEARINGS, PETITIONS, PLEADINGS, OPINIONS AND BRIEFS OF STATE COURT PROCEEDINGS IN THE MATTER OF COMMONWEALTH V. KELLY, COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, CP-51-CR-1011621-1995 WITHIN 45 DAYS OF THE DATE OF THIS ORDER. PRISONER STATE RECORD DUE BY 6/14/2008, ETC.. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 4/29/08. 4/30/08 ENTERED AND COPIES MAILED AND FAXED.(fb) (Entered: 04/30/2008) |
| 06/16/2008 | 9 | MOTION for Extension of Time to File Response/Reply *to Petition for Writ of Habeas Corpus* filed by THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA.Certificate of Service.Motions referred to TIMOTHY R. RICE. (SELZER LORBER, MOLLY) (Entered: 06/16/2008) |
| 06/16/2008 | 10 | ORDER, RESPONDENTS' TIME FOR FILING A RESPONSE TO THE MOTION FOR ISSUANCE OF WRIT IS EXTENDED TO 7/16/08. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 6/16/08. 6/17/08 ENTERED AND COPIES MAILED AND E-MAILED.(fb) (Entered: 06/17/2008) |
| 06/24/2008 | 11 | MOTION BY JAMES KELLY TO PROHIBIT FURTHER EXTENSIONS FOR THE RESPONDENTS TO FILE AN ANSWER TO THE PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS,PROOF OF SERVICE.Motions referred to TIMOTHY R. RICE.(fb) (Entered: 06/25/2008) |
| 06/24/2008 | | State Court Record received and forwarded to Magistrate Judge Rice's chambers. (fb) (Entered: 06/25/2008) |
| 06/25/2008 | 12 | ORDER THAT PETITIONER'S MOTION TO PROHIBIT FURTHER EXTENSIONS FOR THE RESPONDENTS TO FILE AN ANSWER IS DENIED. SIGNED BY |

| | | MAGISTRATE JUDGE TIMOTHY R. RICE ON 6/24/08.6/26/08 ENTERED AND COPIES MAILED AND E-MAILED.(fb) (Entered: 06/26/2008) |
|---|---|---|
| 06/25/2008 | 13 | Receipt returned from Magistrate Judge Rice's chambers, re: Acknowledging receipt of State Court record on 6/25/08. (fb) (Entered: 06/26/2008) |
| 07/15/2008 | 14 | Second MOTION for Extension of Time to File Response/Reply *to Petition for Writ of Habeas Corpus* filed by THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA.Certificate of Service.Motions referred to TIMOTHY R. RICE. (SELZER LORBER, MOLLY) (Entered: 07/15/2008) |
| 07/15/2008 | 15 | ORDER, RESPONDENTS' TIME FOR FILING A RESPONSE TO THE MOTION FOR ISSUANCE OF WRIT IS EXTENDED TO 8/15/08. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 7/15/08. 7/15/08 ENTERED AND COPIES MAILED AND E-MAILED.(fb) (Entered: 07/15/2008) |
| 07/28/2008 | 16 | MOTION BY JAMES KELLY FOR THE COURT TO ACCEPT PETITIONER'S PERMANENT OBJECTION TO ALL MOTIONS FOR EXTENSIONS BY THE RESPONDENT,PROOF OF SERVICE.Motions referred to TIMOTHY R. RICE.(fb) (Entered: 07/28/2008) |
| 07/28/2008 | 17 | ORDER THAT PETITIONER'S MOTION FOR THE COURT TO ACCEPT PETITIONER'S PERMANENT OBJECTION TO ALL MOTIONS FOR EXTENSIONS BY THE RESPONDENTS TO FILE AN ANSWER IS DENIED. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 7/28/08.7/28/08 ENTERED AND COPIES MAILED AND E-MAILED.(fb) (Entered: 07/28/2008) |
| 08/18/2008 | 18 | MOTION for Extension of Time to File Response/Reply *One Day Out-of-Time* filed by GERALD L. ROZUM, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA, THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA.Certificate of Service.Motions referred to TIMOTHY R. RICE. (DOLGENOS, THOMAS) (Entered: 08/18/2008) |
| 08/18/2008 | 19 | Response *to Petition for Writ of Habeas Corpus* by GERALD L. ROZUM, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA, THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D-1, # 5 Exhibit D-2, # 6 Exhibit E, # 7 Exhibit F) (DOLGENOS, THOMAS) (Entered: 08/18/2008) |
| 08/19/2008 | 20 | ORDER THAT RESPONDENTS' MOTION TO FILE ONE DAY OUT-OF-TIME IS GRANTED. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 8/18/08.8/19/08 ENTERED AND COPIES MAILED AND E-MAILED.(fb) (Entered: 08/19/2008) |
| 09/08/2008 | 21 | Reply to RESPONDENT'S response to petition for writ of habeas corpus by JAMES KELLY, proof of service. (fb) (Entered: 09/08/2008) |
| 10/10/2008 | 22 | Entry of Appearance by LAWRENCE E. WOOD on behalf of JAMES KELLY. (fb) (Entered: 10/14/2008) |
| 11/03/2008 | 23 | ORDER THAT PETITIONER'S COUNSEL SHALL FILE AN AMENDED |

|  |  | COUNSELED PETITION FOR HABEAS CORPUS AND OR A BRIEF IN SUPPORT OF THE PETITION FOR HABEAS CORPUS ON DECEMBER 3, 2008. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 11/3/08. 11/4/08 ENTERED AND COPIES MAILED AND E-MAILED.(sc, ) (Entered: 11/04/2008) |
|---|---|---|
| 12/09/2008 | 24 | Amended Petition Writ of Habeas Corpus against GERALD L. ROZUM, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA, THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA, filed by JAMES KELLY.(fb) (Entered: 12/10/2008) |
| 12/12/2008 | 25 | ORDER, THE ATTACHED MOTION IS GRANTED, AND THE DEADLINE FOR FILING DEFT'S AMENDED COMPLAINT IS EXTENDED TO 12/10/08. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 12/10/08. 12/12/08 ENTERED AND COPIES MAILED AND E-MAILED.(fb) (Entered: 12/12/2008) |
| 02/18/2009 | 26 | REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE TIMOTHY R. RICE THAT KELLY'S CLAIMS BE DENIED WITH PREJUDICE(OBJECTIONS TO R&R DUE BY 3/10/2009), ETC.. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 2/17/09. 2/18/09 ENTERED AND COPIES MAILED.(fb) (Entered: 02/18/2009) |
| 02/27/2009 | 27 | Objections to Report and Recommendation filed by JAMES KELLY with Certificate of Service.(WOOD, LAWRENCE) Modified on 3/2/2009 (le, ). (Entered: 02/27/2009) |
| 03/10/2009 | 28 | Letter from JAMES KELLY, dated 3/3/09, re: Written Objections, etc.. (fb) (Entered: 03/10/2009) |
| 03/26/2009 | 29 | ORDERED THAT ANY RESPONSE TO PETITIONER'S OBJECTIONS SHALL BE FILED ON OR BEFORE APRIL 9, 2009 RE 27 MOTION for Leave to Appeal in forma pauperis filed by JAMES KELLY, 28 Letter. SIGNED BY HONORABLE GENE E.K. PRATTER ON 03/26/2009. 03/26/2009 ENTERED AND COPIES E-MAILED. (rab) Modified on 3/26/2009 (rab). (Entered: 03/26/2009) |
| 03/26/2009 |  | Set/Reset Deadlines as to 26 Report and Recommendations,, Set/Clear Flags,. REPLIES DUE BY 4/9/2009. (rab) (Entered: 03/26/2009) |
| 03/26/2009 | 30 | Response to Petitioner's Objections to the Report and Recommendation *and Certificate of Service* by THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA. (SELZER LORBER, MOLLY) (Entered: 03/26/2009) |
| 03/30/2009 | 31 | ORDER RE 27 MOTION for Leave to Appeal in forma pauperis filed by JAMES KELLY, 28 Letter - PARTIES MAY SUBMIT SUPPLEMENTAL BRIEFING ADDRESSING ANY OF THE ISSUES RAISED IN THE REPORT AND RECOMMENDATION, PETITIONER'S OBJECTIONS THERETO, OR RESPONDENTS' RESPONSE TO PETITIONER'S OBJECTIONS, NOT TO EXCEED TWELVE (12) PAGES IN LENGTH. THESE BRIEFS SHALL BE FILED ON OR BEFORE APRIL 20, 2009. SIGNED BY HONORABLE GENE E.K. PRATTER ON 03/30/09. 03/30/09 ENTERED AND COPIES E-MAILED.(rab) (Entered: 03/30/2009) |
| 03/30/2009 |  | Set/Reset Deadlines as to 26 Report and Recommendations,, Set/Clear Flags,. |

|            |    | RESPONSES DUE BY 4/20/2009. (rab) (Entered: 03/30/2009)                                                                                                                                                                                                                                                                                                                                                                   |
| ---------- | -- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| 04/20/2009 | 32 | Memorandum on Behalf of James Kelly filed by JAMES KELLY (WOOD, LAWRENCE) Modified on 4/23/2009 (nds). (Entered: 04/20/2009)                                                                                                                                                                                                                                                                                              |
| 10/06/2009 | 33 | MEMORANDUM AND/OR OPINION SETTING FORTH THE REASONS FOR APPROVING AND ADOPTING THE REPORT AND RECOMMENDATION. SIGNED BY HONORABLE GENE E.K. PRATTER ON 10/5/09. 10/6/09 ENTERED AND COPIES E-MAILED.(rab) (Entered: 10/06/2009)                                                                                                                                                                                            |
| 10/06/2009 | 34 | ORDERED THAT THE REPORT AND RECOMMENDATION IS APPROVED AND ADOPTED. THE PETITION FOR WRIT OF HABEAS CORPUS IS DENIED. THERE IS NO PROBABLE CAUSE TO ISSUE A CERTIFICATE OF APPEALABILITY. THE CLERK OF COURT SHALL MARK THIS CASE CLOSED FOR STATISTICAL PURPOSES. SIGNED BY HONORABLE GENE E.K. PRATTER ON 10/5/09. 10/6/09 ENTERED AND COPIES E-MAILED.(rab) (Entered: 10/06/2009)                                         |
| 10/20/2009 | 35 | MOTION for Reconsideration filed by JAMES KELLY.certificate of service.(WOOD, LAWRENCE) (Entered: 10/20/2009)                                                                                                                                                                                                                                                                                                             |
| 10/20/2009 | 36 | Exhibit RE: MOTION for Reconsideration *map* filed by JAMES KELLY. (WOOD, LAWRENCE) Modified on 10/21/2009 (nd). (Entered: 10/20/2009)                                                                                                                                                                                                                                                                                    |
| 10/26/2009 | 37 | Response to Motion for Reconsideration *and Certificate of Service* by THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA. (SELZER LORBER, MOLLY) (Entered: 10/26/2009)                                                                                                                                                                                                                                                   |
| 10/30/2009 | 38 | ORDER denying 35 MOTION FOR RECONSIDERATION filed by JAMES KELLY. SIGNED BY HONORABLE GENE E.K. PRATTER ON 10/29/09.10/30/09 ENTERED AND COPIES E-MAILED.(rab) (Entered: 10/30/2009)                                                                                                                                                                                                                                      |
| 11/04/2009 | 39 | NOTICE OF APPEAL as to 34 Order (Memorandum and/or Opinion, by JAMES KELLY. Fee not paid. Copies to Judge, Clerk USCA, Appeals Clerk and THOMAS W. DOLGENOS, MOLLY SELZER LORBER, LAWRENCE E. WOOD. (fb) (Entered: 11/04/2009)                                                                                                                                                                                             |
| 11/04/2009 | 40 | Request by JAMES KELLY for certificate of appealability. (fb) (Entered: 11/04/2009)                                                                                                                                                                                                                                                                                                                                      |
| 11/04/2009 | 41 | Clerk's Notice to USCA re 39 Notice of Appeal. (fb) (Entered: 11/04/2009)                                                                                                                                                                                                                                                                                                                                                |
| 11/05/2009 | 42 | Letter from JAMES KELLY, dated 10/27/09, re: Request for relief, etc.. (fb) (Entered: 11/05/2009)                                                                                                                                                                                                                                                                                                                        |
| 11/05/2009 |    | (State Court Record forwarded to USCA). (om, ) (Entered: 11/05/2009)                                                                                                                                                                                                                                                                                                                                                     |
| 11/13/2009 | 43 | CERTIFICATE OF SERVICE by JAMES KELLY. (fb) (Entered: 11/13/2009)                                                                                                                                                                                                                                                                                                                                                        |
| 11/18/2009 |    | NOTICE of Docketing Record on Appeal from USCA re 39 Notice of Appeal filed by JAMES KELLY. USCA Case Number 09-4290 (jl, ) (Entered: 11/18/2009)                                                                                                                                                                                                                                                                         |
| 03/03/2010 | 44 | ORDER of USCA as to 39 Notice of Appeal filed by JAMES KELLY, dated 2/17/10, re: The foregoing amended request for a certificate of appealability is denied, etc.. (fb)                                                                                                                                                                                                                                                   |

|  |  |  |
|---|---|---|
|  |  | (Entered: 03/04/2010) |
| 03/03/2010 |  | Appeal Record Returned from the U.S. Court of Appeals for the Third Circuit. (State Court record included and forwarded to Judge Pratter's chambers). (fb) (Entered: 03/04/2010) |
| 03/09/2010 | 45 | Receipt returned from Judge Pratter's chambers, re: Acknowledging receipt of State Court record on 3/5/10. (fb) (Entered: 03/10/2010) |
| 03/09/2010 | 46 | Letter from Judge Pratter's chambers, dated 3/9/10, re: Returning State Court record to the Clerk of Quarter Sessions for Philadelphia. (fb) (Entered: 03/10/2010) |
| 04/19/2016 | 47 | Certified Copy of Order from USCA that foregoing application pursuant to 28 U.S.C. section 2244 to filed a second or successive 28 U.S.C. section 2254 petition is denied. (jaa, ) (Entered: 04/20/2016) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/07/2022 15:08:05 | | | |
| **PACER Login:** | nilamsanghvi | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:08-cv-01073-GEKP |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**5**

**General Docket**
**Third Circuit Court of Appeals**

| | |
|---|---|
| **Court of Appeals Docket #:** 16-1791 | **Docketed:** 04/05/2016 |
| In re: James Kelly | **Termed:** 04/19/2016 |
| **Appeal From:** United States District Court for the Eastern District of Pennsylvania | |
| **Fee Status:** NA | |

**Case Type Information:**
  **1)** original proceeding
  **2)** shc-2244b
  **3)** DC Civil Case

**Originating Court Information:**
  **District:** 0313-2 :

**Prior Cases:**
  None

**Current Cases:**
  None

| | |
|---|---|
| In re: JAMES KELLY (#DB-5777)<br>     Petitioner | Lawrence E. Wood, Esq.<br>Direct: 610-696-2208<br>Email: larrywood65@verizon.net<br>Fax: 610-430-3514<br>[NTC Retained]<br>Parke Barnes Spangler Oeste & Wood<br>126 West Miner Street<br>West Chester, PA 19382 |
| DISTRICT ATTORNEY PHILADELPHIA<br>     Respondent | District Attorney Philadelphia<br>Email: DAfederal.litigation@phila.gov<br>[NTC city/county gov]<br>Philadelphia County Office of District Attorney<br>3 South Penn Square<br>Philadelphia, PA 19107 |

IN RE: JAMES KELLY,

Petitioner

| 04/05/2016 | ☐ ☐ 147 pg, 5.47 MB | Application for Leave to File Second or Successive Petition pursuant to 28 U.S.C. Section 2244(b) filed. Notice filed by Petitioner James Kelly. Received in the Court of Appeals on 04/04/2016. (TYW) [Entered: 04/05/2016 09:18 AM] |
|---|---|---|
| 04/19/2016 | ☐ ☐ 1 pg, 321.08 KB | ORDER (AMBRO, SHWARTZ and NYGAARD, Circuit Judges) denying Petitioner's appliction pursuant to 28 U.S.C. section 2244 to file a second or successive 28 U.S.C. section 2254 petition, filed. Panel No.: ALD-215. Shwartz, Authoring Judge. (TYW) [Entered: 04/19/2016 12:21 PM] |

Clear All

◉ **Documents and Docket Summary**
○ **Documents Only**

☐ **Include Page Numbers**

**Selected Pages:** 0          **Selected Size:** 0 KB

View Selected

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| Third Circuit - 08/30/2022 07:57:20 | | | |
| PACER Login: | pi1690 | Client Code: | |
| Description: | Docket Report (filtered) | Search Criteria: | 16-1791 |
| Billable Pages: | 1 | Cost: | 0.10 |

**6**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES KELLY,                          :        CIVIL ACTION
              Petitioner              :
                                      :
                                      :        *FILED FEB 18 2009*
       v.                             :        No. 08-1073
                                      :
GERALD L. ROZUM, et al.,              :
              Respondents             :

## REPORT AND RECOMMENDATION

TIMOTHY R. RICE                                    February 17, 2009
U.S. MAGISTRATE JUDGE

 Petitioner James Kelly, a prisoner at the State Correctional Institution in Somerset,

Pennsylvania, has filed this counseled petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. For the following reasons, I respectfully recommend Kelly's claims be denied as

procedurally defaulted, non-cognizable, or meritless.

### FACTUAL AND PROCEDURAL HISTORY

 On August 20, 1996, after a joint trial, a jury found Kelly guilty of first-degree murder

and criminal conspiracy. See Verdict, Pennsylvania v. Kelly, CP 9510-1162 (Ct. Com. Pl. Phila.

entered Aug. 20, 1996). On August 21, 1996, the trial court sentenced Kelly to life imprisonment

for the murder conviction and two and one-half-to-five years imprisonment for the conspiracy

conviction. The sentences were concurrent.

 At the trial, Ernestine Williams and Colie Baxter testified. Williams testified that, prior

to the shooting, she saw and talked with Kelly on the same block on which the shooting occurred.

Aug. 14, 1996 Transcript at 85:10-25, Commonwealth v. Kelly, CP 9510-1162 (Ct. Com. Pl.

Phila.) [hereinafter Transcript]. She saw Kelly pass a brown bag to Larry Mullins, Kelly's co-

1

defendant. See id. at 87:17-20. Mullins placed this brown bag under his coat and did not immediately remove his hand. Id. at 249:2-21. When Mullins removed his hand, he held a gun, which he used to shoot the victim, Travis Hughston. Id. at 249:21-23. Baxter testified he saw Kelly and Mullins run from the scene, enter a car, and drive away. See Aug. 15, 1996 Transcript at 38:13-16, 12:20-22: 11:2-15.

Kelly did not file timely post-sentence motions or an appeal. Kelly filed a petition under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. § 9541, seeking reinstatement of his appellate rights and leave to file post-sentence motions. See Petitioner's Memorandum of Law in Support of Petition for Leave to File Post-Sentence Motion and for Appeal Nunc Pro Tunc and for other Post-Conviction Relief, Pennsylvania v. Kelly, CP 9510-1162 (Ct. Com. Pl. Phila. filed Jul. 14, 1997). The court granted the requested relief and Kelly filed post-sentence motions arguing: (1) the verdict was against the weight of the evidence; (2) the evidence was insufficient to sustain the verdict; (3) the jury rendered an inconsistent verdict; and (4) ineffective assistance of counsel for failing to adequately investigate the case or interview witnesses, failing to present at least one witness, failing to investigate the alibi defense, failing to present an opening statement to the jury; and failing to request proper final instructions and failing to object to the trial court's instructions. See Post Sentence Motions, Pennsylvania v. Kelly, 1162-1995 (Ct. Com. Pl. Phila. filed Jan. 16. 1998) [hereinafter Post Sentence Motions].

Counsel then filed supplemental post-sentence motions alleging counsel ineffectiveness for failing to call witnesses and/or expert witnesses to testify the shooting could not have occurred in a manner consistent with Williams' testimony, failing to conduct a meaningful cross-examination of Williams, and abandoning the defense and investigation of the case. See

2

Supplemental Post-Sentence Motions, Pennsylvania v. Kelly, 1162-1995 (Ct. Com. Pl. Phila. filed Feb. 18, 1998) [hereinafter Supplemental Post-Sentence Motions]. The post-sentence motions were denied by operation of law on May 27, 1998. See Docket at 4, Court of Common Please Trial Division Appeals Unit, Commonwealth v. Kelly, 95-10-1162 (Ct. Com. Pl. Phila.).

Kelly filed a timely appeal claiming: (1) insufficient evidence to sustain the conviction; (2) the verdict was against the weight of the evidence; (3) counsel ineffectiveness for failing to investigate, including failing to interview witnesses and failing to call witnesses; (4) counsel ineffectiveness for failing to investigate a viable alibi defense, failing to file an alibi notice, and failing to present alibi witnesses; (5) counsel ineffectiveness for failing to inform the defendant that counsel neglected to file the alibi notice and preventing defendant from making a knowing and voluntary waiver of such defense; (6) counsel ineffectiveness for failing to present an opening address; (7) counsel ineffectiveness for failing to object to the prosecutor's closing address and failing to request a mistrial and/or cautionary instruction following the prosecutor's comment shifting the burden of proof to Kelly; (8) counsel ineffectiveness for failing to object to the court's charge to the jury that it could consider any prior inconsistent statement as substantive evidence; (9) deprivation of his right to an evidentiary hearing on post-sentence motions because the Commonwealth failed to transfer Kelly from the state correctional institution; and (10) the verdict was inconsistent. See Statement of Matters Complained of on Appeal Pursuant to Pa. R. A. Proc. 1925(b), Commonwealth v. Kelly, 1162-1995 (Ct. Com. Pl. Phila. filed June 25, 1998) [hereinafter Pre-Remand Appeal]. The Superior Court of Pennsylvania affirmed the judgment of sentence, but remanded for an evidentiary hearing on whether trial counsel was ineffective for failing to call alibi witnesses and eyewitnesses and for failing to make an opening statement.

3

Commonwealth v. Kelly 1799 Philadelphia 1998 (Pa. Super. Ct. filed July 9, 1999)

(Memorandum Opinion) [hereinafter Remand Opinion].

At the evidentiary hearing on December 6, 1999 and December 7, 1999, counsel argued

counsel ineffectiveness for failing to call alibi witnesses and eyewitnesses, but did not address

counsel's failure to present an opening statement. See Dec. 6, 1999 Evidentiary Hearing

Transcript at 4:6-18, Commonwealth v. Kelly, 95-10-1162 (Ct. Com. Pl. Phila 1999). The court

denied Kelly's motion for a new trial. See Dec. 7, 1999 Evidentiary Hearing Transcript at 57:25,

58:1-17; Commonwealth v. Kelly, CP 9510-1162 1/1 (Ct. Com. Pl. Phila. filed Dec. 8, 1999)

(Memorandum Opinion) [hereinafter Court Common Pleas Post Remand Decision].

Kelly obtained new counsel and appealed the trial court's ruling. See Brief for Appellant,

Pennsylvania v. Kelly, 2000 EDA 0152 (Pa. Super. Ct. filed Mar. 22, 2000) [hereinafter Post-

Remand Brief]. Kelly argued: (1) counsel ineffectiveness and denial of a fair trial when counsel

failed to secure or present alibi evidence and eyewitness testimony; (2) counsel ineffectiveness

and denial of a fair trial when counsel failed to move in limine to preclude evidence of alleged

pressuring of a witness that was not attributable to Kelly; (3) counsel ineffectiveness and denial

of a fair trial when trial counsel failed to object to the trial court's instruction on accomplice

liability; (4) counsel ineffectiveness and denial of a fair trial when counsel failed to secure

character witnesses; (5) counsel ineffectiveness and denial of a fair trial when direct appellate

counsel failed to raise the legal issues identified above, and failed to challenge the lack of proof

of specific intent to kill or preserve the insufficient evidence claim by seeking allowance of

appeal from the Supreme Court of Pennsylvania. See Post-Remand Brief at 4. The Superior

4

Court affirmed. See Commonwealth v. Kelly, 152 EDA 2000 (Pa. Super. Ct. filed Aug. 24

2000) (Memorandum Opinion) [hereinafter Superior Court Post-Remand Opinion].

On September 21, 2000, Kelly filed a petition for review by the Pennsylvania Supreme

Court alleging: (1) the Superior Court erred by approving trial counsel's failure to secure and

present witnesses; (2) the Superior Court erred by refusing to review claims raised by new

counsel; and (3) a defendant cannot be bound by an answer in a colloquy that he did not want to

call witnesses if trial counsel fails to locate and interview witnesses. See Petition for Allowance

of Appeal at 2-3, Kelly v. Commonwealth, No. 2000 EDA 0152 (Pa. filed Sept. 21, 2000)

[hereinafter Petition for Allowance of Appeal]. The Pennsylvania Supreme Court denied

allocatur on February 9, 2001. Commonwealth v. Kelly, 871 A.2d 141 (Pa. 2001) (table).

On September 26, 2001, Kelly filed a petition for post conviction relief pursuant to 42 Pa.

C.S.A. § 9543, see Petition for Post-Conviction Relief Pursuant to 42 Pa. C.S.A. § 9543,

Commonwealth v. Kelly, C.P. 9510-1162 (Ct. Com. Pl. Phila. filed Sept. 26, 2001) [hereinafter

PCRA Petition], and on October 17, 2001, he filed a supplement to the previously filed petition.

See Petitioner's Supplement to Previously Filed Petition for Post-Conviction Relief Pursuant to

42 Pa. C.S.A. § 9543, Commonwealth v. Kelly, C.P. 9510-1162 (Ct. Com. Pl. Phila. filed Oct.

17, 2001) [hereinafter Supplement to PCRA Petition]. Kelly alleged: (1) counsel ineffectiveness

and denial of a fair trial when counsel failed to move in limine to preclude evidence of alleged

pressuring of a witness not attributable to Kelly; (2) counsel ineffectiveness and denial of a fair

trial when counsel failed to object to trial court's jury instruction on accomplice liability; (3)

counsel ineffectiveness and denial of a fair trial when trial counsel failed to secure character

witnesses; (4) counsel ineffectiveness and denial of a fair trial when trial counsel failed to request

5

discovery and investigate an alternate suspect; (5) the prosecution violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) because it failed to disclose files relating to an alternate suspect; (6) counsel ineffectiveness and denial of a fair trial when direct appellate counsel did not raise the above issues and failed to challenge the lack of proof of specific intent to kill or preserve the insufficient evidence claim; (7) counsel ineffectiveness and denial of the right to testify when trial counsel advised Kelly his criminal record could be used to impeach his credibility if he testified. <u>See</u> <u>id.</u> The court dismissed Kelly's petition on February 19, 2003. <u>See</u> <u>Commonwealth v. Kelly</u>, No. 9510-1162 (Ct. Com. Pl. Phila. filed Jan. 28, 2004) [hereinafter PCRA Opinion].

Kelly waived his right to appellate counsel, and filed a pro se appeal alleging: (1) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for omitting certain rebuttal testimony; (2) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for allowing the admission of irrelevant and prejudicial testimony and prosecutor misconduct; (3) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for not fully utilizing the prior statements of prosecution witnesses on cross examination; (4) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for allowing the jury to see Kelly's "mug shot" from a prior arrest; (5) PCRA counsel ineffectiveness for failing to raise prior counsel ineffectiveness for allowing an in-court identification of Kelly which lacked independent basis and failing to object to the court's instruction; (6) PCRA counsel ineffectiveness for waiving claims related to Kelly's second alibi witness; (7) PCRA counsel ineffectiveness for failing to raise first appellate counsel's ineffectiveness for inadequately questioning trial counsel at the evidentiary hearing, failing to object to the prosecutor's

6

examination of Kelly and his witnesses, and the hearing court's deviation from its mandated

function; (8) denial of due process when PCRA court ruled appellate counsel effective despite

failing to raise trial counsel ineffectiveness for not challenging admissibility of witness

pressuring testimony and not presenting character witnesses; (9) denial of due process when trial

court found no hearing was necessary to resolve Kelly's PCRA claims. See Brief for Appellant

at 5, Commonwealth v. Kelly, 755 EDA 2003, (Pa. Super. Ct. filed Nov. 2, 2004) [hereinafter

PCRA Appeal].

On December 18, 2006, the Superior Court rejected Kelly's claims. See Commonwealth

v. Kelly, 755 EDA 2003 (Pa. Super. Ct. Dec. 18, 2006) (Memorandum Opinion) [Superior Court

PCRA Opinion]. The Honorable Kate Ford Elliott filed a dissenting opinion contending Kelly

had not waived his claims and was entitled to a new trial because his counsel was ineffective for

failing to challenge the admissibility of witness-pressuring testimony and failing to call character

witnesses. Commonwealth v. Kelly, 755 EDA 2003 (Pa. Super. Ct. Dec. 18, 2006) (dissenting,

Elliott, J.) (Memorandum Opinion) [hereinafter Superior Court Dissent]. The Pennsylvania

Supreme Court denied allocatur on October 26, 2007. Commonwealth v. Kelly, 934 A.2d 1277

(Pa. 2007) (table).

On April 21, 2008, Kelly filed a habeas corpus petition alleging: (1) counsel

ineffectiveness for failing to investigate witnesses, file an alibi notice, and present alibi

witnesses; (2) counsel ineffectiveness for failing to secure character witnesses; (3) counsel

ineffectiveness for failing to move to preclude evidence of witness tampering; (4) counsel

ineffectiveness for failing to object to the court's jury instruction on accomplice liability; (5) the

verdict was against the weight of the evidence; (6) insufficient evidence to sustain the verdict; (7)

7

the verdict was inconsistent; (8) appellate counsel ineffectiveness for failing to raise trial

counsel's (a) failure to move to preclude evidence of witness tampering, (b) failure to object to

the court's instruction on accomplice liability,(c) failure to secure character witnesses; and (d)

failure to raise a weight claim; (9) appellate counsel ineffectiveness for failing to preserve the

insufficient evidence claim; (10) counsel ineffectiveness for failing to challenge the affidavit of

probable cause; (11) counsel ineffectiveness for failing to request discovery for, or investigate, an

alternate suspect; (12) counsel ineffectiveness for failing to inform Kelly regarding the alibi

defense, failing to file a notice of alibi defense, and failing to inform Kelly the investigator

located two eyewitnesses; (13) counsel ineffectiveness for failing to give an opening statement;

(14) counsel ineffectiveness for failing to object to the prosecutor's closing argument and failing

to request a mistrial and/or a cautionary instruction to prosecutor comment which shifted the

burden to Kelly; (15) counsel ineffectiveness for failing to realize the police and/or prosecutor

were withholding evidence; (16) counsel ineffectiveness for advising Kelly his criminal history

would be used to impeach his credibility if he testified; (17) counsel ineffectiveness for failing to

preclude the in-court identification of Kelly and for failing to move for a mistrial after such

identification; (18) counsel ineffectiveness for failing to allege the police and/or prosecutor were

withholding evidence when they failed to disclose that Baxter was previously unable to identify

Kelly in a photograph array; (19) counsel ineffectiveness for failing to suppress the identification

of Kelly made by Williams; (20) counsel ineffectiveness for failing to file a motion to declare

Williams incompetent to testify; (21) the prosecution failed to disclose evidence favorable to the

defense, i.e., investigation documents relating to a witness's statement the victim was responsible

for the shootings of "Terry" and "Curt"; (22) the prosecution failed to disclose evidence

8

favorable to the defense, i.e., investigation documents relating to disagreements the victim had

with the Curry family; (23) the prosecution failed to disclose evidence favorable to the defense,

i.e., documents relating to the police statement to Williams that they heard she was paid to blame

Kelly and the shooter was someone named "Tommy"; (24) the prosecution failed to disclose

evidence favorable to the defense, i.e., Baxter was unable to identify Kelly when previously

shown a photograph; (25) the prosecution failed to disclose evidence favorable to the defense,

i.e., investigation reports documenting the two-and-one-half-year investigation; (26) the

prosecution failed to disclose evidence favorable to the defense, i.e., information gained from

witness Corey Braxton; (27) appellate counsel ineffectiveness for failing to allege the Superior

Court erred by refusing to review the weight of the evidence claim; (28) PCRA counsel

ineffectiveness for failing to allege the Superior Court erred by refusing to review the weight of

the evidence claim; (29) denial of a fair trial due to judicial misconduct because the judge failed

to recuse himself even though Kelly's attorney was the son of a long-time friend and former

employer, is rumored to be the judge's godson, and is now his employer; (30) denial of a fair trial

due to judicial misconduct because the judge did not recuse himself from deciding whether trial

counsel was ineffective. See Petition for Writ of Habeas Corpus by a Person in State Custody at

9(a) -9(f), Kelly v. Rozum, 08-1073 (E.D. Pa. filed Apr. 21, 2008) [hereinafter Petition];

Memorandum of Law in Support of Petitioner's Petition for Writ of Habeas Corpus, Kelly v.

Rozum, 08-1073 (E.D. Pa. filed Apr. 21, 2008) [hereinafter Kelly's Memorandum of Law].

Kelly obtained counsel on October 10, 2008, and counsel filed an amended petition on December

9, 2008, reiterating the above-listed claims. See Amended Petition Writ for Habeas Corpus,

Kelly v. Rozum, No. 08-1073 (E.D. Pa. filed Dec. 9, 2008).

For the reasons set forth below, I recommend Kelly's claims be dismissed as procedurally defaulted, non-cognizable, or meritless.

## DISCUSSION

I.    Procedurally Defaulted

A.    Kelly waived claims not properly presented to the state courts

A federal court may not grant habeas relief to a state prisoner unless the prisoner exhausted her available remedies in state court. 28 U.S.C. § 2254(b); O'Sullivan v. Boerkel, 526 U.S. 838, 839 (1999); Picard v. Connor, 404 U.S. 270, 275 (1971); Nara v. Frank, 488 F.3d 187, 197 (3d Cir. 2007); Slutzker v. Johnson, 393 F.3d 373, 379 (3d Cir. 2004). A state prisoner must complete "the State's established appellate review process" to "give the state courts one full opportunity to resolve any constitutional issues." O'Sullivan, 526 U.S. at 845; Nara, 488 F.3d at 197; see also Woodford v. Ngo, 126 S.Ct. 2378, 2386-87 (2006).[1] A petitioner "shall not be deemed to have exhausted the remedies available . . . if [s]he has the right under the law of the [s]tate to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

A claim "fairly presented" to the state courts is exhausted. Baldwin v. Reese, 541 U.S. 27, 29 (2004); O'Sullivan, 526 U.S. at 848; Nara, 488 F.3d at 197; Cristin v. Brennan, 281 F.3d 404, 410 (3d Cir. 2002); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996). The relevant inquiry is whether the petitioner presented in state courts the legal theory and supporting facts asserted in the federal habeas petition. Nara 488 F.3d at 198; Keller v. Larkins, 251 F.3d 408,

---

[1]    Pennsylvania Supreme Court Order No. 218 declares federal habeas petitioners no longer have to appeal to the state supreme court to satisfy the exhaustion requirement. See Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).

413 (3d Cir. 2001); see Revels v. DiGuglielmo, 2005 WL 1677951, *4 (E.D. Pa. 2005) (DuBois, J.).

"[I]f [a] petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred . . . there is procedural default for purposes of federal habeas . . . ." Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991); McCandless, 172 F.3d at 260. Although the issue is best addressed by the state courts, a federal court may dismiss a petition as procedurally barred if state law would unambiguously deem it defaulted. Carter v. Vaughn, 62 F.3d 591, 595 (3d Cir. 1995). Similarly, procedural default occurs when a petitioner presented the claim in the state system, but the state court refuses to address the claim on the merits because of "an established state rule of law independent of the federal claim and adequate to support the refusal." Sistrunk v. Vaughn, 96 F.3d 666, 673 (3d Cir. 1996) (citing Coleman, 501 U.S. at 750). This procedural default doctrine prohibits federal courts from reviewing a petitioner's claim defaulted in state courts on an independent and adequate state law ground. Coleman, 501 U.S. at 729; see Leyva v. Williams, 504 F.3d 357, 365 (3d Cir. 2007); Nara, 488 F.3d at 199; Griggs v. DiGuglielmo, 2007 WL 2007971, at *5 (E.D. Pa. Jul. 3, 2007) (Yohn, J.).

An adequate state law ground exists if: "(1) the state procedural rule speaks in unmistakable terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions." Doctor v. Walters, 96 F.3d 675, 683-84 (3d Cir. 1996). It must be a rule of general applicability which is "firmly established, readily ascertainable, and regularly followed." See Leyva, 504 F.3d at 366 (quoting Szuchon v. Lehman, 273 F.3d 299, 327 (3d Cir. 2001)). The purpose of the

11

procedural default rule is to prevent habeas petitioners from avoiding the exhaustion doctrine by defaulting their federal claims in state court. Coleman, 501 U.S. at 732.

An issue is waived if a petitioner fails to raise it and it could have been raised before trial, at trial, on appeal, in a habeas corpus proceeding, or in a prior proceeding. 42 Pa. Cons. Stat. § 9544(b); see also Sistrunk v. Vaughn, 96 F.3d 666, 671 n.4 (3d Cir. 1996) ("the rules [of Pennsylvania's appellate procedure] dictate that an issue raised at the trial level but not preserved on appeal will not be considered by any subsequent appellate court"); Commonwealth v. D'Collanfield, 805 A.2d 1244, 1245 (Pa. Super. 2002) (issue not preserved on appeal waived). Moreover, the PCRA provides collateral actions must be filed within one year of the date on which the conviction became final. 42 Pa. Cons. Stat. § 9545(b)(1). Such state law waiver and PCRA statute of limitation rules are independent and adequate state law grounds that bar federal habeas review. Peterson v. Brennan, 196 Fed. Appx. 135, 142 (3d Cir. Sept. 26, 2006); Griggs, 2007 WL 2007971, at *5; Frey v. Stowitzky, 2007 WL 1574768, at *2 (E.D. Pa. May 31, 2007) (Giles, J.) (claims procedurally defaulted in federal court because petitioner's direct appeal was dismissed for failure to file a brief and his PCRA petition was untimely); Clymer, 2005 WL 711651, at *4-5 (claim procedurally defaulted because state court has consistently found issues waived if defendant fails to properly brief the issues). They are rules of general applicability which are "firmly established, readily ascertainable, and regularly followed." See Leyva, 504 F.3d at 366 (quoting Szuchon, 273 F.3d at 327).

12

1.    Claims not presented to the state courts

Kelly failed to present the following claims to the state court: appellate counsel ineffectiveness for failing to raise a weight claim (ground 8, in part),[2] see Kelly's Memorandum of Law at ¶131, 109-119; counsel ineffectiveness for failing to challenge the affidavit of probable cause (ground 10); counsel ineffectiveness for failing to inform Kelly about the alibi defense and the eyewitnesses (ground 12); counsel ineffectiveness for failing to raise a claim the prosecution withheld evidence, including questions posed by police to Williams and various police activity sheets (ground 15); counsel ineffectiveness for failing to seek and/or review discovery regarding whether Baxter was unable to identify a photograph of Kelly prior to trial (ground 18); counsel ineffectiveness for failing to move to suppress Williams' identification of Kelly (ground 19); counsel ineffectiveness for failing to file a motion to bar Williams from testifying because she was incompetent (ground 20); Brady violation for the prosecution's failure to disclose investigation documents relating to a witness's statement the deceased was responsible for the shootings of "Terry" and "Curt" (ground 21); Brady violation for the prosecution's failure to disclose investigation documents relating to disagreements the victim had with the Curry family (ground 22); Brady violation for the prosecution's failure to disclose documents relating to the police officers' statement to Williams that they heard she was paid to blame Kelly and the shooter was someone named "Tommy" (ground 23); Brady violation for the prosecution's failure to disclose Baxter was unable to identify Kelly when previously shown a photograph (ground

_____

[2] Kelly's appellate counsel claimed Kelly's conviction was against the weight of the evidence in his post-sentence motions, see Post Sentence Motions, and on appeal, see Pre-Remand Appeal. Therefore, it appears Kelly is arguing counsel ineffectiveness for failing to raise this claim to the Pennsylvania Supreme Court.

13

24); Brady violation for the prosecution's failure to disclose investigation reports documenting

the two-and-one-half-year investigation (ground 25); Brady violation for the prosecution's failure

to disclose information gained from witness Corey Braxton (ground 26);[3] appellate counsel

ineffectiveness for failing to allege the superior court erred when it refused to review the weight

of the evidence claim (ground 27); PCRA counsel ineffectiveness for failing to allege appellate

counsel ineffectiveness for failing to allege the superior court erred by refusing to review the

weight of the evidence claim (ground 28); and denial of a fair trial because the trial judge did not

recuse himself from the trial and the evidentiary hearing (grounds 29 and 30).

Kelly waived these claims when he failed to raise them on direct appeal or during PCRA

review. See 42 Pa. Cons. Stat. § 9544(b); see also Sistrunk v. Vaughn, 96 F.3d at 671 n.4. Kelly

is now passed the one-year limitations period for PCRA. See Pa. Cons. Stat. § 9544(a). Such

independent and adequate state law ground preclude review here, see Peterson, 196 Fed. Appx. at

142, and the claims are procedurally defaulted because he can no longer raise them in state court,

see Coleman, 501 U.S. at 735 n.1.

    2.    Claims not preserved on appeal to the Superior Court or on PCRA review

Kelly first raised ground 4, trial counsel ineffectiveness for failing to object to the court's

jury instruction on accomplice liability, on his post-remand appeal. See Post-Remand Brief at

22. The Superior Court denied review because it was beyond the scope of the limited review

granted to petitioner. See Post-Remand Superior Court Opinion at 4, 4 n.4 (finding issues

---

[3] In state court, Kelly asserted only a Brady violation for the prosecution's failure to
disclose the full name and criminal background of Boochie. See PCRA Petition at ¶ 10f. Kelly
does not raise this claim here. See Petition. Even if he had, Kelly failed to raise it on appeal in
state court. See PCRA Appeal at 5. Therefore, he waived the claim, 42 Pa. Cons. Stat. § 9544(b),
and it is now procedurally defaulted, see Coleman, 501 U.S. at 735 n.1.

waived, but noting review of these issues would not automatically be precluded under the PCRA). Kelly abandoned this claim by failing to present it in any other appellate[4] or PCRA proceeding. See 42 Pa. Cons. Stat. § 9544(b).

Kelly raised direct appellate counsel ineffectiveness for failing to object to the court's instructions on accomplice liability, ground 8, in part, in his post-remand appellate brief, see Post-Remand Brief at 4, and PCRA petition, see PCRA Petition at 2. Kelly waived the claim, see 42 Pa. Cons. Stat. § 9544(b), however, when he failed to raise it on his PCRA appeal, see PCRA Appeal at 5.

In his post-remand brief, Kelly raised ground 9, counsel ineffectiveness for direct appellate counsel's failure to seek allowance of appeal to the Supreme Court for review of Kelly's insufficient evidence claim. See Post-Remand Brief at 4. The Superior Court found the claim unreviewable because it was beyond the scope of remand. See Superior Court Post-Remand Opinion at 4. In addition, although Kelly raised the claim in his PCRA Petition, see PCRA Petition at 2, he did not pursue this claim on PCRA appeal, see PCRA Appeal at 5. Kelly, therefore, waived the claim. See 42 Pa. Cons. State. § 9544(b).

Ground 11, in part, alleges trial counsel ineffectiveness for failing to investigate and request discovery on alternate suspects Boochie, Tommy, and Kendall, and failing to present evidence "Boochie" was a real person with a long and violent arrest record. See Petition at 9b, Kelly's Memorandum of Law at ¶ 142-152. Kelly raised this claim in his PCRA petition, and the

---

[4] In his petition for review to the Pennsylvania Supreme Court, Kelly alleged Superior Court error in failing to review the claim. See Petition for Allowance of Appeal at 2-3. The Supreme Court, however, did not grant review, Kelly, 871 A.2d at 141, and Kelly failed to raise this ineffectiveness claim on PCRA, see PCRA Petition.

PCRA court rejected the claim. See PCRA Petition at 2-3. Kelly did not appeal this ruling. See PCRA Appeal at 5. Kelly, therefore, waived the claim. See 42 Pa. Cons. Stat. § 9544(b).

Kelly first raised ground 13, trial counsel ineffectiveness for failing to deliver an opening statement, on direct appeal. See Pre-Remand Appeal. The Superior Court remanded the claim for an evidentiary hearing. See Remand Opinion. The trial court found the claim meritless because Kelly failed to show he was prejudiced by counsel's failure to make an opening statement. See Common Pleas Court Post Remand Opinion at 3. Kelly did not raise this claim on appeal, see Post-Remand Appeal Brief, or on PCRA, see PCRA Petition, and, therefore, waived it, see 42 Pa. Cons. Stat. § 9544(b).

Ground 16 alleges trial counsel ineffectiveness for advising Kelly his criminal history would be used to impeach his credibility if he testified. See Petition at 9c. On PCRA, Kelly claimed trial counsel ineffectiveness for advising Kelly not to testify. See Supplemental PCRA Petition at ¶3. The PCRA court rejected the claim. See PCRA Opinion at 7. Kelly waived this claim when he failed to appeal it to the Superior Court. See 42 Pa. Cons. Stat. § 9544(b); PCRA Appeal.

Kelly is now passed the one-year limitations period for PCRA. See Pa. Cons. Stat. § 9544(a). Such independent and adequate state law grounds preclude habeas review. See Peterson, 196 Fed. Appx. at 142. Because he can no longer raise these claims in state court, they are procedurally defaulted. See Coleman, 501 U.S. at 735 n.1.

### 3. Claim not raised to the Pennsylvania Supreme Court

Before May 9, 2000, a petitioner failed to exhaust a claim unless he filed a petition for allowance of appeal to the Pennsylvania Supreme Court. Pennsylvania Supreme Court Order

16

218, issued on May 9, 2000, provides "a litigant shall not be required to petition for rehearing or allowance of appeal following an adverse decision by the Superior Court in order to be deemed to have exhausted all available state remedies." See Wenger v. Frank, 266 F.3d 218, 224-25 (3d Cir. 2001). Petitioners, therefore, are no longer required to raise their claims to the Pennsylvania Supreme Court to satisfy the exhaustion requirement. See Lambert, 387 F.3d at 233-34. This rule, however, does not apply where "the time to petition for review by the state supreme court expired prior to the date of the order." See Wenger, 266 F.3d at 226.

On July 9, 1999, the Superior Court issued an order in Kelly's case which affirmed the trial court's judgment, remanded for further proceedings, and relinquished jurisdiction. See Judgment, Commonwealth v. Kelly, 1799 PHL 1998 (Pa. Super. Ct. dated Jul. 9, 1999). This was a final order as to all claims not remanded. See Pa. R. App. Proc. R. 1112(b) (a superior court order is final when order concludes an appeal, even if it remands an appeal, unless the Superior Court retains jurisdiction). Kelly, therefore, had until August 8, 1999, thirty days following this order, to petition for allowance of appeal to the Supreme Court to challenge the claims not remanded. See Pa. R. App. P. R. 1113. He failed to do so.

Kelly raised ground 14, counsel ineffectiveness for failing to object to the prosecutor's closing argument or failing to move for a mistrial due to the argument, in his appeal from his post-sentence motions. See Pre-Remand Appeal. The Superior Court did not list this claim as raised in his 1925(b) statement and, therefore, did not address the issue.[5] See Superior Court

---

[5] Even if he had not waived this claim when he failed to appeal to the Supreme Court, Kelly waived it when he did not raise it on PCRA. See 9544(b). Because the Superior Court did not address the merits, the issue would not have been found previously litigated and Kelly could have raised it on PCRA. 42 Pa. C.S.A. § 9544(a).

17

Remand Opinion. Kelly raised ground 6, insufficient evidence to sustain the conviction, in his

post-sentence motions and on appeal to the Superior Court. See Post Sentence Motions; Pre-

Remand Appeal. Kelly raised ground 5, alleging the verdict was against the weight of the

evidence, in his post-sentence motions,[6] see Post Sentence Motions, and on appeal to the

Superior Court,[7] see Pre-Remand Appeal. Kelly waived these claims when he failed to petition

for allowance of appeal to the Pennsylvania Supreme Court. See Wenger, 266 F.3d at 226.

Kelly is now passed the one-year limitations period for PCRA. See Pa. Cons. Stat. §

9544(a). Such independent and adequate state law grounds now preclude review, see Peterson,

196 Fed. Appx. at 142, and the claims are procedurally defaulted because he can no longer raise

them in state court, see Coleman, 501 U.S. at 735 n.1.

     B.    Cause and Prejudice or a Miscarriage of Justice

Kelly may obtain federal habeas review of claims defaulted pursuant to independent and

adequate state procedural rules only if he "can demonstrate cause for the default and actual

prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider

the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; Smith

---

[6] The Superior Court ruled Kelly waived this claim by failing to include it in his post-sentence motions. See Remand Opinion at 10. It appears, however, Kelly raised this claim in his post-sentence motion. See Post Sentence Motion at ¶ 1. The Commonwealth argues the document "did not appear on the Court of Common Pleas docket, . . . and apparently was not made part of the official record in this matter," and, therefore, the Superior Court could not consider it. See Commonwealth's Reply at 26 n.10. Although it appears the document was not on the docket, see Docket at 3-4, it is a part of the state court record.

[7] In addition, a claim alleging the verdict is against the weight of the evidence is not cognizable on federal habeas. Mattis v. Klopotòski, 2008 WL 2909859, at *4 (E.D. Pa. July 28, 2008) (Fullam, J.) (citing Tibbs v. Florida, 457 U.S. 31, 37-38 (1982)); accord Ming v. Tennis, 2007 WL 1030329, at *2 n.1 (E.D. Pa. Feb. 13, 2007) (Restrepo, J.); Willis v. Varner, 2004 WL 1109780, at *10 (E.D. Pa. May 13, 2004) (Angell, J.); Smith v. Vaughn, 1997 WL 338851, at *8 (E.D. Pa. Jun. 17, 1997) (Yohn, J.).

v. Murray, 477 U.S. 527, 533 (1986); see also Murray v. Carrier, 477 U.S. 478, 485 (1986); Leyva, 504 F.3d at 362 n.6, 366; Griggs, 2007 WL 2007971, at *5. This requirement is grounded in the need for finality and comity, i.e., ensuring state courts have an adequate opportunity to review a case on the merits. Smith, 477 U.S. at 533.

To constitute cause to excuse default, Kelly must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Coleman, 501 U.S. at 753 (quoting Murray, 477 U.S. at 488); Sistrunk, 96 F.3d at 675. To establish prejudice, Kelly must show "actual prejudice resulting from the errors of which [s]he complains." McClesky v. Zant, 499 U.S. 467, 494 (1991) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)). Actual prejudice exists if the alleged errors "worked to [his] actual and substantial disadvantage, infecting [her] entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170.

To establish the requisite fundamental miscarriage of justice, Kelly must demonstrate "actual innocence," Schlup v. Delo, 513 U.S. 298, 324 (1995); Leyva, 504 F.3d at 366, i.e., "new reliable evidence," such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" not presented at trial, Schlup, 513 U.S. at 324; Hubbard v. Pinchak, 378 F.3d 333, 339 (3d Cir. 2004) (addressing claim of actual innocence but rejecting it on the merits), that would make it more likely than not that "no juror, acting reasonably, would have voted to find [petitioner] guilty beyond a reasonable doubt." See House v. Bell, 547 U.S. 518, 538 (2006); Schlup, 513 U.S. at 329 (even a "concededly meritorious constitutional violation" is not sufficient to establish a miscarriage of justice to excuse procedural default absent new

19

evidence of innocence). Kelly must show no reasonable juror would have found him guilty, and not merely that a reasonable doubt exists in light of the new evidence. Schlup, 513 U.S. at 329.

Kelly does not establish cause or prejudice to excuse the default of his claims. Kelly alleges ineffective assistance of counsel as cause for his default. See Petition at 10a. Ineffective assistance of counsel on direct appeal is an independent constitutional claim and will not establish cause for procedural default of another claim unless the ineffective assistance of counsel claim was first raised in state court. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Line v. Larkins, 208 F.3d 153, 167 (3d Cir. 2000). In addition, no constitutional right exists to counsel in state collateral proceedings. Pennsylvania v. Finley, 481 U.S. 551, 555 (1987); Tillet v. Freeman, 868 F.2d 106, 108 (3d Cir. 1989). Thus, any alleged PCRA counsel ineffectiveness cannot establish cause for Kelly's failure to raise his claims in state court. See Cristin v. Brennan, 281 F.3d 404, 420 (3d Cir. 2002).

Kelly also claims a miscarriage of justice because he is innocent. See Petitioner's Reply to Respondent's Response to Petition for Writ of Habeas Corpus at 5, 6-7, Kelly v. Rozum, 08-1073 (E.D. Pa. filed Sept. 8, 2008) [hereinafter Petitioner's Reply]. Kelly, however, presents no new evidence to show that no reasonable juror would have found him guilty. See Schlup, 513 U.S. at 329.

II.    Non-Cognizable Claim

Habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle, 502 U.S. at 67-68; ; Taylor v. Horn, 504 F.3d 416, 448 (3d Cir. 2007); Smith v. Horn, 120 F.3d 400, 426 (3d Cir. 1997); accord, 28 U.S.C. §

20

2241(c). Thus, Kelly must allege a federal constitutional claim in his federal petition to obtain habeas review.

Ground 7 alleges an unconstitutionally inconsistent verdict because the jury found Kelly guilty of murder, but not guilty of possessing an instrument of a crime. See Petition at 9b; Kelly's Memorandum of Law at ¶¶ 124-28. Inconsistent verdicts do not present a federal constitutional question unless the jury convicted the defendant of two crimes and those crimes are mutually exclusive. United States v. Gross, 961 F.2d 1097, 1107 (3d Cir. 1992); see United States v. Powell, 469 U.S. 57, 68-69 (1984); Buehl v. Vaughn, 166 F.3d 163, 178-79 (3d Cir. 1999); Laird v. Horn, 159 F. Supp. 2d 58, 88 (E.D. Pa. 2001) (challenge to the consistency of the verdict will not be considered unless petitioner demonstrates the "verdicts are logically inconsistent" (quoting Masoner v. Thurman, 996 F.2d 1003, 1005 (9th Cir. 1993)).

Kelly has not alleged he was convicted of two mutually exclusive crimes because he does not argue he was convicted of two crimes, one of which he could not have committed by virtue of his conviction for the other. See Gross, 961 F.2d at 1107. Rather, Kelly argues his acquittal on the possession of an instrument of a crime charge is inconsistent with his homicide conviction. See Petition at 9b. Accordingly, Kelly fails to present a cognizable federal habeas claim. See Powell, 469 U.S. at 69 (verdict not unconstitutional where jury found defendant not guilty of conspiracy to possess cocaine and possession of cocaine but guilty of using a telephone to facilitate those offenses); Dunn v. United States, 284 U.S. 390, 393 (1932) (verdict not unconstitutionally inconsistent where found guilty of keeping intoxicating liquor for sale but not guilty of unlawfully possessing and unlawful sale of such liquor); Gross, 961 F.2d at 1107 (Powell foreclosed defendant's argument that his acquittal was inconsistent with his conviction).

21

III.   Meritless Claims

State court decisions merit substantial deference. See 28 U.S.C. § 2254(d)(1). A writ of habeas corpus cannot be granted unless I find the state court's adjudication of Kelly's claims (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). I must presume the state court's findings of fact are correct and Kelly must rebut that presumption of correctness by clear and convincing evidence. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003); Porter, 276 F. Supp. 2d at 296.

A state court ruling is "contrary to" clearly established Supreme Court precedent for the purposes of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law" set forth in Supreme Court cases, or "if the state court confronts a set of facts that are materially indistinguishable from" a Supreme Court decision and nevertheless arrives at a result different from its precedent. Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Jamison v. Klem, 544 F.3d 266, 274 (3d Cir. 2008). The state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court, Williams, 529 U.S. at 405, although district and appellate federal court decisions evaluating Supreme Court precedent may amplify such precedent, Hardcastle v. Horn, 368 F.3d 246, 256 n.3 (3d Cir. 2004) (citing Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999)). The state court is not required to cite or even have an awareness of governing Supreme Court precedent "so long as neither the

22

reasoning nor the result of [its] decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002); Jamison, 544 F.3d at 274-75.

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court cases, but "unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407; Jamison, 544 F.3d at 275 (quoting Matteo, 171 F.3d at 887). When making the "unreasonable application" inquiry, I must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409; see also Matteo, 171 F.3d at 891 (whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under Supreme Court precedent). A court that unreasonably extends an established rule to a new context where it should not apply, or unreasonably fails to extend such a rule to a new context where it should apply, may be deemed to have unreasonably applied the correct rule. Williams, 529 U.S. at 407; Jamison, 544 F.3d at 275 (quoting Matteo, 171 F.3d at 887). A showing of clear error is not sufficient. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); see also Douglas v. Cathal, 456 F.3d 403, 417 (3d Cir. 2006) (grant of writ inappropriate where state determination was not objectively unreasonable, even where reasonable jurists may disagree about the correct disposition of the underlying claim). I may also not grant habeas relief merely because the state court applied federal law erroneously or incorrectly. Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005); Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Clearly established federal law governing ineffectiveness claims is set forth in the two-part test of Strickland v. Washington, 466 U.S. 668 (1984). See Bell v. Cone 535 U.S. 685, 698

23

(2002); United States v. Otero, 502 F.3d 331, 334 (3d Cir. 2007). First, the "defendant must show counsel's performance was deficient," which requires showing "counsel made errors so serious [he] was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland, 466 U.S. at 687. Second, the defendant must show "the deficient performance prejudiced the defense," which requires showing the "errors were so serious as to deprive the defendant of a fair trial." Id.; see generally Outten v. Kearney, 464 F.3d 401, 413-14 (3d Cir. 2006); Thomas, 428 F.3d at 499. "Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687. Pennsylvania applies the same test for ineffective assistance of counsel as the Strickland test used in federal courts.[8] Werts, 228 F.3d at 203; Commonwealth v. Sneed, 899 A.2d 1067, 1075-76 (Pa. 2006).

Counsel's effectiveness is measured objectively considering all the circumstances. Id. at 687-88; Otero, 502 F.3d at 334. In evaluating counsel's performance, I must be "highly deferential" and "indulge a strong presumption" that counsel's challenged actions might be considered sound strategy under the circumstances. Strickland, 466 U.S. at 689. "Strickland and its progeny make clear that counsel's strategic choices will not be second guessed by post hoc determinations that a different trial strategy would have fared better." Rolan, 445 F.3d at 681-82 (citing Strickland, 466 U.S. at 689). The relevant inquiry is not whether Kelly's counsel was

---

[8] In Pennsylvania, the standard to determine whether counsel was constitutionally ineffective requires the petitioner to "rebut the presumption of professional competence" by demonstrating: "(1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interest; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." Sneed, 899 A.2d at 1076. If the petitioner fails to satisfy any of the standard's prongs the claim will be rejected. Id.

24

prudent, appropriate, or perfect. Marshall v. Hendricks, 307 F.3d 36, 91 (3d Cir. 2002). Rather, the focus is simply to ensure Kelly received a fair trial. See id.

To establish prejudice, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Prejudice must be evaluated in light of the "totality of the evidence presented at trial" and "a verdict of conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." See Rolan, 445 F.3d at 982 (quoting United States v. Gray, 878 F.2d 702, 712 (1989)).

Review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas." Yarborough v. Gentry, 540 U.S. 1, 6 (2003). Therefore, if the state court addressed counsel's effectiveness, Kelly must show the state court's decision was objectively unreasonable. Woodford v. Visciotti, 537 U.S. 19, 25 (2002). It is not enough to convince a federal habeas court that, in its independent judgment, the state court erred in applying Strickland. Bell, 535 U.S. at 698-99. Kelly, therefore, must do more than show he would have satisfied Strickland if his claims were being analyzed here in the first instance.

A.   The state court's finding the counsel ineffectiveness claim regarding witnesses was meritless was not contrary to, nor an unreasonable application of, federal law

Kelly raised ground 1, counsel ineffectiveness for failing to call alibi witnesses and eye witnesses and failing to file an alibi notice, in state court. See Post-Sentence Motion at ¶4; Statement of Matter Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b) at ¶3. After an evidentiary hearing, the state court found these claims meritless, see Post-Remand Court Common Pleas Opinion at 2-3, the Superior Court affirmed, see Post-Remand Superior Court

25

Opinion at 6-7, and the Supreme Court denied his petition for allowance of appeal, see Kelly, 871 A.2d at 141.

### 1. Alibi Witnesses

In state court, Kelly claimed counsel ineffectiveness for failing to call alibi witnesses Reverend James Becoat and Joan Arrington and for failing to file an alibi notice. See Post-Sentence Motion at ¶4; Statement of Matter Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b) at ¶3; Post-Remand Brief at 4.

Because the decision whether to call an alibi witness usually involves trial strategy, counsel's failure to present an alibi witness is not ineffective assistance of counsel per se. Commonwealth v. Brown, 767 A.2d 576, 581 (Pa. Super. 2001) (citing Commonwealth v. Auker, 681 A.2d 1305, 1319 (Pa. 1996)). To prevail on his alibi ineffectiveness claim, Kelly was required to prove: (1) the witness existed; (2) the witness was available; (3) counsel was informed of the witness's existence or counsel should otherwise have known of the witness; (4) the witness was prepared to cooperate and testify for the defendant at trial; and (5) the absence of the testimony prejudiced defendant so as to deny him a fair trial. Commonwealth v. Lopez, 739 A.2d 485, 496 (Pa. 1999); accord Commonwealth v. Petras, 534 A.2d 483, 485 (Pa. Super. Ct. 1987).

After an evidentiary hearing, the state court found Kelly's claim meritless because the court questioned Kelly at the close of the Commonwealth's case as to whether he would like to

26

call any witnesses, and Kelly replied he would not.[9] See Post-Remand Court Common Pleas
Opinion at 2-3.

The Superior Court discussed trial counsel's decision not to present Reverend Becoat.
See id. At the hearing, trial counsel noted he was not confident Reverend Becoat would be able
to place Kelly in his presence at the time of the crime. See id. In addition, counsel noted the
Commonwealth had a "bad witness" and he had effectively cross-examined her. See id. The
state court, therefore, found counsel, "as a matter of strategy," "emphasize[d] the
Commonwealth's failure to meet its burden of proving guilt beyond a reasonable doubt, rather
than attempt the more difficult task of establishing an alibi defense." See Post-Remand Superior
Court Opinion at 6-7. The Superior Court also noted Kelly acquiesced to trial counsel's strategy
because the court asked Kelly whether he wished to call witnesses and he responded he did not.

---

[9] At the close of defense's case, the court conducted the following colloquy:

"THE COURT: Are there any additional witnesses that you wanted to be called at
this trial that Mr. Seay did not call?

DEFENDANT KELLY: Well, no. There is a witness, but my defense feels as though
it was no need for him, you know.

THE COURT: So you discussed it with Mr. Seay?

DEFENDANT KELLY: Yes, I did.

THE COURT: And based on that discussion, you decided that witness would not be
called?

DEFENDANT KELLY: Yes, I did.

THE COURT: Was it because it would have been cumulative or - - I don't want to
know why. But you discussed it with him.

Is there anything about your trial which you told your attorney to do that was not
done?

DEFENDANT KELLY: No.

THE COURT: Are you satisfied with Mr. Seay's representation of you so far?

DEFENDANT KELLY: Yes, I am."

See Aug. 16, 1999 Transcript at 100:14-25, 101:1-12.

See Post-Remand Superior Court Opinion at 7 n.5. The Superior Court concluded counsel "had

a reasonable basis for deciding against presenting Reverend Becoat's testimony." See id. at 7.

Even though a detective had already testified Kelly lived close to the scene of the crime,

trial counsel's strategy was not unreasonable where it was unclear whether Reverend Beacoat

could testify Kelly was with him and where the defense was the presence of reasonable doubt.

Thus, the state court determination trial counsel was not ineffective for failing to call the alibi

witnesses was not an unreasonable application of federal law because the trial strategy was not

objectively unreasonable. See Williams, 529 U.S. at 407; Rolan, 445 F.3d at 681-82 (habeas

court will not second guess trial counsel's strategic choices).

Although the Superior Court failed to mention Joan Arrington, Kelly's common law

wife,[10] this claim is also meritless. The state court found trial counsel's decision not to present

an alibi defense was a reasonable strategy. See Post-Remand Court Common Pleas Opinion at 7.

Therefore, it also was reasonable not to call Joan Arrington as alibi witness.[11]

---

[10] It appears Kelly did not raise counsel ineffectiveness for failing to call Wanda
Arrington in state court. See Post-Remand Brief (claiming ineffectiveness for failing to call alibi
and eye witnesses, discussing Wanda and Joan Arrington, but arguing counsel should have called
Reverend Beacoat); Pre-Remand Appeal at ¶ 1b (claiming counsel failed to call the witnesses,
referencing affidavits from Reverend Beacoat and Joan Arrington); Post-Sentence Motions at ¶
5b (claiming counsel failed to subpoena alibi witnesses). The Superior Court failed to mention
Wanda and Joan Arrington, and the trial court mentioned only Reverend Beacoat and Joan
Arrington. Regardless, the claim is meritless.

[11] Although trial counsel testified he would have presented the alibi witnesses if he had
specific information of Joan and Wanda Arrington's corroborative testimony, See Dec.7, 1999
Evidentiary Hearing Transcript at 31:16-20, the court credited trial counsel's testimony, which
stated he did not know of the testimony, id. at 37:4-7, 36:21:22, and found counsel's decision not
to raise an alibi defense was reasonable, see Post-Remand Superior Court Opinion at 7.

## 2.    Eye Witnesses

Kelly raised trial counsel ineffectiveness for failing to investigate and call eye witnesses
Denise Holsey Miller and Lex Traylor in state court. See Post-Sentence Motion at ¶ 4; Statement
of Matter Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b) at ¶ 3.

As with the alibi witnesses, the trial court found the claim meritless because at trial Kelly
stated he did not want his counsel to call witnesses. See Post-Remand Court Common Pleas
Opinion at 2-3. The trial court's decision was made after an evidentiary hearing, in which it
heard conflicting testimony from trial counsel, the investigator, various witnesses, and Kelly.
See Campbell v. Vaughn, 209 F.3d 280, 288 (3d Cir. 2000) (noting the state court implicitly
discredited the petitioner's testimony); LaVellee v. Delle Rose, 410 U.S. 690, 692 (1973) (state
court did not make credibility findings, but finding "it can scarcely be doubted from its written
opinion that respondent's factual contentions were resolved against him"). Thus, the trial court's
factual findings merit deference here absent clear and convincing evidence to the contrary. See §
2254 (e)(1).

The Superior Court noted trial counsel testified he did not know of Traylor and Holsey
Miller, and counsel cannot be found ineffective for failing call witnesses he did not know
existed. See Post-Remand Superior Court Opinion at 6 (citing Commonwealth v. Woods, 710
A.2d 626, 629 (Pa. Super. 1998)). The state court determination that counsel cannot be
ineffective for failing to call witness of whom he did not know was not contrary to, nor an
unreasonable, application of, federal law. See Williams, 529 U.S. at 407; Commonwealth v.
Lopez, 739 A.2d at 496 (to be found ineffective for failing to call a witness, the lawyer must be
know of the witness).

29

Kelly, nevertheless, alleges the state court incorrectly found trial counsel did not know

Traylor and Holsey Miller existed. See Kelly's Memorandum at ¶ 87. The state court credited

trial counsel's testimony he did not know of their existence. See Post-Remand Court Common

Pleas Opinion at 2-3; Post-Remand Superior Court Opinion at 6; Campbell, 209 F.3d at 288

(noting the state court implicitly discredited the petitioner's testimony). Absent clear and

convincing evidence, I am bound by that factual determination. See 28 U.S.C. § 2254(e). To

satisfy the clear and convincing standard, a petitioner must show evidence so "clear, direct,

weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of

the truth of the precise facts in issue."[12] See Porter v. Horn, 276 F. Supp. 2d 278, 296 n.10 (E.D.

Pa. 2003) (Kelly, J.) (quoting Attica, 2001 WL 827455, at *3).

Traylor's name and statement were transmitted to trial counsel during discovery, see

Post-Remand Brief at Ex. B, Prosecutor's Response to Defendant's Discovery Request, and

Holsey Miller was listed as a possible witness during voir dire, see August 9, 1996 Voir Dire

Transcript at 14:18, Commonwealth v. Kelly, No. 1162 (Pa. Ct. Com. Pl. Phila. Aug. 9, 1996;

August 12, 1996 Voir Dire Transcript at 16:9, Commonwealth v. Kelly, No. 1162 (Pa. Ct. Com.

---

[12] In addition, habeas relief would be available only if the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at trial." 28 U.S.C. § 2254(d)(2). As Judge Strawbridge noted, even if Kelly prevailed under § 2254(e)(1), § 2254(d)(2) permits relief only if, in light of the state court's unrebutted factual determinations, its adjudication of the claim was unreasonable. Sterling v. Tennis, 2006 WL 1409719, at *4 (E.D. Pa. May 18, 2006) (citing Lambert, 387 F.3d at 235, 236 n.19). Section 2254(d)(2), restricts review of "the state court's factual determination to the evidence . . . presented to the state court." Sterling, 2006 WL 1409719, at *4 (citing Lambert, 387 F.3d at 235). Additionally, a factual determination should be adjudged "unreasonable under 2254(d)(2) only if [I find] a rational jurist could not reach the same finding on the basis of the evidence in the record." § 2254(d)(2); see Porter, 276 F. Supp. 2d at 296 (§ 2254(d)(2) requires federal habeas courts to objectively examine state court decisions for their reasonableness similar to the unreasonable application of law clause in § 2254(d)(1)).

30

Pl. Phila. Aug. 12, 1996). These facts cast serious doubt on trial counsel's testimony, and were not addressed by either the trial court or the Superior Court.

Nevertheless, even if this evidence constitutes clear and convincing evidence sufficient to rebut the presumption of correctness, Kelly's ineffectiveness claim fails even under a de novo review. Kelly cannot establish he was prejudiced by counsel's failure to call Traylor and Holsey Miller. Traylor did not see the shooting. The statement Traylor gave to the police the night of the shooting noted he saw two black males enter a car at the end of the alley. See Evidentiary Hearing Transcript at Ex. C-2, Investigation Interview Record for Lex Traylor. Traylor stated the person he saw running "had on a beige jacket . . . with a hood, [he] couldn't tell much else . . . because he was almost at the other end of the alley," and "the one in the alley was a male and they were both black." Id. This was the only information trial counsel had in his possession before trial, and it failed to exculpate Kelly.[13]

At the evidentiary hearing, however, Traylor offered a new version. He claimed the man he had seen running down the alley was darker, shorter, and smaller than Kelly, but he was unable to see the person's face. See Transcript of Evidentiary Hearing at 43:1-24, Commonwealth v. Kelly, No. 1162 (Ct. Com. Pl. Phila. Dec. 6, 1999) [hereinafter Dec. 6, 1999 Evidentiary Hearing]. Traylor testified the other person "was a distance away" but was darker than Kelly and Traylor "assumed" he was shorter than Kelly. Id. at 44:4-13.

---

[13] The trial court credited trial counsel's testimony he did not receive the investigator's interview notes. Even if he did, the notes of the interview with Traylor merely state he saw a 5'6" tall male of medium build in a grey hoodie run from the scene. He ran to a car parked at the end of an alley where he met with another black male of about the same height and build, wearing a white jacket. See Evidentiary Hearing Transcript at Ex. D-2.

31

Traylor also submitted a post-trial affidavit. Even if Traylor testified consistent with his post-trial affidavit, the statement most helpful to Kelly, he would have testified that after the shooting, he went to his door and saw a man run away from the scene, the man met up with another man at the end of the alley and enter a car. See Affidavit of Lex Traylor. Both men were around five feet six inches tall with medium builds and neither was Kelly. Id. The testimony in the affidavit was inconsistent with Traylor's police statement made when events were fresh in his mind, and his testimony would have been subject to further impeachment because of the distance and lighting conditions in the alley. See Dec. 6, 1999 Evidentiary Hearing at 52:1-7.

Similarly, Holsey Miller did not see the shooting. Although Holsey Miller's testimony arguably would have been inconsistent with Williams' testimony at trial, Kelly has not shown he was prejudiced by counsel's failure to present such testimony. Holsey Miller testified she saw three strange men fifteen minutes prior to the shooting, and did not see anyone when she looked outside following the gunshots. Dec. 6, 1999 Evidentiary Hearing at 69:10-16. She failed to mention the three men to a police officer when questioned at the scene. Id. at 65:15-17. After she learned Kelly had been arrested for this murder, she did not inform the authorities that Kelly was not on the street fifteen minutes before the shooting. Id. at 69:14-25, 70:1-18, 71:1-8. Moreover, she testified that, although she spoke with the investigator, she did not recall all statements contained in the statement, did not review it after it was written, and had not seen it prior to her testimony at the evidentiary hearing. See Dec. 6, 1999 Evidentiary Transcript at 67-68.

Moreover, Miller's various versions of the evening's events are inconsistent. In her post-trial affidavit, she stated she went outside, saw three strange men, and saw Williams talking to

32

one of the men, who was on the steps. See Evidentiary Hearing at Ex. C-1 [hereinafter Holsey Affidavit]. At the evidentiary hearing, she testified she saw three strange men on the night of the shooting, neither of whom was Kelly, and saw Williams speak with one of the men. See Dec. 6, 1999 Transcript at 59-60. In her pre-trial statement to the investigator, however, she said she saw a person sitting on the steps, as well as other people on the street, but did not mention Williams' conversation with the man on the steps. See Evidentiary Hearing Transcript at Ex. D-1. Rather, she stated her nephew told her Williams had gone around the corner. Id. In addition, in her statement to the investigator, she said her nephew went to the store and returned home after she had already returned, id.; and in her post-trial affidavit, however, she said her nephew returned home with her, see Holsey Affidavit.

Therefore, at the time of trial, her testimony would have been that fifteen minutes prior to the shooting, she saw three men, neither of whom was Kelly. She did not see the shooting and did not see the individuals run from the scene. Although Holsey Miller testified she spoke with Williams the day following the shooting, and Williams stated she did not know the men responsible, see Dec. 6, 199 Transcript at 62; Holsey Affidavit, at trial Williams explained she did not come forward with descriptions of the shooters because she was afraid, see Aug. 14, 1996 Transcript at 92:14-25.

Kelly's conviction was based on the testimony of two witnesses, one witnessed the shooting and one saw Kelly run from the scene. The testimony of Traylor and Holsey Miller does not establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694. Such testimony does not "undermine the confidence in the outcome." See id. Compare Rolan, 445

33

F.3d at 683 (testimony provided at the habeas hearing "would have bolstered [petitioner's] defense and undermined the prosecution's claims of a pre-meditated murder during a robbery). Accordingly, Kelly cannot establish prejudice, as required by Strickland.

C.    Ineffectiveness claims not properly layered

Kelly raised the following trial counsel ineffectiveness claims on PCRA and PCRA appeal: (1) failure to secure and call character witnesses (ground 2); (2) failure to raise trial counsel's ineffectiveness for failing to secure and call character witnesses (ground 8, in part); (3) failure to move in limine to preclude witness-pressuring evidence (ground 3); and (4) failure to raise trial counsel's ineffectiveness for failing to move in limine to preclude witness tampering evidence (ground 8, in part). The Superior Court found Kelly's claims waived because he failed to properly layer them, which the Government argues is an independent and adequate state procedural rule barring habeas review.

Federal habeas courts may not address a procedurally defaulted claim if "the state court opinion includes a plain statement indicating that the judgment rests on a state law ground that is both 'independent' of the merits of the federal claim and an 'adequate' support for the courts decision." Campbell v. Burris, 515 F.3d 172, 176 (3d Cir. 2008) (citing Coleman, 501 U.S. at 729). A state rule is independent and adequate if "the 'rule speaks in unmistakable terms[,] all state appellate courts refuse to review the petitioner's claim on the merits[, and] the state courts' refusal [was] consistent with other decisions,' that is, the procedural rule was 'consistently and regularly applied.'" Campbell, 515 F.3d at 176 (quoting Doctor v. Walters, 96 F.3d 675, 683-84 (3d Cir. 1996).

34

A rule is independent where "the state law alone provides everything necessary to support the court's judgment." Campbell, 515 F.3d at 177. A state procedural rule is adequate and bars federal habeas review "only if it is 'firmly established and regularly followed' by the state courts at the time of the petitioner's trial." Campbell, 515 F.3d at 179 (citing Ford v. Georgia, 498 U.S. 411, 424 (1991)). The rule ensures "state courts do not insulate disfavored claims from federal review, and . . . that federal habeas review is not barred unless the petitioners have fair notice of the steps they must take to avoid default.'" Campbell, 515 F.3d at 179 (citing Bronshtein v. Horn, 404 F.3d 700, 707-08 (3d Cir. 2005)). "[O]ccasional act[s] of grace by a state court" or "a willingness in a few cases to overlook the rule and address the claim on the merits" does not render a rule inadequate." Campbell, 515 F.3d at 179-80 (quoting Banks v. Horn, 126 F.3d 206, 211 (3d Cir. 1997)). Rather, "[a] rule can be adequate if the state supreme court faithfully applies it in 'the vast majority' of cases." Campbell, 515 F.3d at 180 (quoting Dugger, 489 U.S. at 410 n.6)).

Prior to 2002, if a petitioner first claimed ineffectiveness of trial counsel on PCRA appeal, the petitioner had to assert a "layered ineffectiveness claim."[14] To preserve an ineffectiveness claim, a petitioner must have pled appellate counsel ineffectiveness for failing to raise all prior counsel's ineffectiveness. Commonwealth v. Lopez, 854 A.2d 465, 468 (Pa. 2004).

---

[14] Trial counsel ineffectiveness claims were deemed waived on PCRA if petitioner had not raised the claim during post-trial or direct appellate proceedings. Commonwealth v. Rainey, 928 A.2d 215, 225 (Pa. 2007). In Commonwealth v. Grant, 813 A.2d 726, 738 (Pa. 2002), the Court found trial counsel ineffectiveness claims raised for the first time on PCRA will no longer be deemed waived. Grant, however, does not apply where, as here, petitioner's direct appeal concluded prior to Grant. Rainey, 928 A.2d at 225.

Although prior to September 2003 confusion existed as to how to properly present a layered ineffectiveness claim, see Commonwealth v. McGill, 832 A.2d 1014, 1022 (Pa. 2003); Holiday v. Varner, 176 Fed. Appx. 284, 287 (3d Cir. 2006) (not convinced a clearly established procedural rule for pleading a layered ineffectiveness claim existed in 2001, when petitioner filed PCRA petition), McGill resolved the issue.[15] In McGill, the court explained that to properly raise and prevail on a layered ineffectiveness claim, a petitioner must plead appellate counsel ineffectiveness for failing to allege trial counsel ineffectiveness and "present argument on, i.e., develop, each prong of the [ineffectiveness] test as to [appellate counsel's] representation." See id. The McGill court noted because of the earlier confusion, "remand to the PCRA court may be appropriate for cases currently pending in the appellate courts." McGill, 832 A.2d at 1024; accord Commonwealth v. Jones, 912 A.2d 268, 245 (Pa. 2006). The court, therefore, "exempted from McGill's rigid presentation requirements those cases pleaded and filed prior to the McGill decision." Commonwealth v. Dennis, 950 A.2d 945, 955 (Pa. 2008). Remand is not appropriate if the underlying trial counsel ineffectiveness claim lacks merit. See McGill, 832 A.2d at 1022.

It appears the state court does not regularly apply this rule to appeals filed after McGill. See Commonwealth v. Tedford, 960 A.2d 1, 11, 13 (Pa. 2008) (noting, where PCRA court opinion not filed until July, 16, 2004, "a PCRA petitioner who fails to properly layer his claims of ineffectiveness . . . should not have his petition dismissed on that ground without first being provided the opportunity to amend his pleading"); Commonwealth v. Carson, 913 A.2d 220, 233 (Pa. 2006) ("it is necessary that a PCRA petitioner have the ability to amend his petition in order to properly plead, and attempt to prove, layered claims where dismissal of the petition is

---

[15] Although Kelly's PCRA petition was filed 2001, see PCRA Petition; Supplement to PCRA Petition, his PCRA appeal was filed in 2004, after McGill, see PCRA Appeal.

imminent on grounds that such claims were not adequately pled"); Commonwealth v. Jones, 876

A.2d 380, 385 (Pa. 2005) (remand may be necessary to allow petitioner an opportunity to correct

pleading and presentation errors); Superior Court Dissent at 1-2 (Kelly's ineffectiveness claims

are not waived). Therefore, it is unclear whether the requirement that a petitioner must layer

ineffectiveness claims is an independent and adequate state law ground precluding habeas

review. See Campbell, 515 F.3d at 179 (state procedural rule is adequate only if state courts

regularly follow the rule); but see Pitts v. Folino, 2007 WL 2071903, at *5 (E.D. Pa. July 12,

2007) (Dalzell, J.) (procedural default for failure to properly layer ineffectiveness claims "clearly

rests on an independent and adequate state law ground").

Because the claims are meritless, however, I need not determine whether waiver of

ineffectiveness claims not properly layered constitutes an independent and adequate state law

ground. See Medina v. Diguglielmo, 373 F. Supp. 2d 526, 552-53 (E.D. Pa. 2005) (Brody, J.)

(declining to determine whether Pennsylvania's layering requirement was an independent and

adequate state procedural rule because the underlying claim was meritless).

1.    Counsel was not ineffective for failing to motion to preclude evidence of witness
      pressuring

Kelly claimed trial counsel ineffectiveness for failing to move to preclude evidence of

witness pressuring and appellate counsel ineffectiveness for failing to raise trial counsel

ineffectiveness for counsel's failure to move to preclude such evidence. On PCRA, the trial

court found Kelly's trial and appellate counsel ineffectiveness claims for failing to file a motion

to preclude witness tampering evidence were meritless because the underlying claim lacked

merit. See PCRA Opinion at 2-3. The court reasoned the testimony merely showed "Ms.

Williams was taken to an attorney's office for the purpose of giving a statement favorable to the

37

defendant." Id. at 3. No one threatened her or suggested she testify in a specific manner. Id. The court found the defendant failed to prove the claim had arguable merit because it could not conclude the jury could have drawn an inference adverse to the defendant from the testimony. Id. The court also found Kelly failed to prove the introduction of the evidence prejudiced him. Id. The court noted the Superior Court found the evidence sufficient to support a conviction without referencing the complained of testimony and, therefore, Kelly failed to establish the evidence's introduction resulted in the conviction of an innocent individual. Id. The court found post-sentence counsel could not be ineffective for failing to raise this claim because the underlying claim lacked merit. PCRA Opinion at 3.

Absent "extraordinary and compelling circumstances," a habeas court should follow the state court's determination of state law. See Johnson v. Rosemeyer, 117 F.3d 104, 115 (3d Cir. 1997). The state court found, under state law, the testimony was not evidence of witness tampering and did not adversely affect Kelly.[16] Kelly failed to present "extraordinary and compelling circumstances" and, therefore, I am bound by the state court's determination. Accordingly, because the underlying state law claim is meritless, counsel cannot be ineffective for failing to raise the issue. See Buehl, 166 F.3d at 174 (appellate counsel not ineffective for failing to raise meritless claim of trial counsel ineffectiveness); Berberena, 2007 WL 1856877, at *1 (counsel cannot be ineffective for failing to raise a meritless claim).

---

[16] In Pennsylvania "threats by third persons against . . . witnesses are not relevant [and thus not admissible into evidence] unless . . . the defendant is linked in some way to the making of the threats." Commonwealth v. Bryant, 462 A.2d 785, 788 (Pa. 1983) (quoting Commonwealth v. Carr, 259 A.2d 165, 167 (Pa. 1969)). An exception to this rule exists where the evidence is offered to explain a prior inconsistent statement, not to prove the accused's guilt. Id. Such evidence rules are state law issues. See Wilson v. Vaughn, 533 F.3d 208, 214 (3d Cir. 2008)

38

2.      Counsel was not ineffective for failing to secure and call character witnesses

Kelly also claims trial and appellate counsel ineffectiveness for failing to secure and call character witnesses. On PCRA, the trial court found the underlying issue, failure to present character witnesses, was meritless. See PCRA Opinion at 4. The court reasoned the defendant's prior robbery and retail theft convictions could have been used to impeach the credibility of the character witnesses. Id. The court noted a recent change in Pennsylvania law, but found the case was decided after Kelly's trial and found counsel cannot be deemed ineffective for failing to predict a change in the law. Id. at 5 (citing Commonwealth v. Tilley, 780 A.2d 649 (Pa. 2001)). Therefore, because trial counsel cannot be ineffective for failing to raise a meritless claim, appellate counsel cannot be ineffective for failing to raise trial counsel ineffectiveness. Id.

The state court's determination of state law is binding, see Johnson, 117 F.3d at 115, i.e., the character witness's credibility could have been impeached with the defendant's robbery and retail theft convictions, see PCRA Opinion at 4-5. Accordingly, it was not contrary to, or an unreasonable application of federal law to find counsel was not ineffective for failing to raise the meritless claim. See Buehl, 166 F.3d at 174 (appellate counsel not ineffective for failing to raise meritless claim of trial counsel ineffectiveness); Berberena, 2007 WL 1856877, at *1 (counsel cannot be ineffective for failing to raise a meritless claim).

39

D.    Kelly's counsel ineffectiveness claim for failing to object to in-court identification is meritless

On his PCRA appeal, Kelly alleged PCRA counsel ineffectiveness[17] for failing to allege

appellate counsel ineffectiveness for failing to allege trial counsel ineffectiveness for failing to

object to the in-court identification. See PCRA Appeal at 5. To the extent he raised ground 17,

trial counsel ineffectiveness for failing to object to the in-court identification, in state court

through his PCRA counsel ineffectiveness claim, the claim is meritless.[18]

The Superior Court did not address this claim, finding Kelly waived it when he did not

raise it in his PCRA petition, and when he failed to layer the claims. As discussed above, failure

to properly layer ineffectiveness claims likely is not an independent and adequate state

procedural rule. See supra Part C. In addition, because PCRA appeal would be the first

---

[17] Although Kelly does not have a federal constitutional right to counsel for state collateral proceedings, see Finley, 481 U.S. at 555, he has a right to counsel in state collateral proceedings under Pennsylvania law, see Pa. R. Crim. P. R. 904(C); Commonwealth v. Albrecht, 720 A.2d 693, 699 (Pa. 1998).

[18] The circuits are split on whether a petitioner who exhausted an ineffectiveness claim in state court also exhausted the claim underlying the ineffectiveness claim. Compare, e.g., Odem v. Hopkins, 192 F.3d 772, 775-76 (8th Cir. 1999) (underlying Brady claim exhausted where petitioner argued in state court counsel ineffectiveness for failing to "conduct any substantial investigation . . ., make pretrial discovery requests and to request exculpatory evidence . . . ."), with Wilder v. Cockrell, 274 F.3d 255, 260-62 (5th Cir. 1999) (underlying claim unexhausted because the claim differed legally, logically, and mechanically from the ineffectiveness claim and the only cite to federal law was to add another basis counsel could have requested admission of statements). The Third Circuit has not decided the issue, but has suggested exhausting an ineffectiveness claim in state court does not exhaust the underlying claim. Willis v. Vaughn, 48 Fed. Appx. 402, 406 (3d Cir. 2002) (non-precedential) (underlying claim unexhausted because state court not on notice of the claim); see Gattis v. Snyder, 278 F.3d 222, 237 n.6 (3d Cir. 2002); Senk v. Zimmerman, 886 F.2d 661, 614, 614 n.5 (3d Cir. 1989); Dooley v. Petsock, 816 F.2d 885, 889 n.3 (3d Cir. 1987); but see Veal v. Myers, 326 F. Supp. 2d 612, 622 (E.D. Pa. 2004) (Brody, J.) (distinguishing the Third Circuit cases and finding underlying claim exhausted where state court discussed the merits of the underlying claim); Harper v. Kyler, 2005 WL 590617, at *10 (E.D. Pa. Apr. 22, 2005) (Surrick, J.) (same).

opportunity to raise PCRA counsel ineffectiveness, it is unclear whether a petitioner waives a PCRA counsel ineffectiveness claim by failing to raise it in the PCRA petition. See Commonwealth v. Jones, 815 A.2d 598, 610 (Pa. 2002) (discussing the tension between allowing review of PCRA counsel ineffectiveness on appeal and the strict time and serial petition restrictions); Commonwealth v. Hall, 872 A.2d, 1177, 1191 (Pa. 2005) (concurring, Castelle, J.) (noting question of whether PCRA counsel ineffectiveness claims raised for the first time on appeal are subject to the PCRA restrictions remains open). Compare Commonwealth v. Hall, 872 A.2d 1177, 1182-83 (Pa. 2005) (noting claims would be reviewable to the extent they raise PCRA counsel ineffectiveness but finding petitioner did not properly develop the claim), Commonwealth v. Albrecht, 720 A.2d 693, 701 (Pa. 1998) (reviewing PCRA counsel ineffectiveness claim), and Commonwealth v. Perry, 959 A.2d 932, 936-37 (Pa. Super. Ct. 2008) (addressing PCRA counsel ineffectiveness claim), with Commonwealth v. Hojnowski, 2008 WL 4491529 (Pa. Com. Pl. Aug. 25, 2008) (PCRA counsel ineffectiveness claims waived because not raised in the initial PCRA petition).

I need not resolve this issue because the underlying claim is meritless. See Jones, 815 A.2d at 610 (not determining whether PCRA counsel ineffectiveness claims must be raised on PCRA appeal or in a new PCRA petition because the claim was meritless). The claim underlying Kelly's counsel ineffectiveness claim, i.e., Baxter should not have been permitted to identify Kelly at trial, is meritless. A witness' inability to identify someone in a photograph array affects the weight and credibility of the in-court identification, not its admissibility. Commonwealth v. Washington, 927 A.2d 586, 602 (Pa. 2007) (failure to identify someone in line-up affects only the weight and credibility of the identification); accord Commonwealth v. Davis, 351 A.2d 642,

41

648 (1976). Therefore, Kelly's counsel ineffectiveness claim is meritless because counsel cannot be ineffective for failing to raise a meritless claim. See Buehl, 166 F.3d at 174 (appellate counsel not ineffective for failing to raise meritless claim of trial counsel ineffectiveness); Berberena, 2007 WL 1856877, at *1 (counsel cannot be ineffective for failing to raise a meritless claim).

## IV.    Request for an Evidentiary Hearing

Kelly seeks an evidentiary hearing for his federal habeas petition. See Petitioner's Reply to Respondent's Response to Petition for Writ of Habeas Corpus at 10, Kelly v. Rozum, No. 08-1073 (E.D. Pa. filed Sept. 8, 2008). Kelly's request for an evidentiary hearing is denied.

An evidentiary hearing on federal habeas cannot be held where a petitioner developed the claim's factual basis in state court. Goldblum v. Klem, 510 F.3d 204, 220 (3d Cir. 2007). Moreover, if the petitioner "has failed to develop the factual basis of a claim in [s]tate court proceedings," section 2254(e)(2) limits the availability of an evidentiary hearing.[19] See Thomas, 428 F.3d at 498 (quoting § 2254(e)(2)); Miller v. Klem, 2007 WL 2306582, *2 (E.D. Pa. Aug. 8, 2007) (McLaughlin, J.). If a petitioner meets the limitations of section 2254(e)(2), a district court has discretion to grant an evidentiary hearing. Goldblum, 510 F.3d at 220-21.

Failing to develop a claim requires "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams, 529 U.S. at 432. In the usual case, a prisoner has not "failed to develop a claim if he requested an evidentiary hearing in state court

---

[19]    A federal court cannot hold an evidentiary hearing unless the applicant shows the claim relies on a new rule of constitutional law or a factual predicate that could not have been previously discovered, or the applicant shows the "facts underlying the claim would be sufficient to establish . . . that but for the constitutional error, no reasonable factfinder would have found the applicant guilty." § 2254(e)(2).

42

and the state court declined to provide him a hearing." See Thomas v. Varner, 428 F.3d at 498; Lark v. Beard, 2006 WL 1489977, at *4 (E.D. Pa. May 23, 2006) (Padova, J.).

However, even if the petitioner is not barred from obtaining an evidentiary hearing by § 2254(e)(2), it does not mean a hearing is required. See Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir. 2000). A federal court's decision to hold an evidentiary hearing should focus on whether the hearing would be meaningful, i.e., it would have the potential to advance the petitioner's claim or evidence outside the record would help petitioner's cause. Id. A petitioner bears the burden of showing the hearing would be meaningful. Id. An evidentiary hearing, however, "is not required on issues that can be resolved by reference to the state record." Id. at 221 (quoting Schiriro v. Landrigan, 127 S.Ct. 1933, 1940 (U.S. 2007)).

Most of Kelly's claims are not reviewable on federal habeas because the claims are procedurally defaulted or non-cognizable. An evidentiary hearing would not advance these claims because I do not have jurisdiction to review the claims.

Because the state court held an evidentiary hearing on Kelly's ineffective assistance of counsel for failing to call eye witnesses and alibi witnesses in state court and Kelly developed the factual record on this claim in state court, I cannot hold an evidentiary hearing on this claim. See Goldblum, 510 F.3d at 220-21.

Kelly requested an evidentiary hearing for his counsel ineffectiveness claims for failing to secure and call character witnesses and trial and appellate counsel ineffectiveness for failing to move in limine to preclude witness-pressuring evidence, see Memorandum of Law in Support of Petition for Post Conviction Relief Pursuant to 42 Pa.C.S.A. § 9543, Commonwealth v. Kelly, No. 1162-1995 (Ct. Com. Pl. Phila. filed Sept. 26, 2001), and requested remand to the PCRA

43

court for an evidentiary hearing on these claims and his PCRA counsel ineffectiveness claim for failing to raise prior counsel ineffectiveness for failing to object to Baxter's in-court identification, see Superior Court PCRA Opinion. The PCRA court did not hold an evidentiary hearing and the Superior Court denied Kelly's request for remand for an evidentiary hearing. See Superior Court PCRA Opinion at 1. Thus, because he requested an evidentiary hearing in state court, it appears Kelly is not barred from having an evidentiary hearing by § 2254(e)(2) on these claims. See Thomas v. Varner, 428 F.3d at 498.

Kelly, however, has not explained how an evidentiary hearing would advance his claims. As discussed above, the state court's decision Kelly's counsel was not ineffective because the underlying claims counsel failed to raise lacked merit was not objectively unreasonable. See Williams, 529 U.S. at 409; Woodford, 537 U.S. at 25. Thus, an evidentiary hearing to determine whether his counsel's performance was deficient would be meaningless because Kelly cannot satisfy the prejudice prong of Strickland. See United States v. Holloway, 187 Fed. Appx. 198, 204 (3d Cir. 2006) (petitioner failed to establish prejudice where underlying claim was meritless); Ricks v. Pa. Bd. of Probation and Parole, 2009 WL 101699, at *10 (E.D. Pa. Jan. 14, 2009) (Tucker, J.) (same).

Accordingly, I make the following recommendation.

44

RECOMMENDATION

AND NOW, this ___th day of February, 2009, it is respectfully recommended Kelly's

claims be DENIED with prejudice. It is further recommended that there is no probable cause to

issue a certificate of appealability.[20] The petitioner may file objections to this Report and

Recommendation within ten days after being served with a copy thereof. See Local Civ. Rule

72.1. Failure to file timely objections may constitute a waiver of any appellate rights. See Leyva

v. Williams, 504 F.3d 357, 364 (3d Cir. 2007).

BY THE COURT:

TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

---

[20]    Jurists of reason would not debate my recommended procedural or substantive
dispositions of the petitioner's claims. See Slack v. McDaniel, 529 U.S. 473, 484 (2000).
Therefore, no certificate of appealability should be granted. See id.

45

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| JAMES KELLY, | : | CIVIL ACTION |
| Petitioner | : | |
| | : | |
| v. | : | No. 08-1073 |
| | : | |
| GERALD L. ROZUM, et al., | : | |
| Respondents | : | |

**ORDER**

**GENE E.K. PRATTER, J.**

AND NOW, this        day of        , 2009, upon careful and independent

consideration of the petition for a writ of habeas corpus, and after review of the Report and

Recommendation of United States Magistrate Judge Timothy R. Rice, IT IS ORDERED that:

1. The Report and Recommendation is APPROVED and ADOPTED

2. The petition for a writ of habeas corpus is DENIED with prejudice.

3. There is no probable cause to issue a certificate of appealability.

4. The Clerk of the Court shall mark this case closed for statistical purposes.

BY THE COURT:

_____

GENE E.K. PRATTER, J.

7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES KELLY,** | : | **CIVIL ACTION** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GERALD L. ROZUM, ET AL.,** | : | |
| **Respondents** | : | **NO. 08-1073** |

### ORDER

AND NOW, this 5th day of October 2009, upon careful and independent consideration of

Petitioner's Amended Petition for Writ of Habeas Corpus (Docket No. 24) and Respondents'

response thereto; the Report and Recommendation of United States Magistrate Judge Timothy R.

Rice dated February 17, 2009 (Docket No. 26); the Objections to the Report and

Recommendation filed by Petitioner's counsel and the related Letter filed by Petitioner

pro se (Docket Nos. 27 and 28) and Respondents' response thereto; and Petitioner's

supplemental Memorandum in support of his Amended Petition for Writ of Habeus Corpus

(Docket No. 32), as well as related correspondence from counsel, IT IS HEREBY ORDERED

that:

1. The Report and Recommendation is APPROVED and ADOPTED;

2. The Petition for Writ of Habeas Corpus is DENIED;

3. There is no probable cause to issue a certificate of appealability; and

4. The Clerk of Court shall mark this case CLOSED for statistical purposes.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES KELLY,** | : | **CIVIL ACTION** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GERALD L. ROZUM, ET AL.,** | : | |
| **Respondents** | : | **NO. 08-1073** |

### MEMORANDUM

GENE E.K. PRATTER, J.                                                                 OCTOBER 5, 2009

Petitioner James Kelly was convicted of murder and conspiracy.  Petitioner's § 2254

petition alleges that his trial counsel was ineffective.  Magistrate Judge Rice reviewed the record

and the parties' submissions and issued a Report and Recommendation reflecting his conclusion

that all of Petitioner's claims should be denied as procedurally defaulted, non-cognizable, or

meritless.  Petitioner objected to the Report and Recommendation.

There is an no apparent conflict regarding the applicable caselaw, and the Court

concludes that Judge Rice addressed all of the issues carefully and in depth.  Nevertheless,

several of the arguments advanced by Petitioner, particularly regarding whether there would have

been a "reasonable probability of a different outcome" if defense counsel had called Rev. James

Becoat, Ms. Denise Holsey-Miller, Mr. Lex Traylor, and Ms. Joan Arrington to testify at the trial,

prompted the Court to address Petitioner's objections in additional detail. Accordingly, the Court

allowed supplemental briefing regarding Petitioner's objections to the Report and

Recommendation.

After receiving and reviewing all of the parties' submissions, the Report and

Recommendation, and the ample state court record, the Court determines that the parties have

had sufficient opportunity to articulate their arguments and that oral argument is not necessary.

For the reasons that follow, the Court shall approve and adopt Judge Rice's Report and

Recommendation.

## I.    Petitioner's Objections to the Report and Recommendation and Supplemental Briefing

In the initial objections, Petitioner's counsel asserted that his trial counsel was ineffective

because he failed to 1) "[p]rovide an alibi notice where the obvious defense was alibi"; 2) "[c]all

an alibi witness (Rev. BeCoat) [sic] who was actually present just outside the court room"; 3)

"[c]all two witnesses (Holsey Miller and Traylor) who knew petitioner and saw two men (neither

of them petitioner) who were highly probable as the actual shooters; these witnesses were known

to defense counsel, or should have been"; and 4) "[c]all petitioner as a witness, on spurious

grounds." No other grounds were listed in this initial set of objections. See Objections to Report

and Recommendations of Magistrate Judge Timothy R. Rice, Docket No. 27, at 2.

Petitioner then filed a letter, pro se, which included his own set of objections. See Letter

from Mr. Kelly, Docket No. 28. These objections were much more expansive than the objections

that his attorney had filed. Shortly thereafter, counsel sent a letter to the Court noting that he was

"happy to confirm and adopt Mr. Kelly's Objections as well as the ones [counsel] filed, if that

meets with your approval." March 12, 2009 Letter from Counsel. The Court allowed

supplemental briefing, and counsel submitted a more expansive, supplemental brief that

addressed additional claims that had been mentioned in Petitioner's pro se letter but were *not*

mentioned in counsel's original set of objections to the Report and Recommendation.

2

## II.    Defaulted Claims and/or Waived Claims

In the supplemental brief, Petitioner's counsel presents many arguments that were not

addressed in his original set of objections to the Report and Recommendation, and that involve

claims that Judge Rice properly found to be procedurally defaulted or waived. See Report and

Recommendation at 13-15, 18.    For instance, Petitioner argues that the primary witness against

him, Ernestine Williams, only identified Petitioner after going through a "flawed" and

"suggestive" identification procedure. He also argues that his trial counsel failed to object to

certain taped testimony, as he should have, and failed to file an appeal after the trial. Petitioner

also questions the credibility of various snippets of testimony and other evidence, pointing out

supposed "discrepancies" in what seems to be a "weight of the evidence" argument. He hints

that the police may have committed various Brady violations. Finally, he argues that his trial

counsel failed to call Petitioner to the stand, as he should have in light of Pennsylvania Rule of

Evidence 609; indeed, Petitioner asserts that Petitioner was never even *asked* whether he wanted

to testify on his own behalf. See Mem. on Behalf of Pet. James Kelly ("Kelly Supplemental

Mem."), Docket No. 32, at 2-8.

Notably, Petitioner does not argue that these issues were *not* procedurally defaulted or

waived. Instead, he merely states:

> I do not propose to analyze each instance where counsel dropped the ball in respect of the
> layering and wavier issues. Suffice it to say that I rely on the failure to present all
> available witnesses, and particularly Reverend Becoat, as a ground that has never been
> waived or abandoned. However, the other instances of ineffectiveness are important to
> show that Kelly's conviction was a "miscarriage of justice" under Pennsylvania law.

Kelly Supplemental Mem. at 10.

With the invocation of the phrase "miscarriage of justice," as Judge Rice surmises,

3

Petitioner seems to be alluding to a general argument that a petitioner may obtain federal habeus review of claims that were defaulted pursuant to independent and adequate state procedural rules if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental *miscarriage of justice*." See Report and Recommendation at 18-19 (emphasis added, and case citations omitted). However, Petitioner does not address the high threshold for showing "miscarriage of justice," and the Court agrees with Judge Rice that Petitioner has not offered anything to show that Petitioner has met this requirement. See Report and Recommendation at 18-20.[1] Indeed, Petitioner offers no evidentiary basis or legal analysis for the proposition that no reasonable juror could or would have found him guilty. Accordingly, the Court concludes that Judge Rice correctly declined to consider Petitioner's procedurally-defaulted and waived claims.

Even if the claim regarding the failure to call Petitioner to the stand were *not* procedurally defaulted, it would be unpersuasive, given the likelihood that Petitioner's criminal record would have either justified the professional judgment of counsel not to call Petitioner as a witness or, if Petitioner did testify, would have added to the substantial weight of the case against him. Petitioner argues that he should have been called to the stand and that his prior convictions would not have come out because he "had been convicted in 1978 of robbery and in 1984 for retail theft, and his time had been served." Kelly Supplemental Mem. at 7, n. 11. However, Petitioner does not specify *when* he was released from confinement for these convictions, which would bear

_____

on when his "10-year look-back" term started. See Pa. R. Evid. 609. The decision not to call

Petitioner to the stand appears to be reasonable and within the exercise of trial counsel's

professional judgment.

## III.    Trial Counsel's Failure to Call Certain Witnesses at Trial

Petitioner's main argument regarding trial counsel's alleged ineffectiveness is that trial

counsel should have called Rev. Becoat, Ms. Holsey Miller, Mr. Traylor, and Ms. Joan Arrington

to testify at trial.

Petitioner asserts that Rev. Becoat should have been called at trial as an alibi witness.

Rev. Becoat allegedly would have testified that on the night of the shooting, he was with

Petitioner and others (including Ms. Joan Arrington, Petitioner's common law wife)[2] at

---

[2] Joan Arrington was supposedly present in Petitioner's house when Rev. Becoat was visiting, on the night of the shooting. The brief filed by Petitioner's counsel does not identify Joan Arrington by her first name, but just states that "the two Arringtons" were exculpatory witnesses and should have been called at trial. See Kelly Supplemental Mem., Docket No. 32, at 10 ("Beside Rev. Becoat and the two Arringtons, there were two other such [exculpatory] witnesses: Holsey Miller and Traylor. . . .Suffice it to say that I rely on the failure to present all available witnesses, and particularly Reverend Becoat, as a ground that has *never* been waived or abandoned.") (emphasis in original). Petitioner's counsel does not explain the "Arrington" claims in his brief, or why trial counsel's failure to present "the Arringtons" made him ineffective. Indeed, Petitioner's counsel did not mention the Arringtons at all in his official Objections to the Report and Recommendation. See Objections to Report and Recommendations of Magistrate Judge Timothy R. Rice, Docket No. 27. These factors suggest that the claims regarding "the Arringtons" may not have actually been raised in Petitioner's objections to the Report and Recommendation.

However, Petitioner himself mentioned Joan Arrington in a set of objections that he filed pro se shortly after Petitioner's counsel filed his official Objections to the Report and Recommendation. See Letter from Petitioner, Docket No. 28. Also, "the Arringtons" are arguably included in counsel's general assertion that trial counsel was ineffective for failing to present alibi witnesses.

The claim regarding Joan Arrington appears to have been raised in the state courts and is therefore arguably proper for this Court review. That said, Judge Rice correctly found the claim regarding Joan Arrington to be meritless for the same reasons as the claim regarding Rev. Becoat, that is, because trial counsel's decision not to present an alibi defense was a reasonable

5

Petitioner's home, 6 blocks away from the scene of the crime. Petitioner claims that Ms. Holsey Miller and Mr. Traylor should have been called at trial. According to Petitioner, these witnesses would have provided descriptions of the men they saw before the shooting, which would have conflicted with a description of Petitioner.

Judge Rice carefully analyzed the potential testimony of the witnesses Petitioner claims should have been called at trial, providing an analytic framework and an accurate summary of the landscape of Petitioner's trial. See Report and Recommendation at 29-34. He persuasively concluded that even if trial counsel had known of Ms. Holsey Miller and Mr. Traylor before trial,[3] the ineffectiveness claims fail under a de novo review because Petitioner was not prejudiced by trial counsel's failure to present Ms. Holsey Miller and Mr. Traylor at trial. Judge Rice correctly determined that the absent witnesses would have provided testimony that was internally inconsistent, and that there were substantive differences between the information contained in the witnesses' pre-trial statements, the information presented in their affidavits, and

strategy. See Report and Recommendation at 28.

As Judge Rice notes, any claim regarding Wanda Arrington was waived because Petitioner did not raise it in state court. See id.

[3] At the December 7, 1999 evidentiary hearing, trial counsel testified that he did not know of these witnesses before trial, and the state court credited this testimony. A state court's factual determination is entitled to a presumption of correctness unless there is "clear and convincing evidence" to the contrary.

Judge Rice noted, and the Court agrees, that there was significant evidence to question the credibility of trial counsel's testimony on this point. For instance, Mr. Traylor's name and statement were given to trial counsel during discovery, and Ms. Holsey Miller was listed as a possible witness during voir dire. However, even if this evidence was sufficiently "clear and convincing" to rebut the presumption of correctness (which the Court concludes it was not) the presentation of the two witnesses would not have presented "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Report and Recommendation at 28-33 (case citations omitted). In other words, trial counsel's failure to present Ms. Holsey Miller and Mr. Traylor did not fundamentally prejudice Petitioner.

6

the information about which they testified at the state court evidentiary hearing.

As for Rev. Becoat, the Court agrees with Judge Rice that trial counsel's decision not to present an alibi defense for Petitioner was reasonable under the circumstances. This analysis extends to the proposed testimony of Ms. Joan Arrington as well, inasmuch as her testimony would have served the same function as that of Rev. Becoat, that is, placing Petitioner within 6 blocks of the location of the shooting on the night in question.

With respect to Ms. Holsey Miller and Mr. Traylor, neither saw the shooting, and at most they could have testified to seeing men who were not Petitioner near the location where the shooting took place, approximately fifteen minutes before the shooting. As Judge Rice observed in his Report and Recommendation, it is by no means clear what these individuals would have actually testified to, because the descriptions of the men they allegedly saw changed from one presentation to the next in terms of what the men were wearing, the description of the men's relative complexions, and the like. In particular, it appears that Ms. Holsey Miller's renditions varied greatly in the details of who she saw, when and where, and there were marked discrepancies between her statements to the police and her statements to the court regarding the events of the evening in question.

Trial counsel explained not calling Rev. Becoat by pointing to his trial strategy of not wanting to place Petitioner so near to the scene of the crime. He also thought that Ms. Williams was a particularly bad witness whom he could discredit through cross-examination. To that end, there was evidence presented that Ms. Williams was using illegal drugs around the time of the shooting, made an improper identification of Petitioner and changed her story during the investigation. Trial counsel also stated that he was not confident that Rev. Becoat could place

7

Petitioner in his presence at the time of the crime.

Trial counsel is afforded a wide degree of deference in his trial strategy and professional judgment, and Petitioner would have to show that he was prejudiced in order to prevail on his ineffectiveness claims. Trial counsel's strategy not to present the witnesses discussed above was not unreasonable, and did not prejudice Petitioner.

## IV. Facts Not in Evidence

Petitioner's brief repeatedly suggests or refers to facts that are not in evidence. For instance, Petitioner's counsel refers to what he learned during an interview he conducted with Calvin Edwards, Petitioner's brother, but the notes from this interview are not in evidence. Counsel also speculates that "possibly someone helped [witness Colie Baxter] understand the implications of putting Kelly in the black jacket," and states that Colie Baxter assisted police in loading the victim's body onto the paddy wagon. Kelly Supplemental Mem., Docket No. 32, at 2-3. There is no evidence to support these assertions. Similarly, counsel represents, "I am told there are no red lights on Diamond, but I have not made a personal investigation." Id. at 3, n.4. Finally, in arguing that Colie Baxter's identification procedure was suggestive and improper, counsel states, "[w]e must presume that Kelly's picture was shown to Baxter." Id. at 4. However, counsel does not explain *why* "we must presume" this fact. These factual suggestions and references - whether proper or not - relate to claims that Judge Rice properly concluded to be procedurally defaulted or waived.

## V. Conclusion

For the reasons discussed above, the Court will approve and adopt the Report and Recommendation issued by Magistrate Judge Timothy R. Rice, and deny the Petition for Writ of

8

Habeus Corpus. An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

9

**8**

**DLD-110**                                                                              **January 28, 2010**

## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

C.A. No. **09-4290**

JAMES KELLY,
Appellant

VS.

GERALD L. ROZUM, ET AL.

(E.D. Pa. Civ. No. 08-cv-01073)

Present:     FUENTES, JORDAN and HARDIMAN, Circuit Judges

Submitted are:

(1)    Appellant's request for a certificate of appealability under 28 U.S.C.
§ 2253(c)(1); and

(2)    Appellant's amended request for a certificate of appealability under
28 U.S.C. § 2253(c)(1)

in the above-captioned case.

Respectfully,

Clerk

MMW/DNH/mb

_____ORDER_____

The foregoing amended request for a certificate of appealability is denied, as jurists of
reason could not debate that the District Court properly denied his petition for a writ of
habeas corpus, for substantially the reasons set forth in its opinion. See Slack v.
McDaniel, 529 U.S. 473, 483-84 (2000).

By the Court,

/s/ Julio M. Fuentes
Circuit Judge

Dated:       February 17, 2010
MB/cc:       C. Richard Morton, Esq.
             Lawrence E. Wood, Esq.
             Molly S. Lorber Esq.



Marcia M. Waldron

Marcia M. Waldron, Clerk

**9**

**ALD-215**                                                   **April 14, 2016**

## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

### C.A. No. **16-1791**

IN RE: JAMES KELLY                          **FILED**

  (E.D.P.A. Civ. No. 08-cv-01073)          APR 1 9 2016

                                       MICHAEL E. KUNZ, Clerk
Present:    AMBRO, SHWARTZ and NYGAARD, Circuit Judges.  By _____ Dep. Clerk

      Submitted is an application for second or successive petition

      in the above-captioned case.

                              Respectfully,

                              Clerk

MMW/AKP/tyw

_____ORDER_____

      The foregoing application pursuant to 28 U.S.C. § 2244 to filed a second or successive 28 U.S.C. § 2254 petition is denied. Appellant has not made a prima facie showing that his proposed claims satisfy the § 2244 standard. The claims that Appellant seeks to present do not meet the § 2244(b)(2) requirements; none of his claims rely on a new rule of constitutional law or involve a newly discovered factual predicate that could not have previously been discovered through the exercise of due diligence, and moreover, his claims are not based on facts that, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." See 28 U.S.C. § 2244(2)(A)-(B)(i)-(ii)

                       By the Court,

                       s/Patty Shwartz
                       Circuit Judge

Dated:      April 19, 2016
tyw/cc:     Lawrence E. Wood, Esq.        A True Copy:
            DA Philadelphia

                                     Marcia M. Waldron
                                     Marcia M. Waldron, Clerk